**FILED**
WILLIAMSPORT, PA

APR 2 4 2002

MARY E. D'ANDREA, **CLERK**
Per_____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

CHRISTOPHER FURNARI,                     :

        Petitioner,              :

    v.                                   :

UNITED STATES PAROLE COMMISSION :
and WARDEN, Federal Correctional
Institution - Allenwood, Pa.,            :

        Respondent.              :

**CIVIL ACTION NO.**

4:02-CV-555
(Judge Muir)

### PETITIONER FURNARI'S SUBMISSION OF EXHIBITS
### IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

In support of his petition under 28 U.S.C. § 2241 for a writ of habeas corpus, the petitioner, Christopher Furnari, submits copies of pertinent documents, referred to in his petition and in the supporting memorandum by the following Exhibit numbers.  In addition to the twelve exhibits attached to this Submission, petitioner's pre-sentence investigation report

(PSI) and an attached amendment to the PSI are being submitted separately for filing under seal.

Respectfully submitted,
THE PETITIONER

Dated:

By: PETER GOLDBERGER
    JAMES H. FELDMAN, JR.
    50 Rittenhouse Place
    Ardmore, PA  19003

    (610) 649-8200

Attorneys for the Petitioner

## Index of Petitioner's Exhibits

A. Third Superseding Indictment,
   No. SSS 85-CR-139 (RO)  (S.D.N.Y. 1986)

B. Judgment & Commitment (filed 1/13/87)

C. Letter from AUSA Kelley to D. Breitbart, Esq. (12/4/95)

D. Letter from AUSA Kelley to Parole Commission (8/1/96)

E. Letter from AUSA Kelley to Regional Commissioner (12/11/96)

F. Notice of Action: Regional Commissioner (1/8/97)

G. Notice of Action: National Appeals Board (8/19/97)

H. Affidavit of AUSA George A. Stamboulidis (E.D.N.Y.)
   (dated 12/16/97, notarized 12/17/97)

I. Notice of Action: National Appeals Board (4/2/99)

J. Letter from AUSA Kelley to Parole Commission (9/25/00)

K. Notice of Action: Regional Commissioner (12/27/00)

L. Notice of Action: National Appeals Board (4/24/01)

Exhibit A

ALL-STATE® LEGAL   800-222-0510   EDR11   RECYCLED

MC:lq
9-1635A/1C

A  213 a

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                    :

            - v -                           :          INDICTMENT

ANTHONY SALERNO,                          · :          SSS 85 Cr. 139 (RO)
    a/k/a "Fat Tony,"
CARMINE PERSICO,                            : ·
    a/k/a "Junior,"
GENNARO LANGELLA,                           :
    a/k/a "Gerry Lang,"
ANTHONY CORALLO,                            :
    a/k/a "Tony Ducks,"
SALVATORE SANTORO,                          :
    a/k/a "Tom Mix,"
CHRISTOPHER FURNARI,                        :
    a/k/a "Christie Tick,"
RALPH SCOPO, and                            :
ANTHONY INDELICATO,
    a/k/a "Bruno,"

                Defendants.

- - - - - - - - - - - - - - - - - -x

## COUNT ONE

The Grand Jury charges:

That at all times material to this Indictment:

### The Enterprise

1.   ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE

PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang,"

ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a

"Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH

SCOPO, and ANTHONY INDELICATO, a/k/a "Bruno," the defendants,

and others known and unknown to the Grand Jury who are not named

MC:1q
9-1635A/1C

A   213B

as defendants in this Indictment, constituted an enterprise as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, which enterprise is often described as the "Commission" of La Cosa Nostra ("The Commission"), and which operated in New York and other locations in the United States and other countries.

2.   There existed a nationwide criminal society known by various names, including "La Cosa Nostra," and "the Mafia," which society operated through entities known as "Families." Each such Family had as its leader a person known as "Boss," or "Father," or "Acting Boss," a deputy leader known as "Underboss," or "Second," and a high ranking official known as "Consigliere." Each Family further operated through the participation of offi- cers known as "Capos" or "Group Leaders," members known as "Soldiers," and "Associates."

3.   The Boss of each Family, with the assistance of the Underboss and Consigliere, supervised, promoted, and pro- tected the criminal activities of the Capos, Soldiers and Associates of the Family, and, in return, received a part of the illegal earnings of those Capos, Soldiers and Associates.

4.   Five of the La Cosa Nostra Families had their principal headquarters in New York City, although they operated throughout the United States and abroad.  Each Family was often identified by the name of its Boss or of a former Boss.  From

MC:lq
9-1635A/lC

A   213c

1931 up to and including the date of the filing of this
Indictment the succession of Bosses or Acting Bosses of the New
York City La Cosa Nostra Families included the following indivi-
duals:

<table>
<tr><td colspan="2"><u>I</u></td><td colspan="2"><u>II</u></td></tr>
<tr><td colspan="2">Vito Genovese</td><td colspan="2">Albert Anastasia</td></tr>
<tr><td colspan="2">Frank Tieri,<br>a/k/a "Funzi"</td><td colspan="2">Carlo Gambino<br>a/k/a "Carl"</td></tr>
<tr><td colspan="2">Anthony Salerno<br>a/k/a "Fat Tony"</td><td colspan="2">Paul Castellano,<br>a/k/a "Paulie"</td></tr>
</table>

<u>III</u>

Joseph Profaci

Joseph Colombo

Carmine Persico,
a/k/a "Junior"

Thomas DiBella (Acting)

Gennaro Langella (Acting)
a/k/a "Gerry Lang"

<table>
<tr><td><u>IV</u></td><td><u>V</u></td></tr>
<tr><td>Thomas Lucchese,<br>a/k/a "Tommy Brown"</td><td>Joseph Bonanno</td></tr>
<tr><td></td><td>Carmine Galante</td></tr>
<tr><td>Anthony Corallo,<br>a/k/a "Tony Ducks"</td><td>Philip Rastelli<br>a/k/a "Rusty"</td></tr>
</table>

Throughout this Indictment, the five Families headquartered in
New York will be described respectively as the Genovese Family,
the Gambino Family, the Colombo Family, the Lucchese Family and
the Bonanno Family.

MC:lq
9-1635A/1C

A 213D

5.   Each La Cosa Nostra Family was a separate organization.  Normally, the Boss and ruling officers of each Family possessed the full authority to supervise, regulate, and direct all illegal activities which involved or affected the interests of officers and members of that particular Family exclusively. However, illegal activities involving or affecting the interests of officers or members of two or more La Cosa Nostra Families exceeded the jurisdiction of any single Family.  To avoid "wars" between Families, disputes between and among Families over the control of illegal activities had to be resolved by a supreme leader or body.  In or about 1931, the Bosses of the New York and other La Cosa Nostra Families associated to form the "Commission" to serve as the council for La Cosa Nostra Families.  From 1931 up to and including the date of the filing of this Indictment, the Commission had the power to resolve disputes and to regulate relations between and among La Cosa Nostra Families. Furthermore, from in or about the mid-1950's up to and including the filing of the Indictment, the Commission occasionally assumed the power to intervene in Family leadership disputes that could not be resolved within a particular Family.

6.   The Commission was an enterprise distinct from the individual Families, but it was comprised of Bosses and Acting Bosses -- acting in concert with other high-ranking officers -- from the five La Cosa Nostra Families which had their headquarters in New York City.  At different times the Commission

MC:1q
9-1635A/1C

A   213E

also included influential Bosses from a number of La Cosa Nostra Families with their headquarters elsewhere in the United States, including, but not limited to, Families in Chicago, Illinois; Buffalo, New York; and Philadelphia, Pennsylvania.

7.   The Commission reached decisions and issued orders through votes of all or some of the Commission members, or through the actions or decisions of an individual Commission member or members.  From time to time, an individual Commission member or Commission members (or delegates) adjudicated disputes or acted as spokesman in authorizing action on behalf of the Commission.

### Purposes of the Enterprise

8.   The general purpose of the Commission enterprise was to regulate and facilitate the relationships between and among La Cosa Nostra Families.  Specific purposes of the Commission included the following:

a.   Promoting and carrying out joint ventures between and among La Cosa Nostra Families to obtain money through illegal activities.   These Commission joint ventures included a joint venture among several La Cosa Nostra Families which controlled and dominated certain concrete contractors and allocated payoffs on certain concrete contracts in New York City;

b.   Resolving actual and potential disputes and regulating among the several La Cosa Nostra Families regarding

MC:1q
9-1635A/1C                          A   213F

the operation, conduct, and control of illegal activities.  These
illegal activities included interference with interstate commerce
through extortion; extortionate extensions of credit, commonly
called "loansharking" or "shylocking"; gambling or "bookmaking";
infiltration and control of labor unions and labor
organizations.

  c. Extending formal recognition to newly-elected
Bosses of La Cosa Nostra Families, and, from time to time,
resolving leadership disputes within a Family.

  d. Taking such steps as were necessary to
preserve order in, between and among the La Cosa Nostra Families,
including authorizing acts of murder of certain La Cosa Nostra
Family members.

  e. Approving the initiation or "making" of new
members or soldiers in the several La Cosa Nostra Families.

  f. Establishing certain rules governing the
Families, officers and members of La Cosa Nostra.

  g. Keeping persons inside and outside La Cosa
Nostra in fear of the Commission by identifying the Commission
with threats, violence, and murder.

## Means and Methods of the Enterprise

  9. Among the means and methods whereby the said
defendants and others conducted and participated in the conduct
of the enterprise's affairs at all times relevant to the Indict-
ment were the following:

MC:lq
9-1635A/1C

A   213 G

a.   The Commission established a "Club" of cer-
tain construction contractors who poured concrete.  The Commission
controlled the allocation of contracts to pour concrete on
construction jobs where concrete costs exceeded two million
dollars.  The Commission and its co-conspirators and agents would
designate which contractor would be permitted to make the
successful bid on a particular contract.  Often other concrete
contractors would be directed to submit bids higher than that of
the designated winner.  The Commission enforced the rules of the
"Club" with the threat of punishing disobedient contractors, by
causing the contractors' supplies of cement to be stopped, or by
causing certain labor union leaders to create "labor problems"
for the contractors.  The Commission exploited its control over
these concrete-pouring contracts in order to demand and receive
payoffs from concrete contractors.  Among the illegal ways in
which the Commission implemented and exploited its control over
these concrete-pouring contracts were the following:

(i)  The defendants and their co-racketeers
and agents would and did extort, and conspire and attempt to
extort money and property from certain concrete contractors who
sought to bid for, who bid for, and who obtained concrete-pouring
contracts in connection with certain construction projects;

(ii)  The defendants and their co-racketeers
and agents would and did exercise control over and influence the

MC:lq
9-1635A/1C

A   213 *H*

decisions of the District Council of Cement and Concrete Workers, Laborers International Union of North America, and would and did agree to the payment of bribes to an official thereof, to wit, defendant RALPH SCOPO.

        b.   The Commission resolved a leadership dispute within the Bonanno Family, and between the Bonanno Family and other La Cosa Nostra Families, by authorizing the murders of Carmine Galante, a/k/a "Lilo," who was Boss of the Bonanno Family, and Leonard Coppola and Giuseppe Turano, his associates.

        c.   The Commission authorized certain other murders.

        d.   The Commission participated in the selection of a new Boss for the La Cosa Nostra Family in Buffalo, New York.

        e.   The Commission approved the admission of new members to the La Cosa Nostra society of criminals.

        f.   The Commission promoted and encouraged a climate of fear to enhance the ability of the Commission and its members to control La Cosa Nostra and to obstruct justice.

<u>Roles of the Defendants</u>

      10.   The defendants played the following roles, among others, in conducting and furthering the affairs of the enterprise:

MC:lq
9-1635A/1C

# A 213 I

a.   At times relevant to this Indictment, the defendant ANTHONY SALERNO, a/k/a "Fat Tony," was Consigliere, Acting Boss and Boss of the Genovese Family, and was associated in fact with and was a member of the Commission.

b.   At times relevant to this Indictment, unindicted co-conspirator Paul Castellano, a/k/a "Paulie," was Acting Boss and Boss of the Gambino Family, and was associated in fact with and was a member of the Commission; and unindicted co-conspirator Aniello Dellacroce, a/k/a "Neil," a/k/a "O'Neil," was Underboss of the Gambino Family, was associated in fact with the Commission and from time to time was delegated to represent the Gambino Family to the Commission.

c.   At times relevant to this Indictment, the defendant CARMINE PERSICO, a/k/a "Junior," was Boss of the Colombo Family and was associated in fact with and was a member of the Commission; the defendant GENNARO LANGELLA, a/k/a "Gerry Lang," was a Capo and Acting Boss of the Colombo Family, and was associated in fact with and was a member of the Commission; and the defendant RALPH SCOPO was a member of the Colombo Family, was President and business manager of the District Council of Cement and Concrete Workers, Laborers International Union of North America ("Concrete Workers District Council"), and was associated in fact with the Commission.

MC:lq
9-1635A/1C

A   213 J

d.   At times relevant to this Indictment, the defendant ANTHONY CORALLO, a/k/a "Tony Ducks," was Boss of the Lucchese Family, and was associated in fact with and was a member of the Commission; SALVATORE SANTORO, a/k/a "Tom Mix," was Underboss of the Lucchese Family, was associated in fact with the Commission and from time to time was delegated to represent the Lucchese Family to the Commission; and CHRISTOPHER FURNARI, a/k/a "Christie Tick," was Consigliere of the Lucchese Family, was associated in fact with the Commission and from time to time was delegated to represent the Lucchese Family to the Commission.

e.   At times relevant to this Indictment, the defendant ANTHONY INDELICATO, a/k/a "Bruno," was a capo and soldier of the Bonanno Family, and was associated in fact with the Commission.

f.   The defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," and RALPH SCOPO obstructed, delayed and affected and conspired and attempted to obstruct, delay and affect interstate commerce through extortion from concrete contractors.

g.   The defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE

MC:lq
9-1635A/1C

A  213 R

SANTORO, a/k/a "Tom Mix," and CHRISTOPHER FURNARI, a/k/a "Christie
Tick," aided and abetted the defendant RALPH SCOPO, the officer
of a labor organization, which organization represented employees
of concrete contractors who were employed in interstate commerce,
in defendant RALPH SCOPO's requests, demands, receipt and accep-
tances of payments of money from concrete contractors.

h.   The defendant ANTHONY INDELICATO, a/k/a
"Bruno," solicited the murders of Carmine Galante, a/k/a "Lilo,"
Leonard Coppola and Giuseppe Turano, and ANTHONY INDELICATO,
a/k/a "Bruno," committed those murders.

### The Racketeering Conspiracy

11.   From in or about 1970 up to and including the date
of the filing of this Indictment, in the Southern District of New
York and elsewhere, ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE
PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang,"
ANTHONY CORALLO, a k/a "Tony Ducks," SALVATORE SANTORO, a/k/a
"Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," and RALPH
SCOPO and ANTHONY INDELICATO, a/k/a "Bruno," the defendants, and
others known and unknown to the Grand Jury, being persons in
control of and associated with the enterprise described in
Paragraphs 1 through 7 above, which enterprise was engaged in,
and the activities of which affected interstate commerce, did

MC:lq
9-1635A/1C

A   213L

unlawfully, wilfully and knowingly combine, confederate, conspire
and agree together and with each other to conduct and
participate, directly and indirectly, in the conduct of the
affairs of that enterprise through a pattern of racketeering
activity, as that term is defined in Title 18, United States
Code, Sections 1961(1) and 1961(5).

a.    The defendants each participated in the
conduct of the enterprise through the commission of multiple
racketeering acts, as set forth in Paragraphs 12 through 35
below.

