UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

CHRISTOPHER FURNARI,              :
          Petitioner             :
                                 :
     v.                          :  Civil No. 4:CV-02-0555
                                 :  (Muir, J.)          **FILED**
UNITED STATES PAROLE COMMISSION  :                   WILLIAMSPORT, PA
and WARDEN, Federal Correctional :
Institution - Allenwood, PA.,    :                   MAY 3 0 2002
          Respondents            :
                                    MARY E. D'ANDREA, CLERK
                                    Per_____
                                              DEPUTY CLERK

RESPONDENTS' RESPONSE TO
THE PETITION FOR WRIT OF HABEAS CORPUS


                         THOMAS A. MARINO
                         United States Attorney

                         KATE L. MERSHIMER
                         Assistant U.S. Attorney
                         MICHELE E. LINCALIS
                         Paralegal Specialist
                         217 Federal Building
                         228 Walnut Street
                         Harrisburg, PA 17108
                         717/221-4482


OF COUNSEL:

MICHAEL A. STOVER, General Counsel
SHARON GERVASONI, Attorney
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, MD 20815


Dated: May 30, 2002

# Table of Contents

Introduction ............................................... 1

Statement of Facts .......................................... 1

Questions Presented ......................................... 14

Argument .................................................... 15

    I.    THE COMMISSION DID NOT VIOLATE THE LAW OF THE CASE,
            ITS STATUTE OR REGULATIONS, NOR DUE PROCESS IN
            CREDITING CASSO'S STATEMENTS REGARDING FURNARI'S
            CULPABILITY FOR MURDER AND ATTEMPTED MURDER.

          A.    The Law of the Case Was Not as Furnari
                Represents and Does Not Prevent the
                Parole Commission from Considering
                Casso's Statements .......................... 15

          B.    The Notice of Action Reasons Adequately
                Explain the USPC's Reasons for Crediting
                Information Provided by Casso,
                Notwithstanding the Stamboulidis
                Affidavit ................................... 17

          C.    The Parole Commission Has Fully Complied With
                Due Process ................................. 23

    II.   THE COMMISSION'S RELIANCE ON ITS POLICY REGARDING
            DENIAL OF PAROLE WHEN THE OFFENSE BEHAVIOR IS A
            CONTRACT MURDER OR MURDER IN FURTHERANCE OF A
            CRIMINAL ENTERPRISE DOES NOT VIOLATE THE EX POST
            FACTO CLAUSE.

          A.    The Parole Guidelines, Including §2.20,
                Are Not "Laws" for Purposes of the Ex
                Post Facto Clause .......................... 24

          B.    28 C.F.R. §2.20 Does Not Change the
                Punishment Annexed to the Crime When
                Committed ................................... 32

i

III.  THE  PROCEDURES  MANUAL  PROVISION  RELIED  ON  BY
      FURNARI  FOR  THE  PROPOSITION  THAT  THE  PAROLE
      COMMISSION CONSIDERED UNRELIABLE INFORMATION IS NOT
      A REGULATION AND CREATES NO RIGHTS IN
      LITIGANTS  ........................................ 34

IV.   THE PAROLE COMMISSION DID NOT VIOLATE FURNARI'S DUE
      PROCESS RIGHTS, NOR ITS STATUTE OR REGULATIONS, IN
      CONSIDERING HIS OFFENSE BEHAVIOR TO INCLUDE CONDUCT
      FOR WHICH HE WAS NOT CONVICTED  .................... 36

Conclusion  ................................................ 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

Adams v. Keller,
    736 F.2d 320 (6th Cir. 1984) ........................... 33

Arias v. U.S. Parole Commission,
    648 F.2d 196 (3rd Cir. 1981) .......................... 37

Artez v. Mulcrone,
    673 F.2d 1169 (10th Cir. 1982) ....................... 24

Benedict v. United States Parole Committee,
    569 F. Supp. 438 (E.D. Mich. 1983) ................... 35

Billiteri v. U.S. Board of Parole,
    541 F.2d 938 (2nd Cir. 1976) .......................... 22

Bower v. U.S. Parole Commission,
    805 F.2d 885 (9th Cir. 1986) .......................... 38

Brest v. Ciccone,
    371 F.2d 981 (8th Cir. 1967) .......................... 22

California Department of Corrections v. Morales,
    514 U.S. 499 (1995) ................................... 25

Caporale v. Gasele,
    940 F.2d 305 (8th Cir. 1991) .......................... 34

Coleman v. Perrill,
    845 F.2d 876 (9th Cir. 1988) .......................... 34

Collins v. Youngblood,
    497 U.S. 37 (1990) ............................... 24, 25

Dufresne v. Baer,
    744 F.2d 1543 (11th Cir. 1984) ....................... 27

U.S. ex rel Forman v. McCall,
    776 F.2d 1156 (3d Cir. 1985) ..................... 27, 28

U.S. ex rel. Goldberg v. Warden,
    622 F.2d 60 (3rd Cir. 1980) ........................... 37

Fiumara v. O'Brien,
    889 F.2d 254 (10th Cir. 1989) .................... 22, 37

iii

<u>Furnari v. Warden</u>,
   218 F.3d 250 (3rd Cir. 2000) .... 8, 9, 15, 16, 17, 20, 23

<u>Garner v. Jones</u>,
   529 U.S. 244 (2000) ......................... 29, 30, 31

<u>Greenholtz v. Inmates of the Nebraska Penal
and Correctional Complex</u>,
   442 U.S. 1 (1979) ................................ 23

<u>Hackett v. U.S. Parole Commission</u>,
   851 F.2d 127 (6th Cir. 1987) ............... 22, 33, 37

<u>Harris v. Martin</u>,
   792 F.2d 52 (3d Cir. 1986) ..................... 35, 36

<u>Hayward v. United States Parole Commission</u>,
   659 F.2d 857 (8th Cir. 1981) ...................... 27

<u>Kele v. Carlson</u>,
   775 F.2d 243 (8th Cir. 1985) ...................... 33

<u>Kring v. Missouri</u>,
   107 U.S. 221 (1883) ............................... 25

<u>Lynch v. United States Parole Committee</u>,
   768 F.2d 491 (2nd Cir. 1985) ...................... 35

<u>Maddox v. U.S. Parole Commission</u>,
   821 F.2d 997 (5th Cir. 1987) ................... 22, 37

<u>Madonna v. U.S. Parole Commission</u>,
   900 F.2d 24 (3rd Cir. 1990) .................... 32, 36

<u>Melvin v. Petrovsky</u>,
   720 F.2d 9 (8th Cir. 1983) ........................ 38

<u>Northeast Regional Parole Commission v. DiNapoli</u>,
   764 F.2d 143 (2nd Cir. 1985) ...................... 26

<u>Ostrer v. Luther</u>,
   668 F. Supp. 724 (D. Conn. 1987) ................. 35

<u>Portley v. Grossman</u>,
   444 U.S. 1311 (1980) .............................. 27

<u>Prater v. United States Parole Committee</u>,
   802 F.2d 948 (7th Cir. 1986) ...................... 26

<u>Priore v. Nelson</u>,
   626 F.2d 211 (2nd Cir. 1980) ...................... 27

<u>Resnick v. U.S. Parole Commission</u>,
    835 F.2d 1297 (10th Cir. 1987) ........................ 27

<u>Richardson v. Crawford</u>,
    437 F. Supp. 453 (D. Conn. 1977) ..................... 29

<u>Richardson v. United States Parole Commission</u>,
    729 F.2d 1154 (8th Cir. 1984) ........................ 27

<u>Ruip v. United States</u>,
    555 F.2d 1331 (6th Cir. 1977) ........................ 27

<u>Sheary v. U.S. Parole Commission</u>,
    822 F.2d 556 (5th Cir. 1987) ......................... 27

<u>Shepard v. Taylor</u>,
    556 F.2d 648 (2nd Cir. 1977) ..................... 27, 30

<u>Solomon v. Elsea</u>,
    676 F.2d 282 (7th Cir. 1982) ......................... 22

<u>Stroud v. United States Parole Commission</u>,
    668 F.2d 843 (5th Cir. 1982) ......................... 27

<u>Sullivan v. United States</u>,
    340 U.S. 170 (1954) .................................. 34

<u>Tobon v. Martin</u>,
    809 F.2d 1544 (11th Cir. 1987) ....................... 37

<u>United States v. Salerno</u>,
    868 F.2d 524 (2nd Cir. 1989) .......................... 1

<u>Wallace v. Christensen</u>,
    802 F.2d 1539 (9th Cir. 1986) ................. 27, 30, 31

<u>Warren v. United States Parole Commission</u>,
    659 F.2d 183 (D.C. Cir. 1981) ........................ 27

<u>Weaver v. Graham</u>,
    450 U.S. 24 (1981) ................................... 25

<u>Yamamoto v. United States Parole Committee</u>,
    794 F.2d 1295 (8th Cir. 1986) ........................ 26

<u>Zeidman v. United States Parole Commission</u>,
    593 F.2d 806 (7th Cir. 1979) ......................... 27

**DOCKETED CASES**

Furnari  v. Warden,
     No. 4:CV-98-0222 (M.D. Pa., Apr. 12, 1999) ............. 7

**FEDERAL STATUTES**

18 U.S.C. §4206(a) ....................................... 5

18 U.S.C. §4206(b) ................................... 16, 23

18 U.S.C. §4206(c) ...................................... 32

18 U.S.C. §4207 ...................................... 35, 37

18 U.S.C. §4208(h)(2) .................................... 7

28 U.S.C. § 2241 ......................................... 1

**FEDERAL REGULATIONS**

28 C.F.R. §2.13 ......................................... 16

28 C.F.R. §2.14 ......................................... 16

28 C.F.R. §2.19(c) ................................ 18, 21, 35

28 C.F.R. §2.20 ..................... 5, 14, 21, 24, 27-33, 36

## Introduction

On April 4, 2002, petitioner, Christopher Furnari, an inmate at the Allenwood Federal Correctional Institution, White Deer, Pennsylvania, filed, through counsel, a petition for writ of habeas pursuant to 28 U.S.C. § 2241. On April 15, 2002, this Court issued a rule to show cause directing respondents to address the allegations of the petition within twenty days. After having been granted an extension of time, the United States Parole Commission ("Parole Commission" or "USPC") files the following response.