### The Pattern of Racketeering

12.   The pattern of racketeering activity as defined
in Title 18, United States Code, Sections 1961(1) and 1961(5)
consisted of the following acts:

### Conspiracy to Extort Payoffs From
### Certain Construction Companies

### Racketeering Act # 1

13.   It was a part of the pattern of racketeering
activity that from in or about 1981 up to the date of the filing
of this Indictment, in the Southern District of New York and
elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony,"
CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry
Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO,
a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick,"

MC:lq
9-1635A/1C

A   213ᴍ

RALPH SCOPO, and others known and unknown to the Grand Jury,
unlawfully, wilfully, and knowingly would and did combine,
conspire, confederate, and agree together and with each other to
obstruct, delay, and affect commerce by extortion, in that they
would and did combine, conspire, confederate, and agree together
and with each other to obtain property, to wit, sums of money,
from and with the consent of certain New York City area construc-
tion companies in the concrete-pouring business, to wit, members
of a group called the "Club," and others, and their officers,
employees and representatives, which consent had been induced
by the defendants' wrongful use of actual and threatened force,
violence, and fear of economic loss, in violation of Title 18,
United States Code, Section 1951.

### Construction Extortions

### Racketeering Act # 2

A.

14.    It was a part of the pattern of racketeering
activity that in or about August, 1981, in the Southern District
of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a
"Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA,
a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE
SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie
Tick," RALPH SCOPO, and others known and unknown to the Grand
Jury, unlawfully, wilfully, and knowingly would and did obstruct,

9-1635A/1C

A 213N

delay, and affect commerce by extortion and would and did attempt
to do so, in that they would and did obtain and attempt to
obtain property, to wit, money in the approximate amount of
$136,000, from and with the consent of the X.L.O. Concrete
Corporation and its officers, employees and representatives,
which consent had been induced by the defendants' wrongful use
of actual and threatened force, violence and fear of economic
loss, in violation of Title 18, United States Code, Section 1951.

B.

15.   It was a part of the pattern of racketeering
activity that in or about August, 1981, in the Southern District
of New York and elsewhere, the defendant RALPH SCOPO, president
and business manager of the Concrete Workers District Council,
being a representative of, and being an officer of a labor organi-
zation which represents and would admit to membership the
employees of the X.L.O. Concrete Corporation, who are employed
in an industry affecting commerce, aided and abetted by the
defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO,
a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY
CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix,"
CHRISTOPHER FURNARI, a/k/a "Christie Tick," and others known
and unknown to the Grand Jury, unlawfully, wilfully and knowingly
would and did request, demand, receive, and accept, and agree to
receive and accept the payment of money in the approximate amount

Pu:iq
9-1635A/1C

A  2130

of $136,000 from the X.L.O. Concrete Corporation in violation of
Title 29, United States Code, Section 186(b)(1), and Title 18,
United States Code, Section 2.

### Racketeering Act # 3

#### A.

16.   It was a part of the pattern of racketeering
activity that in or about May, 1983, in the Southern District of
New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a
"Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA,
a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE
SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie
Tick," RALPH SCOPO and others known and unknown to the Grand
Jury, unlawfully, wilfully, and knowingly would and did obstruct,
delay, and affect commerce by extortion and would and did attempt
to do so, in that they would and did obtain and attempt to obtain
property, to wit, money in the approximate amount of $326,000,
from and with the consent of the X.L.O. Concrete Corporation
and its officers, employees and representatives, which consent
had been induced by the defendants' wrongful use of actual and
threatened force, violence, and fear of economic loss, in viola-
tion of Title 18, United States Code, Section 1951.

#### B.

17.   It was a part of the pattern of racketeering
activity that in or about May, 1983, in the Southern District of

MC:lq
9-1635A/1C

A  213 P

New York and elsewhere, the defendant RALPH SCOPO, president and
business manager of the Concrete Workers District Council, being
a representative of, and being an officer of a labor organization
which represents and would admit to membership the employees of
the X.L.O. Concrete Corporation, who are employed in an industry
affecting commerce, aided and abetted by the defendants ANTHONY
SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior,"
GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a
"Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER
FURNARI, a/k/a "Christie Tick," and others known and unknown to
the Grand Jury, unlawfully, wilfully, and knowingly would and
did request, demand, receive, and accept, and agree to receive
and accept the payment of money in the approximate amount of
$326,000 from X.L.O Concrete Corporation in violation of Title
29, United States Code, Section 186(b)(1), and Title 18, United
States Code, Section 2.

<u>Racketeering Act # 4</u>

<u>A.</u>

18.   It was a part of the pattern of racketeering
activity that in or about April, 1984, in the Southern District
of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a
"Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA,
a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks,"
SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a

MC:lq
9-1635A/1C

A   213Q

"Christie Tick," RALPH SCOPO, and others known and unknown to

the Grand Jury, unlawfully, wilfully, and knowingly would and

did obstruct, delay, and affect commerce by extortion and would

and did attempt to do so, in that they would and did obtain and

attempt to obtain property, to wit, money in the approximate

amount of $157,000, from and with the consent of the X.L.O.

Concrete Corporation and its officers, employees and representa-

tives, which consent had been induced by the defendants' wrongful

use of actual and threatened force, violence, and fear of

economic loss, in violation of Title 18, United States Code,

Section 1951.

<u>B</u>.

19.  It was a part of the pattern of racketeering

activity that in or about April, 1984, in the Southern District

of New York and elsewhere, the defendant RALPH SCOPO, president

and business manager of the Concrete Workers District Council,

being a representative of, and being an officer of a labor organi-

zation which represents and would admit to membership the

employees of the X.L.O. Concrete Corporation, who are employed

in an industry affecting commerce, aided and abetted by the

defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO,

a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY

CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix,"

CHRISTOPHER FURNARI, a/k/a "Christie Tick," and others known and

MC:lq
9-1635A/1C

A  213 R

unknown to the Grand Jury, unlawfully, wilfully, and knowingly
would and did request, demand, receive, and accept, and agree to
receive and accept the payment of money in the approximate amount
of $157,000 from X.L.O Concrete Corporation in violation of
Title 29, United States Code, Section 186(b)(1) and Title 18,
United States Code, Section 2.

### Racketeering Act # 5

### A.

20.   It was a part of the pattern of racketeering
activity that in or about March, 1984, in the Southern District
of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a
"Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA,
a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks,"
SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a
"Christie Tick," RALPH SCOPO, and others known and unknown to
the Grand Jury, unlawfully, wilfully, and knowingly would and
did attempt to obstruct, delay, and affect commerce by extortion,
in that they would and did attempt to obtain property, to wit,
money in the approximate amount of $177,800, from and with the
consent of the Century-Maxim Construction Corporation and its
officers, employees and representatives, which consent had been
induced by the defendants' wrongful use of actual and threatened
force, violence, and fear of economic loss, in violation of
Title 18, United States Code, Section 1951.

MC:lq
9-1635A/1C

A   213S

**B.**

21.   It was a part of the pattern of racketeering
activity that in or about March, 1984, in the Southern District
of New York and elsewhere, the defendant RALPH SCOPO, president
and business manager of the Concrete Workers District Council,
being a representative of, and being an officer of a labor orga-
nization which represents and would admit to membership the
employees of the Century-Maxim Construction Corporation, who are
employed in an industry affecting commerce, aided and abetted by
the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE
PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang,"
ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a
"Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," and others
known and unknown to the Grand Jury, unlawfully, wilfully, and
knowingly would and did request, demand, receive, and accept, and
agree to receive and accept the payment of money in the approxi-
mate amount of $177,800 from the Century-Maxim Construction
Corporation in violation of Title 29, United States Code, Section
186(b)(1), and Title 18, United States Code, Section 2.

**Racketeering Act # 6**

**A.**

22.   It was a part of the pattern of racketeering
activity that in or about April, 1983, in the Southern District
of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a

MC:lq
9-1635A/1C

A  213 T

"Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA,

a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks,"

SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a

"Christie Tick," RALPH SCOPO and others known and unknown to the

Grand Jury, unlawfully, wilfully and knowingly would and did

obstruct, delay and affect commerce by extortion and would and

did attempt to do so, in that they would and did obtain and

attempt to obtain property, to wit, money in the approximate

amount of $70,600, from and with the consent of the Technical

Concrete Construction Corporation and its officers, employees

and representatives, which consent had been induced by the defen-

dants' wrongful use of actual and threatened force, violence,

and fear of economic loss, in violation of Title 18, United

States Code, Section 1951.

<u>B</u>.

23.   It was a part of the pattern of racketeering

activiy that in or about April, 1983, in the Southern District of

New York and elsewhere, the defendant RALPH SCOPO, president and

business manager of the Concrete Workers District Council, being

a representative of, and being an officer of a labor organiza-

tion which represents and would admit to membership the

employees of the Technical Concrete Construction Corporation,

who are employed in an industry affecting commerce, aided and

abetted by the defendants ANTHONY SALERNO, a/k/a "Fat Tony,"

MC:lq
9-1635A/1C

A   2130

CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry

Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE Santoro,

a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," and

others known and unknown to the Grand Jury, unlawfully, wilfully

and knowingly would and did request, demand, receive, and

accept, and agree to receive and accept the payment of money in

the approximate amount of $70,600 from Technical Concrete

Construction Corporation in violation of Title 29, United States

Code, Section 186(b)(1), and Title 18, United States Code,

Section 2.

<u>Racketeering Act # 7</u>

<u>A</u>.

24.   It was a part of the pattern of racketeering

activity that in or about April, 1984, in the Southern District

of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a

"Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA,

a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks,"

SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a

"Christie Tick," RALPH SCOPO and others known and unknown to the

Grand Jury, unlawfully, wilfully and knowingly would and did

obstruct, delay and affect commerce by extortion and would and

did attempt to do so, in that they would and did obtain and

attempt to obtain property, to wit, money in the approximate

amount of $65,000, from and with the consent of the Technical

MC:lq
9-1635A/1C

A  213 V

Concrete Construction Corporation and its officers, employees
and representatives, which consent had been induced by the defen-
dants' wrongful use of actual and threatened force, violence,
and fear of economic loss, in violation of Title 18, United
States Code, Section 1951.

<u>B</u>.

25.   It was a part of the pattern of racketeering
activy that in or about April, 1984, in the Southern District of
New York and elsewhere, the defendant RALPH SCOPO, president and
business manager of the Concrete Workers District Council, being
a representative of, and being an officer of a labor organiza-
tion which represents and would admit to membership the
employees of the Technical Concrete Construction Corporation,
who are employed in an industry affecting commerce, aided and
abetted by the defendants ANTHONY SALERNO, a/k/a "Fat Tony,"
CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry
Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO,
a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," and
others known and unknown to the Grand Jury, unlawfully, wilfully
and knowingly would and did request, demand, receive, and
accept, and agree to receive and accept the payment of money in
the approximate amount of $65,000 from Technical Concrete
Construction Corporation in violation of Title 29, United States
Code, Section 186(b)(1), and Title 18, United States Code,
Section 2.

ML:lq
9-1635A/1C

A   213 W

## Racketeering Act # 8

26.   It was a part of the pattern of racketeering activity that in or about March, 1982, in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others known and unknown to the Grand Jury, unlawfully, wilfully, and knowingly would and did attempt to obstruct, delay, and affect commerce by extortion, in that they would and did attempt to obtain property, to wit, money in the approximate amount of $73,000, from and with the consent of the Cedar Park Concrete Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence, and fear of economic loss, in violation of Title 18, United States Code, Section 1951.

*No $*
*Bribe*

## Racketeering Act # 9

27.   It was a part of the pattern of racketeering activity that in or about April, 1982 in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie

MC:1q
9-1635A/1C

A   213 X

Tick," RALPH SCOPO, and others known and unknown to the Grand
Jury, unlawfully, wilfully, and knowingly would and did attempt
to obstruct, delay, and affect commerce by extortion, in that
they would and did attempt to obtain property, to wit, money in
the approximate amount of $134,000, from and with the consent of
the North Berry Concrete Corporation and its officers, employees
and representatives, which consent had been induced by the defen-
dants' wrongful use of actual and threatened force, violence, and
fear of economic loss, in violation of Title 18, United States
Code, Section 1951.

<u>Racketeering Act # 10</u>

28.   It was a part of the pattern of racketeering
activity that in or about September, 1982, in the Southern
District of New York and elsewhere, the defendants ANTHONY
SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior,"
GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a
"Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER
FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others known
and unknown to the Grand Jury, unlawfully, wilfully, and know-
ingly would and did attempt to obstruct, delay, and affect
commerce by extortion, in that they would and did attempt to
obtain property, to wit, money in the approximate amount of
$117,000, from and with the consent of the G & G Concrete Corpo-
ration and its officers, employees and representatives, which

9-1635A/1C

A   213 Y

consent had been induced by the defendants' wrongful use of
actual and threatened force, violence, and fear of economic loss,
in violation of Title 18, United States Code, Section 1951.

### Racketeering Act # 11

29.    It was a part of the pattern of racketeering
activity that in or about May, 1984, in the Southern District
of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a
"Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA,
a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE
SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie
Tick," RALPH SCOPO, and others known and unknown to the Grand
Jury, unlawfully, wilfully, and knowingly would and did attempt
to obstruct, delay, and affect commerce by extortion, in that
they would and did attempt to obtain property, to wit, money in
the approximate amount of $95,000, from and with the consent of
the S & A Concrete Company, Inc., a/k/a "S & A Structures, Inc."
and its officers, employees and representatives, which consent
had been induced by the defendants' wrongful use of actual and
threatened force, violence, and fear of economic loss, in viola-
tion of Title 18, United States Code, Section 1951.

### Racketeering Act # 12

30.    It was a part of the pattern of racketeering
activity that in or about August, 1984, in the Southern District
of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a

MC:1q
9-1635A/1C                      A   213z

"Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA,

a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks,"

SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a

"Christie Tick," RALPH SCOPO, and others known and unknown to

the Grand Jury, unlawfully, wilfully, and knowingly would and

did attempt to obstruct, delay, and affect commerce by extortion,

in that they would and did attempt to obtain property, to wit,

money in the approximate amount of $84,000, from and with the

consent of the S & A Concrete Company, Inc., a/k/a "S & A

Structures, Inc." and its officers, employees and representatives,

which consent had been induced by the defendants' wrongful use

of actual and threatened force, violence, and fear of economic

loss, in violation of Title 18, United States Code, Section 1951.

<u>Racketeering Act # 13</u>

31.   It was a part of the pattern of racketeering

activity that in or about May, 1984, in the Southern District

of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a

"Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA,

a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks,"

SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a

"Christie Tick," RALPH SCOPO, and others known and unknown to

the Grand Jury, unlawfully, wilfully, and knowingly would and

did attempt to obstruct, delay, and affect commerce by extortion,

in that they would and did attempt to obtain property, to wit,

9-1635A/1C

A  213 aa

money in the approximate amount of $67,000, from and with the
consent of the S & A Concrete Company, Inc., a/k/a "S & A
Structures, Inc." and its officers, employees and representa-
tives, which consent had been induced by the defendants' wrong-
ful use of actual and threatened force, violence, and fear of
economic loss, in violation of Title 18, United States Code,
Section 1951.

### Murder of Carmine Galante

### Racketeering Act # 14

32.   It was a part of the pattern of racketeering that
from in or about September 1978 up to and including July 31,
1979, in the Southern District of New York and elsewhere, the
defendant ANTHONY INDELICATO, a/k/a "Bruno," and others known
and unknown to the Grand Jury did unlawfully, wilfully, and know-
ingly murder, and solicit, facilitate, and aid and abet the
murder of Carmine Galante, a/k/a "Lilo."

### Murder of Leonard Coppola

### Racketeering Act # 15

33.   It was a part of the pattern of racketeering that
from in or about September 1978 up to and including July 31,
1979, in the Southern District of New York and elsewhere, the
defendant ANTHONY INDELICATO, a/k/a "Bruno," and others known
and unknown to the Grand Jury did unlawfully, wilfully, and know-
ingly murder, and solicit, facilitate, and aid and abet the
murder of Leonard Coppola.

9-1635A/1C

A  213 BB

## Murder of Giuseppe Turano

### Racketeering Act # 16

34.   It was a part of the pattern of racketeering that from in or about September 1978 up to and including July 31, 1979, in the Southern District of New York and elsewhere, the defendant ANTHONY INDELICATO, "Bruno," and others known and unknown to the Grand Jury did unlawfully, wilfully, and knowingly murder, and solicit, facilitate, and aid and abet the murder of Giuseppe Turano.