## Statement of Facts

Furnari is serving a **100 year** sentence for racketeering, extortion, and racketeering conspiracy, imposed by the U.S. District Court for the Southern District of New York on January 13, 1987. According to the presentence investigation report ("PSI") and the Second Circuit's discussion of Furnari's direct appeal, Furnari was the "consigliere" (counselor) of the Lucchese crime family, a position identified as "practically the equivalent of the underboss". United States v. Salerno, 868 F.2d 524, 543 (2nd Cir. 1989); (PSI, Letter from AUSA Kelley, at 2.)[1] Furnari's conviction grew out of his participation in "the Commission", a national ruling body of La Cosa Nostra (Mafia) in the United States, the activities which included the extortion and other racketeering acts that underlaid his conviction. (Id.; PSI, "The Enterprise," at 4).

---

[1] Furnari's PSI and its attachments was filed under seal by his counsel.

At the time of Furnari's conviction, there were five La Cosa Nostra ("LCN") families in New York – Genovese, Gambino, Lucchese, Colombo and Bonanno – the activities which were coordinated by the LCN Commission.[2]    The PSI detailed evidence establishing the structure of LCN families: each was run by a "boss" with the assistance of two deputies known as an "underboss" and "consigliere"; beneath them were "capos" and associates who committed crimes and shared their criminal proceeds with the family leadership.  (PSI, "The Enterprise," at 4-5).

On August 1, 1996, AUSA David Kelley sent a letter to the Parole Commission informing it that Furnari had been a capo prior to becoming consigliere and had been involved in numerous violent acts during his membership in the Lucchese family.  (Exh. 2).[3] Specifically, Furnari had requested that Anthony "Gaspipe" Casso execute Lee Schleifer, who was suspected of cooperating with law enforcement.  According to the AUSA's letter, this information was provided to the government both by Casso and by Thomas "Tommy Irish" Carew (a Lucchese family associate).  (Exh. 2, at 2).

---

[2] For the sake of clarity, references to the LCN Commission will take the form "the Commission" and references to the U.S. Parole Commission will take the form "USPC" or "Parole Commission".

[3] In that Furnari's claims rest upon prior litigation concerning his parole, the USPC has retained the exhibit numbers used on documents submitted to the Court in the previous case in an attempt to avoid confusion.  The USPC submitted the PSI as Exhibit 1 in previous litigation; because Furnari submits it under seal in this case, the USPC has not re-submitted it as an exhibit.  The respondents' exhibits therefore commence with Exhibit 2.

Schleifer's body, which had suffered a gunshot wound, was found by New York City police on February 18, 1975.  (<u>Id</u>).

Kelley further reported that Casso and Carew had informed the government that Furnari issued a "contract" to Casso in the early 1980's to kill Richard Taglianetti, another Lucchese family associate.  (Although Casso and Vittorio Amuso took steps towards carrying out the contract, the intended victim "went on the lam" for several years and the contract was not carried out until Taglianetti resurfaced in Brooklyn in 1992, when he was killed by Lucchese family member George Conti).  (<u>Id</u>).

Kelley reported another murder contract issued by Furnari in the 1970's, to kill Joseph Abinanti, which he assigned to Casso and Amuso.  Amuso shot Abinanti but he survived the shooting and fled to California.  (<u>Id</u>).  Kelley's letter also reported that Alfonso D'Arco (former acting Lucchese family boss) had stated that virtually every murder contract carried out by Lucchese family members while Furnari was consigliere was sanctioned by Furnari. (<u>Id</u>).[4]

---

[4]    Furnari's counsel sent a letter to the USPC dated August 19, 1996, which urged the USPC not to rely on the information in Kelley's letter because it had been provided by Anthony Casso, who had not been "tested" by cross-examination in any criminal trial.  (Exh. 3).  Counsel requested that the USPC not consider Kelley's letter unless the FBI forms 302 regarding debriefings of witnesses were provided to him.  Furnari's counsel also sent a letter to Kelley asking for the FBI forms.  (Exh. 4). Kelley declined to release those forms to Furnari's counsel, noting that there was no legal basis for the request.    (Exh. 5). Furnari's counsel also submitted a letter to the USPC dated December 2, 1996, intended to supplement Furnari's presentation at

The U.S. Parole Commission conducted an initial parole hearing for Furnari on December 3, 1996. (Exh. 7, Initial Hearing Summary). At the hearing, Furnari's counsel attacked the credibility of Anthony Casso, arguing that: (1) his involvement in a vast number of murders made him not credible; (2) that D'Arco's statement that Furnari sanctioned murders while he was consigliere was not credible because D'Arco was in custody from 1983 to 1986 and would have known this only through hearsay; and (3) that to his knowledge there were no murders committed by the Lucchese family between 1983 and 1986.  (Exh. 7, at 1).

AUSA Kelley was present at the hearing and also made a statement.  He stated that D'Arco was, as Furnari's counsel conceded, an expert on the hierarchy and structure of organized crime, and that D'Arco had stated that murders done by Furnari's "crew" of soldiers when he was a capo would only have been done with Furnari's knowledge and approval.  Kelley stated that a number of murders were committed by the Lucchese family while Furnari was capo and consigliere.  The hearing examiner requested AUSA Kelley to submit further information regarding those murders to the USPC for consideration and afforded Furnari's counsel the opportunity to reply to Kelley's information.

Kelley sent the USPC a letter dated December 11, 1996, providing the information requested by the hearing examiner.  (Exh. 8).  Kelley detailed 14 murders committed by members of Furnari's

_____

his initial hearing.  (Exh. 6).

"crew" during the time he was capo and after he became consigliere.[5] Furnari's counsel responded with a letter dated December 18, 1996. (Exh. 9).

The hearing examiner reviewed the letters provided by Kelley and by Furnari's counsel fully before reaching his recommendation. He recommended that Furnari's offense be rated as Category Eight severity because of his involvement in murder. 28 C.F.R. §2.20, Chapter Two, Subchapter A, paragraph 201. Combined with his salient factor score of 8 points, this yielded a parole guideline range of 120+ months. 28 C.F.R. §2.20. The examiner recommended that Furnari be required to serve to a 15 year reconsideration hearing in December 2011, finding that release of Furnari on parole earlier would depreciate the seriousness of the offense and promote disrespect for the criminal justice system. See 18 U.S.C. §4206(a).

The Regional Commissioner adopted this recommendation and Furnari was informed of it by notice of action dated January 8,

---

[5] At least five of these murders occurred after Furnari was consigliere (Vincent Albano, 7/85; Frank DeCicco, 4/86; Nicholas Guido, 12/86; James Hydel, 12/86; Anthony Luongo, 11/86, Vincent Craparotta, 6/84). Kelley further stated that D'Arco and at least two other sources from the Lucchese family had reported that immediately prior to Furnari's conviction in the instant case, he met with other members of the Lucchese family hierarchy to select successors in the event of conviction and imprisonment. They selected Amuso as boss, Mariano Macaluso to replace Furnari, and elevated Casso to capo. They also decided that Anthony Luongo, who had been vying for the position of boss, would pose a threat to the new administration and must be killed. Casso and Amuso were instructed to murder Luongo, who was in fact killed by them. (Exh. 8).

1997. (Exh. 10).  The National Appeals Board affirmed this decision

on administrative appeal.  (Exh. 11, Notice of Action on Appeal).[6]

In February 1998, Furnari filed a petition for writ of habeas

corpus before this Court in case number 4:CV-98-0222, which action

challenged the USPC's parole decision.

---

[6]  The Board found that:

You have properly been held accountable for murders committed
to further the purposes of the Luchese or other crime
families. At a minimum, as the capo of a crew in the Luchese
family, you were in a position to be informed of murders
ordered by the boss of the family.  Given the hierarchical
nature of the organization, it is likely that you directed the
murderous acts of your crew members.  And, in fact, the Parole
Commission finds the information from the U.S. Attorney's
Office on your personal responsibility for several of the
murders (victims Schliefer, Taglianetti, and DeCicco) and
attempted murder (victim Abinanti) to be credible and
reliable, even though much of the information may have come
from Anthony Casso, one of the most violent members of your
organization.  Reliable information on crimes committed
through La Costra Nostra activities has been provided by
members of the criminal organization, including those who have
committed violent crimes.  Even if Casso has continued to
commit or plot other crimes after his debriefing by federal
law enforcement, this does not disqualify him as a reliable
source concerning your criminal activities within the Luchese
family.  In many cases, Casso's information is corroborated by
information from other sources such as Carew and D'Arco.

Your parole denial is warranted because you approved or
participated in the planning of a contract murder
(Taglianetti), the murder of a potential informant/witness
(Schleifer), and a murder and attempted murder to further the
aims of an on-going criminal organization (DeCicco and
Abinanti, respectively).  Any one of these crimes would
support a parole denial.  There are no mitigating
circumstances, including your age, that justify your parole
when weighed against the aggravated nature of the crimes.

(Exh. 11).

During the pendency of those proceedings, the USPC provided a statutory interim hearing to Furnari pursuant to 18 U.S.C. §4208(h)(2) on December 9, 1998. (Exh. 12, hearing summary). At that hearing, Furnari claimed that at the time AUSA Kelley was presenting Casso's statements to the USPC, other prosecutors were concluding that Casso was not credible and that Casso was engaged in new criminal conduct while incarcerated. Furnari presented an affidavit that AUSA George Stamboulidis (of the Eastern District of New York) had submitted in another case, which stated that Casso had lied to prosecutors in matters relevant to *that* case.