### Loansharking Conspiracy

### Racketeering Act # 17

35.   It was a part of the pattern of racketeering activity that from in or about May, 1983, up to the date of the filing of this Indictment, in the Southern District of New York and elsewhere, the defendants ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," and others known and unknown to the Grand Jury, did unlawfully, wilfully and knowingly combine, conspire, confederate and agree together and with each other to make extortionate extensions of credit, as that term is defined in Title 18, United States Code, Section 891, in violation of Title 18, United States Code, Sections 891 and 892.

(Title 18, United States Code, Section 1962(d).)

MC:1q
9-1635A/1C

A   213 cc

<u>COUNT TWO</u>

The Grand Jury further charges:

36.   Paragraphs 1-35 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

37.   From in or about 1970 up to and including the date of the filing of this Indictment, in the Southern District of New York and elsewhere, ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," and RALPH SCOPO, the defendants, and others known and unknown to the Grand Jury, and from in or about 1970 up to and including May 4, 1981, and from in or about December 1, 1984, up to and including the date of the filing of this Indictment, ANTHONY INDELICATO, a/k/a "Bruno," a defendant, being persons in control of and associated with the enterprise described in Paragraphs 1 through 7 of Count One of this Indictment, unlawfully, wilfully, and knowingly did conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise, which was engaged in and the activities of which affected interstate commerce, through a pattern of racketeering activity, to wit, the racketeering acts set forth in Paragraphs 1 through 35 of Count One of this Indictment as racketeering acts 1 through 17.

(Title 18, United States Code, Section 1962(c).)

MC:lq
9-1635A/1C

A 213 ÞÐ

## The Concrete Extortion and Payoff Counts

### COUNT THREE

The Grand Jury further charges:

38. From in or about 1981 up to the date of the filing of this Indictment, in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others to the Grand Jury known and unknown, unlawfully, wilfully, and knowingly would and did combine, conspire, confederate, and agree together and with each other to obstruct, delay, and affect commerce by extortion, in that they would and did combine, conspire, confederate, and agree together and with each other to obtain property, to wit, sums of money, from and with the consent of certain New York City area construction companies in the concrete-pouring business, to wit, members of the "Club" and others, and their officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence, and fear of economic loss.

(Title 18, United States Code, Section 1951.)

mc:lq
9-1635A/1C

A   213 EE
## COUNT FOUR

The Grand Jury further charges:

39.   In or about August, 1981, in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly would and did obstruct, delay, and affect commerce by extortion and would and did attempt to do so, in that they would and did obtain and attempt to obtain property, to wit, money in the approximate amount of $136,000, from and with the consent of the X.L.O. Concrete Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence and fear of economic loss.

(Title 18, United States Code, Section 1951.)

9-1635A/1C

A  213 FF

## COUNT FIVE

The Grand Jury further charges:

40.   In or about August, 1981, in the Southern
District of New York and elsewhere, the defendant RALPH SCOPO,
president and business manager of the Concrete Workers District
Council, being a representative of, and being an officer of a
labor organization which represents and would admit to member-
ship the employees of the X.L.O. Concrete Corporation, who are
employed in an industry affecting commerce, aided and abetted by
the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE
PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang,"
ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a
"Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," and
others known and unknown to the Grand Jury, unlawfully, wilfully
and knowingly would and did request, demand, receive, and
accept, and agree to receive and accept the payment of money in
the approximate amount of $136,000, from the X.L.O. Concrete
Corporation.

(Title 29, United States Code, Sections 186(b)(1)
and Title 18, United States Code, Section 2.)

9-1635A/1C

A   213 GG

## COUNT SIX

The Grand Jury further charges:

41. In or about May, 1983, in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others known and unknown to the Grand Jury, unlawfully, wilfully, and knowingly would and did obstruct, delay, and affect commerce by extortion and would and did attempt to do so, in that they would and did obtain and attempt to obtain property, to wit, money in the approximate amount of $326,000, from and with the consent of the X.L.O. Concrete Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence, and fear of economic loss.

(Title 18, United States Code, Section 1951.)

HC:14
9-1635A/1C

A 213 *H H*

## COUNT SEVEN

The Grand Jury further charges:

42.   In or about May, 1983, in the Southern District of New York and elsewhere, the defendant RALPH SCOPO, president and business manager of the Concrete Workers District Council, being a representative of, and being an officer of a labor organization which represents and would admit to membership the employees of the X.L.O. Concrete Corporation, who are employed in an industry affecting commerce, aided and abetted by the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," and others known and unknown to the Grand Jury, unlawfully, wilfully, and knowingly would and did request, demand, receive, and accept, and agree to receive and accept the payment of money in the approximate amount of $326,000 from X.L.O. Concrete Corporation.

(Title 29, United States Code, Section 186(b)(1) and Title 18, United States Code, Section 2.)

JC:1q
9-1635A/1C

A   213 II

## COUNT EIGHT

The Grand Jury further charges:

43. In or about April, 1984, in the Southern District
of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a
"Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA,
a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks,"
SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a
"Christie Tick," RALPH SCOPO, and others known and unknown to
the Grand Jury, unlawfully, wilfully, and knowingly would and
did obstruct, delay, and affect commerce by extortion and would
and did attempt to do so, in that they would and did obtain and
attempt to obtain property, to wit, money in the approximate
amount of $157,000, from and with the consent of the X.L.O.
Concrete Corporation and its officers, employees and representa-
tives, which consent had been induced by the defendants' wrong-
ful use of actual and threatened force, violence, and fear of
economic loss.

(Title 18, United States Code, Section 1951.)

9-1635A/1C

A   213 JJ

## COUNT NINE

The Grand Jury further charges:

44.   In or about April, 1984, in the Southern District of New York and elsewhere, the defendant RALPH SCOPO, president and business manager of the Concrete Workers District Council, being a representative of, and being an officer of a labor organization which represents and would admit to membership the employees of the X.L.O. Concrete Corporation, who are employed in an industry affecting commerce, aided and abetted by the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," and others known and unknown to the Grand Jury, unlawfully, wilfully, and knowingly would and did request, demand, receive, and accept, and agree to receive and accept the payment of money in the approximate amount of $157,000 from X.L.O. Concrete Corporation.

(Title 29, United States Code, Section 186(b)(1) and Title 18, United States Code, Section 2.)

9-1635A/1C

A    213 KK
COUNT TEN

The Grand Jury further charges:

45. In or about March, 1984, in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others known and unknown to the Grand Jury, unlawfully, wilfully, and knowingly would and did attempt to obstruct, delay, and affect commerce by extortion, in that they would and did attempt to obtain property, to wit, money in the approximate amount of $177,800, from and with the consent of the Century-Maxim Construction Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence, and fear of economic loss.

(Title 18, United States Code, Section 1951.)

MC:iq
9-1635A/1C

A  213 ᴸᴸ

## COUNT ELEVEN

The Grand Jury further charges:

46.   In or about March, 1984, in the Southern District of New York and elsewhere, the defendant RALPH SCOPO, president and business manager of the Concrete Workers District Council, being a representative of, and being an officer of a labor organization which represents and would admit to membership the employees of the Century-Maxim Construction Company, who are employed in an industry affecting commerce, aided and abetted by the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," and others known and unknown to the Grand Jury, unlawfully, wilfully, and knowingly would and did request, demand, receive, and accept, and agree to receive and accept the payment of money in the approximate amount of $177,800 from the Century-Maxim Construction Corporation.

(Title 29, United States Code, Section 186(b)(1)
and Title 18, United States Code, Section 2.)

RC:1q
9-1635A/1C

A   213 мм

## COUNT TWELVE

The Grand Jury further charges:

47.   In or about April, 1983, in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly would and did obstruct, delay, and affect commerce by extortion and would and did attempt to do so, in that they would and did obtain and attempt to obtain property, to wit, money in the approximate amount of $70,600, from and with the consent of the Technical Concrete Construction Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence and fear of economic loss.

(Title 18, United States Code, Section 1951.)

MC:lq
9-1635A/1C

A   213 NN

## COUNT THIRTEEN

The Grand Jury further charges:

48.   In or about April, 1983, in the Southern District of New York and elsewhere, the defendant RALPH SCOPO, president and business manager of the Concrete Workers District Council, being a representative of, and being an officer of a labor organization which represents and would admit to membership the employees of the Technical Concrete Construction Corporation, who are employed in an industry affecting commerce, aided and abetted by the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly would and did request, demand, receive, and accept, and agree to receive and accept the payment of money in the approximate amount of $70,600, from the Technical Concrete Construction Corporation.

(Title 29, United States Code, Sections 186(b)(1)
and Title 18, United States Code, Section 2.)

9-1635A/1C

## A   213 00
### COUNT FOURTEEN

The Grand Jury further charges:

49.   In or about April, 1984, in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly would and did obstruct, delay, and affect commerce by extortion and would and did attempt to do so, in that they would and did obtain and attempt to obtain property, to wit, money in the approximate amount of $65,000, from and with the consent of the Technical Concrete Construction Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence and fear of economic loss.

(Title 18, United States Code, Section 1951.)

MC:lq
9-1635A/1C

A  213 PP

## COUNT FIFTEEN

The Grand Jury further charges:

50.   In or about April, 1984, in the Southern District of New York and elsewhere, the defendant RALPH SCOPO, president and business manager of the Concrete Workers District Council, being a representative of, and being an officer of a labor organization which represents and would admit to membership the employees of the Technical Concrete Construction Corporation, who are employed in an industry affecting commerce, aided and abetted by the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly would and did request, demand, receive, and accept, and agree to receive and accept the payment of money in the approximate amount of $65,000, from the Technical Concrete Construction Corporation.

(Title 29, United States Code, Sections 186(b)(1)
and Title 18, United States Code, Section 2.)

MC:1d
9-1635A/1C

A   213 QQ

## COUNT SIXTEEN

The Grand Jury further charges:

51. In or about March, 1982, in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others known and unknown to the Grand Jury, unlawfully, wilfully, and knowingly would and did attempt to obstruct, delay, and affect commerce by extortion, in that they would and did attempt to obtain property, to wit, money in the approximate amount of $73,000, from and with the consent of the Cedar Park Concrete Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence, and fear of economic loss.

(Title 18, United States Code, Section 1951.)

9-1635A/1C

A  213 RR

## COUNT SEVENTEEN

The Grand Jury further charges:

52. In or about April, 1982, in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others known and unknown to the Grand Jury, unlawfully, wilfully, and knowingly would and did attempt to obstruct, delay, and affect commerce by extortion, in that they would and did attempt to obtain property, to wit, money in the approximate amount of $134,000, from and with the consent of the North Berry Concrete Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence, and fear of economic loss.

(Title 18, United States Code, Section 1951.)

9-1635A/1C

A  213 SS
## COUNT EIGHTEEN

The Grand Jury further charges:

53. In or about September, 1982, in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others known and unknown to the Grand Jury, unlawfully, wilfully, and knowingly would and did attempt to obstruct, delay, and affect commerce by extortion, in that they would and did attempt to obtain property, to wit, money in the approximate amount of $117,000, from and with the consent of the G & G Concrete Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence, and fear of economic loss.

(Title 18, United States Code, Section 1951.)

ME:lg
9-1635A/1C

A   213 TT

## COUNT NINETEEN

The Grand Jury further charges:

54. In or about May, 1984, in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others known and unknown to the Grand Jury, unlawfully, wilfully, and knowingly would and did attempt to obstruct, delay, and affect commerce by extortion, in that they would and did attempt to obtain property, to wit, money in the approximate amount of $95,000, from and with the consent of the S & A Concrete Company, Inc., a/k/a "S & A Structures, Inc." and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence, and fear of economic loss.

(Title 18, United States Code, Section 1951.)

RC:1q
9-1635A/1C

A  213uu

## COUNT TWENTY

The Grand Jury further charges:

55. In or about August, 1984, in the Southern District
of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a
"Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA,
a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks,"
SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a
"Christie Tick," RALPH SCOPO, and others known and unknown to
the Grand Jury, unlawfully, wilfully, and knowingly would and
did attempt to obstruct, delay, and affect commerce by extortion,
in that they would and did attempt to obtain property, to wit,
money in the approximate amount of $84,000, from and with the
consent of the S & A Concrete Company, Inc., a/k/a "S & A
Structures, Inc." and its officers, employees and representatives,
which consent had been induced by the defendants' wrongful use
of actual and threatened force, violence, and fear of economic
loss.

(Title 18, United States Code, Section 1951.)

9-1635A/1C

A  213 VV

## COUNT TWENTY-ONE

The Grand Jury further charges:

56.    In or about May, 1984, in the Southern District of New York and elsewhere, the defendants ANTHONY SALERNO, a/k/a "Fat Tony," CARMINE PERSICO, a/k/a "Junior," GENNARO LANGELLA, a/k/a "Gerry Lang," ANTHONY CORALLO, a/k/a "Tony Ducks," SALVATORE SANTORO, a/k/a "Tom Mix," CHRISTOPHER FURNARI, a/k/a "Christie Tick," RALPH SCOPO, and others known and unknown to the Grand Jury, unlawfully, wilfully, and knowingly would and did attempt to obstruct, delay, and affect commerce by extortion, in that they would and did attempt to obtain property, to wit, money in the approximate amount of $67,000, from and with the consent of the S & A Concrete Company, Inc., a/k/a "S & A Structures, Inc." and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence, and fear of economic loss.

(Title 18, United States Code, Section 1951.)

**Exhibit B**

USA:CHERTOFF
~~ates of America vs.~~

**United States District Court** for

| | |
|---|---|
| **DEFENDANT** | CHRISTOPHER FURNARI _____ a/k/a "Christie Tick"   Date of offense 3/86 |

Souther; District of New York

DOCKET NO ➤ SSS85-0139-06(RO)

## JUDGMENT AND PROBATION/COMMITMENT ORDER

| | |
|---|---|
| **COUNSEL** | In the presence of the attorney for the government the defendant appeared in person on this date ➤ |

| MONTH | DAY | YEAR |
|---|---|---|
| 1 | 13 | 87 |

⌐⌐ WITHOUT COUNSEL   However the court advised defendant of right to counsel and asked whether defendant desired to have counsel appointed by the court and the defendant thereupon waived assistance of counsel.

⌐x⌐ WITH COUNSEL   ⌐ Barry M. Fallick,esq. _____
(Name of Counsel)

**PLEA** ⌐⌐ GUILTY, and the court being satisfied that there is a factual basis for the plea,   ⌐⌐NOLO CONTENDERE,   ⌐⌐NOT GUILTY

There being a finding/verdict of
⌐ ⌐ NOT GUILTY. Defendant is discharged
⌐ xx⌐ GUILTY.

**FINDING & JUDGMENT**

Defendant has been convicted as charged of the offense(s) of

engaging in an enterprise which operated,supervised,promoted crim. activities in interstate commerce and did unlawfully,wilfully and knowingly,combine,conspire to participate i. the conduct of the affairs of that enterprise through a pattern of rack eteering activities. It was pattern of racketeering activities to unlaw fully,wilfully obstruct and affect commerce by extortion by use of act ual and threatened force,violence and fear of economic loss.
T18,USC Sec 1961(4);1962(c)(d);1961(1)and 1961(5);T29,USC Sec 186(b)(1) T18,USC Sec 2; T18,USC Sec 891 and 892.

The court asked whether defendant had anything to say why judgment should not be pronounced. Because no sufficient cause to the contrar was shown, or appeared to the court, the court adjudged the defendant guilty as charged and convicted and ordered that: The defendant is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of

**SENTENCE OR PROBATION ORDER**

On counts 1 2,4,12,14- 20 YEARS, on each count to run consecutively for a total pri. term of ONE HUNDRED YEARS. On counts 3,6,8,19,16- 20 YEARS, on each cou. to run consecutively with each other and concurrent with cts 1,2,4,12,& Counts 17,19,22,23- 20 YEARS on each count. Count 24-14 YEARS.Counts 5, 9,11,13,15- 1 YEAR on each count. Counts 17,19,22,23,24,5,7,9,11,13,15, are to run consecutively with each other and concurrent with counts 1,2 4,12,14,3,6,8,10 & 16. COMMITTED FINE of $25,000., on each of counts 1 2. Fine of $10,000., on each of counts 3-17,19,22,23 & 24, for a total committed fine of $240,000. Pursuant to T28,Sec1918-assessment of costs of prosecution collectively and individually according to law.