The hearing examiner discussed this document and explained his reasons for continuing to credit Casso and corroborating witnesses in the hearing summary. (Exh. 12, pp 3-4). He recommended no change in the prior order -- that Furnari serve to a 15 year reconsideration hearing in December 2011 -- and the Parole Commission adopted that recommendation. (Exh. 13, notice of action). On the Notice of Action, however, the Parole Commission did not include the reasons for continuing to rely upon the Casso information notwithstanding AUSA Stamboulidis' letter regarding Casso's recent credibility problems. (Exh. 13). The National Appeals Board affirmed this decision on administrative appeal by Notice of Action on Appeal dated April 2, 1999. (Exh. 14).

By order dated April 12, 1999, this Court denied Furnari's petition for writ of habeas corpus, finding that there was a rational basis in the record for the USPC's decision. See Furnari

v. Warden, No. 4:CV-98-0222 (M.D. Pa., Apr. 12, 1999)(copy attached as Exhibit 22).   Furnari appealed to the Third Circuit Court of Appeals.

The Third Circuit took judicial notice of the interim hearing and the notices of action that followed it.[7]  The Circuit held that the USPC had erred in failing to "make clear in its decision on the interim hearing whether it continued to believe that the discredited witness [Casso] was credible or otherwise concluded that there was sufficient information from other sources to tie Furnari to murder", and had, thereby, failed to follow its regulation requiring a statement of reasons for denying parole. Furnari v. Warden, 218 F.3d 250, 252 (3rd Cir. 2000).  The Circuit held that "[i]t is not possible to tell from [the Appeal Board's affirmance *after the interim hearing*] whether the Parole Commission continues to rely on Casso and find him credible, or has concluded that there is sufficient additional information tying Furnari to murder to conclude that he is a Category Eight even absent the information provided by Casso." Id. at 256.   The Court ordered the case remanded to the district court "with instructions to grant Furnari's petition conditionally and order the Parole Commission to provide a new statement of reasons consistent with this decision." Id. at 252.

---

[7]  These materials had not been before this Court when it made its decision on the habeas corpus petition.

Importantly, the Circuit did <u>not</u> hold that there was not a rational basis in the record for the USPC's decision.  Rather, it held only that the USPC's decision had not been adequately explained after the interim hearing and the introduction of new information by Furnari.  218 F.3d at 255.  The Court expressly stated that it did "not reach Furnari's constitutional challenges to the initial parole determination"; <i>i.e.</i>, his argument that the Commission violated due process when it relied on information of Casso's statements provided by Kelley at the initial parole hearing.  <u>Id</u>.

On remand, this Court on September 28, 2000 ordered the Parole Commission to either provide Furnari a new statement of reasons or a <u>de novo</u> hearing.  The Parole Commission complied with this order by scheduling a <u>de novo</u> hearing.  (Exh. 15, Notice of Action).

The Parole Commission conducted the <u>de novo</u> hearing on December 8, 2000.  (Exh. 16, Initial Hearing Summary).  At that hearing, the examiner considered a letter submitted to the Parole Commission by AUSA Kelley on September 25, 2000, which discussed the circumstances surrounding the Stamboulidis affidavit, which was attached as Exh. A to that letter.[8]  (Exh. 17, Letter and Attachment).  The examiner also considered a letter from Furnari's attorney, written in response to AUSA Kelley's letter, dated

---

[8]    The letter also attached copies of AUSA Kelley's two previous letters to the Parole Commission; because these documents are already in the record, they have been omitted from this exhibit to avoid unnecessary duplication.

December 6, 2000 (Exh. 18), and a transcript of trial testimony of Carew in the Pagliarulo case, which had been submitted by Furnari at the hearing (Exh. 19).

After that hearing, the Parole Commission found that Furnari's offense severity was properly rated as Category Eight because it involved murder, conspiracy to murder, and multiple separate acts of extortion through racketeering offenses. The Parole Commission found that a decision more than 48 months above the guideline minimum of 100 months was warranted because of aggravating factors.[9]   It ordered that Furnari serve to a 15 year reconsideration hearing in December 2011.[10]   (Exh. 20, Notice of Action).

-----

[9]  These factors were:

You were involved in the hierarchy, first as a Capo and later as a Consigliere of a major organized crime organization and were involved either directly [or indirectly] in the planning or approval of murder and/or attempted murder.  Further, the murder of Lee Schleifer was of a prospective informant/witness and the conspiracy to murder/murder of Richard Taglianetti was a contract murder.  The Commission has determined that there is sufficient corroboration of information provided by Casso to rely upon the information supplied by Casso notwithstanding the affidavit from AUSA Stamboulidis of the Eastern District of New York.

Exh. 20, Notice of Action.

[10]  The Parole Commission retained the same 15 year date of December 2011, rather than calculating 15 years from the de novo hearing date (which would be December 2015) to eliminate the possibility for Furnari to allege vindictiveness because he had received a harsher parole decision after successful litigation. See Exh. 16, p. 9.

On administrative appeal, the National Appeals Board affirmed. Because the sufficiency of the USPC's statement of reasons was the issue before the Third Circuit, the Board's findings are included *in toto*:

> The Commission has reviewed your appeal and relevant documents from the case file, including the Stamboulidis affidavit, the transcript of Thomas Carew's testimony in the Pagliarulo case, AUSA Kelley's letter of September 25, 2000, and Mr. Brietbart's letter of December 6, 2000. This review does not lead the Commission to conclude that a change in the previous offense severity rating or decision is necessary or appropriate.
>
> The Stamboulidis affidavit raises serious doubt about the credibility of Anthony Casso, who has linked you to murders/attempted murder. The Commission has reviewed the affidavit and the other available information and concluded that Casso's information about your involvement in these crimes is accurate. The reasoning is as follows.
>
> You were the leader of a crew in the Lucchese crime family when the crimes were committed. Casso was a member of your crew. It is unlikely that you would be unaware of any murders or plots to murder others in order the fulfill the aims of the criminal enterprise given the structure and discipline of the crime family. Even if only the "boss" of a crime family can order or approve a murder, this does not mean that crew leaders are unaware of the ordered murder, especially since crew members, based on orders presumably passed through the crew leaders, carry out the murders. In addition, there appears to be no restriction on crew leaders initiating requests for a murder. The request simply has to be approved by the family boss.
>
> In order to accept your claim that you had no knowledge of the murders/attempted murder, the Commission would have to conclude that your crew was a renegade unit which committed crimes for reasons unrelated to the enterprise. This conclusion is not warranted because the motives for the murders/attempted murder committed by your crew were related to the aims/purposes of the enterprise, for example to silence a suspected cooperating individual or punish the wrongdoing of a member or associate. Casso's

information simply corroborates the inference that is reasonably made given your leadership role in the crew and Casso's membership in the crew, i.e., that you at the very least knew about, and more likely directed, the murderous activities of members of your crew. You are clearly responsible for the murders/attempted murder under a theory of vicarious criminal liability, and moreover, the information presented shows that you personally solicited or ordered some of the crimes.

AUSA Kelley's assurance in his September 25, 2000 letter as to Casso's credibility regarding your responsibility for the crimes, despite the Stamboulidis affidavit, may be reasonably credited. The AUSA checked with the U.S. Attorney's Office in the Eastern District of New York and was informed that while Casso's denials of recent allegation of crimes committed by him and attempts to impeach other witnesses' credibility were unreliable, that office believed that historical information provided by Casso on your activities was still credible. This is consistent with the Stamboulidis affidavit itself (para. 22) in which the affiant attests to the value of Casso's information on the past organized crime activities of Vincent Gigante, while at the same time noting the unreliability of Casso's statements *concerning more recent events*. It is not unreasonable to find that Casso may not be worthy of belief when it came to his denials of his own recent serious crimes which could (and did) lead to his removal as a protected federal witness, and still conclude that he had given reliable information on past activities of organized crime. AUSA Kelley has corrected the record in the past when your attorney challenged the accuracy of adverse information in your presentence report. Therefore, there is no reason to suspect that the AUSA would ignore his duty to provide accurate information to the Commission or seek a parole denial in reckless disregard of the truth.

The AUSA has asserted that Casso's information is corroborated by other sources, including Tommy Carew. The excerpt of Carew's testimony in the Pagliarulo case does corroborate certain significant information provided by Casso, information which shows that you employed violence to advance the interests of or to protect the Lucchese crime family. For example, Carew testified that you ordered Carew and others to assault James Wolford in order to clear the way for Jimmy Bishop, a painters union official friendly to the Lucchese family, to exercise more control over the union. Even if the allegations of

Carew and others did not result in a conviction for the assault under the reasonable doubt standard of proof, the Commission finds that the information is reliable and that, using the preponderance of the evidence standard, that it is likely you gave the order to assault Wolford.

Carew also states in his testimony that he was given the assignment of meeting Anthony Casso at a club and helping him with "something". The task turned out to be assisting Casso in the disposal of the body of a man who had been shot and killed. The circumstances described therein indicate that the body was that of Lee Schleifer. In his testimony Carew does not identify you as being present at the club after the murder was committed and Schleifer's body was still present. As your attorney points out, this omission is inconsistent with the representation made by AUSA Kelley. However, Carew's testimony indicates that someone other than Casso gave him an assignment to help Casso. Given that you were the person who introduced Carew to the crime family and your crew, that Carew was your driver/bodyguard at the time of this crime, your leadership role in the crew, and Carew's testimony about other "assignments" made by you, it is more likely than not that you were the person who told Carew to help Casso.