**SPECIAL CONDITIONS OF PROBATION**

Pursuant to T18,USC Sec 3013-assessment of $25.00. on counts 5,7,9,11,13 & 15; $50.00, on counts 1-4,6,8,10,12,14,16,17,19,22,23,24, for a total assessment of $900.00. Original indictment and S/SS are dismissed. Deft. is remanded.

**ADDITIONAL CONDITIONS OF PROBATION**

In addition to the special conditions of probation imposed above, it is hereby ordered that the general conditions of probation set out on the reverse side of this judgment be imposed. The Court may change the conditions of probation, reduce or extend the period of probation, and at any time during the probation period or within a maximum probation period of five years permitted by law, may issue a warrant and revoke probation for a violation occurring during the probation period.

**COMMITMENT RECOMMENDATION**

This court orders commitment to the custody of the Attorney

that there be no parole.

RECEIVED
JAN 2   193.

COMMUNITY PROGRAMS
NEW YORK, NEW YORK

It is ordered that the Clerk deliver a certified copy of this judgment and commitment to the U.S. Marshal or other qualified officer

CERTIFIED AS A TRUE COPY ON

**CENTRAL FILE**

SIGNED BY
⌐xx⌐ U.S. District Judge
⌐⌐ U.S. Magistrate

THIS DATE

⌐⌐CLERK
⌐⌐DEPUTY

RICHARD OWEN, USDJ    1/13/87

**Exhibit C**



U.S. Department of Justice

United States Attorney
Southern District of New York

ZA00081

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

December 4, 1995

By Facsimile
David Breitbart, Esq.
52 Duane Street 7th Floor
New York, New York 10007

Re:   United States v. Christopher Furnari
      S3 85 Cr. 139(RO)

Dear Mr. Breitbart:

        This letter is submitted in response to your request that
the Government correct information that appeared in Furnari's
presentence report ("PSR"). Having the benefit of cooperating
witnesses who are familiar with Furnari and his criminal
activities, and who began to cooperate several years after
Furnari's conviction, the Government hereby agrees to the
correction and clarification of certain information contained in
the PSR.

        Specifically, you have objected to references in the PSR
that describe Furnari as serving as consigliere of the Luchese
Family "since at least the late-1970's," and suggest that, through
his position on the Commission as Luchese consigliere, Furnari
implicitly approved of the 1979 murders of Carmine Galente, Leonard
Coppola, and Giuseppi Turrano. See PSR at 20, 28-29. We have
since learned however; that Furnari was only a capo in the Luchese
Family until the early eighties, and consequently, could not have
sat on the Commission at the time of the Galente homicide.

        As you know, in September 1991 Alfonso D'Arco, a longtime
member of the Luchese Family who also had served as capo and acting
boss, began to cooperate with the Government. In his proffers to
the Government and in his trial testimony, D'Arco has identified
Furnari as a Luchese capo in the late seventies and early eighties,
who did not become a consigliere until the early eighties. Thus,
from information received after Furnari's conviction in the above-
captioned matter, we now believe that Furnari was only a capo, and
not a Luchese representative on the Commission at the time of the
Galente homicide.

        However, this does not change our view of Furnari's
character, nor does it diminish the danger he posed as a
participant in a violent criminal enterprise. Through the many

5A00082

years that Furnari was an associate and high-ranking member of the Luchese Family, Furnari was well aware of -- and indeed accepted as a way of life -- the Commission's role in La Cosa Nostra, and its power to order murders.  With full knowledge of the Commission's role in sanctioning murders, Furnari willingly accepted his appointment to Luchese Family consigliere, and as such participated with other members of the Luchese hierarchy in Commission affairs, albeit sometime after the Galente homicide.

In view of D'Arco's information, we agree, with leave of the Court, that the PSR should be amended by annexing to it a copy of this letter.  In addition, a copy of this letter will be forwarded to the United States Parole Commission.  If you have any objection, please let me know.

Very truly yours,

MARY JO WHITE
United States Attorney

By:

DAVID N. KELLEY
Chief, Organized Crime Unit
Tel.: (212) 791-1131

cc:  Joseph Veltre, USPO

**Exhibit D**



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

ᏃA000

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 1, 1996

<u>By Facsimile</u>
Sam Shoquist
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201
(301) 492-5525

Re:  <u>Christopher Furnari Reg. No. 19815-054</u>

Dear Mr. Shoquist:

The Government submits this letter in connection with Furnari's parole hearing, which is currently scheduled for Tuesday, August 6, 1996 at FCI Allenwood. For the reasons set forth below, we respectfully recommend that any request by Furnari to be released on parole at this time be denied.

Furnari, the Consigliere of the Luchese Organized Crime Family, was convicted in November 1986 in this district in <u>United States v. Salerno</u>, <u>et al</u>. SSS 85 Cr. 139 (RO), which was a RICO prosecution of the mafia's "Commission," a group of the most powerful members of the organized crime families of New York who controlled and coordinated various racketeering activities including murder, loansharking, and extortion. Furnari was sentenced in 1987 to 100 years imprisonment. At the time of his conviction, Furnari was one of the most powerful and respected members of the mafia in New York. For many years prior to his conviction, Furnari had been an active member and capo in the Luchese Family who participated in many violent acts in addition to those for which he was convicted. Moreover, and as set forth below, Furnari is still a highly respected Luchese Family member who is likely to return to a high-ranking position if granted an untimely release on parole.

<u>Furnari's Violent Past</u>

In the years since Furnari's conviction, the Government has successfully prosecuted many members and associates of the Luchese Family for a variety of violent racketeering offenses. These prosecutions were made possible in large part by several cooperating witnesses who themselves formerly were members and associates of La Cosa Nostra. Several of those cooperators, including Alfonso D'Arco (former acting Luchese Family Boss),

ZAC0086

Sam Shoquist                                                           2
United States Parole Commission
August 1, 1996

Anthony "Gaspipe" Casso (Luchese Family Consigliere and Underboss),
Peter Chiodo (Luchese Family Capo) and Thomas "Tommy Irish" Carew
(Luchese Family associate), have been debriefed concerning
Furnari's criminal activities prior to his incarceration.[1]  Among
the information these witnesses have provided about Furnari is the
following:

     1.   Casso -- who rose to the level of Consigliere not
long after Furnari's conviction -- and Carew have independently
reported that Furnari was involved in the murder in the mid-1970's
of Lee Schleifer, who was at the time a confederate in narcotics
trafficking with a Luchese Family associate.  Specifically, the
witnesses report that Furnari -- who was a capo at the time --
requested that Casso execute Schleifer when members of the Luchese
Family came to suspect Schleifer of cooperating with law
enforcement.  With the help of a Luchese associate, Casso lured
Schleifer to a vacant Brooklyn social club one winter day, where
Schleifer was shot.  Furnari and Carew, who were waiting at a
nearby restaurant, were then summoned to the social club, and
Schleifer's body was then removed and dumped on a dead end street
in Brooklyn.  According to the New York City Police Department,
Schleifer's body, which had suffered a gunshot wound, was
discovered on a Brooklyn Street on February 18, 1975.

     2.   Casso and Carew also reported that, in the early
1980's Furnari issued a "contract" to Casso to murder Luchese
Family associate Richard Taglianetti.  According to the witnesses,
Taglianetti was targeted for execution because it was believed that
he had participated in the murder of the son of Angelo DeFendis, a
member of the Luchese Family.  In sum, after DeFendis's son was
murdered, DeFendis met with Furnari at the 19th Hole Bar -- where
Furnari typically met with other Luchese Family members -- and
asked for Furnari's help in avenging the death of DeFendis's son.
Furnari assented, suggested that DeFendis and his wife leave town
for a while, and then instructed members of Furnari's crew, Casso
and Vittorio "Vic" Amuso -- who later became the boss of the
Luchese Family -- to murder Taglianetti.  Although Casso and Amuso
took steps to locate and murder Taglianetti, word of the murder
contract soon leaked to Taglianetti and he went on the lam for
several years.  Not until Taglianetti resurfaced in Brooklyn in

---

   [1]  Each of these cooperators have pleaded guilty to a variety
of violent racketeering offenses -- including murders -- and have
testified at numerous proceedings including trials and depositions,
and have also appeared before federal grand juries.  Indeed, Casso
testified before the Senate Permanent Committee on Investigations.

ZA00087

1992 was he finally executed by Luchese Family member George Conti.[2]

3. Casso reported that in the 1970's Furnari received a complaint from Vincent "Chin" Gigante, the boss of the Genovese Organized Crime Family, that Joseph Abinanti, the son of Luchese member Pete "the Killer" Abinanti, had been kidnapping people for ransom and had kidnapped one of Gigante's associates.[3]  Gigante asked Furnari to have the younger Abinanti killed, since each Family was ultimately responsible for the misdeeds of members and associates of the Family.  Furnari assigned the murder contract to Casso and Amuso.  The two then surveilled Abinanti and finally, when Abinanti arrived at his home one evening, Amuso approached Abinanti in his driveway and shot him.  Abinanti survived the shooting and, after recuperating, fled to California.

4. Casso also has recounted a meeting that took place between Gigante, Genovese Consigliere Bobby Manna, and others shortly after Gambino Family Boss Paul Castellano was gunned down in Manhattan in December 1985.  Specifically, Casso advised that a meeting of the group took place at Furnari's Staten Island home. It was decided at the meeting that, since the Castellano murder had not been sanctioned by the Commission (the panel of the hierarchies of four of the five families that was the subject of Furnari's successful prosecution), the Genovese and Luchese families would kill those responsible for the murder, particularly then Gambino Family upstart John Gotti and Frank DeCicco.  After the meeting Furnari asked Casso and Amuso to undertake the execution of the plot, which culminated in the successful bombing of DeCicco as he entered his car on a Brooklyn Street in April 1986.

5. Both Casso and Chiodo have advised that, before his incarceration, Furnari exercised extortionate control over officials of the Painter's Union.  In connection with that, Chiodo has stated that, in approximately 1978, Furnari met with James Bishop, the Secretary of the Painter's International Union.  When Bishop explained that, by moving from Buffalo to New York James Wolford -- a Board member of the International -- was encroaching on Bishop's "territory,"  Furnari directed Chiodo, Carew, and others to give a "beating" to Wolford.  After Chiodo and the others

---

[2]  Independent of Casso, D'Arco reported that he had had discussions with Casso, Conte, and others about avenging the murder of DeFendis's son.

[3]  According to Chiodo, Furnari's protege', Furnari was a trusted friend of Gigante who frequently was called upon to participate in matters in which the Genovese and Luchese Family had mutual or joint interests.

Sam Shoquist                                    ᴴAC0088
United States Parole Commission
August 1, 1996

successfully carried out the assault plot, Wolford left the New
York area.

        6.   Chiodo also reported that in 1987, Chiodo received
word from Furnari, through Furnari's son, then Luchese capo
Christopher "Jumbo" Furnari, Jr., that Chiodo was to give a beating
to Joseph Martinelli, a principal of Northberry Concrete, who
reportedly had failed to make the extortion payments that had been
ordered by Furnari Jr.[4] The beating was never carried out because
Chiodo eventually succeeded in collecting thousands of dollars in
extortion money from Martinelli.    Both Casso and D'Arco
independently reported that discussions within the Family were held
concerning whether Martinelli should be killed or beaten when it
was discovered that he was not paying the Family's extortion
demands.[5]

        7.    In addition to the above, it is D'Arco's
understanding that virtually every murder contract carried out by
Luchese Family members while Furnari was the Family's Consigliere
was first sanctioned by Furnari.

            Furnari's Future in Organized Crime if Released

         Since approximately 1991, the Luchese Family's power and
control over many of its illicit operations has been severely
undermined as a result of numerous federal prosecutions.   These
prosecutions have resulted in the convictions of many Luchese
Family members.   Included among the convicted are Vittorio Amuso,
who replaced Anthony Corallo as Boss shortly after Corallo was
convicted in the same case as Furnari, and Anthony Casso, who, as
Consigliere, was one of Furnari's successors.  We have learned that
although he is incarcerated, Amuso continues to exert tremendous
influence over the ongoing affairs of the Luchese Family.

            Through  D'Arco,  Chiodo,  and  current  confidential

---

        [4] According to several witnesses and informants, Furnari Jr.
was assigned to run Furnari's crew while he was incarcerated.
However, because Furnari Jr. did not cooperate with the Luchese
hierarchy, particularly Amuso and Casso, his membership in the
Family was essentially revoked and he was "shelved."  Furnari Jr.'s
removal from the family was virtually unprecedented, since those in
his predicament customarily would be executed.  However, according
to several sources, Furnari Jr.'s life was spared out of respect
for the Family's imprisoned Consigliere, Furnari Sr.

        [5] Carew essentially corroborates Chiodo's account.  However,
Carew believes that Furnari Jr. never had his father's permission
to give the order for Martinelli's beating.

Sam Shoquist
United States Parole Commission
August 1, 1996

ZA00089          5

informants, we know that Furnari is in the eyes of Luchese Family members and associates a living legend, who still is highly respected and revered by them.  In fact, we know through informant information that Amuso considers Furnari to be his mentor.  Should Furnari be released it is likely -- indeed expected by current Luchese Family members -- that Furnari will be called upon to fill the leadership void in the Luchese Family.

        In view of the foregoing, and the clear intention by the sentencing judge that Furnari serve an extensive prison term, it is respectfully recommended that Furnari not be released on parole at any time in the near or distant future.

                              Respectfully submitted,

                              MARY JO WHITE
                              United States Attorney

                              By:

                              DAVID N. KELLEY
                              Chief, Organized Crime & Terrorism
                              Tel.: (212) 791-1131

cc:  David Breitbart, Esq.
     Jim Clark, FCI Allenwood

Exhibit E

DEC 11 '96  07:10PM USAO SDNY





U.S. Department of Justice

*United States Attorney*
*Southern District of New York*    ＥＡ00112

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

December 11, 1996

<u>By Facsimile</u>
John R. Simpson, Regional Commissioner
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201
(301) 492-5525
Attention:  Anthony Suleski

Re:  <u>Christopher Furnari Reg. No. 19815-054</u>

Dear Mr. Simpson:

The Government respectfully submits this letter, as requested by Hearing Examiner Suleski, at the conclusion of the parole hearing for Furnari, which was held at FCI Allenwood on December 3, 1996.

For the most part, at the hearing Furnari essentially admitted his membership in the Luchese Organized Crime family and his close ties with other organized crime figures, including Frank DeCicco of the Gambino Family who was murdered in the wake of the Paul Castellano execution.  Instead of expressing remorse about his crimes, Furnari spent most of his argument attacking the credibility of Anthony Casso, a trusted associate of Furnari, who provided much of the information of Furnari's other crimes that was set forth in our August 1, 1996 letter.[1]  I have addressed below some of the issues that were raised during the December 3 hearing.