Carew also testified that you gave him the assignment of murdering Joseph Abinanti, the son of a Lucchese member. While this particular contract was recalled, Abinanti was later shot and wounded, according to Casso, by Casso and Vic Amuso at your direction. If you issued a murder contract for Carew to kill Abinanti, there is good reason to credit Casso's information that you also issued such a contract to Casso and Amuso.

Carew testified that he stored multiple handguns for the Lucchese crime family. This information supports the inference that Lucchese family crews, including yours, employed violence to promote the goals of the criminal organization. Therefore, it also indirectly supports the credibility of Casso's statements linking you, a member and leader in the crime family, to murders and attempted murder.

In sum, you have not demonstrated that the information from AUSA Kelley alleging your responsibility for murders and murder plots is unreliable and should not be used to deny you parole. Any one of these crimes (the Schliefer, DeCicco and Taglianetti murders and the attempt to murder

Abinanti) would result in a parole denial under the
policy at 28 C.F.R. §2.20, Offense Behavior Severity
Index, Notes to Chapter Eight offenses.

(Exh. 21, Notice of Action on Appeal)(emphasis added).   This is

the statement of reasons (hereinafter "Notice of Action reasons")

that is now before this Court for review.

Specifically, Furnari claims that: (1) the Notice of Action

reasons, in continuing to credit statements by Casso about Furnari,

violate the law of the case, the Parole Commission statute, and due

process; (2) the Parole Commission's reliance on its policy

regarding contract murders and murders in furtherance of a criminal

enterprise violates the ex post facto clause of the Constitution;

(3) the Parole Commission reliance on information that lacks

sufficient indicia of reliability violates a provision in its Rules

and Procedures Manual (paragraph 2.20-04) regarding determining the

credibility of non-conviction information; and (4) the Parole

Commission violated its statute, regulations, and due process when

it construed the phrase "offense behavior" in its regulations to

include conduct for which Furnari had not been convicted.   Furnari

asserts that the phrases "offense behavior" and "actual offense

behavior" mean "offense of conviction".

### Questions Presented

1.   Did the USPC violate due process, its statute or regulations,
     or the law of the case in crediting Casso's statements
     regarding Furnari's culpability for murder and attempted
     murder?

2.   Did the USPC's reliance on its policy regarding denial of
     parole when the offense behavior is contract murder or murder

in furtherance of a criminal enterprise violate the ex post facto clause?

3.   Whether the procedures manual provision relied on by Furnari for the proposition that the USPC considered unreliable information, which is not a regulation, creates any enforceable rights?

4.   Whether the USPC violated Furnari's due process rights, or its statute or regulations, in considering his offense behavior to include conduct for which he was not convicted?

## Argument

I.   **THE COMMISSION DID NOT VIOLATE THE LAW OF THE CASE, ITS STATUTE OR REGULATIONS, NOR DUE PROCESS IN CREDITING CASSO'S STATEMENTS REGARDING FURNARI'S CULPABILITY FOR MURDER AND ATTEMPTED MURDER.**

   A.   **The Law of the Case Was Not as Furnari Represents and Does Not Prevent the Parole Commission from Considering Casso's Statements.**

Furnari appears to believe that "the law of the case" is that Casso was not reliable or that the components of the Commission's initial statement of reasons cannot be relied upon.  Petitioner's Br. at 12, 14.  This view is incorrect.

The Third Circuit made very clear that it was only the USPC's statement of reasons *after the statutory interim hearing* and the introduction of "significant new information" that "no longer can suffice" because the USPC had not explained how it had weighed the new information.  Furnari, 218 F.3d at 257. It is **not**, as Furnari implies, the information itself that was part of the *initial statement of reasons* that no longer suffices.

Indeed, the Circuit explicitly stated that it was not finding that the Parole Commission could not rely on Casso's statements or

other information in the file: "This information might well meet the standard of providing a rational basis on which to make the classification." 218 F.3d at 257. Rather, the only error found by the Third Circuit was the USPC's failure *to sufficiently articulate its reasoning* in light of new information about Casso's recent credibility problems, not the insufficiency of the evidence the USPC had relied upon (*i.e.*, Casso's statements and other information).[11]

For this reason, Furnari's argument that "[m]ost of the 'reasons' the Board advanced are the same as those the Court of Appeals has already found no longer 'suffice,'" must be rejected. Petitioner's Br., at 14. In short, Furnari incorrectly characterizes the decision of the Third Circuit, which expressly reserved judgment on whether there was a rational basis in the record for a Category Eight rating and found only that the rating had not been adequately explained. Furnari, 218 F.3d at 257.

Furthermore, the Third Circuit did not overrule the finding of this Court that there was a rational basis in the record for the Category Eight rating after the initial hearing. (At the time this Court decided the case, the interim hearing was not in the record).

---

[11] The Circuit held "that the statement given by the Appeals Board is an insufficient statement of reasons for classifying Furnari as a Category Eight. The Parole Commission thus abused its discretion at the interim hearing by failing to comply with 18 U.S.C. §4206(b) and 28 C.F.R. §§2.13 and 2.14, its own regulations requiring a statement of reasons for denying parole." Furnari, 218 F.3d at 257-58.

Rather, the Third Circuit basically found that the introduction of the Stamboulidis affidavit required a further explanation from the Parole Commission that had not been provided and it reserved judgment on whether or not there was a rational basis for the rating.[12]  For these reasons, it is simply untrue that the "law of the case" is that none of the information previously considered may now be considered by the Parole Commission.

## B. The Notice of Action Reasons Adequately Explain the USPC's Reasons for Crediting Information Provided by Casso, Notwithstanding the Stamboulidis Affidavit.

The Parole Commission has, after the de novo hearing, fully complied with its statute and regulations, plus the decision of the Third Circuit, in explaining its reasons for crediting statements from Casso.  The Appeals Board decision (Exh. 21) fully explains its reasons for crediting information provided by Casso -- notwithstanding the Stamboulidis affidavit.  The Appeals Board decision explained that the Parole Commission found Casso's information about Furnari's involvement in murders and attempted murder "accurate" because Furnari was a capo and Casso a member of his crew.  Further, given the structure of the family, it was more likely than not that Furnari would be aware of murders or plots to

---

[12] The Third Circuit held that the post-interim hearing reasons were inadequate because "[i]t is not possible to tell from this decision whether the Parole Commission continues to rely on Casso and find him credible, or has concluded that there is sufficient additional information tying Furnari to murder to conclude that he is a Category Eight even absent the information provided by Casso." 218 F.3d at 256.

murder that were in furtherance of the aims of the organization and that were committed by persons over whom he had control. (Exh. 21, p. 1). Under 28 C.F.R. §2.19(c),[13] even if Furnari did not order murders, he was culpable for them if they were reasonably foreseeable to him or committed by persons over whom he had control.

In this case, the Appeals Board noted that the murders committed by Furnari's crew "were related to the aims/purposes of the enterprise, for example to silence a suspected cooperating individual [Lee Schleifer] or punish the wrongdoing of a member or associate [Richard Taglianetti, who had purportedly been involved in the murder of the son of another Lucchese family member]." As such, the murders were attributable to Furnari under §2.19(c) as being, at the very least, reasonably foreseeable to him but "more likely [being] directed" by him. (Exh. 21, p.1). Therefore, the murders satisfied both prongs of §2.19(c): being both foreseeable to Furnari and committed by persons under his control.

Further, the Appeals Board decision explained why the USPC could reasonably find Casso credible when making statements regarding past activities of organized crime ("historical information"), notwithstanding the lies Casso had more recently made, as detailed in the Stamboulidis affidavit about Casso's more

---

[13] Under 28 C.F.R. §2.19(c), a prisoner is accountable for his own actions and actions done in concert with others, to the extent that those actions are committed by associates over which the prisoner has control, or those actions are reasonably foreseeable to the prisoner.

recent crimes.  The Parole Commission is not required to find an all or nothing situation about credibility -- that Casso is either completely credible or an utter liar.  It is possible for a person to be credible with regard to some matters and not with regard to others.

As the Appeals Board decision pointed out, Casso's serious crimes while a protected witness[14] could, and did, lead to his removal from the witness protection program.  (Exh. 21, p. 2). Therefore, his motive to lie about these crimes, to attempt to avert discovery of his violation of the conditions of his protected witness status, was plain and obvious.  But based on that, the Parole Commission was not required to conclude that Casso was lying about everything he had ever said.  As the Appeals Board decision explained, the statements of Casso which the Commission is crediting were corroborated by other sources.

With regard to the murder of Lee Schleifer, the Appeals Board found Casso's statement that Furnari was involved in this murder corroborated by Carew.  The reasons stated that Carew testified that he was given the assignment to meet Casso and assist him in disposing of Schleifer's body.  (Exh. 21, p. 2).  The Appeals Board then explained why the Commission concluded that Furnari was the

---

[14] Casso assaulted another protected witness while that person was handcuffed and naked when being transported to the shower and he bribed Bureau of Prisons employees to smuggle contraband into both protective custody units where he had been housed, notwithstanding having agreed as a condition of his protected witness status that he would not violate any law.  (Exh. 17, affidavit, ¶¶4, 25-29).

person who so directed Carew:  because Furnari introduced Carew to the Lucchese family and to Furnari's crew; because Carew was Furnari's driver/bodyguard at the time of the crime; and because Carew testified to other "assignments" made to him by Furnari.[15] From all of these facts, the Commission inferred that Furnari was the one who gave Carew the assignment to meet Casso and help him dispose of Schleifer's body.  (Exh. 21, p.2).  The Appeals Board, thus, clearly explained why the Commission "continues to rely on Casso", 218 F.3d at 256, with regard to Casso's statement that Furnari was involved in the murder of Schleifer -- because the information provided by Casso is corroborated by Carew.