1.  Murders by Members of Furnari's Crew
    and by Members of the Luchese Family
    <u>1983-1986</u>

At the hearing inquiry was made concerning the number of

---

[1]  To date, the Government has not been compelled to disclose any of the reports of interviews of Casso, as we have had to do prior to the testimony of D'Arco, Chiodo and Carew.  Because Casso may be called as a witness in upcoming trials and because the information provided in some of his reports is the subject of ongoing investigations, and in the absence of any requirement that we disclose such reports in this instance, the Government elects not to make the disclosures that Furnari has requested.

murders that were committed by members of the Luchese Family crew that Furnari captained until 1983. We have identified the following murders and attempted murder in which Furnari's crew members participated:

| Victim | Date | Participant(s) |
|---|---|---|
| Joseph Abinanti (attempted murder) | 9-1-79 | Vittorio Amuso<br>Anthony Casso |
| Vincent Albano | 7-5-85 | Herbert Pate |
| Gaetano Barbusca | 6-22-74 | Amuso, Casso |
| John Coiro | 6-22-74 | Casso, Amuso |
| David Blakely | Late '70's | Oscar Ansourian,<br>James McCann |
| Frank DeCicco | 4-13-86 | Casso, Amuso |
| Roy DeMeo | 1-20-83 | Jos. Testa<br>P. Testa<br>Casso, Amuso |
| Nicholas Guido | 12-25-86 | J. Testa<br>G. Zappola<br>F. Lastorino |
| James Hydel | 12-86 | Casso, Amuso |
| Bernie LNU | Late '70's | Ansourian, Lastorino |
| Richie LNU | Early '70's | Casso, Amuso |
| Anthony Luongo | 11-11-86 | Casso, Amuso |
| Lee Schleifer | 2-75 | Casso, Amuso |
| Vincent Craparotta | 6/12/84 | Martin Tacetta |

As was reported in our August 1, 1996 letter, Furnari was directly involved in the conspiracies that resulted in the murder of Schleifer and the attempted murder of Joseph Abinanti. In addition, and as we indicated during the hearing, it would not typically be the case for a Luchese Family member or associate to commit a murder without the knowledge and approval -- either tacit or express -- of the crew's capo, who also must have approval from the Family's administration. As far as we can tell, that trend was followed by Furnari's crew, both during and after he served as the crew's capo. Indeed, from D'Arco and at least two other Luchese

5A00114

John R. Simpson, Regional Commissioner                                    3
December 11, 1996

Family sources, we know that immediately prior to his conviction in
this case, Furnari met with other members of the Luchese Family
hierarchy to select their successors in the event they were
convicted and imprisoned for a lengthy period.  At that meeting
they selected Amuso to be the Family's boss, Mariano Macaluso to
replace Furnari as consigliere and Casso to be a capo.  It was then
decided that Anthony Luongo, who had been vying to replace Anthony
Corallo instead of Amuso as boss, would pose a threat to the newly
appointed administration.  Thus, the decision was reached to have
Casso and Amuso murder Luongo.

          Furnari's counsel also claimed at the hearing that there
were no murders committed by the Luchese Family between 1983-86.
As the list above of murders by only members of Furnari's crew  --
one of several Luchese family crews  --  amply demonstrates,
Furnari's assertion is simply inaccurate.  As set forth above, five
of these murders by members and associates of only one Luchese
Family crew occurred during the period 1983-1986, while Furnari was
consigliere.

          2.     Attacks on Casso's Credibility and the Number of
                 Murders Casso Committed

          Quoting from the testimony of FBI Special Agent Chris
Matteice, Breitbart indicated that Casso was responsible for 187
murders and, thus, his information could not be credited.  I have
since spoken to Agent Matteice, as well as several other agents who
have spent years investigating the Luchese Family and who have
personally interviewed D'Arco, Chiodo, Casso and others who were
involved in the affairs of the Luchese Family.

          In particular, Agent Matteice testified in the Eastern
District of New York in United States v. Capaldo in 1994.    On
cross-examination, Mr. Breitbart asked him " . . . how many
homicides or attempted homicides this particular group was
responsible for?"   To which Agent Matteice responded "187."  In my
conversations with him, Agent Matteice has indicated that he
believes the question was directed not toward the number of
homicides that Casso had committed, but toward the number of
homicides D'Arco reported had been committed by members of the
Luchese Family during his tenure in the Family.  Other experts who
are more familiar with both Casso and the Lucchese Family believe
that Casso has participated in a substantial number of homicides
but no where near the number that Mr. Breitbart has drawn from
Agent Matteice's testimony.  Regardless of the exact number, we do
not hide from the fact that Casso was indeed murderous.  However,
this fact alone does not render his information untruthful or
incredible.   In fact, many of the Government's most notable
cooperating witnesses, such as D'Arco, and Salvatore "Sammy the
Bull" Gravano, are responsible for murders in the double digits,
yet juries have found their information to be inherently reliable.

AC0115

John R. Simpson, Regional Commissioner                    4
December 11, 1996

Significantly, in the approximately eight trials in which D'Arco has testified, he often has stood alone as the only witness on many of the charges for which the juries found the defendants guilty.

With regard to Casso, it is clear from our description in our August 1, 1996 letter of the Schleifer and Taglianetti murder plots, and the Wolford beating, as well as the Luongo murder plot described above, that Casso's information does not stand alone but is corroborated by other informants and witnesses in material respects.

At the very least, it is undisputed by several sources that Casso was a trusted and close associate of Furnari, who Furnari helped place in the Luchese Family's hierarchy when he was convicted of the crimes for which he is now being considered for parole. If it wasn't for Furnari, Casso would not likely have been in the position to cause the mayhem to which he has admitted. And should Furnari be paroled, it is likely he will again be embraced by the same murderous enterprise.

3.    Inaccuracies in Furnari's December 2
      Letter

Although Mr. Breitbart's December 2 letter was addressed by both sides at some length at the hearing, the following points arising from his letter and arguments are worthy of note. First, Mr. Breitbart claimed that he wasn't even sure that the Abinanti shooting referred to in our August 1 letter had in fact ever occurred. The fact that Abinanti was shot in his driveway and survived is substantiated by, among other sources, the police officers who responded to the scene of the shooting. In sum, Abinanti was shot by the Luchese Family as an accommodation to the Genovese Family, who were enraged at Abinanti's kidnapping of associates of the Genovese Family (as well as of the Colombo Family). Indeed, because Abinanti was a Luchese Family associate (and his father a Luchese member), the Luchese Family was accountable for his actions, which offended the other families and violated the rules of the Commission. When Abinanti survived the shooting he was essentially banished to California, and no longer the concern of the Genovese. This is not to say, as Mr. Breitbart suggested, that he was completely severed from the Luchese Family. Indeed, several years later, when the Luchese Family needed help locating Anthony DiLappi in California, they enlisted Abinanti.

Second, while defendants against whom Chiodo testified in the Painter's Union case, which involved the beating of Wolford that we described in our August 1 letter, you should also know that Chiodo's information on all matters has been substantially corroborated by many sources, and that his testimony has been found credible by several other juries before which he has testified in other cases.

ZAC0116

John R. Simpson, Regional Commissioner                    5
December 11, 1996

<u>Conclusion</u>

     Furnari was a leader of one of the most dangerous and
deadly criminal organizations in this country's history.  It is
hard to imagine that release at this early date is an appropriate
execution of Judge Owen's sentence.  This is particularly true
given the information of Furnari's other criminal acts, the breadth
of the enterprise that he helped lead, and the expectation held by
many of his confederates who are active in the Luchese Family that
Furnari will return to the fold.

     If you need additional information, please do not
hesitate to contact me.

Very truly yours,

MARY JO WHITE
United States Attorney

By: _____

DAVID N. KELLEY
Chief, Organized Crime & Terrorism
Tel.: (212) 791-1131

cc:  David Breitbart, Esq.
    (by facsimile)

**Exhibit F**

01/09/97 05:12:36                    ->         00000000000                Page 001

U.S Department  of Justice
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland  20815-7201

## Notice of Action

RECEIVED

By

**Name**: FURNARI, Christopher

**Register Number**: 19815-054                    **Institution**: Allenwood FCI

In the case of the above-named  parole action was ordered:

Continue to a 15 Year Reconsideration Hearing (December 2011).


**REASONS**:

Your offense behavior has been rated as Category Eight severity because it
involved murder and multiple separate extortion through racketeering offenses.
Your salient factor score (SFS-95) is 8.  You have been in federal confinement
as a result of your behavior for a total of 121 months as of 12/15/96.
Guidelines established by the Commission indicate a range of 100+ months to be
served before release for cases with good institutional adjustment and program
achievement.  After review of all relevant factors and information presented,
a decision more than 48 months above the minimum guidelines is warranted because
you were involved in the hierarchy, first as a Capo and later as Consigliere of
a major organized crime organization and were involved either directly in the
planning or approval of the murders of numerous individuals.


As required by law, you have also been scheduled for a statutory interim hearing
during December 1998.




**SALIENT FACTOR SCORE (SFS-95)**:  Your salient factor score items have been
computed as shown below.  For an explanation of the salient factor score items,
see the reverse side of this form.

ITEM A[ 1 ]; B[ 1 ]; C[ 2 ];  D[ 1 ]; E[ 1 ]; F[ 1 ]; G[ 1 ]  Total[ 8 ]




Copy to Unit 3B

Carol J Coffey  01-09-97

Appeals   Procedure:
The above decision is appealable  to the National  Appeals  Board under 28 C.F.R. 2.26.

January  8, 1997                                              Docket Clerk: dlw

1/13/97

C. F.

**Exhibit G**

U.S. Department of Jus   ●        NOTICE OF AC ●ON APPEAL
United States Parole Commission
5550 Friendship Boulevard                To: SRK    733·6966
Chevy Chase, Maryland 20815-7201

NAME: Furnari, Christopher        REG. NO. 19815-054        INST: Allenwood FCI

The National Appeals Board examined the appeal of the above named and ordered the following:

Affirmation of the previous decision.

**RESPONSE:**

You have properly been held accountable for murders committed to further the
purposes of the Luchese or other crime families. At a minimum, as the capo of
a crew in the Luchese family, you were in a position to be informed of murders
ordered by the boss of the family. Given the hierarchical nature of the
organization, it is likely that you directed the murderous acts of your crew
members. And, in fact, the Parole Commission finds the information from the
U.S. Attorney's Office on your personal responsibility for several of the
murders (victims Schliefer, Taglianetti, and DeCicco) and attempted murder
(victim Abinanti) to be credible and reliable, even though much of the
information may have come from Anthony Casso, one of the most violent members
of your organization. Reliable information on crimes committed through La Cosa
Nostra activities has been provided by members of the criminal organization,
including those who have committed violent crimes. Even if Casso has continued
to commit or plot other crimes after his debriefing by federal law enforcement,
this does not disqualify him as a reliable source concerning your criminal
activities within the Luchese family. In many cases, Casso's information is
corroborated by information from other sources such as Carew and D'Arco.

Your parole denial is warranted because you approved or participated in the
planning of a contract murder (Taglianetti), the murder of a potential
informant/witness (Schliefer), and a murder and attempted murder to further the
aims of an on-going criminal organization (DeCicco and Abinanti, respectively).
Any one of these crimes would support a parole denial. There are no mitigating
factors, including your age, that justify your parole when weighed against the
aggravated nature of the crimes.

Neither due process, parole statutes nor parole regulations require that you be
granted access to reports which have not been provided to the Parole Commission
for its consideration. Therefore, you are not entitled to discovery of source
materials that the U.S. Attorney's Office may have used to prepare letters
recommending against your parole.

You have failed to show that the Parole Commission cannot fairly decide your
appeal simply because the same Assistant U.S. Attorney who opposed your parole
at your hearing made a general presentation on the topic of organized crime to
agency members and staff two months after the initial decision in your case.
There is also no evidence that any procedures were violated in the Assistant

August 19, 1997            National Appeals Board            Docket Clerk: dzyj

NOTICE OF ACTION ON APPEAL

3. Department of Justice
ted States Parole Commission
0 Friendship Boulevard
vy Chase, Maryland  20815-7201

ME: Furnari, Christopher          REG NO. 19815-054          INST: Allenwood FCI

S. Attorney's representation of his office's views in the course of the parole
termination.

1 decisions by the National Appeals Board on appeal are final.

August 19, 1897                    National Appeals Board                    Docket Clerk: dmj

**Exhibit H**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ZA00061

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

ANTHONY CASSO,

         Defendant.

A F F I D A V I T

90-CR-446 (S-4)(FB)

- - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

      GEORGE A. STAMBOULIDIS, being duly sworn, deposes and says:

      1.  I have been a federal prosecutor since October 1988 and an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for Eastern District of New York (hereinafter "our Office") since January 1990.  From approximately mid-1994 until September 1995, I was also the Deputy Chief of the Organized Crime and Racketeering Section. From approximately September 1995 until the present, I have been the Deputy Chief of the Long Island Division.

      2.  The information contained in this Affidavit is based upon my review of the defendant Anthony Casso's ("Casso") plea and proffer agreements, transcripts of Court proceedings, my notes of meetings with Casso and my conversations and interviews with Matthew J. Brief, Esq., Casso, FBI agents, current and former AUSAs.

      3.  On February 24, 1994, Casso signed a proffer agreement with our Office (attached as Exhibit G to the Notice of Motion for Specific Performance and Other Relief, dated October

ⅢA00062

2

30, 1997 ("Casso Motion").

4.  On February 24, 1994, Casso signed a cooperation agreement (Casso Motion, Exhibit C).  That plea agreement included, among other provisions, the following standard language:

> 5.  If the Office determines that the defendant has cooperated fully, provided substantial assistance to law enforcement authorities and otherwise complied with the terms of this agreement, the Office will file a motion, pursuant to Guidelines Manual §5K1.1 and 18 U.S.C. §3553(e) with the sentencing Court setting forth the nature and extent of his cooperation.  Such a motion will permit the Court, in its discretion, to impose a sentence below the applicable Sentencing guidelines range and also be low any applicable mandatory minimum sentence. In the connection, it is understood that the Office's determination of whether the defendant has cooperated fully and provided substantial assistance, and the Office's assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon him.  The Office cannot and does not make a promise or representation as to what sentence will be imposed by the Court.

> 6.  ANTHONY CASSO must at all times give complete, truthful and accurate information and testimony, and must not commit, or attempt to commit, any further crimes. Should it be judged by the Office that ANTHONY CASSO, also known as "Gaspipe," has failed to cooperate fully, or has intentionally given false, misleading or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this agreement, ANTHONY CASSO will not be released from his plea of guilty but this Office shall be released from its obligation under this agreement (a) not to oppose a Probation Department finding of a downward adjustment of two levels for

5A00063

3

>acceptance of responsibility described in
>Paragraph Two, above, and (b) to file the
>motion described in Paragraph Five, above.
>Moreover, ANTHONY CASSO will also be subject
>to prosecution for any federal criminal
>violation of which the Office has knowledge,
>including , but not limited to, the criminal
>activity described in Paragraph Four, above,
>perjury and obstruction of justice.

(Emphasis supplied).

5.   On March 1, 1994, pursuant to his cooperation

agreement, Casso pleaded guilty before the Honorable Eugene H.

Nickerson to each of the 72 counts in which he was charged in

Indictment No. 90 CR 446 (S-4)(EHN).  During his allocution,

under oath, Casso told the Court that:  he was satisfied with his

legal representation (Plea transcript at p. 4);[1] he had read,

understood and reviewed the plea agreement with Mr. Brief; and

the written plea agreement constituted the entire agreement

between him and the government. (Id. at 7).  Casso also told the

Court that other than the written agreement with the government,

no one made any promise to him that caused him to plead guilty

and no one made him any promise as to what his sentence would be.

(Id. at 19).  At the time of the plea, then-AUSA Gregory

O'Connell also informed the Court that the written plea agreement

constituted the entire agreement between the government and

Casso. (Id. at 6-7).  Similarly, at that time, Mr. Brief advised

the Court that the written agreement was the entire agreement

between Casso and the government. (Id.)  At the time of the plea,

---

[1] The transcript of Casso's guilty plea is attached hereto as Exhibit 1.

≡A00064

4

Casso advised the Court that he understood everything and had no
questions for the Court, and Mr. Brief advised the Court that he
did not know of any reason why Casso should not plead guilty.
(Id. at 18-19).

6.   During debriefings shortly after he signed the
cooperation agreement, Casso revealed that he had: (a) conspired
with Colombo family soldiers and associates to kill Judge
Nickerson; (b) prior to his decision to cooperate with the
government, ordered the murder of and conspired to murder then-
AUSA Charles Rose, who was one of the two prosecutors handling
the instant case; and (c) plotted to escape from MCC New York
and, in the alternative, to have his then Luchese family
associates attack the Eastern District Marshal's van in an effort
to free him -- to this end, with the help of a BOP employee who
he bribed, Casso obtained a handcuff key and instruments that he
used to make clay impressions of keys to prison cell doors at
Metropolitan Correctional Center New York ("MCC").  Casso then
directed his Luchese family underlings to use the impressions to
have keys made, which he planned to use in one of his escape
plans.  Although it is not clear whether questions had been asked
during the proffer session that should have elicited that
information, Casso's failure to disclose this information
previously led to concerns on the part of Messrs. Rose and
O'Connell about Casso's candor on certain issues.