With regard to the attempted murder of Joseph Abinanti, the Appeals Board found that an independent witness, Carew, testified that Furnari had assigned him (Carew) to kill Abinanti.  (Exh. 21, p. 2).  That contract to Carew was recalled.  Later, Abinanti was shot and wounded, according to Casso, by Casso and Amuso at Furnari's direction.  (Exh. 2, p. 3).  The Appeals Board concluded that the fact that Furnari had earlier issued a contract on Abinanti to Carew lent credence to Casso's information that Furnari later issued a contract on Abinanti to Casso and Amuso.  (Exh. 21, p. 2).  In short, Casso's information regarding the Abinanti attempted murder was lent credence by Carew (in Carew's testimony which Furnari himself provided to the Commission; see Exh. 19).  In

---

[15]  All of these are statements taken from Carew's testimony in the Pagliarulo case, which was provided to the Parole Commission by Furnari's attorney at the de novo hearing. Exh. 19, pp. 569-570.

addition to the corroboration of Casso that Carew's testimony provides, it is independent evidence that Furnari ordered Carew himself to kill Abinanti. (Exh. 19, p. 579). Notwithstanding that that contract was recalled before it was performed, solicitation to murder is, under the Commission's regulations, itself a Category Eight offense.   28 C.F.R. §2.20, Chapter One, paragraph 105 (solicitation to commit a Category Eight offense is rated Category Eight) and Chapter Two, paragraph 201 (murder is Category Eight).

The Parole Commission also held Furnari responsible for the murders of DeCicco and Taglianetti (Exh. 21, p. 3) and there was a rational basis in the record to support these findings.   With regard to Taglianetti, this basis consists of AUSA Kelley's letter indicating that both Casso and Carew reported that Furnari had issued a contract on Taglianetti in the early 1980's (Exh. 2, p. 2); and the Appeals Board's explanation of why the Parole Commission found Casso's historical information credible notwithstanding the Stamboulidis affidavit.   (Exh. 21, p. 2). Furnari's argument that Taglianetti was not killed until 1992 (because Taglianetti had been on the lam) is unavailing – Furnari is culpable for the solicitation of murder which the contract represents even though the contract was not carried out at the time he issued it.   The ultimate murder of Taglianetti was reasonably foreseeable to Furnari.   Furnari, therefore, is accountable under the Commission's rules for this murder.   28 C.F.R. §2.19(c).

Similarly, there is a rational basis for the finding that Furnari was culpable for the murder of DeCicco: AUSA Kelley's letter reporting Casso's statement that a meeting to plot the avenging of the murder of Gambino family boss Paul Castellano took place at Furnari's house, with Vincent Gigante, Genovese family consigliere Bobby Manna and others present; Casso's statement that Furnari asked Casso and Amuso to kill DeCicco (Exh. 2, p. 3); and the Appeals Board's explanation of why the Parole Commission found Casso's statements credible notwithstanding the Stamboulidis affidavit.

It is well settled law that determinations as to the credibility of information presented to the Parole Commission for purposes of making a parole decision are committed to the agency's discretion. It "is not the function of the courts to review the discretion of the Board in the denial of applications for parole, or to repass on the credibility of reports and information received by the Board in making its determinations." Brest v. Ciccone, 371 F.2d 981, 982 (8th Cir. 1967). _Accord_ Hackett v. U.S. Parole Commission, 851 F.2d 127, 131 (6th Cir. 1987); Maddox v. U.S. Parole Commission, 821 F.2d 997, 999-1000(5th Cir. 1987); Solomon v. Elsea, 676 F.2d 282, 290 (7th Cir. 1982); Fiumara v. O'Brien, 889 F.2d 254, 57 (10th Cir. 1989)("Appeal courts may not reweigh evidence, repass on the credibility of reports, or substitute their judgment for that of the [Parole] Commission."); Billiteri v. U.S. Board of Parole, 541 F.2d 938 (2nd Cir. 1976).

In this case, the Third Circuit in <u>Furnari</u>, 218 F.3d 250, ordered the Parole Commission to explain its credibility determinations in light of the Stamboulidis affidavit. The Parole Commission has complied with this requirement and with its own statutory requirements. <u>See</u> 18 U.S.C. §4206(b)("state with particularity" the reasons for denial of parole). Otherwise, the Parole Commission's determination that historical information provided by Casso is credible, particularly where corroborated by other government witnesses, is not subject to judicial review.

**C.   The Parole Commission Has Fully Complied With Due Process.**

Assuming *arguendo* that due process applies to applications for parole under the federal parole statute, the Parole Commission has fully satisfied due process. The Supreme Court held in <u>Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex</u>, 442 U.S. 1 (1979), that there is no constitutional right to release on parole and that, if a particular parole statute creates a liberty interest, this does not entitle a prisoner to parole release. Rather, it entitles him to certain procedures required by due process: a hearing and a statement of reasons for denial of parole. Furnari has received both of these and has therefore received all that due process entitles him to receive. In that Furnari does not have a due process right to be released on parole, his due process claim should be rejected.

II.  **THE COMMISSION'S RELIANCE ON ITS POLICY REGARDING DENIAL OF PAROLE WHEN THE OFFENSE BEHAVIOR IS A CONTRACT MURDER OR MURDER IN FURTHERANCE OF A CRIMINAL ENTERPRISE DOES NOT VIOLATE THE EX POST FACTO CLAUSE.**

    A.  **The Parole Guidelines, Including §2.20, Are Not "Laws" for Purposes of the Ex Post Facto Clause.**

Furnari argues that the USPC has violated the ex post facto clause by relying upon the more recent version of its guidelines, 28 C.F.R. §2.20. Petitioner's Br., at 17-18. Furnari's argument fails to address the threshold issue of whether the policy statement to which he objects constitutes a "law" for purposes of the ex post facto clause. Rather, Furnari assumes that it does and proceeds from there. Petitioner's Br., at 17. However, the established case law in all circuits that have considered the question is that parole guidelines are not "laws" within the purview of the ex post facto clause. See text infra at 26-27.

Before addressing that point, we note that the ex post facto clause of the Constitution, Article I, Section 9, Clause 3, "prohibits Congress and the states from enacting any law that 'imposes a punishment for an act which is not punishable at the time it was committed; or imposes additional punishment to that then prescribed....'" (citation omitted). Artez v. Mulcrone, 673 F.2d 1169, 1171 (10th Cir. 1982). In Collins v. Youngblood, 497 U.S. 37 (1990), the Supreme Court clarified that, to be ex post facto, a law must either punish as a crime an act previously committed, which was innocent when done; make more burdensome the punishment for a crime, after its commission; or deprive one

24

charged with a crime of any defense available when the act was committed.  497 U.S. at 52.

The Court specifically disavowed the notion that the ex post facto clause applies to "any change which 'alters the situation of a party to his disadvantage.'"  497 U.S. at 50.[16]  As the Court explained in <u>California Department of Corrections v. Morales</u>, 514 U.S. 499 (1995), the clause is "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" 514 U.S. at 504.  Furthermore, the Court stated that:

> After <u>Collins</u>, the focus of the *ex post facto* inquiry is **not** on whether a legislative change produces some ambiguous sort of '**disadvantage**,' nor ... on whether an amendment affects a prisoner's '**opportunity** to take advantage of provisions for early release,'... but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable.

541 U.S. at 506, n.3 (emphasis in original and added).  Therefore, to the extent Furnari's argument is grounded on the assertion that he has been "disadvantaged" by §2.20, his claim should be rejected

---

[16] While the <u>Collins</u> court did not explicitly overrule <u>Weaver v. Graham</u>, 450 U.S. 24 (1981), it called into question continued reliance on the criterion of "disadvantage" to a party as sufficient to constitute violation of the ex post facto clause. The <u>Collins</u> Court overruled <u>Kring v. Missouri</u>, 107 U.S. 221 (1883), on the ground that its holding could only be justified if the clause were understood to include any change which "alters the situation of a party to his disadvantage," 497 U.S. at 50.  The Court stated that "[w]e think such a reading of the Clause departs from the meaning of the Clause as it was understood at the time of the adoption of the Constitution, and is not supported by later cases." <u>Id</u>.

because it relies on a view of the ex post facto clause that the Supreme Court has disavowed.

Otherwise, returning to our first point, Furnari's ex post facto claim fails in the first instance because his challenge is not to a "law" that is being applied to him but to the Parole Commission's paroling guidelines. It is well settled that the parole guidelines are not "laws" within the meaning of the ex post facto clause. See Prater v. United States Parole Comm., 802 F.2d 948, 952-56 (7th Cir. 1986)(en banc)("If judges get tougher on crime by meting out stiffer sentences or resolving more close procedural questions against criminal defendants, or prosecutors drive harder plea bargains, or Parole Commission takes more jaundiced view of application for parole, ex post facto prohibition is not violated, even though criminal's punishment may end up being longer or harsher than he hoped for when he committed the crime."), id. at 954 (the parole guidelines "are not the exercise of delegated authority (e.g., to make rules of procedure); they are statements of enforcement policy. They are ... 'merely guides, and not laws: guides may be discarded where circumstances require; laws may not."); Yamamoto v. United States Parole Comm., 794 F.2d 1295, 1297-98 (8th Cir. 1986)(citing cases); Northeast Regional Parole Commission v. DiNapoli, 764 F.2d 143, 146 (2nd Cir. 1985)(even assuming that prisoner would have received earlier parole date had earlier guidelines been applied, the guidelines nonetheless are not "laws" within the meaning of the ex post facto clause because they

are flexible, not fixed and rigid; distinguishing <u>Weaver</u> because no discretion exercised in applying rules governing "gain time" at issue in that case); <u>Dufresne v. Baer</u>, 744 F.2d 1543, 1548-50 (11th Cir. 1984); <u>Richardson v. United States Parole Commission</u>, 729 F.2d 1154 (8th Cir. 1984); <u>Resnick v. U.S. Parole Commission</u>, 835 F.2d 1297, 1301 (10th Cir. 1987)(citing <u>Wallace v. Christensen</u>, 802 F.2d 1539, 1553-54 (9th Cir. 1986)). See also <u>Portley v. Grossman</u>, 444 U.S. 1311 (Rehnquist, Circuit Justice, 1980); <u>Stroud v. United States Parole Commission</u>, 668 F.2d 843 (5th Cir. 1982); <u>Warren v. United States Parole Commission</u>, 659 F.2d 183 (D.C. Cir. 1981),; <u>Hayward v. United States Parole Commission</u>, 659 F.2d 857 (8th Cir. 1981); <u>Priore v. Nelson</u>, 626 F.2d 211 (2nd Cir. 1980); <u>Zeidman v. United States Parole Commission</u>, 593 F.2d 806 (7th Cir. 1979); <u>Shepard v. Taylor</u>, 556 F.2d 648 (2nd Cir. 1977); <u>Ruip v. United States</u>, 555 F.2d 1331 (6th Cir. 1977); <u>Sheary v. U.S. Parole Commission</u>, 822 F.2d 556, 558 (5th Cir. 1987).