7.   The recollection of Messrs. Rose and O'Connell
concerning the proffer and debriefing sessions with Casso was, in

ＺＡ００００５

some respects, at odds with the recollection of FBI agents
present during most of the same sessions.  Because Casso was to
be polygraphed as a standard precondition to entrance into the
Witness Security Program (the "Program"), Messrs. Rose and
O'Connell, in consultation with FBI Special Agent Richard
Rudolph, elected to polygraph Casso on certain issues about which
there was the most concern over Casso's candor.  The polygraph
examination included, among others, questions as to whether
Casso: (a) had "initiated" the plan to kill Judge Nickerson; (b)
had or had access to any cash over $500,000; (c) knew the
neighborhood in which then-AUSA Rose lived.  The polygrapher who
administered the polygraph on April 14 and 15, 1994 opined that
Casso's answers to those questions were indicative of deception
by Casso.

8.  On or about August 31, 1994, Messrs. Rose and
O'Connell left our Office to enter private practice.  After
Messrs. Rose and O'Connell left our Office, to my knowledge they
had no new inside information on the Gigante case.

9.  At about that time, I was assigned the case of
United States v. Vincent Gigante, 93 CR 368 (EHN) and 90 CR 446
(EHN), which included the instant case.  As the prosecutor who
took over the Gigante case, it also made sense for me to take
over as the "sponsoring" or contact AUSA for Casso because he was
a witness with firsthand knowledge of Gigante's position as boss
of the Genovese family and his involvement in numerous murders,
murder conspiracies, extortions and other crimes.  As the

ZAG0066

6

prosecutor who was handling the Gigante case, I had an interest in determining the viability of Casso as a witness and maintaining that viability, if it existed.

10.   Shortly after I was assigned the Gigante case, I scheduled a meeting with Casso, Mr. Brief, AUSA Valerie Caproni, who was my supervisor, and FBI Special Agents James Brennan and Richard Rudolph.  On November 1, 1994, that meeting occurred at the protective custody unit ("PCU")[2] at which Casso was then housed.  The main agenda for that meeting was: (a) to interview Casso about what he recalled as to what was said to whom between the time that he first decided to explore the option of cooperating and the early days after he entered the cooperation agreement; and (b) to interview him about those issues on which he failed the polygraph, including, but not limited to, his role in the plot to kill Judge Nickerson, and his criminally acquired income and assets and holdings (including real estate and business holdings and interests, his heroin and marihuana trafficking income and his racketeering activity income).

11.   After that meeting, AUSA Caproni and I were troubled by some of Casso's answers and were not convinced he was being completely candid because certain of his explanations did not make sense.  On the other hand, we were not certain that he was lying about anything in particular, and therefore did not terminate the agreement at that point.

_____

[1] PCUs are prison facilities that house only inmates who are in the Program.

ZA00067

     12.  I continued to hold out hope that Casso could be a viable witness in the <u>Gigante</u> prosecution.  Sometime in or about Summer 1995, I asked AUSA Andrew Weissmann to assist me in the <u>Gigante</u> prosecution.  Given Casso's long heinous criminal history[3] and unresolved concerns about whether he was being completely truthful about issues not related to information he possessed concerning Gigante, we believed that it was unlikely he would be a valuable witness in repeated trials.  Nevertheless, we considered having him testify at the initial <u>Gigante</u> competency hearing before Judge Nickerson -- a proceeding at which there would obviously be no jury -- as a trial run of his abilities as a testifying witness.  Depending on how he did, we would decide whether his testimony could be effectively presented at trial.

     13.  In or about December 1994, the FBI Special Agent

---

[3] Before he entered the cooperation agreement Casso had committed a lifetime of serious crimes, including but not limited to the following crimes:  (a) conspired to murder government witnesses, including Peter Chiodo who was shot numerous times, and members of Chiodo's family; (b) conspired to murder and directed the murder of  government witnesses and people he believed to be government witnesses,  including, but not limited to, Robert Kubecka and Donald Barstow; (c) conspired to kill the Honorable Eugene H. Nickerson, a federal district court judge who was presiding over his case, and had taken steps to further the conspiracy by providing information concerning what he believed to be the town in which the judge lived and his usual mode of travel to the courthouse to others who, according to Casso, were more interested in killing the judge than he was; (d) conspired to kill, and taken steps to further the conspiracy, Charles Rose, then an AUSA assigned to prosecute him; (e) directly or indirectly participated in the murder of more than 36 people; (f) conspired to escape from the MCC-New York in several different ways, including planning a high risk armed raid on the U.S. Marshal's van that transported prisoners from the  Eastern District courthouse back to the MCC New York; (g) while he was awaiting trial in the instant case, directed his underlings in the Luchese family to identify the location where jurors park their cars during jury duty so that he would be able to direct his underlings to identify the jurors sitting during his trial; and (h) corrupted law enforcement officers and thereby obstructed justice by obtaining sensitive law enforcement information which placed lives in jeopardy and otherwise compromised investigations.

ZA00068

8

who was assigned to the case of cooperating witness Carmine Sessa advised me that Sessa informed him that Casso, who was then housed in the same PCU as Sessa, had returned from a meeting with FBI agents on his case, approached Sessa and began discussing a murder that Casso told the agents about.  Sessa was upset that Casso was discussing his knowledge of prior criminal activity with Sessa at all and was further upset at the content of what Casso was telling him.  Specifically, Sessa reported that Casso had told him that Casso had told FBI agents that Sessa had murdered a Vinny "Fat Vinny" DiPiero as a favor to his brother Michael Sessa.  Sessa knew, and had previously reported to the FBI, that he murdered DiPiero because Colombo family acting boss Victor J. Orena directed him to do so as a favor to Casso, who had requested it.[4]  After Sessa informed me that Casso raised this topic with him, I told Sessa, in words or substance, to move away from Casso if he ever again attempted to discuss such matters with him.

14.   While there was no excuse for Casso discussing any aspect of his cooperation with Sessa in direct breach of his cooperation agreement (See paragraph 3c of Casso's cooperation agreement), we were not in a position to conclude that Casso was lying when he reported that DiPiero was not murdered at his

_____

[4] At the time Carmine Sessa began cooperating in April 1993, his brother Michael and Victor J. Orena had been convicted and, approximately one month later, they were sentenced to life imprisonment.  At no time during debriefings of Carmine Sessa did I or anyone else to my knowledge, believe that Sessa provided false information on criminal conduct so as to protect Michael Sessa.

ZAC0069

9

request, because the differences between Sessa's and Casso's account of the murder could be a result of Orena having misled Casso and Sessa about Orena's motive for the murder. Moreover, we had no reason to question Sessa's credibility, which had already been tested and corroborated in many ways, including favorable jury verdicts, guilty pleas motivated by Sessa's cooperation, positive results on search warrants obtained based upon information provided by Sessa, corroboration from other cooperating witnesses, etc.

15. On or about July 12, 1995, at the request of the Israeli government, Casso testified by way of deposition in connection with the Israeli prosecution of Joseph Reisch and Israel Mizrachi. That prosecution resulted in acquittals. Casso's testimony was limited to the May 1989 murder of Michael Markowitz in Brooklyn, New York. A transcript of that testimony is available to the Court upon request.

16. On or about July 16, 1995, the staff at the prison at which Casso was housed with Sessa, decided that Casso should be transferred to another facility, largely because he was a disruptive influence in the PCU.[5] As we thought it best that he be moved away from Sessa and other witnesses with whom he had prior criminal relationships his transfer out of the facility was supported by this Office. On or about July 16, 1995, Casso was transferred to another institution.

---

[5] We had previously heard from Sessa that Casso had said to him that people like he and Sessa could not tell the FBI everything about their prior criminal conduct.

ZA00070

17.   On or about October 13, 1995, Kings County
Assistant District Attorneys ("ADAs") Ken Taub (Chief of the
Homicide Unit) and Alan Lewis (a Homicide Unit ADA) met with
AUSAs Caproni, James Orenstein (Deputy Chief of our Office's
Organized Crime and Racketeering Section ("OCRS")) and Mark
Feldman (Chief of OCRS) to discuss the Kings County District
Attorney's Office's pending murder indictment against Colombo
family soldier Frank "Frankie the Bug" Sciortino and the
possibility of Casso testifying at that trial.   On October 24,
1995, AUSA Caproni (who was then and still is Chief of the
Criminal Division) wrote ADA Taub a letter to confirm a series of
conversations in which the availability of Casso as a witness in
the Sciortino case was discussed.   In that letter, AUSA Caproni
stated that:

> ". . . this Office is not currently in a
> position to state definitively whether we
> will give your Office access to Mr. Casso for
> use in your trial.  We currently plan to call
> him as a witness in the competency hearing of
> Vincent Gigante, scheduled in January 1996.
> Following that hearing, we believe we will be
> able to tell you whether, and if so when, we
> would give you access to him.  We are
> unwilling to give you access to him prior to
> that hearing.
>
> You have inquired what would happen were
> you, against the wishes of this Office,
> simply to subpoena Mr. Casso to testify.  As
> we discussed, our plea agreement with Mr.
> Casso has resolved his federal criminal
> exposure for those crimes he disclosed to us.
> We could not, and obviously did not, resolve
> his state criminal exposure.  Accordingly,
> your question of what would happen were he to
> be subpoenaed is best directed to his
> attorney, Matthew Brief.  Mr. Brief can be

ЗАО0071

11

> reached at (212) 832-5570.  Should you chose
> to subpoena Mr. Casso, please let me know
> several weeks in advance of the date you need
> him in court so that I can have the United
> States Marshals make the appropriate security
> arrangements."

That letter is attached as Exhibit 2.

18.  On November 27, 1995, Mr. Brief wrote ADA Taub a

letter stating, among other things, as follows:

> "As you are aware, Mr. Casso is willing
> to fulfill all his duties and obligations in
> accordance with the Cooperation Agreement.
> He has agreed to testify in any proceeding in
> the Eastern District of New York or elsewhere
> as requested by the Office.  On his behalf, I
> have not received such a request at this time
> from the United States Attorney regarding the
> homicide trial of Frank Sciortino that is
> presently scheduled in Kings County.
>
> Therefore, I am advising you that if
> called to testify at the present time, Mr.
> Casso would assert his Fifth Amendment
> privilege against self-incrimination to each
> and every question that might be posed to him
> in a state criminal proceeding."

(Casso motion, Exhibit N).  The state case against Sciortino was

later resolved with a guilty plea.

19.  On May 15, 1996, Casso voluntarily testified

before the Senate Permanent Subcommittee on Investigations of the

Committee On Government Affairs regarding Russian organized crime

in the United States.  1996 WL 273526 (F.D.C.H.).  As he made

clear in his testimony, it was not pursuant to his agreement with

our Office.  Id.  ("... no promises have been made to me for my

testimony here today.").

20.  As reflected in the Affirmation of Andrew

ZA00072

12

Weissmann dated December 16, 1997 ("Weissmann Aff."), in connection with post-trial attacks on Salvatore Gravano, on or about February 21, 1996, AUSA Weissmann and FBI Special Agent Brennan interviewed Casso over the telephone.  During that conversation, Casso said, among other things, that:  (a) he was not aware of Gravano having been engaged in drug dealing in any manner whatsoever; (b) Gravano had no knowledge of and was not involved in a drug trafficking transaction involving a boat called the Hunter;[6] and (c) prior to cooperating, Casso refused a request from a defendant who was incarcerated with him to help fabricate a story that Gravano participated in that drug deal. Weissmann Aff. at ¶¶ 4-5.

21.  Although we had considered calling Casso during the competency phase of the Gigante case, we ultimately decided that was not necessary.  As the Court is aware, on August 28, 1996, Judge Nickerson found Gigante competent to stand trial. United States v. Gigante, 1996 WL 497050 (E.D.N.Y.).  Following the completion of the Gigante competency hearings, AUSA Weissmann and I decided to begin trial preparation by interviewing accomplice witnesses who were available to testify at Gigante's trial.

22.  On September 27, 1996, AUSA Weissmann, FBI Special Agents Rudolph and Brennan, a paralegal and I interviewed Casso

---

[6] For a discussion of the allegations relating to Gravano's involvement in a shipment of drugs transported by the Hunter see Judge Glasser's decision in United States v. Gotti, 171 F.R.D. 19 (E.D.N.Y. 1997).

ZA00073

regarding the Gigante case. It was clear that based on his face-to-face dealings with Gigante, as well as his dealings with Gigante's subordinates and others who had dealings with Gigante, Casso could give very powerful testimony about many of the crimes for which Gigante was indicted, as well as background position and enterprise evidence. For example, Casso, like Gravano, attended the last Commission[7] meeting with Gigante and others. Accordingly, Casso could have corroborated Gravano's account of, among other things, Gigante's role and statements at that meeting, as well as his leadership role in the Genovese family. Similarly, Casso corroborated former Genovese family associate Peter Savino and former Luchese family captain Peter Chiodo regarding, among other things, Gigante's role in the "Windows extortion conspiracy,"[8] as well as his leadership role in the Genovese family. Likewise, Casso corroborated former Luchese family acting boss Alphonso D'Arco regarding, among other things,

---

[7] The Commission refers to the national ruling body of La Cosa Nostra in the United States. From time to time, it consisted of the bosses of the five New York City-based mafia families. The last Commission meeting was attended by Vincent Gigante, Venero "Benny Eggs" Mangano, John Gotti, Salvatore Gravano, Vittorio "Vic" Amuso and Casso, the boss and underboss of the Genovese, Gambino and Luchese families, respectively. At the meeting, Gigante spoke lucidly and announced his decisions regarding important LCN business.

[8] In Count Five, Gigante was convicted of an extortion conspiracy involving the window replacement and installation industry, in violation of 18 U.S.C. §1951. "Window replacement companies run by Genovese Family members or associates made payments to the Luchese Family and others who influenced local union decisions to permit cheaper non-union laborers to install windows. Genovese members obtained window replacement contracts for jobs with the New York City Housing Authority and other organizations that should have been handled by companies using union employees only. Bid-rigging, bribes, and extortion assured the extremely high profits shared with [Gigante]." United States v. Gigante, 1997 WL 597063 (E.D.N.Y. September 25, 1997).

Gigante's leadership role in the Genovese family, his installation of an acting administration, and his use of Dominic "Quiet Dom" Cirillo as his official messenger.[9]

23. In addition to the Gigante case, other prosecutors in our Office, including AUSA Feldman, considered Casso to be a potentially viable witness with respect to an investigation into certain crimes, the specific details of which were revealed to our Office by Casso.

24. Consistent with the letter and spirit of the cooperation agreement, our Office tried to provide for Casso's security concerns in various ways. Some of these efforts are addressed in a separate affidavit, which will be filed under seal.

25. Sometime between approximately late 1996 to early 1997, our Office learned that Casso was involved in criminal conduct in the PCU in which he was then-incarcerated.

26. On April 24, 1997, AUSAs Caproni, Weissmann and I, with FBI Special Agents Brennan and Rudolph, interviewed Casso in the presence of his attorney, Mr. Brief. As reflected in Mr. Brief's affidavit, we told Mr. Brief we had made no decisions but wanted to hear Casso's full explanation as to all crimes that he committed since the time that he entered the cooperation agreement.

27. During that interview, Casso admitted that in a

---

[9] Because Gigante was feigning mental illness, it was helpful for him to have someone who could relay messages to and from him to other LCN leaders and members.

ZA00075

15

PCU he snuck up on an inmate, while that inmate was being escorted, handcuffed and naked, from the shower to his cell, and beat the victim to the floor where he proceeded to then kick him multiple times.  He also admitted that he had been involved as the instigator in a previous fight with that same inmate, after which he lied about it when questioned by a BOP hearing officer.