The Third Circuit likewise has held that the parole guidelines can constitute "laws" if applied without substantial flexibility, but has found that they have, in fact, been applied with substantial flexibility so as to not be "laws" for purposes of the ex post facto clause. <u>U.S. ex rel Forman v. McCall</u>, 776 F.2d 1156 (3d Cir. 1985).[17] The regulation in question, 28 C.F.R. §2.20,[18] is

_____

[17] Under the unique jurisprudence of the Third Circuit on the ex post facto issue (<u>see</u> 776 F.2d at 1159, noting that the position that parole guidelines could be laws "has since been rejected by every other circuit that has addressed the issue"), it is the parole guidelines as a whole which must be evaluated under the

a feature of the same guidelines addressed by these court decisions. This regulation does no more than set a policy for parole decisionmaking and does not constitute a law.

Furnari implicitly argues that §2.20 is, notwithstanding these numerous cases, a "law" because it "ties the hands of the USPC" once it finds that a murder was committed for one of the specified reasons. Petitioner's Br., at 12. This argument is without merit.

---

"substantial flexibility" test, not any one particular guideline. See Forman, 776 F.2d at 1161 (reviewing statistical evidence regarding percentage of cases "outside" guidelines).

[18]   The rule provides that:

> For Category Eight, no upper limits are specified due to the extreme variability of the cases within this category. For decisions exceeding the lower limit of the applicable guideline category by more than 48 months, the Commission will specify the pertinent case factors upon which it relied in reaching its decision, which may include the absence of any factors mitigating the offense. This procedure is intended to ensure that the prisoner understands that individualized consideration has been given to the facts of the case, and **not to suggest that a grant of parole is to be presumed for any class of Category Eight offenders**. However, a murder committed to silence a victim or witness, a contract murder, a murder by torture, the murder of a law enforcement officer to carry out an offense, or a murder committed to further the aims of an on-going criminal operation, shall not justify a grant of parole at any point in the prisoner's sentence unless there are compelling circumstances in mitigation .... Such aggravated crimes are considered, by definition, at the extreme high end of Category Eight offenses. For these cases, the expiration of the sentence is deemed to be a decision at the maximum limit of the guideline range. (The fact that an offense does not fall under the definition contained herein does not mean that the Commission is obliged to grant a parole).

28 C.F.R. §2.20, Note to guideline table (emphasis added).

The Parole Commission continues to exercise discretion under
§2.20.  As the court noted in Richardson v. Crawford, 437 F. Supp.
453 (D. Conn. 1977):

> A change in the guidelines does somewhat more than
> "clarify", because it alters the significance the
> Commission attaches to particular factors.  But among the
> aspects of the Commission's discretion in making parole
> decisions for regular adult offenders is the power to
> revise its standards for the exercise of its discretion
> in the light of the experience which it is continuously
> generating.  The ex post facto clause does not require
> that parole standards be frozen at the time of
> sentencing.

437 F. Supp. at 456.

As recognized by the Supreme Court, "[W]e can say with some
assurance that where parole is concerned discretion, by its very
definition, is subject to changes in the manner in which it is
informed and then exercised."  Garner v. Jones, 529 U.S. 244, 253
(2000).  The Court noted that:

> The idea of discretion is that it has the capacity, and
> the obligation, to change and adapt based on experience.
> New insights into the accuracy of predictions about the
> offense and the risk of recidivism consequent upon the
> offender's release, along with a complex of other
> factors, will inform parole decisions.

Id.  The Court implied that a claim based solely on the assertion
that "discretion has been changed in its exercise" would not state
an ex post facto claim.  Id. at 254.

As in Garner, the revised §2.20 "permit[s] a more careful and
accurate exercise of the discretion the Board has had from the
outset"; it does not change the punishment annexed to the crime,
because the decision was always, and remains, discretionary, and

29

discretion by its nature "change[s] and adapt[s]".  Garner, 529
U.S. at 253.  The guideline change at issue here indeed "alters the
significance the Commission attaches to particular factors" (i.e.,
the motive of the killer), but it does not eliminate discretion any
more than any other guideline change does.

Under the guideline, 28 C.F.R.. §2.20, if the Commission finds
compelling mitigating circumstances present in the case of a
murderer who falls under the regulation, it may order his release
on parole.  The determination of whether such mitigating
circumstances are present is a discretionary decision:  the
Commission must review such mitigating circumstances as may be
present and decide whether it finds them sufficiently "compelling"
to overcome the presumption that, because of the extremely
aggravated nature of the murder committed, parole should be denied.
Hence, the regulation simply clarifies the exercise of discretion,
and does not eliminate it.  See Shepard, 556 F.2d at 654.

This type of analysis and weighing of facts and circumstances
in a case is at the core of what "discretion" means in the context
of parole decision-making.  As the court explained in Wallace v.
Christensen, 802 F.2d 1539, 1549 (9th Cir. 1986), judgments as to
the institutional behavior of a prospective parolee, the nature and
circumstances of the offense and the history and characteristics of
the prisoner, concepts of general and special deterrence,
retribution and punishment, the relevance of material before the
Commission and criteria for parole determinations are within "zone

30

or field within which the Commission could exercise 'absolute discretion.'" The court stated that "the *process* of decision-making may not be separated, conceptually or practically, from the ultimate *decision* to grant or deny parole", because the Commission "always interprets and applies the Guidelines in rendering parole decisions", which is an exercise of discretion. 802 F.2d at 1550 (emphasis original). The court in essence defined discretion, holding that if "the Commission's decision involves the exercise of judgment among a range of possible choices or options", it constitutes an exercise of discretion. Id. at 1552. Clearly, when the Commission reviews circumstances in mitigation of an aggravated murder to determine whether they are "compelling," it is exercising judgment to choose among a range of possible choices or options (*i.e.*, that the circumstances are compelling, or that they are not compelling), which constitutes exercise of discretion. "[D]iscretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised." Garner v. Jones, 529 U.S. 244, 253 (2000).

Any argument that §2.20 guideline eliminates the exercise of discretion, thus, should be rejected. Section 2.20, like all of the other parole guidelines, is not a "law" for ex post facto purposes.

31

**B.    28 C.F.R. §2.20 Does Not Change the Punishment Annexed to the Crime When Committed.**

Furnari's ex post facto argument also fails because §2.20 of the Commission's guidelines does not increase the punishment of prisoners covered by the regulation.  At the time Furnari committed his crime, the parole guideline range applicable to him, at best, was 100+ months (i.e., an open-ended range), the same range currently applicable to him.[19]  Compare 28 C.F.R. §2.20, guidelines table (1985)(copy appended) with §2.20, guidelines table (2001). Because the Category Eight guideline ranges are expressed as a minimum number of months "plus", the guideline ranges have no upper limit.  Courts have consistently held that the requirement of 18 U.S.C. §4206(c) for a showing of "good cause" to exceed the guideline range is **inapplicable** to Category Eight cases.  E.g., Madonna v. U.S. Parole Commission, 900 F.2d 24, 26 (3rd Cir. 1990) (decision more than 48 months above guideline minimum is not a decision outside the guidelines, as Category Eight guidelines have no upper limit; requirement of 18 U.S.C. §4206(c) for showing of "good cause" for exceeding guidelines inapplicable in Category

_____

[19]    In fact, because under ex post facto analysis, the applicable law is that in effect at the time the crime was committed, and according to the indictment Furnari's crimes began in the 1970's, the guidelines appended to his crime under this theory could be the completely open-ended guidelines specified in the 1977 version of the C.F.R. as follows: "Greater than [those specified] above [for less severe offenses]–however, specific ranges are not given due to the limited number of cases and the extreme variations in severity possible within the category."  28 C.F.R. §2.20, adult guidelines table (1977)(copy appended).

Eight cases); <u>Kele v. Carlson</u>, 775 F.2d 243 (8th Cir. 1985)(same);
<u>Adams v. Keller</u>, 736 F.2d 320 (6th Cir. 1984); <u>Hackett v. U.S.
Parole Commission</u>, 851 F.2d 127 (6th Cir. 1987)(per curiam).

    In other words, **any** parole decision which requires service of
more than the minimum of the guideline range is a decision within
the Category Eight guideline range.  Therefore, Furnari cannot
demonstrate that his incarceration has necessarily increased as a
result of the murder rule, as the Commission had the discretion
even before that rule to deny parole and the guideline range is
unchanged by the rule.

    Furthermore, §2.20 does not create a significant risk of
prolonged incarceration as compared to the prior regulation in that
under either version, a grant of parole is not to be presumed for
any class of Category Eight offenders.  28 C.F.R. §2.20, note.
Release on parole is a discretionary decision.