28.  In that same interview on April 24, 1997, in the presence of his attorney, Casso admitted that, sometime between approximately July 1994 and approximately July 1995, he participated in the smuggling of contraband (approximately three boxes of food) via the mails into the PCU at which he was then housed (hereinafter "PCU-#1").  According to Casso, corrupt BOP employees assisted in the smuggling operation.

29.  In that same interview, in his counsel's presence, Casso admitted that sometime after he was transferred out of PCU-#1 in approximately mid-July 1995, he again participated in the smuggling of contraband via the mails and other ways into the next prison in which he was housed (hereinafter "PCU-#2").  There, he bribed BOP employees with money orders, cash, Radio City Music Hall show tickets and new automobile tires to assist him in smuggling contraband into the prison and otherwise violating prison rules.  According to Casso, among the contraband he arranged to be smuggled into the prison were cash, vodka, wine, food items  including sushi, steaks, turkeys, veal cutlets, a disposable camera, radios, cosmetics and a robe.

30.  Finally, in that same interview, in the presence

ZA00076

of his attorney, Casso admitted that he intentionally destroyed a BOP treadmill by ripping the belt, and that he lied when questioned about the incident by a BOP hearing officer.[10]

31.   On or about May 29, 1997, Mr. Brief sent a letter to AUSA Mark Feldman with a request that copies of the letter be provided to AUSAs Caproni, Weissmann and Stamboulidis.   In that letter, in essence, Mr. Brief requests our Office not to "withdraw from the Plea and Cooperation Agreement" with Casso in response to Casso's criminal activity since he entered the agreement.   In the letter, among other things, counsel makes general references to Casso's criminal activities in the PCUs and acknowledges that he had been told that no decision had been made as to whether Casso's breaches of the cooperation agreement would result in our Office refusing to make a motion under U.S.S.G. §5K1.1 motion ("5K Motion").   (Letter attached to Casso motion as Exhibit V).

32.   On August 1, 1997, Mr. Brief, at Casso's direction, sent another letter to AUSA Mark Feldman, with a request that copies of the letter be provided to AUSAs Caproni, Weissmann and Stamboulidis.   (Letter attached to Casso motion as Exhibit F and hereinafter referred to as the "August 1 Letter".) The letter contains Casso's allegations that two government witnesses in the Gigante trial, Gravano and D'Arco, gave false

---

[10] Although Casso acknowledged smuggling contraband into PCU-#1 and PCU-#2, he adamantly denied any knowledge of any illegal conduct by anyone in PCU-#3, the unit in which he was then incarcerated.

ZAC0077

testimony.  In addition, in the letter, Casso claimed that, the day after Rev. Sharpton was stabbed, Gravano admitted to Casso in a Brooklyn schoolyard that he ordered the stabbing.  Casso raised this in the August 1 Letter as a crime that Gravano failed to disclose to the government and in any of his testimony.

33.  In that letter, Casso also alleged that D'Arco lied when, among other things, he testified in Gigante that, at one point, he was made the acting boss of the Luchese family. Interestingly, D'Arco testified to the same fact at several earlier trials, yet Casso never before had his counsel write our Office about Casso's belief as to the veracity of that or any other fact testified to by D'Arco or any other witness.

34.  At the time we received the August 1 Letter, our Office had made no decision as to whether Casso's breaches of the cooperation agreement would result in the Office refusing to make a 5K Motion.  A decision would have been made by our Office's §5K Committee, which had not even been given a memorandum discussing Casso at the time we received the August 1 Letter.

35.  After we read the August 1 Letter, we concluded that Casso had made up lies about Gravano and D'Arco and directed his counsel to send them in the letter to our Office.  For example, as is event from the paragraphs that follow, Casso made up a conversation that he claimed to have had with Gravano about the stabbing of Rev. Sharpton.  Similarly, he made up the lies implicating Gravano in drug dealing, when he had earlier reported, (see Weissmann Aff. at ¶¶4-5), that he had no knowledge

TA00073

of Gravano being in any way involved in drug dealing. To the extent that Casso asserts that Gravano and D'Arco lied, as between Casso on the one hand and Gravano and D'Arco on the other hand, we credit the testimony of Gravano and D'Arco. Their testimony repeatedly withstood the crucible of cross examination by teams of very skillful attorneys. In addition, they have little incentive to lie about the things that Casso claims they lied about.[11]

36. From November 1990 through approximately April 1995, Gravano was incarcerated.

37. Based on my review of a New York City Police Department report of the incident, on January 12, 1991, an assailant stabbed Reverend Al Sharpton in New York City.

38. On or about August 8, 1997, our Office sent Mr. Brief a letter notifying him that Casso was in breach of paragraphs three and six of his February 24, 1994 cooperation agreement. A copy of that letter was also sent to the Court so that a sentencing date could be set. (Attached to Casso's motion as Exhibit C and Exhibit X).

39. On or about September 5, 1997, our Office sent Mr. Brief a letter furnishing him with notice as to some of the ways

---

[11] For example, in debriefings by FBI agents, Casso has previously admitted that Amuso and he were in fact involved in a joint plot amongst certain members of the Genovese and Luchese families to murder Gambino family boss John Gotti because of his role in the unsanctioned murder of Gotti's predecessor, former Gambino family boss Paul Castellano. D'Arco previously reported his knowledge of that plot and later testified about it in the Gigante competency hearing and trial, and would have no motive to admit to having a role in the conspiracy to murder Gotti if he had no such role.

ZA00073

in which Casso breached his cooperation agreement.  (The letter
is attached to Casso's motion as Exhibit E.)  Those included: (a)
Casso's bribing prison guards so that they would permit him to
smuggle contraband into PCUs; (b) Casso's brutal attack and
assault of a witness in a PCU who had provided information about
Casso's post-cooperation agreement criminal conduct, including
his bribing prison guards and smuggling contraband into a PCU;
and (c) Casso's lies to law enforcement in statements made in
consultation with legal counsel, including his fabrication of
derogatory information about government witnesses D'Arco and
Gravano.  Specifically, once he realized that, unlike Gravano and
D'Arco, he would not be called as a government witness in the
Gigante case, Casso directed his attorney to send the August 1
Letter to our Office and the FBI when he then and there knew full
well and believed that his allegations were false.  For example,
one such allegation was that the day after Reverend Al Sharpton
was stabbed during a parade he led, in a Brooklyn schoolyard,
Gravano told Casso that he ordered the stabbing.  Since the time
that our Office notified Casso that he was in breach for
directing Mr. Brief to send our Office the August 1 Letter
containing lies Casso made up about Gravano and D'Arco, at least
one newspaper article noted that Gravano was in jail at the time
that Casso claimed he had a conversation with him in a
schoolyard.  Following the publication of that article, Casso
filed an affidavit in support of his current motion.  In that
affidavit, Casso claims that he was "mistaken" about Gravano

EA00080

having admitted any involvement in the stabbing of Rev. Sharpton. (Casso Aff. at footnote 7).

40. On or about August 29, 1997, in response to Casso's and Mr. Brief's requests that Casso be housed closer to the Eastern District of New York, Casso was moved from one prison to a prison that is closer to the Eastern District of New York.

41. According to BOP records, on October 9, 1997, Casso was removed from the Program.

Dated: Brooklyn, New York
       December 16, 1997

George A. Stamboulidis
Assistant U.S. Attorney

Sworn to before me this
17th day of December, 1997

Notary Public

GREGORY A. LONG
Notary Public, State of New York
Qualified in Kings County
Commission Expires

**Exhibit I**

04/03/99 02:00:36    ·    ->    00000000000    Page 001    38

**U.S. Department of Justice**
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland  20815-7201

**NOTICE OF ACTION ON APPEAL**

Name:  Furnari, Christopher

Register Number: 19815-054    Institution: Allenwood FCI

The National Appeals Board examined the appeal of the above named and ordered the following:

Affirmation of the previous decision.

**REASONS:**

In response to your claim that the decision was based on erroneous information, the evidence you have presented does not persuade the Commission that the information it has relied upon is inaccurate.  Your request for a de novo hearing is denied.

All decisions by the National Appeals Board on appeal are final.

Date:  April 2, 1999    National  Appeals  Board    Clerk: pgn

**Exhibit J**

 

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

LEGAL
U.S. PAROLE COMMISSION

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 25, 2000

<u>By</u> <u>Federal</u> <u>Express</u>
Sharon Gervasoni
United States Parole Commission
One North Park Building
5550 Friendship Boulevard
Chevy Chase, Maryland 20815

Re: <u>Christopher Furnari Reg. No. 19815-054</u>

Dear Ms. Gervasoni:

The Government respectfully submits this letter in connection with the Commission's upcoming consideration of Furnari's parole. In submissions to the Commission dated August 1, 1996 and December 11, 1996, and in my appearance at a December 3, 1996 hearing at FCI Allenwood, I expressed this Office's strenuous opposition to Furnari's early release. Because of a recent decision from the United States Court of Appeals for the Third Circuit, <u>Furnari</u> v. <u>Warden</u>, 218 F.3d 250 (July 12, 2000), Furnari is back before the Commission for reconsideration. As set forth in more detail below, we continue to oppose Furnari's release, because of his violent past, the danger he will likely pose to the community upon his release, and the likelihood of his return to a position of power in the Luchese Family.

<u>Procedural History</u>

After the 1996 proceedings, the Commission consigned Furnari to offense Category Eight and denied him reconsideration until 2011. This action was based, at least in part, upon the Government's submissions, in which I cited several acts of violence in which Furnari either directly participated, or for which he was ultimately responsible as a ruling member of the Luchese Organized Crime Family of La Cosa Nostra. The information concerning those acts of violence came from several cooperating witnesses, including Anthony Casso, who was a protege of Furnari, and who rose to the rank of Consigliere and Underboss

Sharon Gervasoni
September 25, 2000

of the Luchese Family.

As reported in <u>Furnari</u>, 218 F.3d at 250, Furnari later sought review of the Commission's decision in a habeas corpus petition filed in the United States District Court for the Middle District of Pennsylvania.  Furnari's principal argument in support of his petition was that Casso was unreliable.  While the petition was pending, Furnari had a statutory interim hearing before the Commission .  <u>Id</u>.  In support of his habeas corpus petition, and at the interim hearing, Furnari submitted a copy of a Government affidavit that had been filed in an unrelated case in the Eastern District of New York (the "EDNY Affidavit").[1]  The affiant, AUSA George Stamboulidis of the Eastern District of New York, explained that Casso had breached his cooperation agreement by, among other things, committing crimes while incarcerated and lying about certain matters.  Nonetheless, both the Commission and the judge presiding over Furnari's habeas corpus petition denied Furnari any relief.  The Third Circuit reversed principally because the Commission had failed to articulate its basis for denying Furnari parole, particularly in the face of the "new evidence" contained in the EDNY Affidavit.  Id. at 256-57.  Notwithstanding the EDNY Affidavit, we believe that there is more than ample evidence to support the denial of Furnari's parole.

<u>The EDNY Affidavit and the Government's Reliance on Casso</u>

Absent a clear understanding of the record, it may appear from the <u>Furnari</u> decision that this Office and the United States Attorney's Office in Brooklyn ("USAO EDNY") took conflicting positions concerning Casso and his reliability.  That simply is not the case.  Indeed, despite the representations in the EDNY affidavit, which we have no reason to contest, we believe that the information presented in our 1996 submissions is credible and reliable.  Moreover, prior to its submission to the Commission, my August 1, 1996 letter in which I set forth Casso's allegations was vetted by the EDNY USAO.  When the EDNY determined in late 1997 that Casso had breached his cooperation agreement, and thus terminated its relationship with him, I again spoke to the EDNY USAO and was informed that the information concerning Furnari was not a basis for Casso's termination, and that much of Casso's historical information was believed to be

---

[1]  A copy of the EDNY Affidavit is attached for your convenience as Exhibit A.

Sharon Gervasoni
September 25, 2000

credible, particularly because it had been corroborated in large
measure by other sources.  Consequently, no action was taken
concerning our previous submissions to the Parole Commission
concerning Furnari.

The EDNY Affidavit was submitted to the court in
Casso's own case and sets forth the sequence of events that led
from the initiation of his cooperation to the termination of his
agreement with the Government.  As set forth in the affidavit,
Casso's cooperation agreement was terminated because (1) Casso
withheld certain information, none of which was related to
Furnari or Casso's own prior racketeering activity, (2) he
committed various crimes while in jail, and (3) he attempted to
falsely impeach other Government witnesses.  The bases for these
conclusions are summarized below.

First, in 1994, during the initial debriefings of Casso
that followed the execution of his cooperation agreement, the
EDNY USAO believed that Casso was being less than candid
concerning his earlier plots following his arrest to kill a judge
and an AUSA, and to escape from jail.  EDNY Aff. at ¶ 6.  Indeed,
the results of a polygraph examination indicated that Casso was
deceptive on these issues.  Id. at ¶ 7.  Despite these concerns,
as of September 1996, the EDNY still considered Casso to be a
prospective witness in various matters, including the prosecution
of Vincent "Chin" Gigante, the boss of the Genovese LCN Family.
Id. at ¶¶ 21-22.  Among the reasons the EDNY had for its
continued confidence in Casso was the fact that, as for
historical information concerning the racketeering activities of
the LCN, Casso was corroborated in many respects by other
witnesses, including former Luchese hierarchy members Peter
Chiodo and Alfonso D'Arco.  Id. at ¶¶ 22-23.  As you may recall,
both Chiodo and D'Arco were relied upon, in addition to Casso, in
our 1996 submissions concerning Furnari.  Thus, by August and
December 1996, when we submitted our letters to the Commission,
Casso was still considered to be a credible and viable witness
for organized crime prosecutions.  Accordingly, my representation
to the Commission at the December 3, 1996 hearing in this regard
was completely accurate.

It was not until several months later, in April 1997,
after the Parole Commission had rendered its decision denying
Furnari parole, that Casso's relationship with the Government
began to deteriorate markedly.  At that time, Casso admitted to
EDNY prosecutors that he had assaulted a fellow inmate,

3

Sharon Gervasoni
September 25, 2000

instigated another assault of that inmate, and later lied about it to prison officials.  In addition, Casso admitted that, with the help of prison employees he had bribed, Casso had smuggled various contraband into the protective custody units where he was housed.[2]  Id. at ¶¶ 25-28.  The EDNY prosecutors had these disclosures under review for several months thereafter, and had not made any decision that would affect Casso's availability as a witness until at least August 1997.  Id. ¶ 34.

However, in a letter from Casso's counsel dated August 1, 1997, Casso alleged that D'Arco and Salvatore Gravano -- a former Gambino LCN member who had cooperated with the Government - had given false testimony in the Gigante prosecution.[3]  Casso's allegations were discounted by the EDNY USAO for several reasons. For instance, both D'Arco and Gravano had given the same or similar testimony in other proceedings prior to the Gigante competency hearing and "repeatedly withstood the crucible of cross-examination by teams of very skillful attorneys."  Id. at ¶ 35.  In addition, some of Casso's allegations against Gravano were patently false, and Casso later backed away from them.  See id. ¶¶ 35-37, 39.  Moreover, Casso's allegations appeared to be motivated by his realization that he would not be called to testify in the Gigante case, and thus would lose an opportunity to have his sentence reduced as a reward for his cooperation. Id. at ¶ 39.

_____

[2]  In approximately February 1997, this Office arrested and prosecuted a corrupt Bureau of Prisons employee who was smuggling contraband into a protective custody unit at FCI-Otisville for two inmates.  During the course of the investigation that continued after those arrests, somewhat sketchy information surfaced that inmates other than the defendants, including Casso, had engaged in similar conduct with the same BOP employee.  Not long after this revelation, Casso disclosed this conduct to the EDNY prosecutors. The results of our investigation did not undermine our faith in Casso's historical information since it had been extensively corroborated by other Government witnesses and independent investigative means.

[3]  By late 1997, both D'Arco and Gravano had testified in Gigante's hotly contested competency hearing.  After he was found competent, Gigante went to trial, after which he was convicted of racketeering and sentenced to twelve years in prison.