    Furnari cannot demonstrate that he would have been released on
parole, or even that he was likely to have been released on parole,
under the prior rule.  As just noted under the prior rule,
Furnari's guideline range would have been the same: 100+ months.
There was under the prior rule no presumption that parole would be
granted in any Category Eight case.  28 C.F.R. §2.20, Note.  Having
found Furnari culpable for at least three murders and one attempted
murder, and having found him to have occupied the highest levels of
an LCN family over a substantial period of time, the Parole

Commission, under the prior rule, clearly could have exercised its discretion to deny him parole.

For all of these reasons, Furnari's ex post facto claim is meritless.

**III. THE PROCEDURES MANUAL PROVISION RELIED ON BY FURNARI FOR THE PROPOSITION THAT THE PAROLE COMMISSION CONSIDERED UNRELIABLE INFORMATION IS NOT A REGULATION AND CREATES NO RIGHTS IN LITIGANTS.**

Furnari argues that the Parole Commission violated a provision of its Procedures Manual, paragraph 2.20-04, when it considered information obtained from AUSA Kelley.  That provision provides in pertinent part that, "[t]he normal indicants of reliability are (a) the report is specific as to the behavior alleged to have taken place; (b) the allegation is corroborated by established facts; and (c) the source of the allegation appears credible."  As a preliminary matter, the provision in the Procedures Manual creates no legal rights enforceable in a petition for habeas corpus.

The Commission's Rules & Procedures Manual is not part of the Code of Regulations.  It is well-settled law that the staff manuals do not create any enforceable rights.  See Sullivan v. United States, 340 U.S. 170 (1954).  This includes provisions of the Commission's Rules & Procedures Manual.  See Caporale v. Gasele, 940 F.2d 305, 306 (8th Cir. 1991)(district court does not have jurisdiction to review allegations of violations of the Commission's procedures manual); Coleman v. Perrill, 845 F.2d 876 (9th Cir. 1988)(Parole Commission need not follow provisions in its

Procedures Manual and the decision whether or not to follow those internal rules is within the discretion of the Parole Commission and unreviewable); <u>Lynch v. United States Parole Comm.</u>, 768 F.2d 491, 497 (2nd Cir. 1985)(Parole Commission's Procedures Manual does not create enforceable rights); <u>Ostrer v. Luther</u>, 668 F. Supp. 724, 735 (D. Conn. 1987)(same); <u>Benedict v. United States Parole Comm.</u>, 569 F. Supp. 438, 445-46 (E.D. Mich. 1983)(same).

The Parole Commission's reasoning regarding the credibility of the information it relied upon was presented in the Notice of Actions reasons (Exh. 21), which satisfies 18 U.S.C. §4207, and 28 C.F.R. §2.19.  <u>See</u> argument II, *supra*.

Furnari's claim that there is no factual basis for the Category Eight rating is without merit.  To the extent his argument is that his "offense behavior" includes only the offense he was convicted of, his argument is addressed in section IV, *infra*.

Furnari's argument that his involvement in the hierarchy of an LCN family was not properly an "aggravating factor" to his RICO extortion conspiracy is without merit.  Petitioner's Br., at 24. This is implicitly a "double-counting" argument -- that a factor that was considered in determining the guideline range cannot constitute a reason for departing from that range.  *See, e.g.,* <u>Harris v. Martin</u>, 792 F.2d 52 (3d Cir. 1986).  However, the "double-counting" analysis only applies in cases where a decision outside the guidelines is rendered, and the statute requires a showing of "good cause" for departing from the guideline range.

*See* <u>Harris</u>.  As noted above, see pp. 31-32, *supra*, in Category Eight cases a decision outside the guidelines is not possible, and the double-counting analysis is simply inapplicable.  <u>Maddona</u>, *supra*.  What the Parole Commission was doing when it identified "aggravating factors" in Furnari's case was complying with the requirement of the Note to 28 C.F.R. §2.20 that it "specify the pertinent case factors" explaining a decision more than 48 months above the guideline minimum.  (Exh. 20).  That the USPC characterized them as "pertinent aggravating factors" does not change the fact that the USPC was merely explaining the decision more than 48 months above the guideline minimum, and had no obligation to show "good cause" because it was not departing from the guidelines.

**IV. THE PAROLE COMMISSION DID NOT VIOLATE FURNARI'S DUE PROCESS RIGHTS, NOR ITS STATUTE OR REGULATIONS, IN CONSIDERING HIS OFFENSE BEHAVIOR TO INCLUDE CONDUCT FOR WHICH HE WAS NOT CONVICTED.**

Furnari's argument that the word "offense" in the statute and the phrase "offense behavior" in the USPC Procedures Manual must be read to refer solely to the "offense of conviction" (and therefore to preclude the USPC from considering criminal behavior for which he was not convicted) is clearly meritless.  The case law is venerable and plentiful holding that the Parole Commission is **not** limited to the offense of conviction in making parole decisions, but instead may consider all available relevant information, including dismissed charges, uncharged conduct, and acquitted

36

conduct without violating either due process or its statute and regulations. See, e.g., Fiumara v. O'Brien, 889 F.2d 254, 258 (10th Cir. 1989)(the Commission is not limited to the consideration of formally adjudicated crimes, and is entitled to consider information from prosecutors and other parties when making its determinations regarding the release of prisoners, citing cases).

As the court held in Maddox v. U.S. Parole Commission, 821 F.2d 997 (5th Cir. 1987):

> 18 U.S.C. §4207 contains a nonexhaustive list of information that the Commission may consider in making parole determinations. As with sentencing courts, the only constraints on the information that may be considered by the Parole Commission are constitutional. Specifically, the Commission may consider dismissed counts of an indictment, hearsay evidence, and allegations of criminal activity for which the prisoner has not even been charged.

821 F.2d at 999 (footnotes omitted). Accord Arias v. U.S. Parole Commission, 648 F.2d 196 (3rd Cir. 1981)(USPC can consider alleged offense notwithstanding contained in a separate indictment); U.S. ex rel. Goldberg v. Warden, 622 F.2d 60 (3rd Cir. 1980)(USPC may consider alleged offenses for which prisoner was not convicted in making parole decision); Hackett v. U.S. Parole Commission, 851 F.2d 127, 131 (6th Cir. 1987)(USPC can rate offense severity as rape, based on statement of victim contained in PSI that she had been raped, even though petitioner was only convicted of bank extortion and sentencing court stated that it would not consider the rape allegation for purposes of sentencing); Tobon v. Martin, 809 F.2d 1544, 1545 (11th Cir. 1987)("The law is clear that the

37

Parole Commission may consider any relevant evidence or information in reaching its decision."); <u>Bower v. U.S. Parole Commission</u>, 805 F.2d 885, 888 (9th Cir. 1986)(USPC does not violate due process when it considers unadjudicated allegations in parole decision); <u>Melvin v. Petrovsky</u>, 720 F.2d 9, 11 (8th Cir. 1983)("The Commission is not limited to the indictment and conviction in determining the severity of the offense...").

Furnari's claim that the "only plausible reading" of the Parole Commission statute is that it may consider only the offense of conviction is frivolous (which is why the only case law he cites concerns the effect of ambiguity in a regulation, not the claim that "offense" means "conviction offense" in the USPC statute) and should be dismissed.

### Conclusion

For the reasons stated above, the petition for writ of habeas corpus should be denied.

Respectfully submitted,

THOMAS A. MARINO
United States Attorney

KATE L. MERSHIMER
Assistant U.S. Attorney
MICHELE E. LINCALIS
Paralegal Specialist
217 Federal Building
228 Walnut Street
Harrisburg, PA 17108
717/221-4482

OF COUNSEL:

ROCKNE CHICKINELL, General Counsel
SHARON GERVASONI, Attorney
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, MD 20815

Dated: May 30, 2002

**28 CFR Ch. I (7-1-85 Edition)**

§ 2.20

## GUIDELINES FOR DECISION-MAKING

[Guidelines for decision-making, customary total time to be served before release (including jail time)]

| Offense characteristics: Severity of offense behavior | Offender characteristics: Parole prognosis (salient factor score 1981) | | | |
|---|---|---|---|---|
| | Very Good (10-8) | Good (7-6) | Fair (5-4) | Poor (3-0) |
| | Months | Months | Months | Months |
| Category 1 (formerly "low severity"): | | | | |
| Adult range | <=8 | 6-9 | 9-12 | 12-16 |
| (Youth range) | (<=6) | (6-9) | (9-12) | (12-16) |
| Category 2 (formerly "low moderate severity"): | | | | |
| Adult range | <=8 | 8-12 | 12-16 | 16-22 |
| (Youth range) | (<=8) | (8-12) | (12-16) | (16-20) |
| Category 3 (formerly "moderate severity"): | | | | |
| Adult range | 10-14 | 14-18 | 18-24 | 24-32 |
| (Youth range) | (8-12) | (12-16) | (16-20) | (20-26) |
| Category 4 (formerly "high severity"): | | | | |
| Adult range | 14-20 | 20-26 | 26-34 | 34-44 |
| (Youth range) | (12-16) | (16-20) | (20-26) | (26-32) |
| Category 5 (formerly "very high severity"): | | | | |
| Adult range | 24-36 | 36-48 | 48-60 | 60-72 |
| (Youth range) | (20-26) | (28-32) | (32-40) | (40-48) |
| Category 6 (formerly "Greatest I severity"): | | | | |
| Adult range | 40-52 | 52-64 | 64-78 | 78-100 |
| (Youth range) | (30-40) | (40-50) | (50-60) | (60-76) |
| Category 7 (formerly included in "Greatest I severity"): | | | | |
| Adult range | 52-80 | 64-92 | 78-110 | 100-148 |
| (Youth range) | (40-84) | (50-74) | (60-86) | (76-110) |
| Category 8 (formerly included in "Greatest II severity"): | | | | |
| Adult range | 100+ | 120+ | 150+ | 180+ |
| (Youth range) | (80+) | (100+) | (120+) | (150+) |

NOTE: For Category Eight, no upper limits are specified due to the extreme variability of the cases within this category. For decisions exceeding the lower limit of the applicable guideline category by more than 48 months, the pertinent aggravating case factors considered are to be specified in the reasons given (e.g., that a homicide was premeditated or committed during the course of another felony; or that extreme cruelty or brutality was demonstrated).