4

Sharon Gervasoni
September 25, 2000

On September 5, 1997, after reviewing Casso's false allegations, as well as his April 1997 disclosures concerning his criminal activities in jail, the EDNY determined that Casso had violated the provisions of his cooperation agreement that precluded Casso from, among other things, "providing false, misleading or incomplete information," and from "committ[ing] or attempt[ing] to commit any further crimes." Id. at ¶¶ 4, 35. Among the bases cited by the EDNY for this conclusion were Casso's bribery of prison employees, assault of another inmate who had provided information about Casso's criminal activities while in jail, and Casso's false allegations about Gravano and D'Arco. Id. ¶ 35. Thus, the affidavit clearly suggests that the EDNY's decision to terminate its relationship with Casso was based on Casso's activities after he had cooperated and not because his information on his own and others' racketeering activities was deemed to be incredible. Indeed, this fact was confirmed for me by the EDNY in late 1997, after the EDNY Affidavit was submitted to the court.

## The Information Concerning Furnari

In any event, as set forth in our August 1 and December 11, 1996 letters to the Parole Commission, there is ample evidence of Furnari's violent past, and likely violent future if released, that warrants a rejection of his parole application.[4] Indeed, much of this information stands whether Casso is credited or not.

In the August 1, 1996 letter, we presented information concerning Furnari's direct role in the murder of Lee Schleifer, the conspiracy to murder Richard Taglianetti, the attempted murder of Joseph Abinanti, a conspiracy to murder Frank Decicco and others, an assault of James Wolford, and a conspiracy to assault or murder Joseph Martinelli. I will not repeat those allegations here, but only emphasize the corroboration for several of these incidents.

1. Lee Schleifer homicide: The information provided by Casso, that Furnari ordered the execution of Schleifer in 1975, was independently corroborated by Thomas "Tommy Irish" Carew. Carew was a Luchese Family associate for many years, has pleaded

---

[4]   Copies of my August 1 and December 11, 1996 letters are attached as Exhibits B and C, respectively.

Sharon Gervasoni
September 25, 2000

guilty to various racketeering offenses, and has testified
pursuant to the terms of his cooperation agreement with the
Eastern District of New York.  In fact, Carew reported that,
while Casso lured Schleifer to a Brooklyn social club and then
murdered him, both Carew and Furnari waited together at a nearby
restaurant until the murder was committed.  According to Carew,
he and Furnari met Casso at the social club after the murder, and
Schleifer's body was removed and then dumped on a Brooklyn
Street. This murder was committed while Furnari was Casso's capo,
and, according to LCN protocol, Casso could not commit the murder
without Furnari's approval.

     2.  <u>Conspiracy to Murder Richard Taglianetti</u>: Carew
also corroborated Casso's account of Furnari issuing a contract
to murder Richard Taglianetti.  As set forth in the August 1,
1996 letter, various steps were taken by Casso and others to
carry out Furnari's contract, but Taglianetti was not located and
murdered until 1992 by Luchese Family member George Conte.
Furnari's role, and the reason he ordered the murder (to avenge
Taglianetti's role in the murder of the son of Luchese member
Angelo Defendis) has been corroborated by other Government
witnesses and former Luchese Family members D'Arco and Frank
Gioia, Jr., both of whom have testified for the Government on
numerous occasions.  In addition, the fact that the contract was
reportedly issued in the early 1980's when Furnari was a member
of the Luchese Family Hierarchy gives more reason to credit the
accounts of these witnesses.

     3.  <u>Assault of James Wolford</u>: Former Luchese member
Peter Chiodo also corroborates Casso's report of Furnari's order
to give a "beating" to Wolford, who was a Board member of the
International Painter's Union and was interfering with Furnari's
extortionate control of the union.  Chiodo and Carew carried out
the order.  In addition to Chiodo, however, another cooperator,
Corrado "Dino" Marino, has confirmed Chiodo's account and
Furnari's role in the assault.  Marino was a Luchese Family
associate who pleaded guilty to racketeering in the EDNY and has
testified pursuant to a cooperation agreement with the EDNY USAO.
In particular, Marino has stated that he had been approached by
union officials who complained about Wolford.  Marino then passed
the complaint on to Furnari, and shortly thereafter Chiodo
reported to Marino that Furnari had ordered the beating.

     4.  <u>Conspiracy to Assault Joseph Martinelli</u>: As set
forth in our August 1, 1996 letter, information concerning

Sharon Gervasoni
September 25, 2000

Furnari's role in the conspiracy to assault Joseph Martinelli was
provided by Chiodo, and corroborated in substantial detail by
Carew, D'Arco, and Casso.

In addition, and as set forth in more detail in our
December 11, 1996 letter to the Commission, Furnari led a crew of
Luchese Family members and associates that  -- between the 1970's
and mid-1980's when Furnari was incarcerated -- was responsible
for thirteen murders and an attempted murder (including that of
Schleifer).  As we reported, several cooperators, including
D'Arco, have stated that such murders would not be committed
without the knowledge or approval, tacit or express, of the
crew's capo (i.e., Furnari).  Moreover, from D'Arco and other
sources, we believe that, immediately prior to his conviction,
Furnari and the other members of the Luchese Family hierarchy
orchestrated the rise of Casso and Amuso to replace them.  In the
wake of these promotions, the hierarchy that included Furnari
also agreed to have Anthony Luongo murdered.  Luongo had been
vying to replace Furnari's codefendant Anthony Corallo as boss of
the Luchese Family instead of Amuso.  It was believed that
murdering Luongo would eliminate any division in the Family that
might result from the appointment of the new administration.

<u>Furnari's Potential to Return to the Luchese Family</u>

As we indicated in our August 1, 1996 letter, we have
learned from several confidential sources that Furnari is a
revered and almost mythical figure in the Luchese Family, who
would be received by them with open arms.  The disarray of that
Family has continued since 1996, with members of the present
Luchese Family hierarchy being either convicted of or indicted on
state and federal racketeering charges.  Thus, the Luchese Family
is starving for the type of strong and trusted leadership that
was the hallmark of Furnari's legendary role in the Family.  We
continue to believe that, should Furnari be prematurely released
on parole, he will return to the fold, and resume his
racketeering activities at the expense of many innocent victims.

<u>Conclusion</u>

There is no reason to conclude that, although Casso
breached his cooperation agreement and is no longer cooperating
with the Government, his information concerning Furnari should
not be accepted.  First, the circumstances that led to his
termination did not touch upon the historical information he had

7

Sharon Gervasoni
September 25, 2000

provided.  And as set forth above, much of Casso's information
about Furnari has been corroborated in substantial measure by
other credible witnesses.  Indeed, even without Casso's
information, there is compelling information concerning Furnari's
role in two murders and two assaults.  Moreover, from cooperators
other than Casso, we believe that, as a capo and consigliere,
Furnari was at least indirectly responsible for at least eleven
murders.  Finally, Furnari has the capacity to fill an important
void in the Luchese Family should he be released.  If past
behavior provides any basis to predict future dangerousness,
Furnari certainly poses a grave danger to society and should be
forced to serve the remainder of his sentence.

                            Very truly yours,

                            MARY JO WHITE
                            United States Attorney

                            By: _____
                                DAVID N. KELLEY
                                Chief, Organized Crime and
                                  Terrorism
                                Tel.: (212) 637-1025

**Exhibit K**

JAN-19-2001 FRI 01:22 PM DAVID BREITBART          FAX NO. 126192767          P. 03/04

12/29/88 21:27:81          PAROLE->          88888888888 R   :FAX          Page 881

United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland  20815-7201

Name: FURNARI, Christopher

Register Number: 19815-054          Institution:  Allenwood FCI

In the case of the above-named, the following parole action was ordered:

Continue to 15-Year Reconsideration  hearing (December 2011).

**REASONS**:

Your offense behavior has been rated as Category Eight severity because it involved murder and conspiracy to murder and multiple separate acts of extortion through racketeering offenses. Your salient factor score (SFS-98) is 8. You have been in federal confinement as a result of your behavior for a total of 169 months as of December 8, 2000. Guidelines established by the Commission indicate a range of 100 + months to be served before release for cases with good institutional adjustment and program achievement. After review of all relevant factors and information presented, a decision exceeding the lower limit of the applicable guideline category by more than 48 months is warranted based on the following pertinent aggravating factors. You were involved in the hierarchy, first as a Capo and later as a Consigliere of a major organized crime organization and were involved either directly in the planning or approval of murder and/or attempted murder. Further, the murder of Lee Schleifer was of a prospective informant/witness and the conspiracy to murder/murder of Richard Taglianetti was a contract murder. The Commission has determined that there is sufficient corroboration of information provided by Casso to rely upon the information supplied by Casso notwithstanding the affidavit from AUSA Stamboulidis of the Eastern District of New York.

As required by law, you have also been scheduled for a statutory interim hearing during December 2002.

The above decision is appealable to the National Appeals Board under 28 C.F.R. 2.26. You may obtain appeal forms from your caseworker or U.S. Probation Officer and they must be filed with the Commission within thirty days of the date of this Notice.

See the attached sheet for your individual item points and explanation for the Salient Factor Score.

cc:          U.S. Probation  Office
             Southern  District  of New York
             500 Pearl Street
             Sixth  Floor
             New York, NY  10007-1312

Date: December  27, 2000          Clerk:  vah

**Exhibit L**

U.S. Department of Justice                           NOTICE OF ACTION ON APPEAL
United States Parole Commission
5550 Friendship Boulevard

Name:  Furnari, Christopher

Register Number: 19815-094              Institution:  Allenwood FCI

The National Appeals Board examined the appeal of the above named and ordered the following:

Affirmation of the previous decision.

<u>REASONS</u>:

The Commission has reviewed your appeal and relevant documents from the case file, including the
Stamboulidis affidavit, the transcript of Thomas Carew's testimony in the Pagliarulo case, AUSA
Kelley's letter of September 25, 2000, and Mr. Breitbart's letter of December 6, 2000. This review
does not lead the Commission to conclude that a change in the previous offense severity rating or
decision is necessary or appropriate.

The Stamboulidis affidavit raises doubt about the credibility of Anthony Casso, who has linked you
to murders/attempted murder. The Commission has reviewed the affidavit and the other available
information and concluded that Casso's information about your involvement in these crimes is
accurate. The reasoning is as follows.

You were the leader of a crew in the Lucchese crime family when the crimes were committed. Casso
was a member of your crew. It is unlikely that you would be unaware of any murders or plots to
murder others in order to fulfill the aims of the criminal enterprise given the structure and discipline
of the crime family. Even if only the "boss" of a crime family can order or approve a murder, this
does not mean that crew leaders are unaware of the ordered murder, especially since crew members,
based on orders presumably passed through the crew leaders, carry out the murders. In addition,
there appears to be no restriction on crew leaders initiating requests for a murder. The request
simply must be approved by the family boss.

In order to accept your claim that you had no knowledge of the murders/attempted murder, the
Commission would have to conclude that your crew was a renegade unit which committed crimes for
reasons unrelated to the enterprise. This conclusion is not warranted because the motives for the
murders/attempted murder committed by your crew were related to the aims/purposes of the
enterprise, for example to silence a suspected cooperating individual or punish the wrongdoing of a
member or associate. Casso's information simply corroborates an inference that is reasonably made
given your leadership role in the crew and Casso's membership in the crew, <u>i.e.</u>, that you at the very
least knew about, and more likely directed, the murderous activities of members of your crew. You
are clearly responsible for the murders/attempted murder under a theory of vicarious criminal
liability, and moreover, the information presented shows that you personally solicited or ordered
some of the crimes.

Date: April 24, 2001                                      Clerk: pgn

AUSA Kelley's assurance in his September 25, 2000 letter as to Casso's credibility regarding your responsibility for the crimes, despite the Stamboulidis affidavit, may be reasonably credited. The AUSA checked with the U.S. Attorney's Office in the Eastern District of New York and was informed that while Casso's denials of recent allegation of crimes committed by him and attempts to impeach other witnesses' credibility were unreliable, that office believed that historical information provided by Casso on your activities was still credible. This is consistent with the Stamboulis affidavit itself (para. 22) in which the affiant attests to the value of Casso's information on the past organized crime activities of Vincent Gigante, while at the same time noting the unreliability of Casso's statements concerning more recent events. It is not unreasonable to find that Casso may not be worthy of belief when it came to his denials of his own recent serious crimes which could (and did) lead to his removal as a protected federal witness, and still conclude that he had given reliable information on past activities of organized crime. AUSA Kelley has corrected the record in the past when your attorney challenged the accuracy of adverse information in your presentence report. Therefore, there is no reason to suspect that the AUSA would ignore his duty to provide accurate information to the Commission or seek a parole denial in reckless disregard of the truth.

The AUSA has asserted that Casso's information is corroborated by other sources, including Tommy Carew. The excerpt of Carew's testimony in the Pagliarulo case does corroborate certain significant information provided by Casso, information which shows that you employed violence to advance the interests of or to protect the Lucchese crime family. For example, Carew testified that you ordered Carew and others to assault James Wolford in order to clear the way for Jimmy Bishop, a painters union official friendly to the Lucchese family, to exercise more control over the union. Even if the allegations of Carew and others did not result in a conviction for the assault under the reasonable doubt standard of proof, the Commission finds that the information is reliable and that, using the preponderance of the evidence standard, that it is likely you gave the order to assault Wolford.

Carew also states in his testimony that he was given the assignment of meeting Anthony Casso at a club and helping him with "something". The task turned out to be assisting Casso in the disposal of the body of a man who had been shot and killed. The circumstances described therein indicate that the body was that of Lee Schleifer. In his testimony Carew does not identify you as being present at the club after the murder was committed and Schleifer's body was still present. As your attorney points out, this omission is inconsistent with the representation made by AUSA Kelley. However, Carew's testimony indicates that someone other than Casso gave him an assignment to help Casso. Given that you were the person who introduced Carew to the crime family and your crew, that Carew was your driver/bodyguard at the time of this crime, your leadership role in the crew, and Carew's testimony about other "assignments" made by you, it is more likely than not that you were the person who told Carew to help Casso.

Carew also testified that you gave him the assignment of murdering Joseph Abinanti, the son of a Lucchese member. While this particular contract was recalled, Abinanti was later shot and wounded, according to Casso, by Casso and Vic Amuso at your direction. If you issued a murder contract for Carew to kill Abinanti, there is good reason to credit Casso's information that you also issued such a contract to Casso and Amuso.

Carew testified that he stored multiple handguns for the Lucchese crime family. This information

Date: April 24, 2001                                          Clerk: pgn

supports the inference that Lucchese family crews, including yours, employed violence to promote the goals of the criminal organization.   Therefore, it also indirectly supports the credibility of Casso's statements  linking you, a member and leader in the crime family, to murders and attempted  murder.

In sum, you have not demonstrated   that the information   from AUSA Kelley alleging  your responsibility  for murders and murder plots is unreliable  and should not be used to deny you parole. Any one of these crimes (the Schleifer, DeCicco, and Taglianetti  murders and the attempt  to murder Abinanti)  would result  in a parole denial under the policy at 28 C.F.R. §2.20, Offense Behavior Severity Index, Notes to Category Eight offenses.

All decisions  by the National  Appeals  Board on appeal  are final.



Date: April 24, 2001                                                    Clerk: pgn

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

CHRISTOPHER FURNARI,               :

       Petitioner,               :          **CIVIL ACTION**
                                                **NO. 4:02-CV-555**
    v.                             :
                                                (Judge Muir)
UNITED STATES PAROLE COMMISSION :
and WARDEN, Federal Correctional
Institution - Allenwood, Pa.,     :

       Respondent.               :

### CERTIFICATE OF SERVICE

    On April 23, 2002, I served a copy of the foregoing Submission of Exhibits on the attorney for the respondents, by overnight delivery, postage prepaid, addressed to:

Kate Mershimer, Esq.
Assistant U.S. Attorney
Federal Building, suite 1162
228 Walnut Street
Harrisburg, PA  17108-1754