U.S. PAROLE COMMISSION OFFENSE BEHAVIOR SEVERITY INDEX

Chapter One  Offenses of General Applicability
Chapter Two  Offenses Involving the Person
 Subchapter A—Homicide Offenses
 Subchapter B—Assault Offenses
 Subchapter C—Kidnaping and Related Offenses
 Subchapter D—Sexual Offenses
 Subchapter E—Offenses Involving Aircraft
 Subchapter F—Communication of Threats
Chapter Three  Offenses Involving Property
 Subchapter A—Arson and Property Destruction Offenses
 Subchapter B—Criminal Entry Offenses
 Subchapter C—Robbery, Extortion, and Blackmail
 Subchapter D—Theft and Related Offenses
 Subchapter E—Counterfeiting and Related Offenses
 Subchapter F—Bankruptcy Offenses
 Subchapter G—Violations of Securities or Investment Regulations and Antitrust Offenses

Chapter Four  Offenses Involving Immigration, Naturalization, and Passports
Chapter Five  Offenses Involving Revenue
 Subchapter A—Internal Revenue Offenses
 Subchapter B—Customs Offenses
 Subchapter C—Contraband Cigarettes
Chapter Six  Offenses Involving Governmental Process
 Subchapter A—Impersonation of Officials
 Subchapter B—Obstructing Justice
 Subchapter C—Official Corruption
Chapter Seven  Offenses Involving Individual Rights
 Subchapter A—Offenses Involving Civil Rights
 Subchapter B—Offenses Involving Privacy
Chapter Eight  Offenses Involving Explosives and Weapons
 Subchapter A—Explosives and Other Dangerous Articles
 Subchapter B—Firearms
Chapter Nine  Offenses Involving Illicit Drugs
 Subchapter A—Heroin and Opiate Offenses
 Subchapter B—Marihuana and Hashish Offenses
 Subchapter C—Cocaine Offenses

90

---

**Department of Justice**

 Subchapter D—Other Illicit Drug Offenses
Chapter Ten  Offenses Involving National Defense
 Subchapter A—Treason and Related Offenses
 Subchapter B—Sabotage and Related Offenses
 Subchapter C—Espionage and Related Offenses
 Subchapter D—Selective Service Offenses
 Subchapter E—Other National Defense Offenses
Chapter Eleven  Offenses Involving Organized Criminal Activity, Gambling, Obscenity, Sexual Exploitation of Children, Prostitution, and Non-Governmental Bribery
 Subchapter A—Organized Crime Offenses
 Subchapter B—Gambling Offenses
 Subchapter C—Obscenity
 Subchapter D—Sexual Exploitation of Children
 Subchapter E—Prostitution and Slave Traffic
 Subchapter F—Non-Governmental Bribery
 Subchapter G—Currency Offenses
Chapter Twelve  Miscellaneous Offenses
Chapter Thirteen  General Notes and Definitions
 Subchapter A—General Notes
 Subchapter B—Definitions

CHAPTER ONE  OFFENSES OF GENERAL APPLICABILITY

101  Conspiracy
 Grade conspiracy in the same ... the underlying offense.

102  Attempt
 Grade  attempt in the same ... the offense attempted.

103  Aiding and Abetting
 Grade  aiding and abetting in ... category as the underlying offense.

104  Accessory After the Fact
 Grade accessory after the fact ... gories below the underlying offense, ... less than Category One.

NOTE TO CHAPTER ONE: The ... conspiracy or attempt not being ... may, where the circumstances ... considered  as  a  mitigating ... where there is voluntary withdrawal ... offender prior to completion of the ...

CHAPTER TWO  OFFENSES INVOLVING THE PERSON

Subchapter A—Homicide Offenses

201  Murder
 Murder, or a forcible felony ... the death of a person other ...

*Terms marked by an asterisk ... in Chapter Thirteen.

## Title 28—Judicial Administration

rant, clinical evaluation of risk may override this predictive aid.

(f) Guidelines for reparole consideration are set forth at § 2.21.

(g) The Commission shall review the guidelines, including the salient factor score, periodically and may revise or modify them at any time as deemed appropriate.

aggravating circumstances in a particular case may justify a decision or a ... rating different from that ...

(e) An evaluation sheet containing a "salient factor score" serves as an aid in determining the parole prognosis (potential risk of parole violation). However, where circumstances war-

### ADULT

(Guidelines for decisionmaking, customary total time to be served before release (including jail time))

| Offense characteristics: severity of offense behavior (examples) | Offender characteristics: parole prognosis (salient factor score) | | | |
|---|---|---|---|---|
| | Very good (11 to 9) | Good (8 to 6) | Fair (5 to 4) | Poor (3 to 0) |
| **LOW** | | | | |
| Escape (open institution or program (e.g., CTC, work release)—absent less than 7 d). Marihuana or soft drugs, simple possession (small quantity, for own use). Property offenses (theft or simple possession of stolen property) less than $1,000. | 6 to 10 mo. | 8 to 12 mo. | 10 to 14 mo. | 12 to 16 mo. |
| **LOW MODERATE** | | | | |
| Alcohol law violations. Counterfeit currency (passing/possession less than $1,000). Immigration law violations. Income tax evasion (less than $10,000). Property offenses (theft/fraud/theft from mail/embezzlement/interstate transportation of stolen or forged securities/receiving stolen property with intent to resell) less than $1,000. Selective Service Act violations. | 8 to 12 mo. | 12 to 16 mo. | 16 to 20 mo. | 20 to 28 mo. |
| **MODERATE** | | | | |
| Bribery of a public official (offering or accepting). Counterfeit currency (passing/possession $1,000 to $20,000). Drugs: Marihuana, possession with intent to distribute/sale (small scale, e.g., less than 50 lb.). "Soft drugs," possession with intent to distribute/sale (less than $500). Escape (secure program or institution, or absent 7 d or more—no force or threat used). Firearms Act, possession/purchase/sale (single weapon—not sawed-off shotgun or machinegun). Income tax evasion ($10,000 to $50,000). Mailing threatening communications. Misprision of felony. Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/receiving stolen property) $1,000 to $19,999. Smuggling/transporting of alien(s). Theft of motor vehicle (not multiple theft or for resale). | 12 to 16 mo. | 16 to 20 mo. | 20 to 24 mo. | 24 to 32 mo. |

## Chapter I—Department of Justice   § 2.20

### ADULT—Continued

(Guidelines for decisionmaking, customary total time to be served before release (including jail time))

| Offense characteristics: severity of offense behavior (examples) | Offender characteristics: parole prognosis (salient factor score) | | | |
|---|---|---|---|---|
| | Very good (11 to 9) | Good (8 to 6) | Fair (5 to 4) | Poor (3 to 0) |
| **HIGH** | | | | |
| Counterfeit currency (passing/possession) $20,000–$100,000. Counterfeiting (manufacturing). Drugs: Marihuana, possession with intent to distribute/sale (medium scale, e.g., 50 to 1,999 lb.). "Soft drugs," possession with intent to distribute/sale ($400 to $5,000). Explosives, possession/transportation. Firearms Act, possession/purchase/sale (sawed-off shotgun(s), machine gun(s), or multiple weapons). Mann Act (no force—commercial purposes). Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/receiving stolen property) $20,000 to $100,000. | 18 to 20 mo. | 20 to 26 mo. | 26 to 34 mo. | 34 to 44 mo. |
| **VERY HIGH** | | | | |
| Robbery (weapon or threat). Breaking and entering (bank or post office—entry or attempted entry to vault). Drugs: Marihuana, possession with intent to distribute/sale (large scale, e.g., 2,000 lb. or more)). "Soft drugs," possession with intent to distribute/sale (over $5,000). "Hard drugs," possession with intent to distribute/sale (not exceeding $100,000). Extortion. Mann Act (force). Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/receiving stolen property) over $100,000 but not exceeding $500,000. Sexual act (force). | 26 to 36 mo. | 36 to 48 mo. | 48 to 60 mo. | 60 to 72 mo. |
| **GREATEST** | | | | |
| Aggravated felony (e.g., robbery, sexual act, aggravated assault)—weapon fired or personal injury. Aircraft hijacking. Drugs: "Hard drugs," possession with intent to distribute/sale (in excess of $100,000). Explosives (detonation). Kidnapping. Willful homicide. | (Greater than above—however, specific ranges are not given due to the limited number of cases and the extreme variations in severity possible within the category) | | | |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA


CHRISTOPHER FURNARI,                :
                Petitioner          :
                                    :
            v.                      :    Civil No. 4:CV-02-0555
                                    :    (Muir, J.)
UNITED STATES PAROLE COMMISSION     :
and WARDEN, Federal Correctional    :
Institution - Allenwood, PA.,       :
                Respondents         :


### CERTIFICATE OF SERVICE BY MAIL

    The undersigned hereby certifies that she is an employee in
the Office of the United States Attorney for the Middle District
of Pennsylvania and is a person of such age and discretion as to
be competent to serve papers.

    That on May ___, 2002, she served a copy of the attached

### RESPONDENTS' RESPONSE TO
### THE PETITION FOR WRIT OF HABEAS CORPUS

by placing said copy in a postpaid envelope addressed to the
person hereinafter named, at the place and address stated below,
which is the last known address, and by depositing said envelope
and contents in the United States Mail at Williamsport,
Pennsylvania.

Addressee:

Peter Goldberger
James H. Feldman, Jr.
50 Rittenhouse Place
Ardmore, PA 19003-2276

_____
MICHELE E. LINCALIS
Paralegal Specialist