*C to Jr LC*

*20*
*5/30/02*
*gp*

*ORIGINAL*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

CHRISTOPHER FURNARI,          :
                Petitioner    :
                              :
        v.                    :    Civil No. 4:CV-02-0555
                              :    (Muir, J.)
UNITED STATES PAROLE COMMISSION :
and WARDEN, Federal Correctional :
Institution - Allenwood, PA., :
                Respondents   :


RESPONDENTS' EXHIBITS IN SUPPORT OF THEIR RESPONSE TO
THE PETITION FOR WRIT OF HABEAS CORPUS


                    THOMAS A. MARINO
                    United States Attorney

                    KATE L. MERSHIMER
                    Assistant U.S. Attorney
                    MICHELE E. LINCALIS
                    Paralegal Specialist
                    217 Federal Building
                    228 Walnut Street
                    Harrisburg, PA 17108
                    717/221-4482

OF COUNSEL:

MICHAEL A. STOVER, General Counsel
SHARON GERVASONI, Attorney
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, MD 20815

                              **FILED**
                              **WILLIAMSPORT, PA**

Dated: May 30, 2002          MAY 3 0 2002

                    MARY E. D'ANDREA, CLERK
                    Per_____
                              DEPUTY CLERK

## TABLE OF CONTENTS

Letter from AUSA David N. Kelley dated 8/1/96   . . . . . Exh. 2[1]

Letter from Atty. David Breitbart dated 8/19/96   . . . . Exh. 3

Letter from Atty. David Breitbart dated 9/9/96   . . . . . Exh. 4

Letter from AUSA David N. Kelley dated 9/17/96   . . . . . Exh. 5

Letter from Atty. David Breitbart dated 12/2/96   . . . . Exh. 6

Initial Hearing Summary   . . . . . . . . . . . . . . . . Exh. 7

Letter from AUSA David N. Kelley dated 12/11/96   . . . . Exh. 8

Letter from Atty. David Breitbart dated 12/18/96   . . . . Exh. 7

Notice of Action dated 1/8/97   . . . . . . . . . . . . . Exh. 10

Notice of Action on Appeal dated 8/19/97   . . . . . . . . Exh. 11

SIH/Review Hearing Summary   . . . . . . . . . . . . . . . Exh. 12

Notice of Action dated 12/29/98 . . . . . . . . . . . . . Exh. 13

Notice of Action on Appeal dated 4/2/99   . . . . . . . . Exh. 14

Notice of Action dated 10/31/00 . . . . . . . . . . . . . Exh. 15

Initial Hearing Summary   . . . . . . . . . . . . . . . . Exh. 16

Letter from AUSA David N. Kelley dated 9/25/00
    and Affidavit of George A. Stamboulidis   . . . . . . Exh. 17

---

[1] Respondents have retained the exhibit numbers used on documents submitted to the Court in a previous case in an attempt to avoid confusion.  The USPC submitted the PSI as Exhibit 1 in previous litigation; because Furnari submits it under seal in this case, the USPC has not re-submitted it as an exhibit.  The respondents' exhibits therefore commence with Exhibit 2.

Letter from Atty. David Breitbart dated 12/6/00   . . . . Exh. 18

Transcript of Carew's Trial Testimony   . . . . . . . . . Exh. 19

Notice of Action dated 12/27/00 . . . . . . . . . . . . . Exh. 20

Notice of Action on Appeal dated 4/24/01  . . . . . . . . Exh. 21
Slip Opinion in <u>Furnari v. Warden</u>,
     No. 4:CV-98-0222 (M.D. Pa., Apr. 12, 1999)   . . . . Exh. 22

## CERTIFICATE

I, SHARON GERVASONI, Attorney in the Office of General Counsel, United States Parole Commission, 5550 Friendship Boulevard, Chevy Chase, Maryland, 20815, certify that the attached documents are true copies of documents contained in the parole file of **Christopher Furnari,** Register Number **19815-054,** reviewed by me on the date stated below.

IN WITNESS WHEREOF, I have signed this _15th_ day of May, 2002, and have affixed the seal of the United States Parole Commission.

Sharon Gervasoni
Attorney
U.S. Parole Commission





U.S. Department 'f Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

August 1, 1996

By Facsimile
Sam Shoquist
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201
(301) 492-5525

   Re: <u>Christopher Furnari Reg. No. 19815-054</u>

Dear Mr. Shoquist:

   The Government submits this letter in connection with
Furnari's parole hearing, which is currently scheduled for Tuesday,
August 6, 1996 at FCI Allenwood. For the reasons set forth below,
we respectfully recommend that any request by Furnari to be
released on parole at this time be denied.

   Furnari, the Consigliere of the Luchese Organized Crime
Family, was convicted in November 1986 in this district in <u>United
States</u> <u>v.</u> <u>Salerno</u>, <u>et al.</u> SSS 85 Cr. 139 (RO), which was a RICO
prosecution of the mafia's "Commission," a group of the most
powerful members of the organized crime families of New York who
controlled and coordinated various racketeering activities
including murder, loansharking, and extortion. Furnari was
sentenced in 1987 to 100 years imprisonment. At the time of his
conviction, Furnari was one of the most powerful and respected
members of the mafia in New York. For many years prior to his
conviction, Furnari had been an active member and capo in the
Luchese Family who participated in many violent acts in addition to
those for which he was convicted. Moreover, and as set forth
below, Furnari is still a highly respected Luchese Family member
who is likely to return to a high-ranking position if granted an
untimely release on parole.

<u>Furnari's Violent Past</u>

   In the years since Furnari's conviction, the Government
has successfully prosecuted many members and associates of the
Luchese Family for a variety of violent racketeering offenses.
These prosecutions were made possible in large part by several
cooperating witnesses who themselves formerly were members and
associates of La Cosa Nostra. Several of those cooperators,
including Alfonso D'Arco (former acting Luchese Family Boss),



EXHIBIT

2

*Ex 2 P?*

Sam Shoquist                                                              2
United States Parole Commission
August 1, 1996

Anthony "Gaspipe" Casso (Luchese Family Consigliere and Underboss),
Peter Chiodo (Luchese Family Capo) and Thomas "Tommy Irish" Carew
(Luchese Family associate), have been debriefed concerning
Furnari's criminal activities prior to his incarceration.[1]  Among
the information these witnesses have provided about Furnari is the
following:

    1.  Casso -- who rose to the level of Consigliere not
long after Furnari's conviction -- and Carew have independently
reported that Furnari was involved in the murder in the mid-1970's
of Lee Schleifer, who was at the time a confederate in narcotics
trafficking with a Luchese Family associate.  Specifically, the
witnesses report that Furnari -- who was a capo at the time --
requested that Casso execute Schleifer when members of the Luchese
Family came to suspect Schleifer of cooperating with law
enforcement.  With the help of a Luchese associate, Casso lured
Schleifer to a vacant Brooklyn social club one winter day, where
Schleifer was shot.  Furnari and Carew, who were waiting at a
nearby restaurant, were then summoned to the social club, and
Schleifer's body was then removed and dumped on a dead end street
in Brooklyn.  According to the New York City Police Department,
Schleifer's body, which had suffered a gunshot wound, was
discovered on a Brooklyn Street on February 18, 1975.

    2.  Casso and Carew also reported that, in the early
1980's Furnari issued a "contract" to Casso to murder Luchese
Family associate Richard Taglianetti.  According to the witnesses,
Taglianetti was targeted for execution because it was believed that
he had participated in the murder of the son of Angelo DeFendis, a
member of the Luchese Family.  In sum, after DeFendis's son was
murdered, DeFendis met with Furnari at the 19th Hole Bar -- where
Furnari typically met with other Luchese Family members -- and
asked for Furnari's help in avenging the death of DeFendis's son.
Furnari assented, suggested that DeFendis and his wife leave town
for a while, and then instructed members of Furnari's crew, Casso
and Vittorio "Vic" Amuso -- who later became the boss of the
Luchese Family -- to murder Taglianetti.  Although Casso and Amuso
took steps to locate and murder Taglianetti, word of the murder
contract soon leaked to Taglianetti and he went on the lam for
several years.  Not until Taglianetti resurfaced in Brooklyn in

_____

    [1]  Each of these cooperators have pleaded guilty to a variety
of violent racketeering offenses -- including murders -- and have
testified at numerous proceedings including trials and depositions,
and have also appeared before federal grand juries.  Indeed, Casso
testified before the Senate Permanent Committee on Investigations.

EX21 P2

Sam Shoquist
United States Parole Commission
August 1, 1996

3

1992 was he finally executed by Luchese Family member George Conti.[2]

3.   Casso reported that in the 1970's Furnari received a complaint from Vincent "Chin" Gigante, the boss of the Genovese Organized Crime Family, that Joseph Abinanti, the son of Luchese member Pete "the Killer" Abinanti, had been kidnapping people for ransom and had kidnapped one of Gigante's associates.[3]   Gigante asked Furnari to have the younger Abinanti killed, since each Family was ultimately responsible for the misdeeds of members and associates of the Family.   Furnari assigned the murder contract to Casso and Amuso.   The two then surveilled Abinanti and finally, when Abinanti arrived at his home one evening, Amuso approached Abinanti in his driveway and shot him.   Abinanti survived the shooting and, after recuperating, fled to California.

4.   Casso also has recounted a meeting that took place between Gigante, Genovese Consigliere Bobby Manna, and others shortly after Gambino Family Boss Paul Castellano was gunned down in Manhattan in December 1985.   Specifically, Casso advised that a meeting of the group took place at Furnari's Staten Island home. It was decided at the meeting that, since the Castellano murder had not been sanctioned by the Commission (the panel of the hierarchies of four of the five families that was the subject of Furnari's successful prosecution), the Genovese and Luchese families would kill those responsible for the murder, particularly then Gambino Family upstart John Gotti and Frank DeCicco.   After the meeting Furnari asked Casso and Amuso to undertake the execution of the plot, which culminated in the successful bombing of DeCicco as he entered his car on a Brooklyn Street in April 1986.

5.   Both Casso and Chiodo have advised that, before his incarceration, Furnari exercised extortionate control over officials of the Painter's Union.   In connection with that, Chiodo has stated that, in approximately 1978, Furnari met with James Bishop, the Secretary of the Painter's International Union.   When Bishop explained that, by moving from Buffalo to New York James Wolford -- a Board member of the International -- was encroaching on Bishop's "territory," Furnari directed Chiodo, Carew, and others to give a "beating" to Wolford.   After Chiodo and the others

---

[2]   Independent of Casso, D'Arco reported that he had had discussions with Casso, Conte, and others about avenging the murder of DeFendis's son.

[3]   According to Chiodo, Furnari's protege', Furnari was a trusted friend of Gigante who frequently was called upon to participate in matters in which the Genovese and Luchese Family had mutual or joint interests.

Sam Shoquist
United States Parole Commission
August 1, 1996

4

successfully carried out the assault plot, Wolford left the New
York area.

     6.   Chiodo also reported that in 1987, Chiodo received
word from Furnari, through Furnari's son, then Luchese capo
Christopher "Jumbo" Furnari, Jr., that Chiodo was to give a beating
to Joseph Martinelli, a principal of Northberry Concrete, who
reportedly had failed to make the extortion payments that had been
ordered by Furnari Jr.[4]  The beating was never carried out because
Chiodo eventually succeeded in collecting thousands of dollars in
extortion money from Martinelli.  Both Casso and D'Arco
independently reported that discussions within the Family were held
concerning whether Martinelli should be killed or beaten when it
was discovered that he was not paying the Family's extortion
demands.[5]

     7.    In addition to the above, it is D'Arco's
understanding that virtually every murder contract carried out by
Luchese Family members while Furnari was the Family's Consigliere
was first sanctioned by Furnari.

<u>Furnari's Future in Organized Crime if Released</u>

     Since approximately 1991, the Luchese Family's power and
control over many of its illicit operations has been severely
undermined as a result of numerous federal prosecutions.  These
prosecutions have resulted in the convictions of many Luchese
Family members.  Included among the convicted are Vittorio Amuso,
who replaced Anthony Corallo as Boss shortly after Corallo was
convicted in the same case as Furnari, and Anthony Casso, who, as
Consigliere, was one of Furnari's successors.  We have learned that
although he is incarcerated, Amuso continues to exert tremendous
influence over the ongoing affairs of the Luchese Family.

     Through D'Arco, Chiodo, and current confidential

---

    [4] According to several witnesses and informants, Furnari Jr.
was assigned to run Furnari's crew while he was incarcerated.
However, because Furnari Jr. did not cooperate with the Luchese
hierarchy, particularly Amuso and Casso, his membership in the
Family was essentially revoked and he was "shelved."  Furnari Jr.'s
removal from the family was virtually unprecedented, since those in
his predicament customarily would be executed.  However, according
to several sources, Furnari Jr.'s life was spared out of respect
for the Family's imprisoned Consigliere, Furnari Sr.

    [5] Carew essentially corroborates Chiodo's account.  However,
Carew believes that Furnari Jr. never had his father's permission
to give the order for Martinelli's beating.

Sam Shoquist                                                              5
United States Parole Commission
August 1, 1996

informants, we know that Furnari is in the eyes of Luchese Family
members and associates a living legend, who still is highly
respected and revered by them. In fact, we know through informant
information that Amuso considers Furnari to be his mentor. Should
Furnari be released it is likely -- indeed expected by current
Luchese Family members -- that Furnari will be called upon to fill
the leadership void in the Luchese Family.

        In view of the foregoing, and the clear intention by the
sentencing judge that Furnari serve an extensive prison term, it is
respectfully recommended that Furnari not be released on parole at
any time in the near or distant future.

                          Respectfully submitted,

                          MARY JO WHITE
                          United States Attorney

                          By:
                              DAVID N. KELLEY
                              Chief, Organized Crime & Terrorism
                              Tel.: (212) 791-1131

cc:  David Breitbart, Esq.
     Jim Clark, FCI Allenwood

LAW OFFICES OF

## DAVID BREITBART

52 DUANE STREET

7TH FLOOR

NEW YORK, N.Y. 10007-1206

(212) 608-1313
_____

FAX: (212) 619-2767

August 19, 1996

Sam Shoquist
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, MD.  20815

RE:  Furnari, Christopher
Reg #: 19815-051
FCI Allenwood

Dear Mr. Shoquist:

I have been retained by Mr. Furnari to represent him at his
initial hearing before the Parole Commission.  The original date of
the hearing was to be in the week of June 3-7, 1996.   The hearing
was adjourned to August 6, 1996 at the request United States
Attorney Mary Jo White by AUSA David N. Kelley.  On August 1, 1996,
Mr. Kelley sent you a letter by telefax requesting that Mr. Furnari
not be released on parole at this time.  As a result of this
eleventh hour submission, Mr. Furnari was constrained to obtain an
adjournment of his parole hearing (see letter to Hon. Thomas
Kowalsky attached hereto).

Mr. Kelley's letter of August 1, 1996  is an erroneous,
misleading and unsubstantiated document put before The Commission
in a desperate attempt to keep Mr. Furnari incarcerated.    Mr.
Kelley asserts that the allegations leveled against Mr. Furnari are
derived from debriefings of four informants who are seeking
leniency in exchange for their cooperation:(Alfonso D'Arco, Anthony
"Gaspipe" Casso, Peter Chiodo and Thomas "Tommy Irish" Carew).
Buried in footnote one of his letter is the admission that each of
these self serving informants " have pleaded guilty to a variety of
violent racketeering offenses--including **murders**".

The letter suggests that the FBI debriefings of these
convicted murderers independently confirm the allegations against
Mr. Furnari.  However, If one reads the letter carefully it is
clear that virtually all of the information is derived from
references to ambiguous statements by "Gaspipe" Casso, an info[
never tested by cross examination in a trial in the United St[

EXHIBIT

3

PENGAD-Bayonne, N.J.

EX3,f1

-2-

concerning the "information" he has provided.  In contrast, it is most unclear whether any of the stories recounted are based on first hand information.  Each of the seven tales in Kelley's letter are couched in indirect terms (eg. "witnesses report"). In order to determine whether these reports have any validity it is essential that the source documents (FBI "302s") from which these allegations were purportedly drawn be provided to The Parole Commission and Mr. Furnari well in advance of the October hearing.

Due Process and fundamental fairness require that the FBI "302s" that Mr. Kelley has relied on be produced to allow Mr. Furnari to demonstrate the erroneous and misleading nature of these allegations, if such allegations exist.  In the alternative, Mr. Furnari respectfully requests that if he is not given access to the source documents that Mr. Kelley's letter of August 1, 1996 not be considered by the Commission in determining Mr. Furnari's application for parole.

Very truly yours,

David Breitbart

cc.

Hon. Thomas Kowalsky
Christopher Furnari

September 9, 1996

AUSA David N. Kelley
United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, NY  10007

                              RE:  Furnari, Christopher
                                   Reg #: 19815-051
                                   FCI Allenwood

Dear Mr. Kelley:

    Your letter of August 1, 1996 addressed to Mr. Sam Showquist
of the Parole Commission suggests that the FBI debriefings of
government informants independently confirm the allegations against
Mr. Furnari.

    In order to determine whether these reports have any validity
it is essential that the source documents (FBI "302s") from which
these allegations were purportedly drawn be provided to The Parole
Commission and Mr. Furnari well in advance of the October hearing.
As of this date I have been assured that the 302's have not been
received by Parole and that if available, copies would be forwarded
to me.

    Due Process and fundamental fairness require that the FBI
"302s" that or whatever documents you have relied on be produced.
In the alternative, Mr. Furnari respectfully requests that if he is
not given access to the source documents that you withdraw the
letter of August 1, 1996 to assure it has no impact on the Parole
Commission's decision.

                              Very truly yours,



                              DAVID BREITBART


DB:ag

cc: Sam Showquist


EXHIBIT
4

05/30/02  09:06 FAX 301 492 5563          US PAROLE COMMISSION                          ☑002



*United States A...rney*
*Southern Distri...f New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 17, 1996

David Breitbart, Esq.
52 Duane Street 7th Floor
New York, New York 10007

                Re:  <u>Christopher Furnari</u>
                     Inmate # 19815-051

Dear Mr. Breitbart:

        I have received your letter dated September 9, 1996 in
which you requested documentation supporting my August 1, 1996
letter in opposition to your client's release on parole.  I am not
aware of any authority to support your request and, consequently,
I am not inclined at this juncture to provide you with any
materials.

        If you would like to discuss this matter further, please
do not hesitate to contact me.

                        Very truly yours,

                        MARY JO WHITE
                        United States Attorney

                        By:
                        DAVID N. KELLEY
                        Chief, Organized Crime & Terrorism
                        Tel.:(212) 791-1131

cc: Sam Shoquist

EXHIBIT
5

LAW OFFICES OF

DAVID BREITBART

52 DUANE STREET

7TH FLOOR

NEW YORK, N.Y. 10007-1206

(212) 608-1313

FAX: (212) 619-2767

December 2, 1996

Sam Shoquist
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland  20815-7201

RE:  Christopher Furnari, Reg. No. 19815-054

Dear Mr. Shoquist:

Mr. Furnari submits this letter to supplement his presentation during his upcoming parole hearing on December 3, 1996 at FCI Allenwood.

As you are aware Mr. Furnari, after being sentenced 10 years ago, had been classified as a level 8 for parole purposes as a result of a reference to the 1979 homicide of Carmine Galanti which was authorized by the Mafia's Commission.  Many years later, it became apparent, and the government agreed, that Mr. Furnari was not a member of the Commission until 1983.  Thus, he could bear no responsibility for the murder of Mr. Galanti.  An order attesting to this fact and amending Mr. Furnari's presentencing investigation was signed by Judge Owen.  This then should have resulted in Mr. Furnari being reclassified as a level 7.

On August 1, 1996, the Parole Commission received a letter authored by David N. Kelley alleging other crimes of violence and imploring the Parole Commission to deny parole release to Mr. Furnari at this time.  The timing of the letter and the supplied information is a total distortion of the facts alleged and was designed to unfairly prejudice Mr. Furnari's eligibility.  In contesting these allegations we rely on trial testimony and 302s supplied by the government in connection with other criminal proceedings.  In contrast to the government's refusal to provide supporting documentation for its' allegations, Mr. Furnari will provide This Commission with any backup materials requested.

EXHIBIT

6

The information proffered by the government must be examined closely. Mr. Kelley in a footnote on page 2 of his letter suggests that each and every one of his sources of information, namely; Alphonso D'Arco, Anthony "Gaspipe" Casso, Peter Chiodo and Thomas Carew have testified at numerous proceedings, including trials and depositions. This, I assume, is to suggest that they are reliable witnesses who have been tested by cross-examination after discovery material has been provided to counsel. This is just not true with regard to the key source of information in Mr. Kelley's letter. Anthony Casso has never been called as a witness in any trial. As a result, no discovery materials with regard to prior statements has ever been handed over to defense counsel. As the Commission knows after receipt of the August 1, 1996 letter, Counsel for Furnari requested of the Parole Commission and then the government any and all of the debriefing statements that reflect the new allegations against Mr. Furnari. The Commission advised that they have none, and Mr. Kelley indicated he would turn nothing over.

As far as the other three; Chiodo, D'Arco and Carew they have ben called by the government. Each of them has been tested under cross-examination. Discovery documents consisting mostly of interviews by FBI agents are available in the legal community. None of these men have ever before implicated Furnari in any of the new crimes which have surfaced in Mr. Kelley's August 1, 1996 letter, except as will be further discussed. It was as a result of the analysis of the prior testimony that the original order to supplement Mr. Furnari's PSI was made and acquiesced to by the government. Mr. Kelley was one of the Assistant U.S. Attorneys who had used Mr. D'Arco as a trial witness. In fact, it was Mr. Kelley who, after checking with Mr. D'Arco, was forced to agree that Mr. Furnari was not involved in the Commission in 1979. It was the government's position that Mr. Furnari's tenure in the administration of the Luchese Family was 1983-1986. Mr. Furnari was convicted in November 1986.

Almost all of the allegations that Mr. Furnari was predisposed to violence came from Anthony Casso. What we know from previous trials where he was prominently mentioned makes him unworthy of belief. We know that after the Commission trial in 1986, he acceded to positions of authority in the Luchese Family. Christopher Mattiece, the head of the FBI's Luchese Family investigation unit described Casso in a manner that can only be interpreted as seriously depraved. His conduct and actions can only be described as the symptoms of a severe paranoid schizophrenic. Agent Mattiece said in 1993 in the case of U.S. v. Frank Arnold et al that the FBI had information and proof that Casso was responsible for 187 murders or conspiracies to murder. Never in the history of the criminal justice system has there ever been such a character. Mr. Casso, who began cooperating with the government over 3 years ago, has never been called as a witness.

2

Ex 6, P2

There can only be two possible explanations for this decision by the government. Either it has been decided that he is too inherently unreliable to risk a prosecution on, or his debriefing materials e.g., FBI's 302's are so inconsistent with other informants such as D'Arco, Chiodo and Carew, that Casso's testimony would require over turning many previous convictions.

To jeopardize Mr. Furnari's liberty on the hearsay allegations of such a source of information without having the opportunity to examine the witness or even see any of the underlying materials is totally unfair. The Casso allegations deprive Mr. Furnari of both his right to confront a witness and his right to Due Process of Law.

Mr. D'Arco has testified and has been cross-examined on many occasions by many attorneys. Mr. D'Arco has reputedly described his role in organized crime. He says he rose as high as acting boss of the Luchese Crime Family. As such, he had intimate contact with the administration of his family, including "Gaspipe Casso" and the administrations of other crime families. He professed being involved with organized crime for decades as an associate, a soldier, a captain and as an acting boss. He also held himself out as a historian of organized criminal activity.

In paragraph number 7 on page 4 of Mr. Kelley's letter, dated August 1, 1996, Mr. D'Arco is quoted as stating that virtually every murder contract carried out by Luchese Family members while Furnari was the Family's Consigliere was first sanctioned by Furnari. First, the Parole Commission should be aware that nowhere in the hundreds of pages of FBI interviews does D'Arco make such a claim. Second, nowhere in the thousands of pages of D'Arco testimony does D'Arco make such an allegation. Third, D'Arco was the primary source of information that exonerated Furnari from any involvement in the Galanti homicide which is now no longer a part of his PSI. Fourth, during the period of 1983-1986 which the government alleges is the tenure of Mr. Furnari as Luchese Consigliere, Mr. D'Arco was in jail on a narcotics conviction and when he got out of jail in 1986, Mr. Furnari was incarcerated. Fifth, there is no record available that indicates that any homicide was committed during the 1983-1986 time frame by the Luchese Family. Furthermore, lastly, Mr. D'Arco testified under oath on many occasions that only the boss of the family could sanction or order a murder.

3

Ex 6, P3

Paragraph numbered 6 on page 4 refers to an allegation of a beating ordered by Mr. Furnari. I would first like to point out that Mr. Furnari was already in custody at that time. Footnote number 5 on that page has another government informant, Carew, indicating that Mr. Furnari was not involved. As far as the last sentence in that paragraph about family discussions to kill or beat Mr. Martinelli, Mr. D'Arco has testified that those discussions occurred in and around 1990 and that any orders to hurt or kill Martinelli came from Casso and then boss Vic Amuso. It is thus fair to conclude that this is included in a letter to provide a false basis to deny parole to Mr. Furnari. This is impermissible because it was Mr. Casso and Mr. D'Arco who conspired to kill Mr. Martinelli years after Mr. Furnari was in custody.

Paragraph number 5 refers to an alleged incident in approximately 1978 or 1979. Chiodo has been called to testify and has testified about this alleged incident before the Honorable Jack Weinstein in the Eastern District of New York. This also was in the trial of United States v. Frank Arnold et al in 1993. This is the same trial wherein FBI Agent Christopher Mattiece indicated that "Gaspipe" Casso was responsible for 187 murders or conspiracies to murder. The evidence adduced at the trial was that James Wolford on behalf of the Buffalo N.Y. organized crime family was attempting to take over the N.Y. Painters Union. Chiodo testified to having given James Wolford a beating along with Tommy Carew and others. He indicated that he had done this at the behest of Christopher Furnari. Frank Arnold was accused of being involved in that assault along with Mr. Furnari. The jury acquitted everyone in that trial that was accused in that assault on Mr. Wolford. The jury's decision in the Eastern District of New York clearing these accused of being a co-conspirator of Mr. Furnari of any complicity with the Wolford assault should be dispositive of this renewed allegation against Mr. Furnari for the purposes of the Parole Commission.

Paragraph 4 implies that Anthony Casso was present at a meeting in Christopher Furnari's house, that included the administration of other families. No meeting ever took place that Furnari participated in. Certainly, there never was such a meeting of any kind in Furnari's house. There can be no question that every Mafia informant that has ever testified has indicated that no soldier from one family can interact with the administration of another family. The idea that Casso was present at such a meeting is absurd. Surveillance was enormous in and around the time that the Commission case was being investigated. Such a meeting certainly would have been the subject of physical and photographic surveillance. No evidence of such a surveillance of such a meeting has ever been produced. Moreover, the Parole Commission should be aware that Frank DeCicco, the victim of this bombing was highly regarded by and a friend of Mr. Furnari's and it is also common knowledge that Anthony Casso hated Frank DeCicco. As far as the

4

Joseph D'Arco, the son of Al D'Arco, and a Luchese soldier, together with George Zappala, according to D'Arco, were the individuals responsible for the murder of Anthony DiLapi. This was another "hit" ordered by Casso and Amuso. D'Arco ordered his own son to carry this one out. That the government attempts to weave these facts into an allegation against Mr. Furnari transcends credulity.

In paragraph 2, Mr. Kelley tries to attribute a 1992 murder of Richard Taglianetti to Mr. Furnari. At that time, Mr. Furnari had been incarcerated for 6 years and Mr. Amuso was the boss and Mr. Casso was the underboss of the Luchese family. Firstly, according to Alphonse D'Arco, only a boss can order a homicide. Hence, the allegation that Furnari ordered a hit in the early 80's is absurd. Mr. Kelley attempts to support Casso's allegation with footnote 2 on page 3. Therein, Mr. Kelley writes that independent of Casso, D'Arco had discussions with Casso and Conte about arranging the murder of DeFendis's son. This may add some credence to the fact that DeFendis had a son, even that the son was killed. This could even support the concept that the death of the son had to be avenged. It says nothing about Richard Taglianetti and certainly nothing about Furnari talking to Casso about Taglianetti in the early 80's. There is also no discovery material available from any of these government informants that in anyway implicates Mr. Furnari in any threat on Mr. Taglianetti in the early 80's.

The allegation in paragraph 1 is the best example of due process violation in Mr. Kelley's letter. Again, we reiterate that Furnari did not have the authority to order someone killed. Mr. D'Arco is very clear in his testimony that as a student of the history of the Luchese Family that rule has always been in existence. There was a rule against dealing with drugs in the Luchese Family before Amuso and Casso took over the reins of the family in 1986. The fact that Mr. Casso was a drug dealer has been repeated by Mr. Kelley's informants on many occasions. The fact that Mr. Casso was also a heavy drug user is also common knowledge. The enormity of his drug habit somewhat explains his causing the death or conspiring to cause the death of 187 people. That Mr. Furnari despises drugs is also common knowledge. It would not surprise this observer that Mr. Casso murdered Lee Schleifer. We would also not be surprised if it pertained to narcotics dealing. Again, there is not one document anywhere that in anyway implicates Mr. Furnari. The fact that Mr. Casso has never been called as a witness in any trial in all of his years of cooperation speaks the loudest about the fact that even the government doesn't trust his statements.

In a concluding portion of his letter, Mr. Kelley attempts to suggest that Mr. Furnari would resume an important role in organized crime. First, I'd like to point out that Mr. Furnari during his 10 years of incarceration has been a model prisoner. He has taken advantage of every educational and social program available to him. The evaluations of him by those members of the Bureau of Prisons who have come into contact with him speak more loudly than I ever could. He has cooperated with and helped the prison officials in whatever institution that he has been held in.

Mr. Kelley advises that the present administration of the Luchese Family is the same administration that banished Mr. Furnari's son from New York. Mr. Furnari's son has relocated to Florida and Christopher Furnari Sr. hopes to be released to Florida if and when he is paroled. That is half a continent away from any organized crime contact for which he was convicted in 1986.

I would further point out that the government has introduced sworn testimony from the same informants who supply information to Mr. Kelley for his August 1, 1996 letter, that anytime this administration felt that a member had influence or respect or leadership qualities he was exiled or ordered killed. These include but are not limited to Michael Salerno, a Bronx captain who was considered a leader and very well respected who had just recently killed John Petrocelli at the administrations command - who was labeled a "rat" by Casso and ordered killed; Anthony "Buddy" Luongo, who Casso reputedly along with Amuso bragged about killing because of his prominence and potential to assume Luchese leadership; Mariano "Mac" Macaluso a former consigliere who in his seventies was forced into retirement on the threat of death, Neil Migliore a former underboss who was ordered murdered and although shot through the window of a restaurant survived and was forced to retire, Michael Pappadio who was considered a power figure and in charge of the Luchese Families Garment Center interests, was murdered by Al D'Arco, at the order of Casso and Amuso according to D'Arco, Anthony DiLapi who was a leader who Al D'Arco's son murdered, the explanation for this one was that he had conspired in a power play with a former underboss, Tom "Mix" Santoro, in an attempt to wrest the leadership of the family away from then boss Anthony Corvallo. We should not forget that two of the informants that Mr. Kelley relies on for his information in this application were also ordered killed by this administration. Peter Chiodo, a former captain and part of a troika that participated in running the family while Casso and Amuso were on the lam was, shot 12 times and survived. Al D'Arco the former acting boss also states there was a contract placed on his life which caused him to become an informant.

Based on the foregoing and the statutory analysis contained in my May 8, 1996 letter to this Commission, it is respectfully submitted, that Mr. Furnari is a Category Seven with a Salient Factor Score of ten.  At this time he has served 120 months or forty months over the resultant guidelines period of 52-80 months.  Mr. Furnari is now 72 years old and asks to be paroled to spend what time he has left in this world with his family in Florida.  If released on parole he will continue to live as a model of rehabilitation.  If he does not he will be committing himself to the horrible fate of a man who will die in prison.  He should not be punished for crimes he did not commit but attributed to him by a mass murderer.  He should be given the chance to live out his years in the freedom he earned and must continue to earn.

Respectfully submitted,

David Breitbart

DB:ag

8

## INITIAL HEARING SUMMARY

| | | | |
|---|---|---|---|
| **Name:** . . . . . . . . | FURNARI, Christopher | **2/3 or MR Date:** . . . . . | 7/16/53 |
| **Reg No:** . . . . . . . | 19815-054 | **Projected MR Date:** . . | 11/24/44 |
| **Hearing Date:** . . . | 12/3/96 | **Full Term Date:** . . . . . | 11/15/86 |
| **Institution:** . . . . . | Allenwood FCI | **Months in Custody:** . . | 120 |
| **Examiner:** . . . . . . | Suleski, Anthony, J. | **As Of:** . . . | 12/15/96 |
| | | **Severity Rating:** . . . . . | Eight |
| | | **Salient Factor Score:** . | 8 |
| | | **Guideline Range:** . . . . | 100+ mths. |

**Recommended Release**  Fifteen Year Reconsideration Hearing in December 2011.

I.   The panel has discussed the prisoner's severity rating, salient factor score and guidelines with the prisoner.  The prisoner admitted his involvement in the Lucchese organized crime family but denied any direct or indirect involvement in any murders.  Beyond this, the subject through his attorney David Breitbart discussed at some length that during the time frame involved the subject was not consigliere of the Lucchese family.  He only became consigliere in 1983, well after the murders of Carmine Galente, Leonard Coppola, and Giseppe Turano.  During the time frame reflected in the presentence investigation the subject's involvement with the Lucchese was that of a "Capo" or the boss of a group of organized crime members.  He spoke at some length about several government witnesses, one of which is named D'Arco, who is an acknowledged expert as to organization and rules and regulations of organized crime.  He stated that D'Arco himself has testified that it was only the boss of the family who may order or approve the murder of an individual and that these orders are passed down through the hierarchy of the family.  As Furnari was not a member of the hierarchy of the family during this time period he could not have known or been responsible for the murders.  He talked about rules of the organized crime family's pertaining to initiation, drug sales, and use of a bomb to kill anyone (at least one of the alleged murders).  He indicated that D'Arco has stated that violations of these rules would lead to death.

He went on to talk about D'Arco, D'Arco's statement that the subject was involved in every murder that the family committed between 1983 and 1986 when he was the consigliere.  He stated that between 1983 and 1986 D'Arco was in jail and could not have know about how the family was being run personally and any statements he made was hearsay.  Further, Breitbart stated that during 1983 to 1986 to the best of his knowledge there were no murders committed by the Lucchese family.

FURNARI.198                                                        Page 1 of

EXHIBIT

7

● ●

Anthony Breitbart talked about the fact that most of the information given here was done by Amuso Caso, who Breitbart described as a lair and a murderer who an FBI witness testified at another trial committed or was responsible

for 187 murders himself. He stated that he was an unreliable witness who the government has refused to use at trial as his testimony would conflict with others. He stated that they have been unable to obtain documentation from the government on Caso's statements as the government has refused to disclose it. He talked at some length about the four individuals including Caso who have given information about the subject including Tommy Tony Carew, an associate in the Lucchese family, Peter Chiodo, a soldier, a capo who later administered the family for a period of time and Al D'Arco who rose from associate to capo to under boss and

acting boss of the Lucchese family. He stated that testimony of these people would conflict with that of Caso and that is why he has not been used by the government. He stated that D'Arco has been responsible for at least nineteen murders and he went on state that the allegations made by Mr. Kelly in his August 1, 1996 letter are denied by the subject and the witnesses Kelly states that he has are untrustworthy.


Assistant U.S. Attorney Kelly testified at some length that the informants that have been used by the  government are indeed trustworthy and have resulted in a number a convictions. Caso's testimony has not been used to this date as he has not been needed. He did indicate that Caso has testified in a trial in relation to an Israeli prosecution and he has also testified before Congress on organized crime. He advised that Caso's information has been corroborated by various government witnesses and he considers him to be a reliable witness and the information brought forth reliable. He had not brought this information to the attention of the    Parole Commission before this time based on the subject's one hundred year sentence and the fact that the government is tied down with other organized crime matters with the subject being incarcerated on a long sentence. He talked at some length about D'Arco and his record keeping. He stated that not only was he a historian of the government but also kept meticulous records and his memoirs have been used to convict a number of people. He indicated that the government believes that information provided by D'Arco and Caso relative to the subject is correct. The individuals who he provided in his letter have been most effective witnesses for the government.

Kelly talked about the hierarchy and structure of organized crime as provided by D'Arco who he stated    Breitbart has conceded is an expert on this matter. D'Arco has been involved for thirty years in organized crime and stated that only the boss of an organized crime family can order a murder. The consigliere and under boss are the conduit to carry out the ordered murders. However, the capo(and Furnari was a capo during this period of time)is the conduit from the hierarchy of the family to the soldiers or members who actually carry out the murder. He stated that there was no way that the murders done by members of Furnari's crew would have been done without his knowledge and approval. It is noted that Breitbart had talked for some length as to there never being a surveillance that caught a meeting at the subject's house.    Kelly explained that most of the surveillance on the subject was carried out at a bar and restaurant were he conducted most or practically all of his business.

FURNARI.198                                                        Page 2 of

EX 7, P2

They did not believe that there was a need to carry out surveillance on the subject at his residence. Kelly testified that there were a number of murders while subject was capo and also while he was consigliere.

Kelly advised that subject was one of the most powerful members of the Lucchese family and remains a      respected organized crime figure. He stated that there intelligence indicates that because the Lucchese family is currently in a state of upheaval that he would be a neutral person because of the respect given him to leave prison and immediately take over in a higher role of management of the family. He advised that while subject was consigliere he knew of at least one and probably more murders that were committed. One was of DiCicco. There were also murders or attempted murders that he talked about while the subject was a capo.

As numerous allegations were made on both sides in this case AUSA Kelly was given until 12/11, which was the date he stated that he could comply with, to provide by letter information particularly as to murders that were committed by members of the subject's Lucchese family crew while he was capo and also murders that were alleged while he was consigliere. Since Breitbart's office is directly across the street from the AUSA he stated that he would hand carry a copy of the letter to Breitbart before he faxed it to the Parole Commission.      Breitbart indicated that he could probably have his response done by the following day and if not he would contact the Parole Commission.

Upon examination and explanation from the prisoner the examiner finds his SFS to be 8.


## II.    Additions/Follow Up to Initial Hearing:

AUSA Kelly prepared a letter dated 12/11/96 which was received in the probation office by fax the same date     and a hard copy the following date. On 12/12/96 Ivar Goldart of David Breitbart's office faxed a letter to Mr. Kowalski asking for permission to fax a response by 12/16/96. This examiner telephoned Goldart on 12/13/96 and informed that I would be out of the office until 12/20/96 when I would examine the response which should be in my office by 12/19/96.

Kelly's letter of 12/11/96 is separated into three areas and a conclusion. The first area addresses the murders  by members of Furnari's crew and by members of the Lucchese family while Furnari was capo. There are seven murders and one attempted murder during the time subject was capo of the family. There are an additional six murders reflected in the list most of which would have been committed while the subject was consigliere of the family. He talked about the subject's direct involvement in the planning of the murder of Anthony Luongo which occurred on 11/11/86 while subject was consigliere.

In his second point Kelly talked about Breitbart's attacks on government witness ~~Amuso~~ Anthony Casso by Mr.      Breitbart. He stated that he spoke to the FBI agent who Breitbart indicates testified that the subject committed 187 murders and stated that the FBI agent, agent Matteice told him that the homicides were committed by an organized crime group meaning the

FURNARI.198                                                      Page 3 of

Lucchese family. In his third point he talked about what he described as inaccuracies in the subject's December 2, 1996 letter. He stated that Furnari through his attorney stated that he wasn't even sure that Abinanti shooting refered to in the government's August 1 letterhead in fact ever occurred. He indicated that Abinanti was shot in his driveway but did survive and was ordered by the Lucchese family as an accommodation to the Genevese family were in enraged at Abinanti's kidnapping of associates of the Gevevese family. He concluded by stating that the subject was a leader of one of the most dangerous and deadly criminal organizations in the countries history and he has information that the expectation of many of Furnari's confederates is that he would hold an active leading role in the Lucchese family if returned to the street.

Attorney Breitbart letter of 12/18/96 states that ~~Amuse~~ Anthony "gas pipe" Casso is a mass murder whose allegations are relied upon by Kelly and Kelly has refused to provide corroboration of Casso's allegations as reflected in Kelly's footnote on page one of his 12/11/96 letter. He stated that ~~a strange~~ it strains credulity that future trials and ongoing investigations relative to crimes that are more than twenty years old would in anyway have any effect on future prosecutions. He described Casso's allegations as unreliable and that they should not be ~~re~~considered in relation to the subject's parole eligibility decision. He went on to refer to most of the murders reflected in AUSA Kelly's letter, blaming each of these on Casso or others and not the subject.

### III. Institutional Factors:

### A. Discipline:

None

### B. Program Achievement:

The subject has completed five hundred hours of the prison fellowship program and has presented certificates of verification of this. He has also involved himself in individual counseling as needed. He also completed a number of self improvement courses including astronomy, business, business discussion class and military history. He works in the recreation department were he receives above average work evaluations requiring minimal supervision.

### IV. Fines, Restitution, Court Assessment:

Subject had a $900 felony assessment and a $240,000 committed fine. He has been involved in the inmate financial responsibility program and has paid $175 towards his felony assessment and $2,050 towards the committed fine.

### V. Release Plans:

FURNARI.198

Page 4 of

Upon release subject will reside with his wife in Staten Island, New York. Records indicated that employment will be established if necessary upon release.

## VI. Representative:

Subject was represented by David Breitbart, 52 Duane Street, Seventh Floor New York, NY 1007-1206. See I and II above for Breitbart's statements.

Also present at the hearing and providing a short statement was Benjamin Malcolm, 305 Broadway Suite 200,    New York, NY 1007. Malcolm provided some testimony as to the 1976 USPC organization act and how it affected this case. He stated that he has calculated this as a multiple category five offense. It is noted that Malcolm was not considered a representative by the examiner and was allowed to speak quite briefly only out of respect to his prior position of Commissioner.

## VII. Risk:

Subject must be considered a more serious risk than reflected in his SFS based upon his involvement as an administrator, as capo and as consigliere, of a major organized crime organization and was responsible either through his knowledge of or participation in planning of numerous murders committed by members of the crime family.

## VIII. Evaluation:

The applicable guideline range is 100+ months. Based upon testimony and letters of the Assistant U.S. Attorney who testified at the hearing, the examiner believes that a recommendation of anything less than a fifteen year reconsideration would depreciate the seriousness of the offense and promote a disrespect for the criminal justice system as well as go against the wishes of the sentencing court who gave the subject a one hundred year sentence. The examiner believes that arguments made by the AUSA out weigh those made by Mr. Breitbart and convinced the examiner that the subject, who was an admitted capo of the Luchesse family, was involved in the murders of numerous individuals while a capo and later a consigliere. Breitbart indicated that the government's information has come from unreliable witnesses. Kelly indicates that testimony by these witnesses have resulted in numerous convictions and although one of the individuals who have provided information to the government has himself been involved in many murders that does not take away from the credibility of this information particularly in light of the fact that the AUSA indicates that it has been corroborated by other government witnesses. The examiner believes statements made by Kelly that documents requested of Casso, a government witness, were not provided as he maybe called to witness in up coming trials to be credible.

Breitbart's statements made in all of his letters have been reviewed extensively by this examiner and the        examiner believes that information provided by the AUSA is more

FURNARI.198                                          Page 5 of

Ex 7 25

credible.

Although this extensive a hearing is not ordinarily provided at an initial, in fairness to the subject the examiner wished to examine all allegations made by the government and answers made by Breitbart prior to reaching any decision for a recommendation. The recommendation of the examiner will as previously stated be continued to a fifteen year reconsideration hearing in December 2011. It is noted that in a memo of 5/2/94 and a addendum to the guidelines for decision making there is a statement that a murder carried out to further the      business aims of an ongoing criminal operation shall not justify a presumptive parole at any point in the prisoner's sentence unless there are compelling circumstances in mitigation. The only circumstance in mitigation in this case that could be considered as the subject's age. The AUSA stated personally and in his letter of 12/11/96 that he believes that if released the subject will again be involved in the hierarchy of the Lucchese organized crime family.

## XI.  Panel Recommendation:

Continue to a fifteen year reconsideration hearing in December 2011.

AMG
December 24, 1996

Addendum by Shoquist 1/8/97

Before ever making a release decision in this case the Commission must very carefully consider its policy as set forth below as found on page 28 of the procedures manual.

*Note: For Category Eight, no upper limits are specified due to the extreme variability of the cases within this category. For decisions exceeding the lower limit of the applicable guideline category BY MORE THAN 48 MONTHS, the pertinent aggravating case factors considered are to be specified in the reasons given (e.g, that a homicide was premeditated or committed during the course of another felony; or that extreme cruelty or brutality was demonstrated.) This procedure is intended to ensure that the prisoner

understands that individualized consideration has been given to the facts of the case, and not to suggest that a grant of parole is to be presumed for any class of Category Eight offenders.

A murder committed to silence a victim or witness, a contract murder, premeditated murder by torture, the premeditated murder of a law enforcement officer to carry out an offense, or a murder carried out to further the business aims of an on-going criminal operation, shall not justify a presumptive parole at any point in the prisoner's sentence unless there are compelling circumstances in mitigation (e.g., a youthful offender who participated in a murder planned and executed by his parent). Such crimes are considered, by definition, at the extreme high end of Category Eight offenses. For these cases, the expiration of the sentence is deemed a decision at the maximum limit of the guideline range. The fact that an offense does not fall under the definition contained in this rule does not mean that the Commission is obliged to grant a presumptive parole.

FURNARI.198                                                    Page 6 of

U.S. Departmer    f Justice

*United States Attorney*
*Southern District of New York*

U.S. PAROLE COMMISSION
RECEIVED
DEC 12 1996
EASTERN REGIONAL OFFICE

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 11, 1996

By Facsimile
John R. Simpson, Regional Commissioner
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201
(301) 492-5525
Attention:  Anthony Suleski

                Re:  Christopher Furnari Reg. No. 19815-054

Dear Mr. Simpson:

        The Government respectfully submits this letter, as
requested by Hearing Examiner Suleski, at the conclusion of the
parole hearing for Furnari, which was held at FCI Allenwood on
December 3, 1996.

        For the most part, at the hearing Furnari essentially
admitted his membership in the Luchese Organized Crime family and
his close ties with other organized crime figures, including Frank
DeCicco of the Gambino Family who was murdered in the wake of the
Paul Castellano execution.  Instead of expressing remorse about his
crimes, Furnari spent most of his argument attacking the
credibility of Anthony Casso, a trusted associate of Furnari, who
provided much of the information of Furnari's other crimes that was
set forth in our August 1, 1996 letter.[1]  I have addressed below
some of the issues that were raised during the December 3 hearing.

        1.   Murders by Members of Furnari's Crew
             and by Members of the Luchese Family
             1983-1986

        At the hearing inquiry was made concerning the number of

---

        [1]  To date, the Government has not been compelled to disclose
any of the reports of interviews of Casso, as we have had to do
prior to the testimony of D'Arco, Chiodo and Carew.  Because Casso
may be called as a witness in upcoming trials and because the
information provided in some of his reports is the subject of
ongoing investigations, and in the absence of any requirement that
we disclose such reports in this instance, the Government elects
not to make the disclosures that Furnari has requested.

EXHIBIT
8

John R. Simpson, Regional Commissioner                    2
December 11, 1996

murders that were committed by members of the Luchese Family crew
that Furnari captained until 1983.  We have identified the
following murders and attempted murder in which Furnari's crew
members participated:

| Victim | Date | Participant(s) |
|---|---|---|
| Joseph Abinanti (attempted murder) | 9-1-79 | Vittorio Amuso<br>Anthony Casso |
| Vincent Albano | 7-5-85 | Herbert Pate |
| Gaetano Barbusca | 6-22-74 | Amuso, Casso |
| John Coiro | 6-22-74 | Casso, Amuso |
| David Blakely | Late '70's | Oscar Ansourian, James McCann |
| Frank DeCicco | 4-13-86 | Casso, Amuso |
| Roy DeMeo | 1-20-83 | Jos. Testa<br>P. Testa<br>Casso, Amuso |
| Nicholas Guido | 12-25-86 | J. Testa<br>G. Zappola<br>F. Lastorino |
| James Hydel | 12-86 | Casso, Amuso |
| Bernie LNU | Late '70's | Ansourian, Lastorino |
| Richie LNU | Early '70's | Casso, Amuso |
| Anthony Luongo | 11-11-86 | Casso, Amuso |
| Lee Schleifer | 2-75 | Casso, Amuso |
| Vincent Craparotta | 6/12/84 | Martin Tacetta |

        As was reported in our August 1, 1996 letter, Furnari was
directly involved in the conspiracies that resulted in the murder
of Schleifer and the attempted murder of Joseph Abinanti.  In
addition, and as we indicated during the hearing, it would not
typically be the case for a Luchese Family member or associate to
commit a murder without the knowledge and approval -- either tacit
or express -- of the crew's capo, who also must have approval from
the Family's administration.  As far as we can tell, that trend was
followed by Furnari's crew, both during and after he served as the
crew's capo.  Indeed, from D'Arco and at least two other Luchese

John R. Simpson, Regional Commissioner                          3
December 11, 1996

Family sources, we know that immediately prior to his conviction in
this case, Furnari met with other members of the Luchese Family
hierarchy to select their successors in the event they were
convicted and imprisoned for a lengthy period.    At that meeting
they selected Amuso to be the Family's boss, Mariano Macaluso to
replace Furnari as consigliere and Casso to be a capo.   It was then
decided that Anthony Luongo, who had been vying to replace Anthony
Corallo instead of Amuso as boss, would pose a threat to the newly
appointed administration.   Thus, the decision was reached to have
Casso and Amuso murder Luongo.

        Furnari's counsel also claimed at the hearing that there
were no murders committed by the Luchese Family between 1983-86.
As the list above of murders by only members of Furnari's crew --
one of several Luchese family crews -- amply demonstrates,
Furnari's assertion is simply inaccurate.   As set forth above, five
of these murders by members and associates of only one Luchese
Family crew occurred during the period 1983-1986, while Furnari was
consigliere.

        2.      Attacks on Casso's Credibility and the Number of
                Murders Casso Committed

        Quoting from the testimony of FBI Special Agent Chris
Matteice, Breitbart indicated that Casso was responsible for 187
murders and, thus, his information could not be credited.   I have
since spoken to Agent Matteice, as well as several other agents who
have spent years investigating the Luchese Family and who have
personally interviewed D'Arco, Chiodo, Casso and others who were
involved in the affairs of the Luchese Family.

        In particular, Agent Matteice testified in the Eastern
District of New York in United States v. Capaldo in 1994.   On
cross-examination, Mr. Breitbart asked him "  . . . how many
homicides or attempted homicides this particular group was
responsible for?"   To which Agent Matteice responded "187."   In my
conversations with him, Agent Matteice has indicated that he
believes the question was directed not toward the number of
homicides that Casso had committed, but toward the number of
homicides D'Arco reported had been committed by members of the
Luchese Family during his tenure in the Family.   Other experts who
are more familiar with both Casso and the Lucchese Family believe
that Casso has participated in a substantial number of homicides
but no where near the number that Mr. Breitbart has drawn from
Agent Matteice's testimony. Regardless of the exact number, we do
not hide from the fact that Casso was indeed murderous.   However,
this fact alone does not render his information untruthful or
incredible.    In fact, many of the Government's most notable
cooperating witnesses, such as D'Arco, and Salvatore "Sammy the
Bull" Gravano, are responsible for murders in the double digits,
yet juries have found their information to be inherently reliable.

John R. Simpson, Regional Commissioner
December 11, 1996

Significantly, in the approximately eight trials in which D'Arc
has testified, he often has stood alone as the only witness on man
of the charges for which the juries found the defendants guilty.

With regard to Casso, it is clear from our description i
our August 1, 1996 letter of the Schleifer and Taglianetti murde
plots, and the Wolford beating, as well as the Luongo murder plc
described above, that Casso's information does not stand alone bu
is corroborated by other informants and witnesses in materia
respects.

At the very least, it is undisputed by several source
that Casso was a trusted and close associate of Furnari, wh
Furnari helped place in the Luchese Family's hierarchy when he wa
convicted of the crimes for which he is now being considered fc
parole. If it wasn't for Furnari, Casso would not likely have bee
in the position to cause the mayhem to which he has admitted. Ar
should Furnari be paroled, it is likely he will again be embrace
by the same murderous enterprise.

3.    Inaccuracies in Furnari's December 2
      Letter

Although Mr. Breitbart's December 2 letter was addresse
by both sides at some length at the hearing, the following point
arising from his letter and arguments are worthy of note. First
Mr. Breitbart claimed that he wasn't even sure that the Abinant
shooting referred to in our August 1 letter had in fact eve
occurred. The fact that Abinanti was shot in his driveway an
survived is substantiated by, among other sources, the polic
officers who responded to the scene of the shooting. In sun
Abinanti was shot by the Luchese Family as an accommodation to th
Genovese Family, who were enraged at Abinanti's kidnapping c
associates of the Genovese Family (as well as of the Colombo
Family). Indeed, because Abinanti was a Luchese Family associate
(and his father a Luchese member), the Luchese Family was
accountable for his actions, which offended the other families and
violated the rules of the Commission. When Abinanti survived the
shooting he was essentially banished to California, and no longe
the concern of the Genovese. This is not to say, as Mr. Breitbar
suggested, that he was completely severed from the Luchese Family
Indeed, several years later, when the Luchese Family needed hel
locating Anthony DiLappi in California, they enlisted Abinanti.

Second, while defendants against whom Chiodo testified :
the Painter's Union case, which involved the beating of Wolfor
that we described in our August 1 letter, you should also know tha
Chiodo's information on all matters has been substantial:
corroborated by many sources, and that his testimony has been four
credible by several other juries before which he has testified :
other cases.

Ex 8, ¶4

John R. Simpson, Regional Commissioner                              5
December 11, 1996

<u>Conclusion</u>

        Furnari was a leader of one of the most dangerous and
deadly criminal organizations in this country's history.  It is
hard to imagine that release at this early date is an appropriate
execution of Judge Owen's sentence.  This is particularly true
given the information of Furnari's other criminal acts, the breadth
of the enterprise that he helped lead, and the expectation held by
many of his confederates who are active in the Luchese Family that
Furnari will return to the fold.

        If you need additional information, please do not
hesitate to contact me.

                        Very truly yours,

                        MARY JO WHITE
                        United States Attorney

                        By: _____
                            DAVID N. KELLEY
                            Chief, Organized Crime & Terrorism
                            Tel.: (212) 791-1131

cc:  David Breitbart, Esq.
     (by facsimile)



LAW OFFICES OF

DAVID BREITBART

52 DUANE STREET
7TH FLOOR
NEW YORK, N.Y. 10007-1206
(212) 608-1313
‾‾‾‾‾
FAX: (212) 619-2767

December 18, 1996

By Telefax

John R. Simpson, Regional Commissioner
United States Parole Commission
550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

Attention: Anthony Suleski

### Re: Christopher Furnari Reg. No. 19815-054

At the conclusion of the December 3, 1996 parole hearing for Mr. Furnari at FCI Allenwood, Hearing Examiner Suleski invited the AUSA David N. Kelley to submit reports corroborating its position as to the matters contested at the hearing. Upon my application, Mr. Suleski was kind enough to allow Mr. Furnari until close of business on December 19, 1996 to respond.

Analysis of Mr. Kelley's submissions revealed that his presentation rested almost entirely on the word of a government informant, the mass murderer, "Gaspipe" Casso. Thus, the Government was given the opportunity to provide documentation to support the challenged Casso allegations. These allegations were contained in Mr. Kelley's letter dated August 1, 1996 (hereinafter August 1 letter), submitted in opposition to the Mr. Furnari's parole application. In a letter dated December 11, 1996, the Government has obdurately refused to provide such documentary support "in the absence of any requirement" that they do so. (page 1, footnote 1, December 11, 1996 letter of David N. Kelley, hereinafter December 11 letter).

Kelley's refusal to back up the allegations leveled against Mr. Furnari after Mr. Furnari demonstrated untrustworthiness of Casso's lies at the hearing should foreclose their use as part of the record of the hearing. Consequently, due process and fundamental fairness prohibit the use of the challenged allegations, concerning decades old crimes, as the basis of the denial of Mr. Furnari's request that he be determined to be parole eligible.

**EXHIBIT**

9

2

It strains credulity beyond the breaking point that "future trials" and "ongoing investigations" will be compromised by the release of information relating to matters which are more than **twenty years old**. It is far more palpable that the Government's refusal to release this information is based on the desire to not subject Casso's dishonesty to a public airing until "required to do so", if ever. Moreover, Kelley's refusal in all likelihood, rests on the same conclusion that has driven the Government from putting Casso on the witness stand: Casso is not to be trusted and his stories conflict with other informants' testimony upon which convictions have been obtained.

Based on the foregoing and the specifics that follow, Mr. Furnari respectfully requests that the Government's submissions of August 1, 1996 and testimony related thereto be stricken from the record as being too unreliable to be considered in connection with his parole eligibility decision.

## Casso's Allegations Against Furnari are Unsupported and Insupportable

Under the first numbered subheading of the December 11, 1996 letter Mr. Kelley attempts to attribute murders to "Furnari's Crew" and members of the Luchese Family 1983-86. In attempting to pin responsibility on Furnari for what are conceded to be almost entirely Casso's killings Kelley avoids a direct statement of Furnari's involvement with the exceptions of the attempted murder of Joseph Abinanti(9-1-79 by Amuso and Casso and the murder of Lee Schleiffer (2-75 by Amuso and Casso).[1] Instead, he asks that the Parole Commission join him in speculating that "it would not typically be the case for a Luchese Family member or associate to commit a murder without the knowledge and approval-- either tacit or express(emphasis added)--of the crew's capo, who also must have approval from the Family's administration.(December 11 letter at P.2)." Added to this speculation is the further qualification: "As far as we can tell, this trend (emphasis added) was followed by Furnari's crew, both during and after he served as the crew's capo ."[2] The source of this hypothesis, although probably it is Casso, is not stated. Assuming that Casso is not the sole source of this conjecture, it is obvious that even an educated guess is no substitute for evidence and thus, it is unworthy of consideration.

---

[1] December 11 letter at page 2. The allegation concerning Mr Abinanti was addressed in my presentation on December 3, 1996 and in my December 1, 1996 letter to the Parole Commission at pages 5 and 6. With respect to the death of Mr. Scleiffer, on page 6 of that letter I suggested, as Mr. Kelley now concedes, that it was Casso who killed Mr. Scleiffer.

[2] December 11 letter at p.2.

3

We are fortunate to be able to respond to many of the specifically enumerated murder allegations on the basis of previously supplied government reports. The only conclusion to be taken is that the allegations are purely and solely based on the uncorroborated declarations of Anthony "Gas Pipe" Casso in his attempt to buy freedom by implicating others, here Mr. Furnari, for murders of his own doing. I will not refer to any allegation that has been addressed by our previous letter or the hearing at Allenwood.

### Joseph Abinanti

Abinanti's alleged attempted murder has previously been discussed.

### Vincent Albano

Albano was a Genevese family associate who was killed by Casso in 1985. Information available is that another Genevese family associate, Herbie Pate, directly solicited Casso to murder Albano as a result of a personal dispute between Albano and Pate.

### Gaetano Barbusca
### John Coiro

Available information confirms that Casso murdered John Coiro and Gaetano Barbusca. Reports reflect that Alphonse Persico is reputed to have wanted Casso to kill John Coiro. Casso was chosen because of his relationship with Coiro. Casso carried out the contract to kill Coiro and in the course of the murder Gaetano Barbusca, who was not a target, was accidently shot.

### David Blakely

There is little or no material available with regard to David Blakely being killed in the late 70's. What we have confirmed from material available to the public is that the FBI believed that Oscar Ansourian was a Bonanno Associate. In addition, James McCann was a close associate of both Casso and Al D'Arco. McCann reportedly hid guns and bombs for D'Arco and Casso and was involved in the murder of Michael Pappadio with D'Arco. There is simply no trail to Furnari based on this information.

### Frank DeCicco

Some new information has come to light with regard to the bombing of Frank DeCicco. It is our understanding of FBI intelligence reports that DeCicco was killed by Casso as a result of the direct solicitation by another crime family boss, outside of the Luchese crime family. That boss had come to know Casso as a driver to Commission meetings.

4

James Hydel
Nicholas Guido

It was the murder of DeCicco that also led to Casso killing James Hydel and Nicholas Guido. Again according to FBI intelligence reports these two men were induced to kill Casso by Angelo Ruggiero and Nicholas Paradiso. They had been told that Casso was responsible for DeCicco's death. They attempted to kill Casso but missed. Casso then retaliated by kidnapping, torturing and killing Hydel. He also killed a man named Nicholas Guido. He killed the wrong Nicholas Guido. The real Nicholas Guido was subsequently tried and convicted of the attempted murder of Casso.

Bernie (last name unknown) and Richie (last name unknown)

Bernie (last name unknown) and Richie (last name unknown) are sad examples of the fact that Casso killed men whose names he didn't even know and for reasons known only to him. Anonymous allegations of murder should not deprive Mr. Furnari of his right to parole.

Anthony Luongo and Lee Schleiffer

Anthony Luongo and Lee Schleiffer have been dealt with. The only additional information we have come up with on the Schlieffer murder is that Tommy "Irish" Carew testified in U.S. v. Pagliarulo that he did help Casso dispose of the body, but that he went alone to the club where Casso had killed Schlieffer and made no mention of Furnari having been present.

Vincent Craporatta

No member of Organized crime in New York even knew of the murder of Vincent Craporatta in 1984. This homicide was committed in New Jersey by New Jersey people. Sometime after 1989, Al D'Arco was put in charge of the New Jersey faction of the Luchese crew. This crew had been supervised by Anthony Acceturo. When D'Arco took over the responsibilities of the New Jersey faction he learned that one of the problems was that Martin Tacetta and another New Jersey soldier named Ricciardi were indicted and facing trial for the murder of Vincent Craporatta. Craporatta had been spontaneously killed with golf clubs over an argument about Joker Poker machines. We are at a total loss to understand why Mr. Kelley believes this murder should affect Mr. Furnari's parole application.

Roy DeMeo

Roy DeMeo's murder is probably the most heavily documented on Kelley's list. This is due to the research that went into the writing of the book "Murder Machine" by Jerry Capeci and Gene Mustain. I point out that in the acknowledgment page in the book great credit is given to Det. Kenneth McCabe for his work in the DeMeo crew investigation. We only mention this because it was Ken

5

McCabe who came to the parole hearing with David Kelley, as an advisor and has seen fit not to be heard from.

The story line of the book is that Roy DeMeo was a Gambino soldier with a murder for hire crew responsible for between 15 - 200 homicides. The activities of the crew was causing so much law enforcement heat that Paul Castellano, the boss of the Gambino crime family, ordered DeMeo killed. All Law Enforcement authorities are aware that the contract to kill DeMeo was given to Nino Gaagi. Casso apparently takes credit for being involved in the De Meo murder also.

## Kelley's Defense of Casso is Unseemly and Hopeless

Equally unavailing is Mr. Kelley's defense of Casso's credibility (Letter of December 11, point 2).  Kelley takes issue with Casso being assigned 187 murders or attempted murders.  The number was derived from the testimony of Special Agent Chris Matteice.  Kelley, has reinterviewed the agent and others and reports the 187 figure was not intended to depict the work of Casso alone.  Rather than provide a new number he states that the "murderous" Casso participated in a "substantial number of homicides but no where near the number that (I have) drawn from Agent Matiece's testimony."[3]

Mr. Kelley then, quite correctly points out that several other murderous government informers have testified at trials, some of which have resulted in convictions.  Therefore, he suggests Casso should be believed.[4]  As I have pointed, this underscores the difference between Casso and the others .  Casso has never testified at trial.  He has never been tested by cross-examination. His debriefings have never been disclosed and his testimony is not as far as anyone knows is not buttressed by reels of tape, FBI surveillance and testimony.

Finally, Kelley suggests that even if Furnari had nothing to do with Casso's misdeeds, he is responsible for them because he put Casso in a position to do them.[5]  This suggestion is foreign to the law.  Following this line of thinking, perhaps the obstetrician who assisted in Casso's birth should bear some responsibility for Casso's crimes as well.

Mr. Kelley, concludes by asking the Parole Commission to punish Mr. Furnari for crimes which are unstated and uncharged.  He then restates the suggestion that if paroled, Mr. Furnari will

---

[3] December 11 letter at page 3.

[4] December 11 Letter at page 3.

[5] December 11 Letter at page 4.

6

return to the life of organized crime. Mr. Furnari is responsible for the crimes for which he was convicted. Judge Owens sentenced him, in part, for a murder the government now concedes he had no responsibility for.

<u>Conclusion</u>

Mr. Furnari prays that he may spend his remaining days with his children in Florida. If he ever returns to a life of crime, he will be subject to reincarceration and the very real probability that he die in prison. He can not and will not make that mistake. He should be classified as a being no higher than a level seven and be paroled as soon as possible.

Sincerely,

David Breitbart

U.S Department of Justice      **Notice of Action**
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland  20815-7201

**Name**: FURNARI, Christopher

**Register Number**: 19815-054          **Institution**: Allenwood FCI

In the case of the above-named parole action was ordered:

Continue to a 15 Year Reconsideration Hearing (December 2011).

**REASONS:**

Your offense behavior has been rated as Category Eight severity because it involved murder and multiple separate extortion through racketeering offenses. Your salient factor score (SFS-95) is 8.  You have been in federal confinement as a result of your behavior for a total of 121 months as of 12/15/96. Guidelines established by the Commission indicate a range of 100+ months to be served before release for cases with good institutional adjustment and program achievement.  After review of all relevant factors and information presented, a decision more than 48 months above the minimum guidelines is warranted because you were involved in the hierarchy, first as a Capo and later as Consigliere of a major organized crime organization and were involved either directly in the planning or approval of the murders of numerous individuals.

As required by law, you have also been scheduled for a statutory interim hearing during December 1998.

**SALIENT FACTOR SCORE (SFS-95):**  Your salient factor score items have been computed as shown below.  For an explanation of the salient factor score items, see the reverse side of this form.

ITEM A[ 1 ]; B[ 1 ]; C[ 2 ];  D[ 1 ]; E[ 1 ]; F[ 1 ]; G[ 1 ]  Total[ 8 ]

**Appeals Procedure:**
The above decision is appealable to the National Appeals Board under 28 C.F.R. 2.26:

January 8, 1997                            Docket Clerk: dlw

Page 1 of 1

EXHIBIT
10

. A presumptive parole date is conditioned upon your maintaining good institutional conduct and the development of a suitable release plan. Prior to release your case will be subject to review to ascertain that these conditions have been fulfilled.

You may obtain appeal forms from your caseworker and they must be filed with the Commission within thirty days of the date this Notice was sent. Copies of this Notice are sent to your institution and/or your probation officer. In certain cases copies may also he sent to the sentencing court. You are responsible for advising any others, if you so wish.

## SALIENT FACTOR SCORE (SFS-81)

ITEM A.   PRIOR CONVICTIONS/ADJUDICATIONS *(ADULT OR JUVENILE)*

None = 3; One = 2; Two or three = 1; Four or more = 0

ITEM B.   PRIOR COMMITMENTS OF MORE THAN THIRTY DAYS *(ADULT OR JUVENILE)*

None = 2; One or two = 1; Three or more = 0

ITEM C.   AGE AT COMMENCEMENT OF THE CURRENT OFFENSE/PRIOR COMMITMENTS OF MORE THAN THIRTY DAYS *(ADULT OR JUVENILE)*

Age at commencement of the current offense: 26 years of age or more = 2***; 20-25 years of age = 1***; 19 years of age or less = 0

      *** EXCEPTION:  If five or more prior commitments of more than thirty days, *(adult or juvenile)*, place an 'x' here ( ) and score this item... = 0

ITEM D.   RECENT COMMITMENT FREE PERIOD *(THREE YEARS)*

No prior commitment of more than thirty days *(adult or juvenile)*, or released to the community from last such commitment at least three years prior to the commencement of the current offense = 1; Otherwise = 0

ITEM E.   PROBATION/PAROLE/CONFINEMENT/ESCAPE STATUS VIOLATOR THIS TIME

Neither on probation, parole, confinement, or escape status at the time of the current offense; nor committed as a probation, parole, confinement, or escape status violator this time = 1; Otherwise = 0

ITEM F.   HISTORY OF HEROIN/OPIATE DEPENDENCE

No history of heroin or opiate dependence = 1; Otherwise = 0

## MOST FREQUENT SPECIAL CONDITIONS

Special Drug Aftercare Condition:
    You shall participate as instructed by your probation officer in a program approved by the Parole Commission for treatment of narcotic addiction or drug dependency, which may include testing and examination to determine if you have reverted to the use of drugs.

Special Alcohol Aftercare Condition:
    You shall participate in a community based program for the treatment of alcoholism as directed by your probation officer.

Special Mental Health Aftercare Condition:
    You shall participate in an in-patient or an out-patient mental health program as directed by your probation officer.

Special Community Treatment Center Condition:
    You shall reside in and participate in a program of the Community Corrections Center as instructed until discharge by the Center Director, but no later than 120 days from admission.

**U.S. Department of Justice**
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

**NOTICE OF ACTION ON APPEAL**

---

**NAME:** Furnari, Christopher        **REG. NO.** 19815-054        **INST:** Allenwood FCI

---

The National Appeals Board examined the appeal of the above named and ordered the following:

Affirmation of the previous decision.

**RESPONSE:**

You have properly been held accountable for murders committed to further the purposes of the Luchese or other crime families. At a minimum, as the capo of a crew in the Luchese family, you were in a position to be informed of murders ordered by the boss of the family. Given the hierarchical nature of the organization, it is likely that you directed the murderous acts of your crew members. And, in fact, the Parole Commission finds the information from the U.S. Attorney's Office on your personal responsibility for several of the murders (victims Schliefer, Taglianetti, and DeCicco) and attempted murder (victim Abinanti) to be credible and reliable, even though much of the information may have come from Anthony Casso, one of the most violent members of your organization. Reliable information on crimes committed through La Cosa Nostra activities has been provided by members of the criminal organization, including those who have committed violent crimes. Even if Casso has continued to commit or plot other crimes after his debriefing by federal law enforcement, this does not disqualify him as a reliable source concerning your criminal activities within the Luchese family. In many cases, Casso's information is corroborated by information from other sources such as Carew and D'Arco.

Your parole denial is warranted because you approved or participated in the planning of a contract murder (Taglianetti), the murder of a potential informant/witness (Schliefer), and a murder and attempted murder to further the aims of an on-going criminal organization (DeCicco and Abinanti, respectively). Any one of these crimes would support a parole denial. There are no mitigating factors, including your age, that justify your parole when weighed against the aggravated nature of the crimes.

Neither due process, parole statutes nor parole regulations require that you be granted access to reports which have not been provided to the Parole Commission for its consideration. Therefore, you are not entitled to discovery of source materials that the U.S. Attorney's Office may have used to prepare letters recommending against your parole.

You have failed to show that the Parole Commission cannot fairly decide your appeal simply because the same Assistant U.S. Attorney who opposed your parole at your hearing made a general presentation on the topic of organized crime to agency members and staff two months after the initial decision in your case. There is also no evidence that any procedures were violated in the Assistant

---

August 19, 1997                    National Appeals Board                    Docket Clerk: dmj


EXHIBIT
11

**U.S. Department of Justice**
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland  20815-7201

**NOTICE OF ACTION ON APPEAL**

---

NAME: Furnari, Christopher          REG. NO. 19815-054          INST: Allenwood FCI

---

U.S. Attorney's representation of his office's views in the course of the parole determination.


All decisions by the National Appeals Board on appeal are final.

---

August 19, 1997                    National Appeals Board                    Docket Clerk: dmj



# SIH/REVIEW HEARING SUMMARY

| | |
|---|---|
| **Hearing Type:** . . . SIH | **2/3 or MR Date:** . . . . . 11-24-2044 |
| **Name:** . . . . . . . . . FURNARI, Christopher | **Projected MR Date:** . . |
| **Reg No:** . . . . . . . 19815-054 | **Full Term Date:** . . . . . 11-15-2086 |
| **Hearing Date:** . . . 12-9-1998 | **Months in Custody:** . . 145 |
| **Institution:** . . . . . . Allenwood FCI | **As Of:** . . 12-9-1998 |
| **Examiner:** . . . . . . Jeffrey S. Kostbar | |

**Recommended Release** No change in 15-year reconsideration date (December, 2011).

## I.   Previous Commission Action:

The subject's initial hearing Notice of Action was issued on January 8, 1997 and ordered that the subject be continued to a 15-year reconsideration hearing (December 2011). The subject was not designated as an original jurisdiction case.

This examiner believes that the subject should be an original jurisdiction case. He is a major organized crime figure who is reported to have been significantly involved with 14 murders while a capo and consigliari.

The subject appealed his Parole Commission decision; by Notice of Action dated August 19, 1997, the decision was affirmed.

The subject is currently 74 years old and serving a 100 year sentence.

## II.   Codefendants:

The subject has numerous codefendants as noted in the U.S. Attorney report attached to the presentence investigation.

## III.   Institutional Adjustment And Release Plans:

The subject has had excellent institutional adjustment and has not received any incident reports during his 12 years of incarceration. If he is ever released, he hopes to reunite with his wife who lives in Staten Island, NY.

## IV.   Fines, Restitution, Court Assessment:

The subject has a $240,000 committed fine on the record. He paid a $175 of a non committed

FURNARI.198

Page 1 of 4

EXHIBIT

12



fine and the remaining $725 was declared uncollectible.

## V.    Representative:

David Breitbart, Attorney at Law, 52 Dwane Street, New York, NY 10007-1206. Also present at the hearing was Attorney Steven Kareagener. As a courtesy he was allowed to sit in on the hearing but was not the official representative.

## VI.    Risk:

As a category Eight offender, the subject's guidelines have no maximum. He is a very significant risk to the community given the fact that he is a lifetime member of organized crime.

## VII.  Evaluation:

This examiner was originally informed that the representative in this case would arrive between 10:30 a.m. and 11:00 a.m. This was the last case on the docket. At 11:12 a.m. the representative had not arrived. This examiner called in Mr. Furnari and gave him the opportunity to proceed without representation. He desired not to proceed but he refused to request a continuance. This examiner adjourned the hearing based upon the presumption that the representative would not appear, Mr. Furnari was sent back to his unit.

Approximately 10 minutes later, and as this examiner was making ready to leave the institution, the representatives did arrive. I initially indicated to them that the case would not be heard and would be heard again on the next docket in February 1999 as Mr. Furnari had been sent back to his unit. However, I reassessed this position and informed the attorneys that I would hear the case and they were processed in the hearing room approximately 25 minutes later. Mr. Furnari was returned to the visiting room from his unit.

The subject's attorney did explain that they drove from New York and were caught up in traffic and had so informed institution staff that they would be late, however this information was never provided to this examiner by the institution staff. Presumably they must have talked to a correctional officer in the main building and not to the case management staff.

The scope of today's hearing, which was explained to the subject's representative and himself, is a statutory interim hearing on a case wherein a 15-year reconsideration hearing is a standing decision. It was explained that this was not a full de novo hearing.

It is counsel's request that the Commissioner consider his verbal arguments today and his written arguments and upon his review so order a full de novo hearing wherein the 15-year reconsideration hearing date can be advanced in this case.

Concerning this statutory interim hearing situation, this examiner is recommending that no

FURNARI.198                                                         Page 2 of 4

change be made in the 15-year reconsideration hearing date. While the subject is a 74-year-old individual suffering from aging normal to that age, he is a lifetime member of organized crime in the New York area who rose to a very high position in the crime family. Specifically, he was able to rise to the position of Consigliere and function on a major level as a member of the Commission.

Concerning the request for a full de novo hearing, and an ultimate advancement of the 15-year reconsideration hearing, this examiner notes as follows:

First, counsel has submitted to the court a 2241 submission which has been pending for 10 months. I was informed by counsel that the government has fully responded to this submission and that the Parole Commission Legal Office has also been active in this case and has responded to the submission. This examiner believes that it is imperative that the attorney for the Commission responsible for this case be consulted about this case by the Commissioner and that the Commission's legal response to the filing be included as information in the inmate file for all Reviewers of this case. When I returned to the office I included the government reponse to the 2241 in the file for the Commissioner review.

Secondly, counsel argues that there is a great deal of information he has submitted to the Commission which was unknown to the Commission when making either the original decision or the National Appeals Board decision. This information bears directly on the credibility of one of the government's prime witnesses, Anthony Casso. In short, counsel argues that Anthony Casso was personally responsible for 36 murders and was culpable in over 180 murders. Mr. Casso began working with prosecutors and was ultimately kept in a witness-protection program unit by the Bureau of Prisons.

Counsel argues that he did present the argument previously to the Commission that Mr. Casso was not credible and not reliable. However, he did not have documentation to back up this argument and the Commission continued to believe in the reliability of Mr. Casso's statements based upon a presentation by the U.S. Attorney's office that the information supplied by Mr. Casso as credible.

Defense now presents the argument that at the time the U.S. Attorney's office was presenting to the Parole Commission that Mr. Casso was reliable and that his information was reliable, the government actually knew that Mr. Casso was a liar and engaged in new criminal conduct while incarcerated by the Bureau of Prisons. That new conduct involved bribing government officials in a witness-protection facility, smuggling and attempted murder twice of a man who was taking about himself.

Defense points out that Mr. Casso breached his own cooperation agreement with the government, was deemed to be a liar, and in a government affidavit dated December 17, 1997 by George Stamboulidis, Assistant U.S. Attorney, it was pointed out that Mr. Casso had made up lies about other organized crime figures by implicating those other organized crime figures in criminal activities.

FURNARI.198                                                                   Page 3 of 4



They also pointed out that the December 4, 1995 letter of David Kelley, Chief of the Organized Unit, exonerated Mr. Furnari from the 1979 murders which are detailed in the PSI and the original U.S. government position. This is due to the fact that it was later found the subject was functioning as a capo and not a consigliere at the time those murders occurred.

It is believed by this examiner that the Commission most probably has set forth a position on these matters as the Commission has apparently responded to the defense submission. This examiner did not have a copy of that position until I obtained it after the hearing and included it in the file. It is noted that when the Commission last reviewed this case by the National Appeals Board, the Commission did state the position that while the subject may have not provided truthful information concerning other individuals, that was not a reason to disqualify him as a reliable source concerning Mr. Furnari's criminal activities.

This examiner believes, given the information which I have (which initially excluded the government's response to the submission of defense counsel, but it has now been made a part of the file) justify a "no reopen" decision in this case. The reasons the Commission gave in the National Appeals Board's Notice of Action dated August 19, 1997 remain valid and appropriate and a de novo hearing to consider advancing the 15-year reconsideration hearing date should not be scheduled.

This examiner would note that there appears to be only one other addition to the original defense petition which is the supplemental affidavit by defense counsel, Steven Kartagener, dated April 24, 1998 which has attached the affidavit from George Stamboulidis, Assistant U.S. Attorney, which was previously referred to.

In a nutshell, what the defense counsel would like the Commission to believe is that the two (D'arco and Casso) government informants were both such liars that none of the information they provided is credible and that the case should be reopened. There may have been other informants or souces of information available to the AUSA office which he did not disclose at the time of his testimony. Because the AUSA was alledgely so "misinformed" by his informants, his prior testimony that our subject was involved in 14 murders by his crew when he was a capo and later when he was consigliari, should not be considered credible.

This examiner comes to the conclusion that it is credible to believe that a lifelong organized crime member who functioned at very high levels within the organization would resonably be expected to know of and participate in numerous violent crimes, to include murder on a regular basis. This after all is the nature of such organized criminal activities. Consequently, while there may indeed be cause to believe that the informants for the government were disreputable characters who may not have been truthful all of the time, this does not invalidate the governments case and their testimony as to the actions of this individual in the organization.

This examiner believes that it is significantly more likely than not that Mr. Furnari knew of, and had direct or indirect responsibility for multiple murders given his position in the organized crime family. This examiner would continue to find the information provided by the

FURNARI.198                                                              Page 4 of 4



AUSA and his testimony to be valid.

Only if the AUSA office were to substantially reverse it's position regarding the subject's involvement in organized crime activities would this examiner suggest a re-review of this matter. Such information would need to rise to the level of an exoneration of the subject relative to murderous criminal acts as indicated by the AUSA office previously. I do not find defense counsel position persuasive in matter.

## VIII. Recommendation:

No change in 15-year reconsideration (December, 2011)

## IX.    Reasons:

CLW
December 17, 1998

**U.S. Department of Justice**
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201



**Notice of Action**

---

Name: FURNARI, Christopher

Register Number: 19815-054                Institution: Allenwood FCI

---

In the case of the above-named, the following parole action was ordered:

No change in 15 Year Reconsideration Hearing in December, 2011.

The above decision is appealable to the National Appeals Board under 28 C.F.R. 2.26.

You may obtain appeal forms from your caseworker or U.S. Probation Officer and they must be filed with the Commission within thirty days of the date this Notice was sent. Copies of this Notice are sent to your institution and to your probation officer. In certain cases, copies may also be sent to the sentencing court. You are responsible for advising any others, if you so wish.

**REASONS:**

Retroactivity does not apply. Neither your recalculated severity rating (old Category Eight; new Category Eight) nor your recalculated salient factor risk category (old Category Very Good, old score 8; new Category Very Good, new score 8) is more favorable. This statement means that a finding has been made by the Parole Commission at your hearing that no regulatory or procedural changes have been made by the Parole Commission since your last hearing which would positively affect your case in terms of Offense Severity or Salient Factor Scoring.

As required by law, you have also been scheduled for a statutory interim hearing during December, 2000.

fc:    U.S. Probation Officer
        Southern District of New York
        500 Pearl Street
        Sixth Floor
        New York, NY 10007

Date: December 29, 1998                              Clerk: frm                **EXHIBIT**

                                                                                              13

BOP-ALM                                    Page 1 of 1                    FURNARI.198

**U.S. Department of Justice**
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201



**NOTICE OF ACTION ON APPEAL**

Name: Furnari, Christopher

Register Number: 19815-054                Institution: Allenwood FCI

The National Appeals Board examined the appeal of the above named and ordered the following:

Affirmation of the previous decision.

**REASONS**:

In response to your claim that the decision was based on erroneous information, the evidence you have presented does not persuade the Commission that the information it has relied upon is inaccurate. Your request for a _de novo_ hearing is denied.

All decisions by the National Appeals Board on appeal are final.

**EXHIBIT**

14

PENGAD-Bayonne, N. J.

Date: April 2, 1999          National Appeals Board          Clerk: pgn

 

**U.S. Department of Justice**                    Notice of Action
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland  20815-7201

---

Name:  FURNARI,  Christopher

Register  Number:  19815-054            Institution:   Allenwood  FCI

---

In  the  case  of  the  above-named,  the  following  parole  action  was  ordered:

Reopen  and  schedule  for  a  de  novo  hearing  before  December  27,  2000.

**REASONS**:

Decision  of  the  Court  of  Appeals  for  the  Third  Circuit  and  the  United  States  District  Court  for  the
Middle  District  of  Pennsylvania.

THE  ABOVE  DECISION  IS  NOT  APPEALABLE.

Copies  of  this  Notice  are  sent  to  your  institution  and  to  your  U.S.  Probation  Officer.  In  certain  cases,
copies  may  also  be  sent  to  the  sentencing  court.  You  are  responsible  for  advising  any  others  you  wish
to  notify.

fc:      U.S.  Probation  Office
         Southern  District  of  New  York
         500  Pearl  Street
         Sixth  Floor
         New  York,  NY  10007-1312

Date:  October  31, 2000                              Clerk:  dlw

BOP-Allenwood   FCI            Page  1 of 1            FURNARI.198

EXHIBIT
15



&lt;SUMCODE-INITIAL_SUM&gt;

## INITIAL HEARING SUMMARY

**Offense of Conviction - Count 1 Racketeering Conspiracy; Count 2 Racketeering; Count 5, 7, 9, 11, 13, 15; Payment to an Employee Representative; Counts 3, 4, 6, 8, 10, 12, 14 and 16 Through 21 Extortion.**

| | |
|---|---|
| **Name** . . . . . . . . . :FURNARI, Christopher | **2/3 or MR Date** . . . . . : 11/24/2044 |
| **Reg No** . . . . . . . . :19815-054 | **Projected MR Date** . . : |
| **Hearing Date** . . . . : 12/8/2000 | **Full Term Date** . . . . . : 11/15/2086 |
| **Institution** . . . . . . :Allenwood FPC | **Months in Custody** . . : 169 |
| **Examiner** . . . . . . . :Jeffrey S. Kostbar | **As Of** . . . : 12/9/2000 |
| | **Severity Rating** . . . . . : Eight |
| | **Salient Factor Score** . : 8 |
| | **Guideline Range** . . . . : 100+ |

**Recommended Release**  Continue to 15 Year Reconsideration Hearing December 2015 and refer for Original Jurisdiction Consideration.

### I.Procedural Issue:

Upon this examiner's arrival, I found Attorney David Breitbart of 52 Duane Street, New York, NY 10007-1206 sitting at the hearing table prepared to function as the subject's representative. Also present was Attorney Steven Kareagener. This examiner had conducted a Statutory Interim Hearing in this case December of 1998 and the same two attorneys were present. At that hearing, strictly as a courtesy, I allowed the second attorney to sit in on the hearing but to not function as an official representative. Although I explained the rules concerning representatives to Mr. Breitbart at that hearing I was persuaded to make an exception in 1998.

In spite of this, Mr. Breitbart once again appeared with Attorney Steven Kareagener. I informed Mr. Breitbart that I would not permit the second attorney to be present and again explained the rules to him. He objected to the removal of Mr. Steven Kareagener from the room and went on record with his objections. This examiner believes that Mr. Furnari is entitled to the same due process consideration as other inmates and that in vast majority of those cases they are allowed one representative. Consequently, this examiner has held Mr. Furnari to that standard at this hearing and Mr. Kareagener was removed from the room with objections from Mr. Breitbart.

This examiner explained to Mr. Furnari and Mr. Breitbart that this was to be an Initial Hearing as ordered by the Parole Commission in response to litigation which they had filed. I

**EXHIBIT**

16

informed Mr. Breitbart of my intent to deal with issues not related to the offense behavior and offense severity first. Following that, I indicated that I would deal with issues of the offense severity and criminal conduct and allow Mr. Furnari and his representative to respond to the government version of the overall offense behavior on a point by point basis. Particularly, the letters from Assistant United States Kelly and the allegations contained therein. Mr. Furnari and his counsel indicated that they had had all of this material disclosed to them and were prepared to respond.

However, Attorney Breitbart objected to the procedural manner in which I was to proceed with this hearing. He desired to give an opening argument, similar to the type attorneys present in criminal cases. This examiner denied Mr. Breitbart that opportunity and indicated that he would have full opportunity to bring forth everything he wanted to bring forth during a summation which I would allow he and Mr. Furnari.

This examiner refers the reader to prior hearing summaries and pre-hearing evaluations dating from 1996. In addition, I refer the reader to Assistant US Attorney Kelly's letter of 8/1/96 and 9/25/2000.

Examiner Pinner has prepared an excellent and lengthy Initial Pre-hearing Assessment for this hearing. Rather than dictate redundant information I again refer the reader to that Pre-hearing Assessment typed on 12/5/2000.

In short summary, Christopher Furnari was a Capo and then a Consigliere of the Lucchese Crime Family. When he was consigliere, he was also a member of the "Commission" the National Ruling Body of La Cosa Nostra, which was made up of representatives of the various crime families. He was convicted in 1986 of extortion based RICO violations and sentenced to 100 years. The subject appeared before the Commission for his Initial Hearing in this case on 12/3/96. In addition to the information contained in the Pre-sentence Investigation, the Commission received additional information in a letter dated 8/1/96. The letter was prepared by Assistant US Attorney David Kelly, Chief of the Organized Crime Unit in the S/NY, which indicated that several murders had been committed by the subject's crew and by the Family, during the time the subject held positions Capo and Consigliere of the Lucchese Crime Family.

Much of the information which supported the Category Eight finding of the Parole Commission concerning the murderous behavior was obtained from Anthony (Gaspipe) Casso by way of Assistant US Attorney Kelly. There was much argument at the Initial Hearing from the subject's representative that Casso was not reliable. The Parole Commission found that the subject was involved in the murders of Schleifer, Taglianetti and DeCicco an attempted murder of Abinati. The subject was considered for a 15 Year Reconsideration Hearing for 2011.

After a Statutory Interim Hearing and after exhausting the subject's administrative appeals he did file a petition for habeas corpus claiming that the Commission could not rely on witness Casso. The Parole Commission prevailed in District Court, but on appeal to the 3rd Circuit, lost.

The 3rd Circuit held at the Parole Commission failed to follow its statute and regulation at the



SIH because its statements of reasons did not make clear if the Commission was continuing to rely upon the information from Casso, not withstanding Stamboulidis affidavit, or had determined that there was sufficient information not received from Casso to support its finding. Accordingly, the court ordered the Parole Commission to provide Furnari with a new statement of reasons consistent with the court's opinion. On remand, the District Court ordered that the Parole Commission provide a new statement of reasons, or a De Novo Hearing within 90 days of the court's order. By NOA dated 10/31/2000 the Commission ordered that the case be reopened and schedule for a De Novo Hearing before 12/27/2000.

After receipt of the court's opinion, Attorney Gervasoni requested that Assistant US Attorney Kelly provide the Commission with any information he might have which would assist at the new hearing. Mr. Kelly did provide a letter dated 9/25/2000 in which he maintains that although Mr. Casso breached his cooperation agreement with the government and, he has known to have done so by committing numerous acts inconsistent with a cooperation agreement, these acts did not touch upon the historical information he had provided to that point in time. Further, the Assistant US Attorney maintains that much of Casso's information about Furnari had corroborated in substantial measure by other credible witnesses.

Attorney Breitbart forcefully argued and presented evidence to discredit Casso. Casso is now serving 36 life terms for murder. The subject's representative argued that at the time of the Initial Hearing in 1996 the Assistant US Attorney (Kelly) was fully aware of the activities of Casso which ultimately resulted in his breach of cooperation agreement. He implicates Assistant US Attorney Kelly as trying to deceive the Parole Commission by making it appear that Casso was a credible informant when in fact he was totally incredible even at that time.

Mr. Breitbart argued that he finds it inconceivable that the Parole Commission would continue to use any information allegedly provided by Casso through Assistant US Attorney Kelly at this late stage, especially given the repudiation of Mr. Casso by a US Attorney's Office.

Representative Breitbart also maintains that each and every potential independent corroborating witness is not a credible witness and that there is no corroboration offered whatsoever by those individuals. This examiner will go through each of those individuals by name in this report. Representative Breitbart indicates that Assistant US Attorney Kelly is an excellent writer who could weave bits and pieces of information together to make it appear that there was corroboration when in fact there was not and those individuals are not credible themselves.

Representative Breitbart indicated that AUSA Kelly has a vendetta against himself and Furnari. He believes that the genesis of this vendetta occurred a short time after he entered the case in anticipation of the Initial Hearing after Furnari had served 10 years.

Representative Breitbart indicates that when he reviewed the Pre-sentence Investigation he noted that the PSI held the subject accountable for the murder of Glaenti and two other individuals in 1979. The original PSI erroneously indicated that the subject was a member of the "Commission" at that point in time and thus should be held responsible. Representative Breitbart brought this issue to the attention of AUSA Kelly and prevailed upon him to get the

FURNARI.198                                                      Page 3 of 10

matter corrected.

Representative Breitbart now believes that AUSA Kelly did not understand the effect this correction would have on the parole decision making and parole offense severity rating process. The attorney believes that Kelly was not aware that the Category Eight severity could not be justified if the Glaenti matter was taken out. Consequently, when Kelly became aware of this he then wrote a letter indicating that Furnari was responsible for multiple other homicides and attempted homicides.

The attorney believes that Kelly has now made this entire matter "personal". He believes Kelly felt "conned" by himself, the attorney.

The attorney indicates that in 1996 Kelly told the Parole Commission that Casso was "pure as driven snow" and this was clearly not true and Kelly knew it. He argues Kelly knew Casso had been repudiated for not telling the truth and for committing new criminal acts.

In short, the attorney would like the Parole Commission to find that Mr. Kelly himself has problems with credibility regarding this case.

The attorney points out that the original hearing examiner, Suleski, in 1996 based his decisions on statements of the AUSA Kelly and indicated that he would believe the government attorney over the version of facts presented by Mr. Furnari and his counsel. The representative questions the appropriateness of this entire approach.

Representative Breitbart also brings forth his skepticism of the independence of the Parole Commission in even evaluating this case given his belief that AUSA Kelly has been an "instructor" to the Commission and the Commission staff. To support this position he presented to this examiner a memorandum dated 3/6/97 from Acting Staff Director Sam Shoquist indicating that there would be training which was to be conducted by AUSA David Kelly. Mr. Shoquist has been a decision maker in the past in this case and in the list of the participants noted was this examiner's name. This examiner cannot recall ever attending training with Mr. Kelly or meeting him, although I may indeed have been at that training. In short, the attorney argues that the Parole Commission would be prejudice to support any version given by Mr. Kelly as he has been an instructor for the Parole Commission and close to the Commission and its staff. He therefore doubts the credibility of the Commission itself in being able to evaluate this case.

Representative Breitbart did not deny the subject's guilt for the charges upon which he was convicted and stressed that these were non violent extortion and threat charges as opposed to serious murder or attempted murder charges. The representative did not deny that the subject was a high ranking member of the Lucchese Crime Family nor that he was on the "Commission". However, he desires that the Parole Commission determine that he is a non violent individual and that there has been no credible evidence to support the allegations of violence. He stated that Furnari's "reputation on the streets is of a non violent benevolent despot". He stressed Mr. Furnari's age of 76 and states that there is no credibility to AUSA Kelly's assertion that if released he would return to organized criminal activity. He believes

FURNARI.198                                                          Page 4 of 16

that this is ludicrous given the age of Mr. Furnari.

The Commission must determine relative to this hearing whether or not it will utilize information of violent Category Eight behavior as supplied by government attorney by Casso. We must determine whether Casso holds any credibility given his repudiation in the Stamboulidis affidavit. Further, the Parole Commission must gage whether or not the other individuals brought forth as corroborating witnesses by AUSA Kelly are credible and have provided credible corroboration of Casso's statements.

In the case of the Lee Schleifer homicide, Casso indicated that Furnari ordered the execution of Schleifer in 1975. This information was independently corroborated by "Tommy Irish" Carew, who was a Lucchese Family associate. Counsel indicates that Carew testified to this matter in a separate case on 5/26/94 in the E/NY. He was a witness for the prosecution in the Pagliaruzo case. During the course of his testimony he exonerated Furnari. He stated that someone else did it. The subject's representative indicates that AUSA Kelly has completely distorted the facts relative to this matter. He claims that the issue of the Lee Schleifer homicide is a 100 percent pure Casso allegation and has not been corroborated by anyone.

Conspiracy to murder Richard Taglianetti. AUSA Kelly indicated that Tommy Irish Carew also corroborated Casso's account of Furnari issuing a contract in the early 1980s to murder Richard Taglianetti. Steps were taken to carry out the murder but Taglianetti was not located and was not murdered until 1992 by Lucchese Family member George Conte. According to Mr. Kelly, Furnari's role, the reason he ordered the murder was to avenge Taglianetti's murder of the son of Lucchese member Angelo Defendis. This has been corroborated, according to Mr. Kelly, by other government witnesses and former Lucchese Family members D'Arco and Frank Gioia, Jr., both of whom testified for the government on numerous occasions. Mr. Kelly indicated that the fact that the contract was issued in the early 80s when Furnari was a member of the Lucchese Family hierarchy gives more reason to credit the accounts of these witnesses.

The subject's representative argued that Frank Gioia would have been 11 years old in the early 80s. He himself has now been repudiated by the government as a witness as he was involved in seven murders. He indicates Frank Gioia was a bad student in high school at the time of the murders and the planning of the murders.

Representative Breitbart argued that D'Arco and Gioia simply corroborated the story on the streets that there was a contract out due to the murder of Angelo Defendis' son.

Counsel pointed out that in 1992 Furnari had been in prison 6 years. He states that Zappoloa and Conte were the actual killers and the reason the victim was killed because he slapped a woman of a person who was higher in the Mafia hierarchy.

Once again, counsel argues that this is a pure Casso allegation. He states that Kelly uses words to weave the theory of corroboration that does not in actuality exist. He further states that victim Taglianetti was around from the 1980s through 1992 and not gone from the area. He does not find it credible that Taglianetti could have existed and lived if Furnari actually

conspired to murder him as was alleged. He states that the entire charge "belies credulity" as at the time of the murder Furnari was in prison for 6 years.

Assault of James Wolford: Peter Chiodo corroborated Casso's report of Furnari's order to give a beating to Wolford, who is a member of International Painters Union and was interfering with Furnari's extortion of the control of the union. Casso and Chiodo carried out the order. The assault was also corroborated by Curroda "Dino" Marino. Marino was a Lucchese Family associate who pled guilty to racketeering in the E/NY and testified for the government as a cooperating witness.

Once again subject's representative argued that using Casso is completely irrational and AUSA Kelly must have noting else. He states that this is a full Casso charge. He indicates that he defended Chiodo and Marino in a 1993 case called US v. Capaldo which he refers to as US v. Arnold. He states that Furnari was an un-indicted co conspirator in that case. He states that the jury listened to Chiodo and Marino and his client, Arnold, was acquitted. He states that Chiodo and Marino were simply not credible and not believable and not believed by the jury. He indicates that when given the chance, a jury evaluated the evidence and they said no way. He believes that the fact a prior jury has not believed Chiodo and Marino would suggest that they are not credible witnesses and not capable of providing credible corroboration of Casso's story.

Conspiracy to Assault Joseph Martinelli: Letter dated 9/25/2000 from AUSA Kelly refers to his 8/1/96 letter outlining Furnari's role in the conspiracy to assault Martinelli. The information was provided by Chiodo and corroborated in substantial detail by Carew, D'Arco and Casso. Counsel indicates that it was actually Furnari's son who went to Chiodo and asked for permission to beat Martinelli in regard to an extortion scheme. Carew, on page 4 of the 1996 letter from AUSA Kelly, is noted to have indicated that he did not feel that the son had Furnari Sr., permission to engage in the beating. As a result, counsel points out that Furnari's son was thrown out of the family for lying and blaming the beating on Furnari Sr., and Captain Bobby Amuso. The only reason he was allowed to live was out of respect for the father.

While it appears to this examiner that there is some conflicting information between the witnesses regarding this event and Furnari's role the AUSA maintains that the event was still at the behest of Furnari Sr., and corroborated.

In his letter of 9/25/2000, Mr. Kelly stated that "there is no reason to conclude that, although Casso breached his cooperation agreement and is no longer cooperating with the government, his information concerning Furnari should not be accepted". He indicated that the circumstances which led to the determination of the cooperation agreement and ultimately the conviction of Casso did not touch upon the historical information he had provided. Also, much of Casso's information about Furnari has been corroborated in substantial measure by other credible witnesses. Even without Casso's information, Mr. Kelly indicates that there is compelling information concerning Furnari's role in two murders and two assaults. Moreover, it was pointed out that the US Attorney's Office S/NY believed from cooperators other than Casso, that Furnari, as Capo and Consigliere, was at least indirectly responsible for at least

eleven murders.

This examiner comes to the conclusion that it is credible to believe that a lifelong organized crime member "Furnari" who functioned at very high levels within the organization would reasonably be expected to know of and participate in numerous violent criminal acts, to include murder and multiple murder or conspiracy to murder.

This examiner comes to the conclusion that the government informants, all of whom were organized crime figures, were and are disreputable characters who may not have been truthful all of the time and who may have committed serious criminal acts themselves. However, this examiner firmly believes that this does not invalidate the information which they have supplied to the government while they were cooperating with the government. This examiner believes that the multiplicity of these individuals statements and corroboration of each other and of Casso's statements would suggest that it is more likely than not that the allegations as set forth by AUSA Kelly in his letters to the Parole Commission are true.

If one were to concur with Mr. Furnari and his representative's arguments one would have to believe that the Parole Commission itself is not a credible organization in regard to Furnari's case in that the Commission and its staff is somehow tied to and influenced by AUSA Kelly who had functioned, apparently, as a trainer at a Commission meeting in 1997. This examiner sees no evidence of this and, in fact, I had no recall of Mr. Kelly ever even being in the Parole Commission Office.

Defense Counsel would also have the Commission to believe that AUSA Kelly is not credible himself and is simply carrying on a personal vendetta against Mr. Furnari and his representative. Again, this examiner finds no evidence to support this conjecture.

Mr. Furnari and his representative would have the Parole Commission believe that all of the allegations against him concerning Category Eight behavior alleged by AUSA are 100 percent Casso allegations and thus, standing alone, are not credible given Casso's ultimate repudiation as a government witness and his conviction on 36 murders. This examiner believes the information supplied by AUSA Kelly is credible information and that those government witnesses noted by Mr. Kelly, although organized criminals themselves, is credible corroboration of Casso cooperative statements.

The nature of organized crime itself is not, to use the words of the representative to function as benevolent despots. Rather, organized crimes engages in extreme violent behavior to include murder and conspiracies to murder. This is simply a known historical fact.

This examiner finds it inconceivable that Furnari, functioning at the highest levels of organized crime, which is not even a disputable fact in this case, would be unknowing and non participatory in the extreme violent acts of the organization. Thus, the information given by Casso and corroborating witnesses are lent credibility by the very nature of the organization in which the subject participated and the level in which he participated.

This examiner finds it more likely than not that the subject did participate in the violent acts



that alleged by AUSA Kelly in his letters to the Commission and that the Commission should rely on the information given by Casso notwithstanding the Stamboulidis affidavit.

**II.    Modifications, Additions, Corrections from Prehearing Assessment:**

None.

**III.    Institutional Factors:**

**A.    Discipline:**

Clear conduct.

**B.    Program Achievement:**

The subject is currently 76 years old. He emphasized at today's hearing that he has now completed 700 hours of Religious Training. He continues to do well while incarcerated in terms of adjustment to incarceration.

**IV.    Fines, Restitution, Court Assessment:**

$240,000 fine. This has not been paid. He paid a $175 non committed fine.

**V.    Release Plans:**

The subject plans to release to live with family members in New York or Florida.

**VI.    Representative:**

David Breitbart, Attorney at Law, 52 Duane Street, New York, NY 10007-1206. Telephone (212) 608-1313. Fax No. (212) 619-2767.

The counsels comments are incorporated in the Present Offense Section above.

**VII.    Risk:**

The subject is an extreme risk to the community when released. Historically, through this examiner's 25 years of experience in the Correctional and Criminal Justice fields, I am aware that individuals involved in large organized criminal activities are many times elderly individuals. The counsel has indicated that if the subject is released from prison he would not be a threat to the community and would simply live with family members for the remaining years he has left in his life. This is in direct contradiction to the belief of the AUSA Office. AUSA Kelly has indicated that the subject has almost a mythical reputation within La Cosa Nostra and would be welcomed back by the family and once again become a major participant in this organized criminal activity.

This examiner believes that a decision in excess of 48 months above the minimum Category Eight guidelines is appropriate to this case given that the Lee Schleifer murder was of a perspective informant/witness. The murder of Taglianetti was a contract murder. Parole Commission rules suggest that murder or conspiracy to murder under these circumstances would suggest that parole not be granted in a case.

## VIII. Evaluation:

The applicable guideline range is 100+ months. The subject has currently served 169 months as of 12/9/2000. Your offense behavior is rated as Category Eight severity because it involved murder and conspiracy to murder and multiple separate acts of extortion through racketeering offenses.

After review of all relevant factors and information presented, a decision more than 48 months above the minimum guidelines is warranted because you were involved in the hierarchy, first as a Capo and later as a Consigliere of a major organized crime organization and were involved either directly in the planning or approval of murder and/or attempted murder. Further, the murder of Lee Schleifer was of a ~~perspective~~ *prospective* informant/witness and the conspiracy to murder/murder of Richard Taglianetti was a contract murder. The Commission has determined that there is sufficient corroboration of information provided by Casso to rely upon the information supplied by Casso notwithstanding the affidavit from AUSA Stamboulidis of the E/NY.

## XI. Panel Recommendation:

Refer to Commissioner for Original Jurisdiction consideration. Continue to a 15 Year Reconsideration Hearing, December 2015.

## ADDENDUM:

At the conclusion of the hearing this examiner gave counsel the opportunity to present all written documentation he had in his possession to support his allegations concerning the credibility of the Commission, Casso and all alleged corroborating witnesses. This examiner has accepted those and noted them and made them a part of the file. Counsel did speak to each and every submission as he was making his arguments which have been related above.

This examiner did recess the hearing for a few moments relative to counsel's request to discuss any further items with his client near the end of the hearing. I then continued the hearing after which time counsel stressed the update of religious hours Furnari has participated in and his release plans.

## ADDENDUM BY SHOQUIST:

Fifteen year reconsideration hearing date should be December, 2011 (i.e.: the same date previously ordered) to avoid appearance of vindictiveness in reconsideration date being later

after court-ordered hearing.  Correct reconsideration date is December, 2011.

PAH
December 16, 2000




**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 25, 2000

By Federal Express
Sharon Gervasoni
United States Parole Commission
One North Park Building
5550 Friendship Boulevard
Chevy Chase, Maryland 20815

Re: Christopher Furnari Reg. No. 19815-054

Dear Ms. Gervasoni:

    The Government respectfully submits this letter in
connection with the Commission's upcoming consideration of
Furnari's parole.  In submissions to the Commission dated August
1, 1996 and December 11, 1996, and in my appearance at a December
3, 1996 hearing at FCI Allenwood, I expressed this Office's
strenuous opposition to Furnari's early release.  Because of a
recent decision from the United States Court of Appeals for the
Third Circuit, Furnari v. Warden, 218 F.3d 250 (July 12, 2000),
Furnari is back before the Commission for reconsideration.  As
set forth in more detail below, we continue to oppose Furnari's
release, because of his violent past, the danger he will likely
pose to the community upon his release, and the likelihood of his
return to a position of power in the Luchese Family.

### Procedural History

    After the 1996 proceedings, the Commission consigned
Furnari to offense Category Eight and denied him reconsideration
until 2011.  This action was based, at least in part, upon the
Government's submissions, in which I cited several acts of
violence in which Furnari either directly participated, or for
which he was ultimately responsible as a ruling member of the
Luchese Organized Crime Family of La Cosa Nostra.  The
information concerning those acts of violence came from several
cooperating witnesses, including Anthony Casso, who was a protege
of Furnari, and who rose to the rank of Consigliere and Underboss

EXHIBIT
17



Sharon Gervasoni
September 25, 2000

of the Luchese Family.

         As reported in <u>Furnari</u>, 218 F.3d at 250, Furnari later
sought review of the Commission's decision in a habeas corpus
petition filed in the United States District Court for the Middle
District of Pennsylvania.  Furnari's principal argument in
support of his petition was that Casso was unreliable.  While the
petition was pending, Furnari had a statutory interim hearing
before the Commission .  <u>Id</u>.  In support of his habeas corpus
petition, and at the interim hearing, Furnari submitted a copy of
a Government affidavit that had been filed in an unrelated case
in the Eastern District of New York (the "EDNY Affidavit").[1]  The
affiant, AUSA George Stamboulidis of the Eastern District of New
York, explained that Casso had breached his cooperation agreement
by, among other things, committing crimes while incarcerated and
lying about certain matters.  Nonetheless, both the Commission
and the judge presiding over Furnari's habeas corpus petition
denied Furnari any relief.  The Third Circuit reversed
principally because the Commission had failed to articulate its
basis for denying Furnari parole, particularly in the face of the
"new evidence" contained in the EDNY Affidavit.  Id. at 256-57.
Notwithstanding the EDNY Affidavit, we believe that there is more
than ample evidence to support the denial of Furnari's parole.

            <u>The EDNY Affidavit and the Government's Reliance on Casso</u>

         Absent a clear understanding of the record, it may
appear from the <u>Furnari</u> decision that this Office and the United
States Attorney's Office in Brooklyn ("USAO EDNY") took
conflicting positions concerning Casso and his reliability.  That
simply is not the case.  Indeed, despite the representations in
the EDNY affidavit, which we have no reason to contest, we
believe that the information presented in our 1996 submissions is
credible and reliable.  Moreover, prior to its submission to the
Commission, my August 1, 1996 letter in which I set forth Casso's
allegations was vetted by the EDNY USAO.  When the EDNY
determined in late 1997 that Casso had breached his cooperation
agreement, and thus terminated its relationship with him, I again
spoke to the EDNY USAO and was informed that the information
concerning Furnari was not a basis for Casso's termination, and
that much of Casso's historical information was believed to be

---

         [1]  A copy of the EDNY Affidavit is attached for your
convenience as Exhibit A.

                                    2



Sharon Gervasoni
September 25, 2000

credible, particularly because it had been corroborated in large
measure by other sources.  Consequently, no action was taken
concerning our previous submissions to the Parole Commission
concerning Furnari.

     The EDNY Affidavit was submitted to the court in
Casso's own case and sets forth the sequence of events that led
from the initiation of his cooperation to the termination of his
agreement with the Government.  As set forth in the affidavit,
Casso's cooperation agreement was terminated because (1) Casso
withheld certain information, none of which was related to
Furnari or Casso's own prior racketeering activity, (2) he
committed various crimes while in jail, and (3) he attempted to
falsely impeach other Government witnesses.  The bases for these
conclusions are summarized below.

     First, in 1994, during the initial debriefings of Casso
that followed the execution of his cooperation agreement, the
EDNY USAO believed that Casso was being less than candid
concerning his earlier plots following his arrest to kill a judge
and an AUSA, and to escape from jail.  EDNY Aff. at ¶ 6.  Indeed,
the results of a polygraph examination indicated that Casso was
deceptive on these issues.  Id. at ¶ 7.  Despite these concerns,
as of September 1996, the EDNY still considered Casso to be a
prospective witness in various matters, including the prosecution
of Vincent "Chin" Gigante, the boss of the Genovese LCN Family.
Id. at ¶¶ 21-22.  Among the reasons the EDNY had for its
continued confidence in Casso was the fact that, as for
historical information concerning the racketeering activities of
the LCN, Casso was corroborated in many respects by other
witnesses, including former Luchese hierarchy members Peter
Chiodo and Alfonso D'Arco.  Id. at ¶¶ 22-23.  As you may recall,
both Chiodo and D'Arco were relied upon, in addition to Casso, in
our 1996 submissions concerning Furnari.  Thus, by August and
December 1996, when we submitted our letters to the Commission,
Casso was still considered to be a credible and viable witness
for organized crime prosecutions.  Accordingly, my representation
to the Commission at the December 3, 1996 hearing in this regard
was completely accurate.

     It was not until several months later, in April 1997,
after the Parole Commission had rendered its decision denying
Furnari parole, that Casso's relationship with the Government
began to deteriorate markedly.  At that time, Casso admitted to
EDNY prosecutors that he had assaulted a fellow inmate,

3

Sharon Gervasoni
September 25, 2000

instigated another assault of that inmate, and later lied about it to prison officials.  In addition, Casso admitted that, with the help of prison employees he had bribed, Casso had smuggled various contraband into the protective custody units where he was housed.[2]  Id. at ¶¶ 25-28.  The EDNY prosecutors had these disclosures under review for several months thereafter, and had not made any decision that would affect Casso's availability as a witness until at least August 1997.  Id. ¶ 34.

However, in a letter from Casso's counsel dated August 1, 1997, Casso alleged that D'Arco and Salvatore Gravano -- a former Gambino LCN member who had cooperated with the Government - had given false testimony in the Gigante prosecution.[3]  Casso's allegations were discounted by the EDNY USAO for several reasons.  For instance, both D'Arco and Gravano had given the same or similar testimony in other proceedings prior to the Gigante competency hearing and "repeatedly withstood the crucible of cross-examination by teams of very skillful attorneys."  Id. at ¶ 35.  In addition, some of Casso's allegations against Gravano were patently false, and Casso later backed away from them.  See id. ¶¶ 35-37, 39.  Moreover, Casso's allegations appeared to be motivated by his realization that he would not be called to testify in the Gigante case, and thus would lose an opportunity to have his sentence reduced as a reward for his cooperation.  Id. at ¶ 39.

---

[2]  In approximately February 1997, this Office arrested and prosecuted a corrupt Bureau of Prisons employee who was smuggling contraband into a protective custody unit at FCI-Otisville for two inmates.  During the course of the investigation that continued after those arrests, somewhat sketchy information surfaced that inmates other than the defendants, including Casso, had engaged in similar conduct with the same BOP employee.  Not long after this revelation, Casso disclosed this conduct to the EDNY prosecutors. The results of our investigation did not undermine our faith in Casso's historical information since it had been extensively corroborated by other Government witnesses and independent investigative means.

[3]  By late 1997, both D'Arco and Gravano had testified in Gigante's hotly contested competency hearing.  After he was found competent, Gigante went to trial, after which he was convicted of racketeering and sentenced to twelve years in prison.



Sharon Gervasoni
September 25, 2000

On September 5, 1997, after reviewing Casso's false allegations, as well as his April 1997 disclosures concerning his criminal activities in jail, the EDNY determined that Casso had violated the provisions of his cooperation agreement that precluded Casso from, among other things, "providing false, misleading or incomplete information," and from "committ[ing] or attempt[ing] to commit any further crimes." Id. at ¶¶ 4, 35. Among the bases cited by the EDNY for this conclusion were Casso's bribery of prison employees, assault of another inmate who had provided information about Casso's criminal activities while in jail, and Casso's false allegations about Gravano and D'Arco. Id. ¶ 35. Thus, the affidavit clearly suggests that the EDNY's decision to terminate its relationship with Casso was based on Casso's activities after he had cooperated and not because his information on his own and others' racketeering activities was deemed to be incredible. Indeed, this fact was confirmed for me by the EDNY in late 1997, after the EDNY Affidavit was submitted to the court.

### The Information Concerning Furnari

In any event, as set forth in our August 1 and December 11, 1996 letters to the Parole Commission, there is ample evidence of Furnari's violent past, and likely violent future if released, that warrants a rejection of his parole application.[4] Indeed, much of this information stands whether Casso is credited or not.

In the August 1, 1996 letter, we presented information concerning Furnari's direct role in the murder of Lee Schleifer, the conspiracy to murder Richard Taglianetti, the attempted murder of Joseph Abinanti, a conspiracy to murder Frank Decicco and others, an assault of James Wolford, and a conspiracy to assault or murder Joseph Martinelli. I will not repeat those allegations here, but only emphasize the corroboration for several of these incidents.

1. Lee Schleifer homicide: The information provided by Casso, that Furnari ordered the execution of Schleifer in 1975, was independently corroborated by Thomas "Tommy Irish" Carew. Carew was a Luchese Family associate for many years, has pleaded

---

[4] Copies of my August 1 and December 11, 1996 letters are attached as Exhibits B and C, respectively.



Sharon Gervasoni
September 25, 2000

guilty to various racketeering offenses, and has testified
pursuant to the terms of his cooperation agreement with the
Eastern District of New York.  In fact, Carew reported that,
while Casso lured Schleifer to a Brooklyn social club and then
murdered him, both Carew and Furnari waited together at a nearby
restaurant until the murder was committed.  According to Carew,
he and Furnari met Casso at the social club after the murder, and
Schleifer's body was removed and then dumped on a Brooklyn
Street.  This murder was committed while Furnari was Casso's capo,
and, according to LCN protocol, Casso could not commit the murder
without Furnari's approval.

     2.  <u>Conspiracy to Murder Richard Taglianetti</u>: Carew
also corroborated Casso's account of Furnari issuing a contract
to murder Richard Taglianetti.  As set forth in the August 1,
1996 letter, various steps were taken by Casso and others to
carry out Furnari's contract, but Taglianetti was not located and
murdered until 1992 by Luchese Family member George Conte.
Furnari's role, and the reason he ordered the murder (to avenge
Taglianetti's role in the murder of the son of Luchese member
Angelo Defendis) has been corroborated by other Government
witnesses and former Luchese Family members D'Arco and Frank
Gioia, Jr., both of whom have testified for the Government on
numerous occasions.  In addition, the fact that the contract was
reportedly issued in the early 1980's when Furnari was a member
of the Luchese Family Hierarchy gives more reason to credit the
accounts of these witnesses.

     3.  <u>Assault of James Wolford</u>: Former Luchese member
Peter Chiodo also corroborates Casso's report of Furnari's order
to give a "beating" to Wolford, who was a Board member of the
International Painter's Union and was interfering with Furnari's
extortionate control of the union.  Chiodo and Carew carried out
the order.  In addition to Chiodo, however, another cooperator,
Corrado "Dino" Marino, has confirmed Chiodo's account and
Furnari's role in the assault.  Marino was a Luchese Family
associate who pleaded guilty to racketeering in the EDNY and has
testified pursuant to a cooperation agreement with the EDNY USAO.
In particular, Marino has stated that he had been approached by
union officials who complained about Wolford.  Marino then passed
the complaint on to Furnari, and shortly thereafter Chiodo
reported to Marino that Furnari had ordered the beating.

     4.  <u>Conspiracy to Assault Joseph Martinelli</u>: As set
forth in our August 1, 1996 letter, information concerning

 

Sharon Gervasoni
September 25, 2000

Furnari's role in the conspiracy to assault Joseph Martinelli was
provided by Chiodo, and corroborated in substantial detail by
Carew, D'Arco, and Casso.

        In addition, and as set forth in more detail in our
December 11, 1996 letter to the Commission, Furnari led a crew of
Luchese Family members and associates that  -- between the 1970's
and mid-1980's when Furnari was incarcerated -- was responsible
for thirteen murders and an attempted murder (including that of
Schleifer).  As we reported, several cooperators, including
D'Arco, have stated that such murders would not be committed
without the knowledge or approval, tacit or express, of the
crew's capo (i.e., Furnari).  Moreover, from D'Arco and other
sources, we believe that, immediately prior to his conviction,
Furnari and the other members of the Luchese Family hierarchy
orchestrated the rise of Casso and Amuso to replace them.  In the
wake of these promotions, the hierarchy that included Furnari
also agreed to have Anthony Luongo murdered.  Luongo had been
vying to replace Furnari's codefendant Anthony Corallo as boss of
the Luchese Family instead of Amuso.  It was believed that
murdering Luongo would eliminate any division in the Family that
might result from the appointment of the new administration.

<u>Furnari's Potential to Return to the Luchese Family</u>

        As we indicated in our August 1, 1996 letter, we have
learned from several confidential sources that Furnari is a
revered and almost mythical figure in the Luchese Family, who
would be received by them with open arms.  The disarray of that
Family has continued since 1996, with members of the present
Luchese Family hierarchy being either convicted of or indicted on
state and federal racketeering charges.  Thus, the Luchese Family
is starving for the type of strong and trusted leadership that
was the hallmark of Furnari's legendary role in the Family.  We
continue to believe that, should Furnari be prematurely released
on parole, he will return to the fold, and resume his
racketeering activities at the expense of many innocent victims.

<u>Conclusion</u>

        There is no reason to conclude that, although Casso
breached his cooperation agreement and is no longer cooperating
with the Government, his information concerning Furnari should
not be accepted.  First, the circumstances that led to his
termination did not touch upon the historical information he had

Sharon Gervasoni
September 25, 2000

provided.  And as set forth above, much of Casso's information
about Furnari has been corroborated in substantial measure by
other credible witnesses.  Indeed, even without Casso's
information, there is compelling information concerning Furnari's
role in two murders and two assaults.  Moreover, from cooperators
other than Casso, we believe that, as a capo and consigliere,
Furnari was at least indirectly responsible for at least eleven
murders.  Finally, Furnari has the capacity to fill an important
void in the Luchese Family should he be released.  If past
behavior provides any basis to predict future dangerousness,
Furnari certainly poses a grave danger to society and should be
forced to serve the remainder of his sentence.

Very truly yours,

MARY JO WHITE
United States Attorney

By:
    DAVID N. KELLEY
    Chief, Organized Crime and
        Terrorism
    Tel.: (212) 637-1025

8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ANTHONY CASSO,

         Defendant.

- - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

<u>A F F I D A V I T</u>

90-CR-446 (S-4)(FB)

     GEORGE A. STAMBOULIDIS, being duly sworn, deposes and says:

     1.  I have been a federal prosecutor since October 1988 and an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for Eastern District of New York (hereinafter "our Office") since January 1990.  From approximately mid-1994 until September 1995, I was also the Deputy Chief of the Organized Crime and Racketeering Section. From approximately September 1995 until the present, I have been the Deputy Chief of the Long Island Division.

     2.  The information contained in this Affidavit is based upon my review of the defendant Anthony Casso's ("Casso") plea and proffer agreements, transcripts of Court proceedings, my notes of meetings with Casso and my conversations and interviews with Matthew J. Brief, Esq., Casso, FBI agents, current and former AUSAs.

     3.  On February 24, 1994, Casso signed a proffer agreement with our Office (attached as Exhibit G to the Notice of Motion for Specific Performance and Other Relief, dated October

2

30, 1997 ("Casso Motion").

    4.  On February 24, 1994, Casso signed a cooperation agreement (Casso Motion, Exhibit C).  That plea agreement included, among other provisions, the following standard language:

> 5.  If the Office determines that the defendant has cooperated fully, provided substantial assistance to law enforcement authorities and otherwise complied with the terms of this agreement, the Office will file a motion, pursuant to Guidelines Manual §5K1.1 and 18 U.S.C. §3553(e) with the sentencing Court setting forth the nature and extent of his cooperation.  Such a motion will permit the Court, in its discretion, to impose a sentence below the applicable Sentencing guidelines range and also be low any applicable mandatory minimum sentence. In the connection, it is understood that the Office's determination of whether the defendant has cooperated fully and provided substantial assistance, and the Office's assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon him.  The Office cannot and does not make a promise or representation as to what sentence will be imposed by the Court.

> 6.  ANTHONY CASSO must at all times give complete, truthful and accurate information and testimony, and must not commit, or attempt to commit, any further crimes. Should it be judged by the Office that ANTHONY CASSO, also known as "Gaspipe," has failed to cooperate fully, or has intentionally given false, misleading or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this agreement, ANTHONY CASSO will not be released from his plea of guilty but this Office shall be released from its obligation under this agreement (a) not to oppose a Probation Department finding of a downward adjustment of two levels for

> acceptance of responsibility described in
> Paragraph Two, above, and (b) to file the
> motion described in Paragraph Five, above.
> Moreover, ANTHONY CASSO will also be subject
> to prosecution for any federal criminal
> violation of which the Office has knowledge,
> including , but not limited to, the criminal
> activity described in Paragraph Four, above,
> perjury and obstruction of justice.

(Emphasis supplied).

    5.  On March 1, 1994, pursuant to his cooperation agreement, Casso pleaded guilty before the Honorable Eugene H. Nickerson to each of the 72 counts in which he was charged in Indictment No. 90 CR 446 (S-4)(EHN).  During his allocution, under oath, Casso told the Court that:  he was satisfied with his legal representation (Plea transcript at p. 4);[1] he had read, understood and reviewed the plea agreement with Mr. Brief; and the written plea agreement constituted the entire agreement between him and the government. (Id. at 7).  Casso also told the Court that other than the written agreement with the government, no one made any promise to him that caused him to plead guilty and no one made him any promise as to what his sentence would be. (Id. at 19).  At the time of the plea, then-AUSA Gregory O'Connell also informed the Court that the written plea agreement constituted the entire agreement between the government and Casso. (Id. at 6-7).  Similarly, at that time, Mr. Brief advised the Court that the written agreement was the entire agreement between Casso and the government. (Id.)  At the time of the plea,

---

[1]  The transcript of Casso's guilty plea is attached hereto as Exhibit 1.

4

Casso advised the Court that he understood everything and had no
questions for the Court, and Mr. Brief advised the Court that he
did not know of any reason why Casso should not plead guilty.
(Id. at 18-19).

6.    During debriefings shortly after he signed the
cooperation agreement, Casso revealed that he had: (a) conspired
with Colombo family soldiers and associates to kill Judge
Nickerson; (b) prior to his decision to cooperate with the
government, ordered the murder of and conspired to murder then-
AUSA Charles Rose, who was one of the two prosecutors handling
the instant case; and (c) plotted to escape from MCC New York
and, in the alternative, to have his then Luchese family
associates attack the Eastern District Marshal's van in an effort
to free him -- to this end, with the help of a BOP employee who
he bribed, Casso obtained a handcuff key and instruments that he
used to make clay impressions of keys to prison cell doors at
Metropolitan Correctional Center New York ("MCC").  Casso then
directed his Luchese family underlings to use the impressions to
have keys made, which he planned to use in one of his escape
plans.  Although it is not clear whether questions had been asked
during the proffer session that should have elicited that
information, Casso's failure to disclose this information
previously led to concerns on the part of Messrs. Rose and
O'Connell about Casso's candor on certain issues.

7.    The recollection of Messrs. Rose and O'Connell
concerning the proffer and debriefing sessions with Casso was, in

5

some respects, at odds with the recollection of FBI agents
present during most of the same sessions.  Because Casso was to
be polygraphed as a standard precondition to entrance into the
Witness Security Program (the "Program"), Messrs. Rose and
O'Connell, in consultation with FBI Special Agent Richard
Rudolph, elected to polygraph Casso on certain issues about which
there was the most concern over Casso's candor.  The polygraph
examination included, among others, questions as to whether
Casso: (a) had "initiated" the plan to kill Judge Nickerson; (b)
had or had access to any cash over $500,000; (c) knew the
neighborhood in which then-AUSA Rose lived.  The polygrapher who
administered the polygraph on April 14 and 15, 1994 opined that
Casso's answers to those questions were indicative of deception
by Casso.

    8.  On or about August 31, 1994, Messrs. Rose and
O'Connell left our Office to enter private practice.  After
Messrs. Rose and O'Connell left our Office, to my knowledge they
had no new inside information on the Gigante case.

    9.  At about that time, I was assigned the case of
United States v. Vincent Gigante, 93 CR 368 (EHN) and 90 CR 446
(EHN), which included the instant case.  As the prosecutor who
took over the Gigante case, it also made sense for me to take
over as the "sponsoring" or contact AUSA for Casso because he was
a witness with firsthand knowledge of Gigante's position as boss
of the Genovese family and his involvement in numerous murders,
murder conspiracies, extortions and other crimes.  As the

6

prosecutor who was handling the Gigante case, I had an interest in determining the viability of Casso as a witness and maintaining that viability, if it existed.

10. Shortly after I was assigned the Gigante case, I scheduled a meeting with Casso, Mr. Brief, AUSA Valerie Caproni, who was my supervisor, and FBI Special Agents James Brennan and Richard Rudolph. On November 1, 1994, that meeting occurred at the protective custody unit ("PCU")[2] at which Casso was then housed. The main agenda for that meeting was: (a) to interview Casso about what he recalled as to what was said to whom between the time that he first decided to explore the option of cooperating and the early days after he entered the cooperation agreement; and (b) to interview him about those issues on which he failed the polygraph, including, but not limited to, his role in the plot to kill Judge Nickerson, and his criminally acquired income and assets and holdings (including real estate and business holdings and interests, his heroin and marihuana trafficking income and his racketeering activity income).

11. After that meeting, AUSA Caproni and I were troubled by some of Casso's answers and were not convinced he was being completely candid because certain of his explanations did not make sense. On the other hand, we were not certain that he was lying about anything in particular, and therefore did not terminate the agreement at that point.

---

[2] PCUs are prison facilities that house only inmates who are in the Program.

12.   I continued to hold out hope that Casso could be a viable witness in the <u>Gigante</u> prosecution.  Sometime in or about Summer 1995, I asked AUSA Andrew Weissmann to assist me in the <u>Gigante</u> prosecution.  Given Casso's long heinous criminal history[3] and unresolved concerns about whether he was being completely truthful about issues not related to information he possessed concerning Gigante, we believed that it was unlikely he would be a valuable witness in repeated trials.  Nevertheless, we considered having him testify at the initial <u>Gigante</u> competency hearing before Judge Nickerson -- a proceeding at which there would obviously be no jury -- as a trial run of his abilities as a testifying witness.  Depending on how he did, we would decide whether his testimony could be effectively presented at trial.

13.   In or about December 1994, the FBI Special Agent

---

[3] Before he entered the cooperation agreement Casso had committed a lifetime of serious crimes, including but not limited to the following crimes:  (a) conspired to murder government witnesses, including Peter Chiodo who was shot numerous times, and members of Chiodo's family; (b) conspired to murder and directed the murder of government witnesses and people he believed to be government witnesses, including, but not limited to, Robert Kubecka and Donald Barstow; (c) conspired to kill the Honorable Eugene H. Nickerson, a federal district court judge who was presiding over his case, and had taken steps to further the conspiracy by providing information concerning what he believed to be the town in which the judge lived and his usual mode of travel to the courthouse to others who, according to Casso, were more interested in killing the judge than he was; (d) conspired to kill, and taken steps to further the conspiracy, Charles Rose, then an AUSA assigned to prosecute him; (e) directly or indirectly participated in the murder of more than 36 people; (f) conspired to escape from the MCC-New York in several different ways, including planning a high risk armed raid on the U.S. Marshal's van that transported prisoners from the Eastern District courthouse back to the MCC New York; (g) while he was awaiting trial in the instant case, directed his underlings in the Luchese family to identify the location where jurors park their cars during jury duty so that he would be able to direct his underlings to identify the jurors sitting during his trial; and (h) corrupted law enforcement officers and thereby obstructed justice by obtaining sensitive law enforcement information which placed lives in jeopardy and otherwise compromised investigations.

who was assigned to the case of cooperating witness Carmine Sessa
advised me that Sessa informed him that Casso, who was then
housed in the same PCU as Sessa, had returned from a meeting with
FBI agents on his case, approached Sessa and began discussing a
murder that Casso told the agents about.  Sessa was upset that
Casso was discussing his knowledge of prior criminal activity
with Sessa at all and was further upset at the content of what
Casso was telling him.  Specifically, Sessa reported that Casso
had told him that Casso had told FBI agents that Sessa had
murdered a Vinny "Fat Vinny" DiPiero as a favor to his brother
Michael Sessa.  Sessa knew, and had previously reported to the
FBI, that he murdered DiPiero because Colombo family acting boss
Victor J. Orena directed him to do so as a favor to Casso, who
had requested it.[4]  After Sessa informed me that Casso raised
this topic with him, I told Sessa, in words or substance, to move
away from Casso if he ever again attempted to discuss such
matters with him.

        14.  While there was no excuse for Casso discussing any
aspect of his cooperation with Sessa in direct breach of his
cooperation agreement (See paragraph 3c of Casso's cooperation
agreement), we were not in a position to conclude that Casso was
lying when he reported that DiPiero was not murdered at his

_____

        [4] At the time Carmine Sessa began cooperating in April 1993, his brother Michael and
Victor J. Orena had been convicted and, approximately one month later, they were sentenced to
life imprisonment.  At no time during debriefings of Carmine Sessa did I or anyone else to my
knowledge, believe that Sessa provided false information on criminal conduct so as to protect
Michael Sessa.

request, because the differences between Sessa's and Casso's account of the murder could be a result of Orena having misled Casso and Sessa about Orena's motive for the murder. Moreover, we had no reason to question Sessa's credibility, which had already been tested and corroborated in many ways, including favorable jury verdicts, guilty pleas motivated by Sessa's cooperation, positive results on search warrants obtained based upon information provided by Sessa, corroboration from other cooperating witnesses, etc.

15. On or about July 12, 1995, at the request of the Israeli government, Casso testified by way of deposition in connection with the Israeli prosecution of Joseph Reisch and Israel Mizrachi. That prosecution resulted in acquittals. Casso's testimony was limited to the May 1989 murder of Michael Markowitz in Brooklyn, New York. A transcript of that testimony is available to the Court upon request.

16. On or about July 16, 1995, the staff at the prison at which Casso was housed with Sessa, decided that Casso should be transferred to another facility, largely because he was a disruptive influence in the PCU.[5] As we thought it best that he be moved away from Sessa and other witnesses with whom he had prior criminal relationships his transfer out of the facility was supported by this Office. On or about July 16, 1995, Casso was transferred to another institution.

---

[5] We had previously heard from Sessa that Casso had said to him that people like he and Sessa could not tell the FBI everything about their prior criminal conduct.

10

17.  On or about October 13, 1995, Kings County Assistant District Attorneys ("ADAs") Ken Taub (Chief of the Homicide Unit) and Alan Lewis (a Homicide Unit ADA) met with AUSAs Caproni, James Orenstein (Deputy Chief of our Office's Organized Crime and Racketeering Section ("OCRS")) and Mark Feldman (Chief of OCRS) to discuss the Kings County District Attorney's Office's pending murder indictment against Colombo family soldier Frank "Frankie the Bug" Sciortino and the possibility of Casso testifying at that trial.  On October 24, 1995, AUSA Caproni (who was then and still is Chief of the Criminal Division) wrote ADA Taub a letter to confirm a series of conversations in which the availability of Casso as a witness in the Sciortino case was discussed.  In that letter, AUSA Caproni stated that:

> ". . . this Office is not currently in a position to state definitively whether we will give your Office access to Mr. Casso for use in your trial.  We currently plan to call him as a witness in the competency hearing of Vincent Gigante, scheduled in January 1996. Following that hearing, we believe we will be able to tell you whether, and if so when, we would give you access to him.  We are unwilling to give you access to him prior to that hearing.

> You have inquired what would happen were you, against the wishes of this Office, simply to subpoena Mr. Casso to testify.  As we discussed, our plea agreement with Mr. Casso has resolved his federal criminal exposure for those crimes he disclosed to us. We could not, and obviously did not, resolve his state criminal exposure.  Accordingly, your question of what would happen were he to be subpoenaed is best directed to his attorney, Matthew Brief.  Mr. Brief can be

11

reached at (212) 832-5570. Should you chose
to subpoena Mr. Casso, please let me know
several weeks in advance of the date you need
him in court so that I can have the United
States Marshals make the appropriate security
arrangements."

That letter is attached as Exhibit 2.

18. On November 27, 1995, Mr. Brief wrote ADA Taub a

letter stating, among other things, as follows:

"As you are aware, Mr. Casso is willing
to fulfill all his duties and obligations in
accordance with the Cooperation Agreement.
He has agreed to testify in any proceeding in
the Eastern District of New York or elsewhere
as requested by the Office. On his behalf, I
have not received such a request at this time
from the United States Attorney regarding the
homicide trial of Frank Sciortino that is
presently scheduled in Kings County.

Therefore, I am advising you that if
called to testify at the present time, Mr.
Casso would assert his Fifth Amendment
privilege against self-incrimination to each
and every question that might be posed to him
in a state criminal proceeding."

(Casso motion, Exhibit N). The state case against Sciortino was

later resolved with a guilty plea.

19. On May 15, 1996, Casso voluntarily testified

before the Senate Permanent Subcommittee on Investigations of the

Committee On Government Affairs regarding Russian organized crime

in the United States. 1996 WL 273526 (F.D.C.H.). As he made

clear in his testimony, it was not pursuant to his agreement with

our Office. Id. ("... no promises have been made to me for my

testimony here today.").

20. As reflected in the Affirmation of Andrew

12

Weissmann dated December 16, 1997 ("Weissmann Aff."), in connection with post-trial attacks on Salvatore Gravano, on or about February 21, 1996, AUSA Weissmann and FBI Special Agent Brennan interviewed Casso over the telephone. During that conversation, Casso said, among other things, that: (a) he was not aware of Gravano having been engaged in drug dealing in any manner whatsoever; (b) Gravano had no knowledge of and was not involved in a drug trafficking transaction involving a boat called the Hunter;[6] and (c) prior to cooperating, Casso refused a request from a defendant who was incarcerated with him to help fabricate a story that Gravano participated in that drug deal. Weissmann Aff. at ¶¶ 4-5.

21.    Although we had considered calling Casso during the competency phase of the Gigante case, we ultimately decided that was not necessary. As the Court is aware, on August 28, 1996, Judge Nickerson found Gigante competent to stand trial. United States v. Gigante, 1996 WL 497050 (E.D.N.Y.). Following the completion of the Gigante competency hearings, AUSA Weissmann and I decided to begin trial preparation by interviewing accomplice witnesses who were available to testify at Gigante's trial.

22.    On September 27, 1996, AUSA Weissmann, FBI Special Agents Rudolph and Brennan, a paralegal and I interviewed Casso

---

[6] For a discussion of the allegations relating to Gravano's involvement in a shipment of drugs transported by the Hunter see Judge Glasser's decision in United States v. Gotti, 171 F.R.D. 19 (E.D.N.Y. 1997).

regarding the <u>Gigante</u> case.  It was clear that based on his face-
to-face dealings with Gigante, as well as his dealings with
Gigante's subordinates and others who had dealings with Gigante,
Casso could give very powerful testimony about many of the crimes
for which Gigante was indicted, as well as background position
and enterprise evidence.  For example, Casso, like Gravano,
attended the last Commission[7] meeting with Gigante and others.
Accordingly, Casso could have corroborated Gravano's account of,
among other things, Gigante's role and statements at that
meeting, as well as his leadership role in the Genovese family.
Similarly, Casso corroborated former Genovese family associate
Peter Savino and former Luchese family captain Peter Chiodo
regarding, among other things, Gigante's role in the "Windows
extortion conspiracy,"[8] as well as his leadership role in the
Genovese family.  Likewise, Casso corroborated former Luchese
family acting boss Alphonso D'Arco regarding, among other things,

---

[7] The Commission refers to the national ruling body of La Cosa Nostra in the United
States. From time to time, it consisted of the bosses of the five New York City-based mafia
families. The last Commission meeting was attended by Vincent Gigante, Venero "Benny Eggs"
Mangano, John Gotti, Salvatore Gravano, Vittorio "Vic" Amuso and Casso, the boss and
underboss of the Genovese, Gambino and Luchese families, respectively. At the meeting, Gigante
spoke lucidly and announced his decisions regarding important LCN business.

[8] In Count Five, Gigante was convicted of an extortion conspiracy involving the window
replacement and installation industry, in violation of 18 U.S.C. §1951. "Window replacement
companies run by Genovese Family members or associates made payments to the Luchese Family
and others who influenced local union decisions to permit cheaper non-union laborers to install
windows. Genovese members obtained window replacement contracts for jobs with the New
York City Housing Authority and other organizations that should have been handled by
companies using union employees only. Bid-rigging, bribes, and extortion assured the extremely
high profits shared with [Gigante]." <u>United States v. Gigante,</u> 1997 WL 597063 (E.D.N.Y.
September 25, 1997).

14

Gigante's leadership role in the Genovese family, his
installation of an acting administration, and his use of Dominic
"Quiet Dom" Cirillo as his official messenger.[9]

    23.  In addition to the _Gigante_ case, other prosecutors
in our Office, including AUSA Feldman, considered Casso to be a
potentially viable witness with respect to an investigation into
certain crimes, the specific details of which were revealed to
our Office by Casso.

    24.  Consistent with the letter and spirit of the
cooperation agreement, our Office tried to provide for Casso's
security concerns in various ways.  Some of these efforts are
addressed in a separate affidavit, which will be filed under
seal.

    25.  Sometime between approximately late 1996 to early
1997, our Office learned that Casso was involved in criminal
conduct in the PCU in which he was then-incarcerated.

    26.  On April 24, 1997, AUSAs Caproni, Weissmann and I,
with FBI Special Agents Brennan and Rudolph, interviewed Casso in
the presence of his attorney, Mr. Brief.  As reflected in Mr.
Brief's affidavit, we told Mr. Brief we had made no decisions but
wanted to hear Casso's full explanation as to all crimes that he
committed since the time that he entered the cooperation
agreement.

    27.  During that interview, Casso admitted that in a

---

[9] Because Gigante was feigning mental illness, it was helpful for him to have someone
who could relay messages to and from him to other LCN leaders and members.

PCU he snuck up on an inmate, while that inmate was being escorted, handcuffed and naked, from the shower to his cell, and beat the victim to the floor where he proceeded to then kick him multiple times. He also admitted that he had been involved as the instigator in a previous fight with that same inmate, after which he lied about it when questioned by a BOP hearing officer.

28. In that same interview on April 24, 1997, in the presence of his attorney, Casso admitted that, sometime between approximately July 1994 and approximately July 1995, he participated in the smuggling of contraband (approximately three boxes of food) via the mails into the PCU at which he was then housed (hereinafter "PCU-#1"). According to Casso, corrupt BOP employees assisted in the smuggling operation.

29. In that same interview, in his counsel's presence, Casso admitted that sometime after he was transferred out of PCU-#1 in approximately mid-July 1995, he again participated in the smuggling of contraband via the mails and other ways into the next prison in which he was housed (hereinafter "PCU-#2"). There, he bribed BOP employees with money orders, cash, Radio City Music Hall show tickets and new automobile tires to assist him in smuggling contraband into the prison and otherwise violating prison rules. According to Casso, among the contraband he arranged to be smuggled into the prison were cash, vodka, wine, food items including sushi, steaks, turkeys, veal cutlets, a disposable camera, radios, cosmetics and a robe.

30. Finally, in that same interview, in the presence

of his attorney, Casso admitted that he intentionally destroyed a BOP treadmill by ripping the belt, and that he lied when questioned about the incident by a BOP hearing officer.[10]

31.   On or about May 29, 1997, Mr. Brief sent a letter to AUSA Mark Feldman with a request that copies of the letter be provided to AUSAs Caproni, Weissmann and Stamboulidis.   In that letter, in essence, Mr. Brief requests our Office not to "withdraw from the Plea and Cooperation Agreement" with Casso in response to Casso's criminal activity since he entered the agreement.   In the letter, among other things, counsel makes general references to Casso's criminal activities in the PCUs and acknowledges that he had been told that no decision had been made as to whether Casso's breaches of the cooperation agreement would result in our Office refusing to make a motion under U.S.S.G. §5K1.1 motion ("5K Motion").   (Letter attached to Casso motion as Exhibit V).

32.   On August 1, 1997, Mr. Brief, at Casso's direction, sent another letter to AUSA Mark Feldman, with a request that copies of the letter be provided to AUSAs Caproni, Weissmann and Stamboulidis.   (Letter attached to Casso motion as Exhibit F and hereinafter referred to as the "August 1 Letter".) The letter contains Casso's allegations that two government witnesses in the Gigante trial, Gravano and D'Arco, gave false

-----

[10] Although Casso acknowledged smuggling contraband into PCU-#1 and PCU-#2, he adamantly denied any knowledge of any illegal conduct by anyone in PCU-#3, the unit in which he was then incarcerated.

testimony.  In addition, in the letter, Casso claimed that, the day after Rev. Sharpton was stabbed, Gravano admitted to Casso in a Brooklyn schoolyard that he ordered the stabbing.  Casso raised this in the August 1 Letter as a crime that Gravano failed to disclose to the government and in any of his testimony.

33.  In that letter, Casso also alleged that D'Arco lied when, among other things, he testified in <u>Gigante</u> that, at one point, he was made the acting boss of the Luchese family. Interestingly, D'Arco testified to the same fact at several earlier trials, yet Casso never before had his counsel write our Office about Casso's belief as to the veracity of that or any other fact testified to by D'Arco or any other witness.

34.  At the time we received the August 1 Letter, our Office had made no decision as to whether Casso's breaches of the cooperation agreement would result in the Office refusing to make a 5K Motion.  A decision would have been made by our Office's §5K Committee, which had not even been given a memorandum discussing Casso at the time we received the August 1 Letter.

35.  After we read the August 1 Letter, we concluded that Casso had made up lies about Gravano and D'Arco and directed his counsel to send them in the letter to our Office.  For example, as is event from the paragraphs that follow, Casso made up a conversation that he claimed to have had with Gravano about the stabbing of Rev. Sharpton.  Similarly, he made up the lies implicating Gravano in drug dealing, when he had earlier reported, (<u>see</u> Weissmann Aff. at ¶¶4-5), that he had no knowledge

of Gravano being in any way involved in drug dealing.  To the extent that Casso asserts that Gravano and D'Arco lied, as between Casso on the one hand and Gravano and D'Arco on the other hand, we credit the testimony of Gravano and D'Arco.  Their testimony repeatedly withstood the crucible of cross examination by teams of very skillful attorneys.  In addition, they have little incentive to lie about the things that Casso claims they lied about.[11]

36.  From November 1990 through approximately April 1995, Gravano was incarcerated.

37.  Based on my review of a New York City Police Department report of the incident, on January 12, 1991, an assailant stabbed Reverend Al Sharpton in New York City.

38.  On or about August 8, 1997, our Office sent Mr. Brief a letter notifying him that Casso was in breach of paragraphs three and six of his February 24, 1994 cooperation agreement.  A copy of that letter was also sent to the Court so that a sentencing date could be set. (Attached to Casso's motion as Exhibit C and Exhibit X).

39.  On or about September 5, 1997, our Office sent Mr. Brief a letter furnishing him with notice as to some of the ways

_____

[11]  For example, in debriefings by FBI agents, Casso has previously admitted that Amuso and he were in fact involved in a joint plot amongst certain members of the Genovese and Luchese families to murder Gambino family boss John Gotti because of his role in the unsanctioned murder of Gotti's predecessor, former Gambino family boss Paul Castellano. D'Arco previously reported his knowledge of that plot and later testified about it in the Gigante competency hearing and trial, and would have no motive to admit to having a role in the conspiracy to murder Gotti if he had no such role.

in which Casso breached his cooperation agreement.  (The letter is attached to Casso's motion as Exhibit E.)  Those included: (a) Casso's bribing prison guards so that they would permit him to smuggle contraband into PCUs; (b) Casso's brutal attack and assault of a witness in a PCU who had provided information about Casso's post-cooperation agreement criminal conduct, including his bribing prison guards and smuggling contraband into a PCU; and (c) Casso's lies to law enforcement in statements made in consultation with legal counsel, including his fabrication of derogatory information about government witnesses D'Arco and Gravano.  Specifically, once he realized that, unlike Gravano and D'Arco, he would not be called as a government witness in the Gigante case, Casso directed his attorney to send the August 1 Letter to our Office and the FBI when he then and there knew full well and believed that his allegations were false.  For example, one such allegation was that the day after Reverend Al Sharpton was stabbed during a parade he led, in a Brooklyn schoolyard, Gravano told Casso that he ordered the stabbing.  Since the time that our Office notified Casso that he was in breach for directing Mr. Brief to send our Office the August 1 Letter containing lies Casso made up about Gravano and D'Arco, at least one newspaper article noted that Gravano was in jail at the time that Casso claimed he had a conversation with him in a schoolyard.  Following the publication of that article, Casso filed an affidavit in support of his current motion.  In that affidavit, Casso claims that he was "mistaken" about Gravano

20

having admitted any involvement in the stabbing of Rev. Sharpton. (Casso Aff. at footnote 7).

40. On or about August 29, 1997, in response to Casso's and Mr. Brief's requests that Casso be housed closer to the Eastern District of New York, Casso was moved from one prison to a prison that is closer to the Eastern District of New York.

41. According to BOP records, on October 9, 1997, Casso was removed from the Program.

Dated: Brooklyn, New York
        December 16, 1997

George A. Stamboulidis
Assistant U.S. Attorney

Sworn to before me this
17th day of December, 1997

Notary Public

PEGGY A. LONG
Notary Public, State of New York
No. 41-....
Qualified in Queens and Cert. Kings County
Commission Expires. Oct 27, 194_

** TOTAL PAGE.21 **

LAW OFFICES OF

# DAVID BREITBART
52 DUANE STREET
7TH FLOOR
NEW YORK, N.Y. 10007-1208

(212) 608-1313

FAX: (212) 619-2767

---

**BY FAX & FEDERAL EXPRESS**

December 6, 2000

Sharon Gervasoni, Esq.
United States Parole Commission
One North Fork Building
5550 Friendship Boulevard
Chevy Chase, Maryland 20815

RE:   **Christopher Furnari, Reg. No. 19815-054**

Dear Ms. Gervasoni:

As you may recall, I, along with co-counsel Steven R. Kartagener, Esq., represent Christopher Furnari, who is currently serving a 100-year sentence at Allenwood FCI. At the suggestion of the United States Court of Appeals for the Third Circuit, the United States Parole Commission (hereinafter "USPC") has decided to provide Mr. Furnari with a *de novo* parole hearing. *See United States v. Furnari*, 218 F.3d 250, 258 (3d Cir. 2000). The purpose of this letter is: (1) to request respectfully that Mr. Furnari's Severity of Offense Category be fixed at a level no higher than Category Seven; (2) to request respectfully that, in light of Mr. Furnari's exemplary institutional record, he be found eligible for immediate release on parole; and (3) to address the issues raised by AUSA David N. Kelley in his letter of September 25, 2000 (hereinafter referred to as "the Kelley Letter").

**Mr. Furnari's Severity of Offense Category Should
Be Fixed at a Level No Higher than Category
Seven, and He Should Be Found Eligible for
Immediate Release on Parole**

Mr. Furnari is 76 years old, and he is currently incarcerated at Allenwood Federal Correctional Institution (medium security) pursuant a judgment of United States District Court for the Southern District of New York (Owens, J.), which was rendered in 1986. Mr. Furnari was convicted in the so-called "Commission Case" of RICO and RICO conspiracy, based on extortion in

EXHIBIT

18

Sharon Gervasoni, Esq.
December 6, 2000
Page 2

the New York City construction industry. As the Court of Appeals for the Second Circuit found, Mr. Furnari was alleged to have been the "Consigliere" of the Luchese Crime Family (for a brief summary of the "Commission Case," *see United States v. Salerno,* 868 F.2d 524, 527-530 [2d Cir. 1989]). Upon conviction, Judge Owens sentenced Mr. Furnari and most of his co-defendants to 100-year terms of imprisonment. Mr. Furnari has been incarcerated since November 19, 1986.

Only one of the defendants in the "Commission Case," Anthony Indelicato, was expressly charged with any murders – those being the murders of Organized Crime boss Carmine Galante and two of his cohorts. Mr. Furnari's original Presentence Report ("PSR") suggested that he might have had something to do with the Galante murder. However, in a letter dated December 4, 1995, AUSA David N. Kelley, Chief of the Organized Crime Unit of the United States Attorney's Office for the Southern District of New York, conceded that Mr. Furnari had absolutely nothing at all to do with the Galante murder. Based upon the Government's concession that Mr. Furnari could not have been involved in the Galante murder, I obtained a Court order exonerating him from the allegations of murder contained in the indictment, and referred to in his PSR.

Without that attributed murder, Mr. Furnari's Severity of Offense category under the Parole Guidelines should be recognized as being either Category Five or Category Seven. Pursuant to Parole Guidelines §2.20, Chapter Eleven, Subchapter A, § 1101; Chapter Three, Subchapter C, § 322(a), it may well be that the crime for which defendant was convicted is Category Five, since the so-called "Commission Case" was based upon a theory of extortion, with implied threats of injury to persons or property, in the New York City concrete industry. In any event, however, pursuant to Parole Guidelines §2.20, Chapter Eleven, Subchapter A, § 1101; Chapter Three, Subchapter C, § 322(c) Chapter Eleven, Subchapter F, § 1151; and Chapter Three, Subchapter D, § 331(a), the "Commission Case" extortions, with losses in excess of $5,000,000, would be, at most, rated as a Category Seven offense.

Mr. Furnari's Offender Characteristics Salient Factor Score, as previously communicated to him, is "8." Consequently, Mr. Furnari's presumptive Parole Guidelines range should be calculated as being 52-80 months. Pursuant to Parole Guidelines § 2.2(a), because Mr. Furnari is serving a 100-year sentence, he may be released on parole "after completion of ten years . . ." Mr. Furnari, at this point, has in fact served more than 14 years in prison.

Mr. Furnari should be found to be immediately eligible for release on parole. Moreover, because this 76-year-old inmate has established an exemplary institutional record, and because he no longer poses any real criminal threat to the community, that immediate parole should be granted.

Sharon Gervasoni, Esq.
December 6, 2000
Page 3

**In Determining Whether Mr. Furnari Should Be Found Eligible for Parole, Any Reliance upon Information Previously Provided to the Government by Anthony "Gaspipe" Casso, a Mad-dog Murderer and Pathological Liar Whose Credibility and Reliability Have Been Thoroughly Disavowed by the Government, Would Serve to Deny Mr. Furnari His Constitutional Right to Due Process of Law, and Would Render Any Adverse Ruling Made by the USPC Patently Arbitrary and Capricious.**

At Mr. Furnari's initial parole hearing on December 3, 1996, AUSA Kelley asserted that Mr. Furnari should spend the rest of his life in prison, without parole, because he had supposedly been involved in a number of murders and other violent activities (for which he had never been charged). To support these allegations, AUSA Kelley provided the USPC with information that the Government had received from then Government cooperator Anthony "Gaspipe" Casso, the former Underboss of the Luchese Crime Family. Casso, who had the blood of many victims on his own murderous hands, had cut a cooperation deal with the Government in the hope of avoiding the imposition of numerous life sentences. AUSA Kelley admitted that "most of the information [that he had concerning Mr. Furnari] does come from Casso." Mins. of Initial Parole Hearing, p. 25. During the course of the hearing, AUSA Kelley essentially vouched for Casso's credibility as a reliable informant. Mr. Furnari was denied parole on the basis of the Casso information.

It was, of course, later realized that AUSA Kelley had painted a picture of Casso and his supposed credibility and reliability that actually had nothing to do with reality. At about the same time that AUSA Kelley stood before the USPC hearing officer and vouched for Casso, AUSA's in Kelley's own unit were investigating Casso for having bribed and corrupted prison officials at the institution where he was incarcerated. Furthermore, as we eventually learned, by that time Casso's credibility had already become highly suspect, and Casso had already failed, in 1994, an FBI polygraph examination.

On December 16, 1997, AUSA George A. Stamboulidis, a senior prosecutor in the United States Attorney's Office for the Eastern District of New York, executed an affidavit (hereinafter referred to as the "Stamboulidis Affidavit") detailing why for so many years Casso's reliability and credibility had been doubted by the Government. The affidavit was filed in federal Court in support of the Government's ultimately successful efforts to disavow its cooperation agreement with Casso. This affidavit was submitted to the USPC at the time of Mr. Furnari's two-year, interim parole hearing in December, 1998. The Stamboulidis Affidavit offers a gold mine of information indicating that from the very outset, and long before AUSA Kelley made any representations to the Parole Commission supportive of Casso's credibility, Government prosecutors had formed serious doubts,

Sharon Gervasoni, Esq.
December 6, 2000
Page 4

for good cause, about Casso's "post-cooperator" truthfulness.

Because Casso's post-cooperation agreement debriefings in 1994 had raised "concerns . . . about Casso's candor on certain issues," which included plots by him to kill Federal District Court Judge Eugene H. Nickerson and Assistant United States Attorney Charles Rose, and to engineer his armed escape from federal custody, a decision was made to have Casso polygraphed by an FBI polygraphist. Stamboulidis Affidavit, pp. 4-5, paras. 6, 7. According to the Stamboulidis Affidavit,

> "The polygraph examination included, among others, questions as to whether Casso: (a) had 'initiated' the plan to kill Judge Nickerson; (b) had or had access to any cash over $500,000; (c) knew the neighborhood in which then-AUSA Rose lived. *The polygrapher who administered the polygraph on April 14 and 15, 1994 opined that Casso's answers to those questions were indicative of deception by Casso."*

Stamboulidis Affidavit, p. 5, para. 7 (emphasis added).

At subsequent debriefings conducted by AUSA Stamboulidis, the Government continued to believe that Casso might not be telling the truth about matters concerning which he was asked to provide information. Stamboulidis Affidavit, pp. 6-7, paras. 11-12. Also, it was reported to the Government that Casso had revealed to another Government informant, one Carmine Sessa, that Casso had provided the Government with information about a murder that Sessa believed to be false. Stamboulidis Affidavit, pp. 7-8, para. 13.

By letter dated August 1, 1997, Casso's attorney provided the Government with information that his client had asked him to communicate, including an allegation that the day after Rev. Al Sharpton (a New York City civil rights advocate) had been stabbed, Salvatore "Sammy Bull" Gravano had admitted to Casso that he had ordered the stabbing. Stamboulidis Affidavit, pp. 16-17, para. 32. Stamboulidis concluded that Casso was blatantly lying, since it was absolutely clear that at the time that Gravano supposedly had this conversation with Casso in a Brooklyn schoolyard, Gravano was being held incommunicado, in federal custody. Stamboulidis Affidavit, pp. 17-18, paras. 35-37.

In addition to the information contained in the Stamboulidis Affidavit, there were other indicia which clearly revealed that by August, 1997, the Government was prepared to thoroughly repudiate Casso's information, and his role as a Government cooperator. In an unrelated but notorious Organized Crime case entitled *United States v. Vincent Gigante*, (Cr. No. 93-368 [JBW]), which had been recently prosecuted in the Eastern District of New York, the Government sent a letter to the attorneys for Mr. Gigante which revealed that the Government no longer considered Casso to be a reliable informant. By letter dated August 8, 1997, Assistant United States Attorney Andrew

DEC-06-2000 WED 12:32 PM DAVID BREITBART          FAX NO. 12126192767          P. 06/13

Sharon Gervasoni, Esq.
December 6, 2000
Page 5

Weissmann, who is currently Chief of the Criminal Division of the United States Attorney's Office for the Eastern District of New York -- the prosecutorial office that entered into the cooperation agreement with Casso -- provided Gigante's counsel with a letter from Casso asserting that Government cooperators Sammy the Bull Gravano and Alphonse D'Arco had lied at the Gigante trial.[1]  In his letter, AUSA Weissmann categorized Casso's information as being "untrue." He went on to explain why the Government would not trouble itself to disprove Casso's allegations:

> "Because it does not constitute material discoverable under *Brady*, we have not included in this letter the substantial evidence that refutes ***Casso's latest spurious allegations*** made in the attached letter, including statements previously made by Casso himself."

Emphasis added.

AUSA Kelley did not bother to reveal any of these facts to the USPC or to Mr. Furnari's counsel before the National Appeals Board rejected Mr. Furnari's administrative appeal on August 19, 1997. Although we, as Mr. Furnari's counsel, did disclose all of this information to the USPC at the time of Mr. Furnari's interim, two-year hearing, it had no real effect on the USPC's quick denial of Mr. Furnari's request for parole.

Fortunately for Mr. Furnari, the United States Court of Appeals for the Third Circuit recognized that there was something terribly wrong with denying a man parole, and requiring him to die in prison, on the basis of information coming from an inveterate liar like Casso. Although a two-judge majority of the Court conditionally granted Mr. Furnari's habeas corpus petition upon the technical ground that the USPC had violated its own rules by not providing Mr. Furnari with an adequate statement of reasons when it classified him as a Category Eight and again denied him parole after the interim, two-year hearing (*see* 218 F.3d at 252, 257-258), a reading of the opinion makes absolutely clear that the absent statement of reasons was relevant only because the Court had unequivocally found Casso to be extremely unreliable and unworthy of belief.

The Court of Appeals, noting that Casso was a "discredited witness" (218 F.3d at 252), observed that the USPC, being bound by the "preponderance of the evidence" standard, "may not base its judgment as to parole on an inaccurate factual predicate [citations omitted]." 218 F.3d at 254-255. In this context, the Court found that:

> "Stamboulidis's affidavit undeniably represents significant information that, if the Parole Commission were to accept it, would be relevant to the question at the initial hearing whether the

---

[1]Casso had been identified as a possible Government witness for the Gigante trial, which occurred from June-July, 1997, but the Government never called him to the stand.

Sharon Gervasoni, Esq.
December 6, 2000
Page 7

Against the historical backdrop of this matter, we are now astonished to see that AUSA
Kelley is again asking the USPC to accept as credible the information provided to the Government
by Anthony "Gaspipe" Casso. Essentially, AUSA Kelley seems to argue that because Casso's
information about Mr. Furnari was not specifically proven to be false by Government investigation,
and did not serve as the basis for the termination of Casso's cooperation agreement, it is proper for
the Government -- a Government that obviously wants to keep Mr. Furnari in prison -- to parse out
small particles from the mass of patently unreliable information and serve them up as being a palatable
basis for requiring Mr. Furnari to die behind bars. *See* Kelley Letter, pp. 2-3, 5, 7. We are all simply
to pretend that there is no fetid stink surrounding the entire Casso affair.

We do not believe that the Government can so easily disavow Casso's credibility and
reliability when it chooses to do so, and then prop him up as a source of supposedly reliable
information when it wants to keep another alleged member of Organized Crime in prison. If the
Stamboulidis Affidavit tells the truth about Casso, as we believe it does, then we respectfully submit
that constitutional due process and concerns about fundamental fairness mandate the conclusion that
no rational fact finder could rely upon information provided by the thoroughly "discredited" Casso
in order to find by a preponderance of the evidence that Mr. Furnari is not ever to be set free. Should
such a finding be made on the basis of the Casso information, that finding would, necessarily, be
fatally arbitrary and capricious.

The Government's present effort to resurrect Casso's credibility for the purpose of assuring
that Mr. Furnari dies in prison does make one thing clear – the Government lacks any other
meaningful, hard information that accurately links Mr. Furnari to the allegations of violent behavior
that the Government is trying so hard to attribute to him. Casso is once again being trundled before
this Commission as the primary source of supposedly reliable information concerning Mr. Furnari.
And then, using the same tactics as used in the past of referring obliquely and amorphously to
undocumented "corroboration" that supposedly comes from other Government cooperators,
themselves former Organized Crime members who have cut themselves self-serving cooperation
deals, the Government would have this Commission find that it has shown by a preponderance of the
evidence that Mr. Furnari is guilty of a host of uncharged crimes.

We respectfully urge this Commission to refuse to rubber stamp the unsupported, conclusory
allegations concerning Mr. Furnari that were leveled against him at his first parole hearing, and are
now again simply being repeated by the Government with no additional elements of specificity or
proof of documentation. If there is to be the appearance of real integrity in this *de novo* fact-finding
process, after the previous vouching for Casso's reliability was shown to be ill-founded, the
Commission should insist that the same Government officer who provided the previous, flawed
information must now provide, at the very least, some written documentation supporting his claims
that a number of different individuals have "corroborated" Casso's information concerning Mr.
Furnari. FBI 302's or debriefing transcripts should be required from this Government attorney, who
is so bent on keeping Mr. Furnari in jail at any cost, before his non-specific allegations about

Sharon Gervasoni, Esq.
December 6, 2000
Page 8

supposed corroboration are taken at face value. With respect to his ability to divine what is, or is not, reliable corroborative information, AUSA Kelley is simply stating to the Commission, "trust me." AUSA Kelley may well be an honorable man, but his previous failure of judgment on this issue mandates that the USPC demand something more at this juncture.

A review of the specific allegations of criminality now being hurled against Mr. Furnari supports our argument.

**The Kelley Letter Failures to Provide an Adequate Factual Basis for Concluding by a Preponderance of the Evidence That Mr. Furnari Should Be Held Accountable for the Violent Acts, Committed by Others, That Are Now Being Attributed to Him**

1. The Lee Schleifer Homicide:    The Government's allegations concerning the murder of Lee Schleifer, a drug dealer who was murdered by Casso, offer a good example as to why the USPC should call for some independent documentation of the assertions being made in the Kelley Letter. According to the Kelley Letter, which merely repeats allegations about the Schleifer murder that were made against Mr. Furnari at his initial parole hearing, Casso reported that Mr. Furnari ordered the Schleifer murder. Also according to the Kelley Letter, a Luchese gangster turned Government cooperator named "Tommy Irish" Carew corroborated Casso's information. The Kelley Letter reports that Carew and Mr. Furnari waited together for Casso to commit the murder, and that Carew and Mr. Furnari then went together to the scene of the crime, a Brooklyn social club. The body was then removed and dumped on a nearby Brooklyn street.

However, contrary to the Kelley Letter's undocumented assertions, Carew has testified under oath, as a Government cooperator in a case entitled *United States v. Pagliarulo*, that he alone helped Casso dispose of Schleifer's body after Casso murdered him, and Carew never mentioned anything about Mr. Furnari having been present, or having played any role in the homicide or its cover-up.

"[Carew]:    I was to meet Anthony [Casso] in a club on 15[th] Avenue. It was owned by a fellow by the name of Swaggle at that time. We had previously had the crap game in the basement of that club. I was told to meet Anthony there, that he needed my help with something, and I went there and rang the bell and banged on the door. Anthony came to the door. He led the way. He closed the door. He led the way to the basement. There was a body on the floor and I helped him put the body in a bag, and I cleaned up the blood, and we carried the body out through the back door. And there was an alleyway and he had a car parked there. We put the body in the trunk of the car and we took it and dumped it, dropped it on the street off

Sharon Gervasoni, Esq.
December 6, 2000
Page 11

"corroborated in substantial detail" by these government cooperators must not be accepted at face value, without any further factual examination. If Carew's sworn testimony, offered as a Government witness, was truthful, then no basis exists for attributing the Martinelli beating conspiracy to Mr. Furnari.

In addition to the four specific, unsuccessful allegations against Mr. Furnari which are detailed and answered above, the Kelley Letter additionally accuses Mr. Furnari in non-specific, general terms with all sorts of murder and mayhem. *See* Kelley Letter, p. 7. However, in the absence of a stitch of corroborative documentation, and in view of the fact that all of the more specific allegations of violence are found to be wanting when carefully scrutinized, we urge the USPC not to accept these generally provocative, but unsupported, assertions as grounds for denying Mr. Furnari parole. To do so would be to make a mockery of these proceedings.

The Kelley Letter ends by describing Mr. Furnari as being an "almost mythical figure in the Luchese Family." We respectfully submit that the only information shown to be "mythical" in the Kelley Letter is that provided by the Government. Completely lacking from the Kelley Letter, however, is a scintilla of hard, documented, potentially reliable information that might warrant the denial of Mr. Furnari's parole. We urge the USPC to recognize that there does not exist any appropriate reason why this elderly, 76-year-old model prisoner who has already served 14 years in prison, and who has never been convicted of a violent crime, should not be immediately granted parole so that he might spend the few remaining years of his life at liberty, with a wife and sons whom he loves so dearly.

Respectfully submitted,

David Breitbart, Esq.

560

Cincotta-cross-Horlick

1 A.   And then there is a cafe.  I think the Cafe Segesta or
2 Cafe Sicilia.
3 Q.   Which is?  Sicilia or Segesta?
4 A.   I really can't recall.
5 Q.   You do know there is a cafe there?
6 A.   There is a cafe.
7 Q.   And white Camaro is written on there paper?
8 A.   White Camaro, 5:30.
9        MR. ROSE:  If I may read this document?
10       THE COURT:  Certainly.  It is in evidence.
11       MR. ROSE:  In front of realty 65th Street and Bay
12 Parkway, 5:30, white Camaro.
13       Thank you, sergeant.
14       THE COURT:  Do you have any questions, Mr. Horlick?
15       MR. HORLICK:  Yes, Your Honor.
16 CROSS-EXAMINATION
17 BY MR. HORLICK:
18 Q.   Sergeant, that little paper that you have just looked at,
19 did you ever determine whose handwriting it was written in?
20 A.   No, sir.
21 Q.   Were there any tests done to determine who wrote these
22 five or eight pages of handwriting?
23 A.   Which five or eight pages?
24 Q.   I will hold them up for you.
25 A.   No.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

561

Cincotta-cross-Horlick

1 Q.   That's Exhibit 12-A-5.
2        No specific tests or handwriting tests?
3 A.   No.
4 Q.   The diary that you say you found which is 12-A-6 in
5 evidence, this red book, did you look through it to see if
6 there were other appointments similar to that?
7 A.   Yes, I did.
8 Q.   Did you find similar notations about places to go or cars
9 to bring?
10 A.   Yes, I did.
11       But not for that date.
12 Q.   No, those are other dates.
13 A.   Yes, right.  Exactly.
14 Q.   That white Camaro, did you ever learn whether or not it
15 was the property of Mr. Sigona?
16 A.   He was in possession of it.  He dealt in cars.  I did not
17 research it to see if the title was in his name.  He was in
18 the business of selling used cars.  At the time of his death
19 he had about five or six cars in his possession.
20 Q.   On December 7, 1988, was that white Camaro a stolen car
21 or was it properly owned and registered?
22 A.   It was not stolen.  The status of his registration was in
23 question.  It was not properly registered.
24 Q.   Since 1988, have you been able to determine the status of
25 the registration?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

562

Cincotta-redirect-Rose

1 A.   No.
2 Q.   What do you mean when you say the status of the
3 registration?
4 A.   I mean that the vehicle wasn't reported stolen.  It was
5 not currently registered.
6 Q.   Current on December 7?
7 A.   Right.
8 Q.   By the way, did it have any license plates on it?
9 A.   Yes.  It had a Jersey license plate on it that did not
10 belong to that car.
11       MR. HORLICK:  Thank you.
12       THE COURT:  All right.
13 REDIRECT EXAMINATION
14 BY MR. ROSE:
15 Q.   Do you know where Dino Marino lived in relation to Angelo
16 Sigona?
17 A.   At the time I knew exactly where he lived.  Right now I
18 can only recollect that it was like a block or two away on one
19 of the bay streets.  Bay 41 or so.
20       MR. ROSE:  Thank you, sergeant.
21       THE COURT:  All right.  Do you have another -- thank
22 you.
23       Do you have another witness?
24       MR. O'CONNELL:  Yes, Your Honor.
25       The government is calling Thomas Carew.--

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

563

Carew-direct-O'Connell

1        THE COURT:  Okay.
2        MR. O'CONNELL:  It will just take a minute to arrange
3 to bring him in, Your Honor.
4        (Pause.)
5        THE COURT:  All right.  Just stop there and face me
6 and raise your right hand, while these gentlemen sit down.
7 T H O M A S       C A R E W  ,
8    called as a witness, having been first duly sworn,
9    was examined and testified as follows:
10 DIRECT EXAMINATION
11 BY MR. O'CONNELL:
12       THE COURT:  Please be seated.
13       Would you state your name, please?
14       THE WITNESS:  Thomas Carew.
15       THE COURT:  How do you spell your last name?
16       THE WITNESS:  C A R E W.
17       THE COURT:  Okay.  That microphone isn't on,
18 Mr. Carew.  So you could sit back and keep your voice up so
19 everyone can hear.
20       THE WITNESS:  Okay.
21       MR. O'CONNELL:  May I proceed, Your Honor?
22       THE COURT:  Please.
23       All right, Mr. O'Connell.
24 Q.   Mr. Carew, are you testifying pursuant to a plea
25 agreement with the government?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

EXHIBIT

19

PAGE 141  SHEET 36

564

Carew-direct-O'Connell

1  A.  Yes, I am.
2  Q.  A cooperation agreement?
3  A.  Yes.
4      MR. O'CONNELL:  May I approach the witness, Your
5  Honor?
6      THE COURT:  Yes.
7  Q.  I show you what's been marked as Government Exhibit
8  3500-1470.  Please take a moment to examine it.
9      (Pause.)
10     Is that a signed copy of your agreement, your
11 cooperation agreement, Mr. Carew?
12 A.  Yes.
13 Q.  Does that bear your signature and the signature of
14 government counsel and of your own attorney?
15 A.  Yes.
16 Q.  Is that the entire agreement that you have with the
17 United States Government?
18 A.  Yes.
19 Q.  Mr. Carew, pursuant to that agreement, am I correct you
20 pled guilty to all criminal charges in the indictment in this
21 case, the pending case?
22 A.  Yes.
23 Q.  Yes, sir?
24 A.  Yes.
25 Q.  Keep your voice up, please.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

PAGE 142

565

Carew-direct-O'Connell

1  A.  Okay.
2  Q.  Those charges included racketeering, murder and
3  extortion; is that correct?
4  A.  Yes.
5  Q.  Could you tell the jury what sentence you are currently
6  facing under your cooperation agreement and guilty plea in
7  this case?
8  A.  Zero to life imprisonment.
9  Q.  Could you tell the jury what your understanding is as to
10 what your obligation under this cooperation agreement is?
11 A.  To tell the truth and tell everything I know.
12 Q.  Under your agreement with the government, what promises
13 has the government made to you in return for your cooperation
14 and your compliance with this agreement?
15 A.  They didn't make any promises.  They just said that if I
16 testify truthfully they will give the Judge a letter that I --
17 that they feel that I testified truthfully.
18 Q.  Has anyone in the government promised you a specific
19 sentence of any kind in return for your cooperation?
20 A.  No.
21 Q.  What is your understanding as to who will determine what
22 sentence you will receive?
23 A.  The Judge.
24 Q.  Mr. Carew, I'd like to turn your attention now to a brief
25 inquiry into your own background.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

PAGE 143

566

Carew-direct-O'Connell

1      You were arrested in this case in approximately
2  October 1992; is that correct?
3  A.  Yes.
4  Q.  Earlier in your life, were you arrested previously?
5  A.  Yes, I was.
6  Q.  Tell the jury when you were arrested for the first time
7  and the offense for which you were arrested?
8  A.  In 19 and 61, I was arrested for conspiracy to armed
9  robbery.
10 Q.  Were you convicted in that case?
11 A.  Yes, I was.
12 Q.  Did you receive a sentence?
13 A.  I did, yes.
14 Q.  Tell the jury what sentence you received?
15 A.  I received a three and a half to seven year sentence.
16 Q.  Mr. Carew, around that time, 1960, 1961, prior to your
17 arrest, had you engaged in other criminal activity other than
18 that specific offense, for which you were arrested?
19 A.  Yes.
20 Q.  Explain to the jury just very briefly the kinds of
21 criminal activity that you were engaging in back in 1960,
22 1961, around that time?
23 A.  I was engaged in gambling, selling stolen property and
24 armed robbery.
25     THE COURT:  Keep your voice up.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

PAGE 144

567

Carew-direct-O'Connell

1      THE WITNESS:  Okay.
2  Q.  Back around that same time, did there come a time when
3  you met a member of an organized crime family that you later
4  became associated with?
5  A.  Yes.
6  Q.  Who was that person?
7  A.  Chris Funari, Christy Tic.
8  Q.  What crime family did you learn he belonged to?
9  A.  Lucchese Crime Family.
10 Q.  In the early 1960s or approximately 1960, could you
11 explain to the jury how your relationship with Mr. Funari
12 began and how frequently you began to see him?
13 A.  Yes.  I -- I had a -- an argument with a couple of guys
14 and they went -- they went to Christy and because -- because I
15 started hanging out at his club and he straightened out the
16 argument and I started staying with him more and more.
17 Q.  At the time you began staying with him, as you put it,
18 did you recognize at that time that he was a person who was
19 involved in organized crime?
20 A.  Yes.
21 Q.  You made your own deliberate decision at that time,
22 voluntarily, to become associated with that individual?
23 A.  Yes.
24 Q.  Is it fair to say that that was the beginning of a long
25 relationship that you had with the Lucchese Crime Family?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

PAGE 145  SHEET 32

568

Carew-direct-O'Connell

1  A.   Yes.
2  Q.   Now, you testified a moment ago that you served
3  approximately three years in jail; is that correct?
4  A.   I did about thirty-one months out of the three and a half
5  to seven year bit.
6  Q.   Could you tell the jury over what period of time
7  approximately you served that particular prison sentence?
8  A.   I was convicted in 1963 and I did about six months at
9  that time and I was released on a certificate of reasonable
10 doubt pending an appeal, and I was out on an appeal bond for
11 about two years.  I went back to jail in 19 and 66 after
12 losing the appeal, and I was in jail until the end -- towards
13 the end of '68.
14 Q.   Now from the time you were arrested until the time you
15 went to jail, did you still continue from time to time to
16 engage in criminal activities?
17 A.   Yes.
18 Q.   Notwithstanding your conviction?
19 A.   Yes.
20 Q.   Did you continue to maintain your relationship with
21 Mr. Funari?
22 A.   Yes.
23 Q.   Turning your attention to the time period you were
24 actually in jail, the longer stretch, if you will, in the
25 mid-to late sixties?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 146

569

Carew-direct-O'Connell

1  A.   Yes.
2  Q.   Can you tell the jury whether you made any other friends,
3  if you will, or associates, associations with people who were
4  engaged in organized crime while you were actually in jail?
5  A.   Yes.  Vic Amuso was in jail at the same time as I was and
6  he worked right near me.  We were friends.  And Anthony
7  Stabile was there and I was friendly with him too.
8  Q.   This individual Vic Amuso you are referring to, is that
9  the same individual who later was promoted to a very high
10 ranking position in the Lucchese Crime Family?
11 A.   Yes.  Eventually he became the boss.
12 Q.   After you came out of prison in late 1960s, did you
13 continue seeing Mr. Funari?
14 A.   Yes.
15 Q.   Did your relationship grow closer with him?
16 A.   Yes.
17 Q.   Could you explain to the jury what you began to do for
18 Mr. Funari upon your release from prison in the late 1960s and
19 rejoining?
20 A.   Well, I started to hang out with him quite a bit and
21 eventually I was -- he made me his driver and I used to drive
22 him around to his meetings and pick him up and hang out with
23 him, kind of bodyguard and driver.
24 Q.   Did you continue to engage in criminal activities in
25 addition to being his driver, bodyguard?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 147

570

Carew-direct-O'Connell

1  A.   Yes.
2  Q.   Tell the jury just generally the kinds of criminal
3  activities you engaged in after rejoining Mr. Funari in late
4  1960s?
5  A.   Selling swag or stolen property, hijacking, labor
6  racketeering enforcer, insurance fraud.  That's about it.
7  Q.   Did you ever engage in illegal gambling?
8  A.   Oh, yes, gambling and I had a junkyard.  I chopped some
9  cars.
10 Q.   Roughly over what period of time did you serve as the
11 driver for Christy Tic Funari?
12 A.   Late '50s through the middle '70s, around '76 or
13 somewheres around there.  '77.
14 Q.   You told the jury about one arrest you had in 1961.
15      During the time period in which you were working as a
16 driver for Mr. Funari, did there come a time when you were
17 arrested again?
18 A.   Yes.
19 Q.   Approximately when were you arrested for the second time?
20 A.   In 1971, I was arrested for possession of stolen
21 property.  I had a transmission from a stolen car was found in
22 my place of business, my junkyard.
23 Q.   Was this during the same time period in which you were
24 selling stolen car parts?
25 A.   Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 148

571

Carew-direct-O'Connell

1  Q.   What happened to that case?
2  A.   It was dismissed.
3  Q.   Did there come a time when you were arrested for a third
4  time?
5  A.   Yes.
6  Q.   Tell the jury for what?
7  A.   In the middle '70s I was arrested for possession of
8  fireworks.  I had a garage full of fireworks and I was
9  arrested for that.
10 Q.   What was the disposition of that case, Mr. Carew?
11 A.   I paid a fine.
12 Q.   During this time period in 1970s, while you were the
13 driver for Mr. Funari, you testified a moment ago that you
14 engaged in labor racketeering.
15      Can you explain to the jury what your role was in
16 labor racketeering and what connection if any it had to
17 Mr. Funari and the Lucchese Crime Family?
18 A.   Well, at various times I worked as a shop steward on
19 construction jobs that Mr. Funari put me on, and then later
20 on, I was acting -- active in giving a couple of union guys
21 beatings to put them in line.
22 Q.   During this time period, did you consider in your own
23 mind to hold a position within that Lucchese Crime Family of
24 some sort?
25 A.   Not really.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 149  SHEET 38

572

Carew-direct-O'Connell

1  Q.  Did you ever become a -- an actual member or --

2  A.  No, I can't.

3  Q.  Or soldier in the Lucchese Family?

4  A.  No, I'm Irish and I couldn't be.

5  Q.  What did you have to be in terms of ethnic background as

6  you understood it to become an actual member?

7  A.  Your father had to be Italian.

8  Q.  You were disqualified by reason of your Irish ancestry?

9  A.  Yes.

10  Q.  During that time period in the 1970s, did you meet a

11  person named Peter Chiodo?

12  A.  Yes, I did.

13  Q.  Approximately when did you meet Mr. Chiodo?

14  A.  Around 1975.

15  Q.  Briefly, could you explain the circumstances to the jury

16  that led to your meeting Mr. Chiodo?

17  A.  Mr. Chiodo had asked -- Mr. Chiodo's father had asked

18  Chris Funari to help his son Pete.  He had a dispute with some

19  members of the Colombo Crime Family, and he wanted Christy to

20  represent his son with them, and Chris did.

21       We -- he had a meeting one night in which I attended

22  and he sat down with them and he got a good decision for Pete

23  and then Pete came with him.

24  Q.  After Mr. Chiodo obtained this result that you described

25  from his meetings with Mr. Funari, did Mr. Chiodo become

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 150

573

Carew-direct-O'Connell

1  associated in any way with Mr. Funari?

2  A.  Yes.

3       He stayed with -- he stayed in The 19th Hole with

4  us.  He became friendly with Chris.

5  Q.  You just referred to a place called The 19th Hole?

6  A.  Yes.

7  Q.  Could you explain to the jury what The 19th Hole had to

8  do with the Lucchese Crime Family activities as you understood

9  it back in the mid-1970s?

10  A.  Well, we stayed there.  Chris kind of held court there.

11  That was his hangout, it was his place and we stayed there and

12  we had all his meetings were -- were made there and his

13  appointments.

14       (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 151

574

Carew/direct/O'Connell

1  BY MR. O'CONNELL:

2  Q.  Now, by reason of your relationship with Mr. Funari, did

3  you come to know other persons who were associated with

4  Mr. Funari during that time period?

5  A.  Yes.

6  Q.  Could you give the jury a few examples of persons who

7  associated with Mr. Funari in his 19th Hole crowd back in the

8  mid-1970's?

9  A.  Nick DiCostanza, Angelo DeFendis, Frankie Bollino,

10  Frankie Hart, myself, Tommy DiDonato, Johnny Black, but Johnny

11  was in Florida, but when he came up, he came there.  That's

12  about it.  Oh, Pete Chiodo.  Do you want associates, too?

13  Q.  If you can mention associates in the 1970's?

14  A.  Associates, Dino Marino was coming around.  Dino had a

15  barbershop, and he used to cut Chris's hair.  He got friendly

16  with him and he started coming around.  Frankie Bola, B O L A.

17  Q.  You mention a Mr. Abuso, who you had met in prison from

18  the early 1960's.  Did he have any relationship with

19  Mr. Funari during this time period?

20  A.  Yes, Vic came around, and Gaspipe, Anthony Casso.  Vic

21  came around.  Anthony was around first, and then Vic came

22  around after that.

23  Q.  Did there come a time in the 1970's when certain persons

24  who were associated with Mr. Funari, who met the right

25  criteria, became actually made members of the Lucchese Crime

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 152

575

Carew/direct/O'Connell

1  Family that were in your group?

2  A.  Yes.

3  Q.  Who were those individuals that became made members of

4  the Lucchese Crime Family from among the associates around

5  Mr. Funari around that time?

6  A.  Vic Abuso, Anthony Casso, Bobby Abuso, Angelo, Nicky

7  DiCostanza, Frankie Hart, Frankie Bollino, Tommy DiDonato,

8  Johnny Black; later on, Johnny Black became a member.

9  Q.  You referred to a person by the name of Angelo.  Did you

10  know that person's last name?

11  A.  Yes, DeFendis.

12  Q.  Now, during this time period in the 1970's, you mentioned

13  that Mr. Chiodo as well as yourself were in this crew with

14  Mr. Funari, is that correct?

15  A.  Yes.

16  Q.  Did you and Mr. Chiodo ever engage in criminal activities

17  together during that time period?

18  A.  Yes.

19  Q.  And briefly describe to the jury the kinds of criminal

20  activities you and Mr. Chiodo engaged in?

21  A.  We worked crap games together, and we did one of the --

22  we did an assault on a union official together.

23       We used to sell, you know, stolen property and

24  different things like that.  I hung out with Pete quite a bit.

25  Q.  Did you become friends with Peter Chiodo?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 153  SHEET 39

576

Carew/direct/O'Connell

1 A.   Yes.  I'm godfather to his daughter.

2 Q.   Mr. Carew, you just referred to an assault on a union

3 official.  Do you recall who that union official was who was

4 assaulted?

5 A.   Yes.  His name was Wolford, James Wolford.

6 Q.   What union was he connected to?

7 A.   He was in the painters' union.

8 Q.   Just very briefly, how did it come to pass that you and

9 Mr. Chiodo became involved in an assault on James Wolford of

10 the painters' union?

11 A.   Jimmy Bishop, who was an official of the union, went to

12 Dino Marino and asked if Dino could get him some help to get

13 Wolford out of the way so that Jimmy Bishop would have more

14 control over the union.  And Dino went to Chris, and we were

15 assigned to give him a beating.

16 Q.   Did you participate in that beating?

17 A.   Yes, I did.

18 Q.   What was the result?

19 A.   He eventually left.  I believe he resigned his position,

20 and went back to a different part of the state where he came

21 from.  I think he came from Buffalo, but I'm not sure.

22 Q.   What happened, if anything, to Mr. Bishop in connection

23 with the union?

24 A.   After that, he became very strong and he was the Luchese

25 Crime Family's guy in the union.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 154

572

Carew/direct/O'Connell

1 Q.   Did the Luchese Crime Family continue a relationship with

2 the painters' union following that episode?

3 A.   Yes.

4 Q.   For how long, as you understood?

5 A.   Right up until recently, you know, until the present.

6 Q.   Now, you testified that during the 1970's, that you

7 engaged in violence from time to time, is that correct?

8 A.   Yes.

9 Q.   One example was the beating that you participated in

10 involving Mr. Wolford, is that right?

11 A.   Yes.

12 Q.   Did you learn that the Luchese Crime Family engaged in

13 murder?

14 A.   Yes.

15 Q.   Calling your attention to the mid-1970's, did there come

16 a time when you received a particular assignment where you

17 were requested to assist Anthony Casso in a certain matter?

18 A.   Yes.

19 Q.   Tell the jury what the assignment was and briefly

20 describe what happened?

21 A.   I was to meet Anthony in a club on 15th Avenue.  It was

22 owned by a fellow by the name of Swaggie at that time.  We had

23 previously had the crap game in the basement of that club.  I

24 was told to meet Anthony there, that he needed my help with

25 something, and I went there and rang the bell and banged on

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 155

578

Carew/direct/O'Connell

1 the door.  Anthony came to the door.  He led the way.  He

2 closed the door.  He led the way to the basement.  There was a

3 body on the floor and I helped him put the body in a bag, and

4 I cleaned up the blood, and we carried the body out through

5 the back door.  And there was an alleyway and he had a car

6 parked there.  We put the body in the trunk of the car and we

7 took it and dumped it, dropped it on the street off West 6th

8 Street, I think it was West 7th and Avenue V.  A little dead

9 end street.  We put the body in there, and then we left.

10 Q.   Did you participate in the murder of that individual?

11 A.   No, I didn't.

12 Q.   Had you participated in the planning of that murder?

13 A.   No.

14 Q.   Was your role limited to what you just described in your

15 testimony?

16 A.   Just that was it.

17 Q.   Did Mr. Casso indicate, at that time when he brought you

18 to that body lying on the basement floor, who had killed that

19 individual?

20 A.   No.  Who had killed him?

21 Q.   Who had killed that individual?

22 A.   I assumed he did.  He was the only one there.  He said

23 that --

24 Q.   Was there a weapon in the area of the body?

25 A.   Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 156

579

Carew/direct/O'Connell

1 Q.   What kind of weapon?

2 A.   It was -- I believe it was an automatic weapon.  It was

3 on the sink.  I didn't really pay attention.  He picked it up

4 and took it after that.

5 Q.   Turning your attention to the late 1970's, did there come

6 a time when you actually received an assignment from

7 Mr. Funari to murder the son of a Luchese member?

8 A.   Yes.

9 Q.   Who was that individual?

10 A.   Joey Abbinanti.  He was the son of a guy by the name of

11 Pete the Killer.

12 Q.   Was Joey Abbinanti killed?

13 A.   No.  We did some surveillance.  While that was in

14 progress, the thing was called off.  They told us the contract

15 was off at that time.

16 Q.   So there's no misunderstanding with your role in that

17 particular episode, when you were asked to participate by

18 Mr. Funari, did you agree to it?

19 A.   Yes.

20 Q.   Over the years in the 1970's, Mr. Carew, in the course of

21 your experience, did you come to learn that the Luchese Crime

22 Family, including Mr. Funari's crew, would store weapons for

23 use by its members and associates from time to time?

24 A.   Yes.

25 Q.   Did you ever become involved in the storing of weapons?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 157  SHEET 40

**Carew/direct/O'Connell**                                           588

1   A.   Yes.
2   Q.   Could you explain to the jury what kinds of weapons you
3   stored for the Luchese Crime Family and over what period of
4   time?
5   A.   Well, myself and I believe two other guys were given
6   attache cases that held handguns.  The one I had had ten
7   handguns in it, and I put it away.
8   Q.   For how long did you store this case of handguns?
9   A.   I had it a long time.  I gave it to Peter Chiodo and
10  Anthony Casso around '87, '88.  So I had to have it probably
11  close to ten years.
12  Q.   Apart from the guns that you stored for the Luchese Crime
13  Family, did you also keep guns for yourself?
14  A.   Yes, I did.
15  Q.   Tell the jury the kinds of guns that you would have at
16  various times over the years?
17  A.   I had a machine gun with a silencer.  I had a couple of
18  automatic pistols with silencers.  I had regular Smith &
19  Wesson .38's, handguns.
20  Q.   Did there come a time when you decided to get rid of all
21  the weapons in your possession?
22  A.   Yes, I did.
23  Q.   Was there a particular event that took place which
24  influenced you to make that decision?
25  A.   Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 158

**Carew/direct/O'Connell**                                           581

1   Q.   What was the event that made you make that decision to
2   get rid of all the weapons you had?
3   A.   Well, Peter Chiodo was shot, and he was cooperating with
4   the government, so I got rid of everything that I had in my
5   possession.
6   Q.   Now, turning your attention back to the late 1970's, the
7   time period in which you were the driver, as you described it,
8   for Mr. Funari.  You testified that Mr. Funari was a made
9   member of the Luchese Crime Family, am I correct?
10  A.   Yes.
11  Q.   Did there come a time in the late 1970's when Mr. Funari
12  was promoted to a higher position in the Luchese family?
13  A.   Yes.
14  Q.   Tell the jury what position and approximately when?
15  A.   He was made captain I think it was around '77, something
16  like that, somewhere in that vicinity.  1977, I think.
17  Q.   Up until the time that Mr. Funari became a captain, you
18  were his driver?
19  A.   Yes.
20  Q.   Did Mr. Funari's promotion to captain affect you and your
21  position with Mr. Funari in any way?
22  A.   Well, when you're in that position, you have to have a
23  made member so your running around, because you have to make
24  appointments with other people, and sometimes you sit in on
25  different things.  And there, usually the protocol was, a made

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 159

**Carew/direct/O'Connell**                                           582

1   member had to do that.  Some guys might not want to, somebody
2   who wasn't a made member, or wouldn't want to make
3   appointments with them and everything.  They would want to
4   deal with a member.
5   Q.   Did you lose your position then as Mr. Funari's driver?
6   A.   Yes.
7   Q.   Following that change in your position in the late
8   1970's, did there come a time when you reduced your
9   involvement, your active involvement, with the Luchese Crime
10  Family?
11  A.   Yes.
12  Q.   Approximately when did that happen?
13  A.   Around the end of '79, I started -- I had a couple of
14  legitimate business opportunities, and I went and asked if it
15  would be all right if I took them and spent less time, you
16  know, with the group, and I had everybody's blessing.  They
17  let me go.
18  Q.   When you say "everybody's blessing," was there anybody in
19  particular who allowed you to dissociate yourself from active
20  involvement with the Luchese family?
21  A.   Yes, Chris Funari.
22  Q.   Could you just very briefly describe the kinds of
23  activities you were planning to engage in once you separated
24  from the Luchese family?
25  A.   Yes.  I had an opportunity to go into the jobber business

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 160

**Carew/direct/O'Connell**                                           583

1   in the clothing center, sell job lots of clothing, and I
2   wanted to take it.
3       And I had started to buy and sell some buildings, fix
4   them up and sell them, you know, one-story taxpayer buildings
5   I was fixing and selling.  That's what I wanted to do.
6   Q.   Is it fair to say that up until now, throughout the
7   1960's, 1970's, that you didn't declare or report to the
8   government all of the income you were earning in your various
9   illegal activities?
10  A.   Yes.  That's fair to say.
11  Q.   Is it also fair to say that throughout the next decade,
12  you followed that same pattern and failed to report all of
13  your income from your various activities?
14  A.   I declared some, but I didn't declare it all, no.
15  Q.   Now, you described several kinds of businesses that you
16  were planning on entering into.  Did you, in fact, go into the
17  business of selling job lots of clothing and enter into the
18  construction business starting in late 1979 and 1980?
19  A.   Yes, I did.
20  Q.   During that time period, so the jury understands clearly,
21  did you still remain friendly, if you will, with the Luchese
22  Crime Family figures you had been associated with for the past
23  twenty years?
24  A.   Yes, I did.
25  Q.   Did you still, from time to time, go to see Mr. Funari

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 161  SHEET 41

584

Carew/direct/O'Connell

1  over in the 19th Hole?
2  A.   Yes.
3  Q.   You described some legitimate business activities you
4  engaged in, starting in 1979 or 1980, Mr. Carew?
5  A.   Yes.
6  Q.   Despite moving into some legitimate businesses, did you
7  nevertheless, from that time forward, also engage in criminal
8  activities from time to time?
9  A.   Yes, I did.
10 Q.   Did you engage in any criminal activities tied to the
11 clothing business?
12 A.   Yes, I did.
13 Q.   Briefly, tell the jury what kind of criminal activities
14 you engaged in that area?
15 A.   I was manufacturing knock-off, what they call knock-off
16 jeans.  I would make a jean with the same label and hangtags
17 and everything of a major-name jean, and I would sell them
18 through vendors that I had become acquainted with.
19 Q.   You testified back in the 1970's from time to time you
20 would sell stolen property?
21 A.   Yes.
22 Q.   Did opportunities to sell stolen property present
23 themselves, in the 1980's, to you from time to time?
24 A.   Occasionally, yes.
25 Q.   And did you engage in that kind of activity?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 162

585

Carew/direct/O'Connell

1  A.   I did, a couple of times, yes.
2  Q.   Did there come a time when you defrauded an insurance
3  company in connection with a car?
4  A.   Yes.
5  Q.   Very briefly, what did that involve?
6  A.   I claimed a car was stolen, and I collected the money,
7  the insurance company money.
8  Q.   With regard to the construction business, could you
9  briefly describe the type of construction businesses you
10 engaged in in the 1970's?
11 A.   I had a concrete company, and I used to do foundations
12 and sidewalks and things like that.  I had another company
13 that dealt strictly in home improvement and in building of
14 homes, and that's what I did.
15 Q.   When you say you had a concrete company, did you actually
16 manufacture concrete?
17 A.   No.  We put in the foundations and the frames and
18 everything, the forms for the foundations.  We owned the
19 forms, and we set foundations and footings for other
20 builders.  And we did sidewalks, in general, concrete work,
21 curbs and sidewalks, things like that.
22 Q.   So you were a contractor of sorts involved in concrete
23 foundation installation, and sidewalks?
24 A.   Yes.
25 Q.   That area?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 163

586

Carew/direct/O'Connell

1  A.   Yes, as well as building houses.  Yes.
2  Q.   Now, in the mid-1980's, did there come a time when a
3  particular Luchese member asked you to work on a construction
4  job on his residence?
5  A.   Yes.
6  Q.   Who was that Luchese member in the 1980's who asked for
7  your services in construction-related work on a residence?
8  A.   Anthony Casso.
9  Q.   Could you just briefly describe the job that Mr. Casso
10 asked you to do?
11 A.   Anthony had some plans that he had for a house that he
12 wanted to be built on a lot he owned on Avenue X, in the Mill
13 Basin section of Brooklyn.  The house was to be put on a plot
14 that there was an existing house on.
15      He wanted the existing house to be demolished and to
16 put a foundation and everything in, footings and foundation in
17 to support the new house that he wanted to have built there,
18 and he wanted me to guide him through it.  He asked me if I
19 could spend some time and give him some advice, that he asked
20 me to do the foundation work, which I did.
21 Q.   I would like to return to that matter in a moment.  I
22 would like to ask you a few other questions first.
23      Mr. Carew, throughout your criminal career, were you
24 ever involved in selling, manufacturing, importing or using
25 narcotics or drugs of any kind?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 164

587

Carew/direct/O'Connell

1  A.   No.
2  Q.   Mr. Carew, did there come a time when a particular
3  Luchese member who you knew to be involved in a drug deal
4  asked you for particular assistance on that drug deal?
5  A.   Yeah.
6  Q.   Who was that Luchese member who asked for the help?
7  A.   Mike DeSantis asked me to do him a favor and sit on a
8  house, be kind of a watchman on a house that he intended to
9  bring some drugs to.  He was going to put a van in the garage,
10 and he wanted to make sure the house was clean and that nobody
11 went near it.
12 Q.   Were the drugs ever brought to the house?
13 A.   No.  The load was confiscated.
14 Q.   Approximately when did Mr. DeSantis ask you to perform
15 that function?
16 A.   In 1990.  I guess it was the end of the summer of 1991, I
17 believe.
18 Q.   On another occasion, did some other person, at a previous
19 time, who you also knew was involved in drug dealing, once ask
20 you to do him a favor?
21 A.   Yes, a fellow by the name of Ray Fontaine.  He asked me
22 to mediate a dispute he had with one of his partners on a drug
23 deal.  The guy took a bunch of pot that they had, and Ray
24 wanted his share back.  And I mediated the deal and they had
25 an agreement who got what.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 165  SHEET 42

588

Carew/direct/O'Connell

1  Q.   Were you involved in that pot deal?
2  A.   No.
3  Q.   What was your understanding of why Mr. Fontaine looked to
4  you to help mediate his dispute?
5  A.   Well, more or less, it was like a strong-arm reason.  He
6  felt I had a reputation that might get him the results he
7  wanted.
8  Q.   What was the result?
9  A.   He got the results he wanted.  They made an agreement on
10  the goods that they had, and Rap got his share and the other
11  guy got his share.
12  Q.   Did you have to engage in violence to accomplish that?
13  A.   Yes.
14  Q.   Were you prepared to, if necessary?
15  A.   Yes.
16  Q.   I would like to return to the construction job Mr. Casso
17  asked you to perform -- is that the mid-1980's, approximately?
18  A.   I believe it was around the end of '86, sometime in '86,
19  the summer of '86.
20  Q.   Did you work on that project over a period of time?
21  A.   Yes, I did.  We had -- as I said before, there was an
22  existing house there, so I had to -- he had a building permit
23  that was a reconstruction permit.
24       It wasn't a total brand-new house, so we had a leave
25  a couple of walls up, and we had to be a little delicate about

       ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 166

589

Carew/direct/O'Connell

1  how we put that in so that the building department didn't come
2  down on him and make him stop.  So I took the house down in
3  sections, and we put in the foundation, and eventually we took
4  the whole house down.  He decided not to go any further with
5  the house, and we took the other house down and we fenced in
6  the lot.
7  Q.   Throughout the time period when you were working on that
8  job, did you see Mr. Casso?
9  A.   Yes.  There was several months I saw him all the time,
10  yes.
11  Q.   This is the same Mr. Casso whom you had met back in the
12  1970's or thereabouts, around Mr. Funari, is that correct?
13  A.   I know Anthony close to twenty-five, thirty years, yes,
14  the same one.
15  Q.   Turning your attention to late 1986, around the turn of
16  the year, early 1987, did there come a time when Mr. Casso
17  brought up in conversation with you a very specific matter
18  concerning your friend Peter Chiodo?
19  A.   Yes.
20  Q.   Tell the jury, as best you can recall, what Mr. Casso
21  discussed with you on that occasion concerning Mr. Chiodo?
22  A.   He asked me if I could get in touch with Pete.  He said
23  that he would like to see him and discuss having Pete be
24  straightened out, having him be a made member.
25       He asked me what I thought about that, you know, if I

       ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 167

590

Carew/direct/O'Connell

1  thought Pete would go for it.  And I said, I think so, but I'm
2  not sure, you know.  He's doing construction up in Jersey.
3  And I wasn't sure.  But I agreed to go to Pete and ask him,
4  which I did.
5  Q.   Now, is it fair to say, Mr. Carew, that discussions
6  regarding the straightening out, as you put it, or the making
7  of a member in the Luchese Crime Family, is something that
8  ordinarily would only be discussed with and among made
9  members?
10  A.   Yes.
11  Q.   Could you explain to the jury what your understanding was
12  as to why Mr. Casso would discuss this matter with you when
13  you've explained to the jury that you weren't a made member?
14  A.   I knew Anthony a long time, and I had been around the
15  family a long time and I was friendly with Pete, and it fit
16  the time frame.  I could get to Pete, and I was trusted by
17  Mr. Casso.  So he told me to bring the message to him.
18  Q.   By that particular point in time, based on your
19  testimony, is it fair to say that you had been friendly with
20  members of the Luchese Crime Family for over twenty-five years
21  by that point in time?
22  A.   Middle's '80s, from '60.  Twenty-five years.
23  Q.   Well, in accordance with Mr. Casso's request, did you
24  contact Mr. Chiodo?
25  A.   Yes, I did.

       ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 168

591

Carew/direct/O'Connell

1  Q.   Did you have a conversation concerning this matter with
2  him?
3  A.   Yes.
4  Q.   Did you receive a response from him?
5  A.   Yes.
6  Q.   What was that?
7  A.   He told me to tell Anthony and Vic that it would be his
8  honor, and I made an appointment for him to come and talk to
9  them himself.
10  Q.   Did there come a time when you learned that Mr. Chiodo
11  was actually inducted as a member into the Luchese Crime
12  Family?
13  A.   Yes.
14  Q.   How long after Mr. Casso brought this matter up?
15  A.   I would say it was probably a couple of months.  I was
16  called and told to meet Pete and bring him to a location, and
17  I did.  I picked him up.  I met him.
18       We met Frankie Lastorino and Bobby Amuso, and they
19  went in a car and went away.  I was told to come back a couple
20  -- in a couple of hours.
21  Q.   Were you able to accompany Mr. Chiodo to this ceremony,
22  if you will?
23  A.   No.  As I said, I was told to come back in a couple of
24  hours, which I did, and I met them after they came back.
25  Q.   Did you discuss what had happened with Mr. Chiodo upon

       ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 169  SHEET 43

Carew/direct/O'Connell                                   592

1  his return?

2  A.   Yes.  We had a drink congratulating Pete, and then Bobby

3  left, and I had dinner with Pete.

4  Q.   After Mr. Chiodo became a member of the Luchese Crime

5  Family, turning your attention to early 1987, did you make a

6  decision to become a little more active once again in the

7  affairs of the Luchese Crime Family?

8  A.   Yes.

9  Q.   Could you tell the jury, briefly, what led you to making

10 this decision to become more active once again in the affairs

11 of the Luchese Crime Family?

12 A.   Well, Pete said he needed me to hang out.  I knew a lot

13 of guys and I had been around a long time, and he wanted me to

14 start hanging out with him again and become active, and he

15 said there would be a lot of financial opportunities that I

16 would do good.  And then I decided to go back into it almost

17 every day, getting back into the crime family.

18 Q.   After Mr. Chiodo became an actual member of the Luchese

19 Crime Family, did he set up a headquarters of any kind or a

20 meeting place for himself and the persons around him?

21 A.   Yeah.  We put up a club on McDonald Avenue.  Myself,

22 Gabe, Mikey D and Pete put up some money, and we built a

23 club.  We took a building and made it a club.

24 Q.   You just referred to an individual named "Mikey D."  Do

25 you know that person's last name other than "D"?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 170

Carew/direct/O'Connell                                   593

1  A.   Yes, Mike DeSantis.

2  Q.   You mentioned a person named "Gabe."  Do you know that

3  person's last name?

4  A.   I'm not sure of Gabe's last name.  Lombardo, I think.

5  Yeah, Gabe Lombardo.

6  Q.   Prior to coming to court today, did you have an

7  opportunity to view certain photographs --

8  A.   Yes.

9  Q.   -- in preparation for your testimony?

10 A.   Yes.

11 Q.   At the time you reviewed them, were names that appear on

12 these photographs covered?

13 A.   Yes.

14 Q.   Were you able to verify the identity of many of the

15 persons depicted in the photographs you reviewed?

16 A.   Yes.

17 MR. O'CONNELL:  Your Honor, may I approach the

18 witness?

19 THE COURT:  Yes.

20 Q.   I would like you to examine Government's Exhibit 2-78,

21 which is in the jurors' books.

22 (Pause.)

23 Q.   Have you had an opportunity to look at it?

24 A.   Yes.

25 Q.   Is this one of the photographs you reviewed?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 171

Carew/direct/O'Connell                                   594

1  A.   Yes.

2  Q.   Are these persons indicated as "Michael DeSantis and Gabe

3  Lombardo" two of the individuals that you identified

4  previously?

5  A.   Yes.  The fellow over here next to me, his name is Sal.

6  Q.   You're off to the far right of the picture?

7  A.   The far right, yes.

8  Q.   You're indicated by your name, "Tommy Carew"?

9  A.   Yes.

10 Q.   The person next to you --

11 A.   No.  His name is not there.  Sal was around Joe Beck, and

12 that's Don Trusciello.

13 Q.   The other two individuals, Michael DeSantis and Gabe

14 Lombardo?

15 A.   Yes, that's Michael DeSantis and Gabe Lombardo.  Gabe

16 died a couple of years ago.

17 Q.   Mr. DeSantis and Mr. Lombardo were one of the first

18 persons to open the club on McDonald Avenue, along with you

19 and Mr. Chiodo?

20 A.   Yes.

21 Q.   Turn your attention to Exhibit 2-61, the photo of the La

22 Donna Rosa restaurant.  Would you go to the La Donna Rosa

23 restaurant from time to time?

24 A.   Yes.

25 Q.   Did anybody in particular operate the La Donna Rosa

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 172

Carew/direct/O'Connell                                   595

1  restaurant?

2  A.   Yes, it was operated by Little Al D'Arco.

3  Q.   Was he associated in some way with the Luchese Crime

4  Family?

5  A.   Yes.  He was the acting boss for a while.

6  Q.   Prior to becoming acting boss, what position did he hold,

7  Al D'Arco?

8  A.   He was a captain.  He had what was the Paulie Vario's old

9  crew.

10 Q.   Are these individuals --

11 THE COURT:  They are not hearing you, Mr. Carew.

12 Q.   Can you repeat that answer?

13 THE COURT:  You have to keep your voice up.

14 Who was Al D'Arco?  He had something?

15 THE WITNESS:  He was the acting boss.  Then, prior

16 to that, he was a captain, that he had members of the old

17 Paulie Vario crew under his jurisdiction.

18 Q.   With respect to Exhibit 2-61, are these individuals

19 accurately indicated by the names on these photos, "Michael

20 DeSantis," the far right?

21 A.   That's Michael DeSantis.  That's myself.  Don Trusciello.

22 And that guy is Petey Canarsie.  You don't have a name by him.

23 Q.   Which fellow are you referring to as "Petey Canarsie"?

24 A.   The fellow in back of me.  Looks like he's coming out the

25 door.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 173  SHEET 44

596

Carew/direct/O'Connell

1  Q.   Did he have any connection with the Luchese Crime Family?
2  A.   He was friends with Mike DeSantis. He didn't have no
3  real connection to the family. He was a friend of Mikey
4  DeSantis.
5  Q.   If you would turn to Exhibit 2-131. Moving from left to
6  right, could you identify the persons that you know or knew,
7  and what relationship, if any, they had with any organized
8  crime entity?
9  A.   That's Angelo DeFendis. He's a soldier with us.
10       Bruno Facciola, he was a soldier.
11       Frankie the Hat. He was just an associate.
12       Sammy Kaplan was an associate and a good friend of
13  Chris', Chris Funari. When he left, he was the consigliere of
14  the family.
15       THE COURT:  Keep your voice up, now. You don't have
16  a little private conversation with Mr. O'Connell.
17       THE WITNESS:  Okay.
18       THE COURT:  Keep your voice up.
19       THE WITNESS:  Chris was the consigliere of the
20  family when he left.
21  Q.   When you say "he left," did he go on vacation or
22  someplace else?
23  A.   No. He was sentenced to a hundred years in prison for
24  his role in the Luchese Crime Family dealings.
25  Q.   Turning your attention back to 1987 once again, you

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 174

597

Carew/direct/O'Connell

1  testified that early on when you became active once again in
2  the Luchese Crime Family's affairs, that you and Mr. Chiodo,
3  Gabe Lombardo and Michael DeSantis opened a club on McDonald
4  Avenue?
5  A.   Yes.
6  Q.   Did Michael DeSantis have a particular business that he
7  operated in the same vicinity?
8  A.   Yes. He had a body and fender shop across the street.
9  Q.   What was the name of that business?
10  A.   Concept Auto Body.
11  Q.   Did you and Mr. Chiodo and other persons in your crew
12  meet from time to time at the Concept Auto premises in
13  addition to McDonald Avenue -- the McDonald Avenue social
14  club?
15  A.   Yes.
16  Q.   During this time in 1987, did there come a time when
17  Mr. DeSantis introduced you to a friend of his who was to
18  become an associate of your crew?
19  A.   Yes.
20  Q.   Who was that person?
21  A.   Richie Pagliarulo.
22  Q.   Do you see that person Richard Pagliarulo, who
23  Mr. DeSantis introduced to you at that time, present in this
24  courtroom today?
25  A.   Yes, I do.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 175

598

Carew/direct/O'Connell

1  Q.   Would you point him out and describe him for the jury?
2  A.   Richie is sitting right there in the middle between Jay
3  Horlick and Mr. Keelan.
4       THE COURT:  All right. He identified
5  Mr. Pagliarulo.
6  Q.   Mr. DeSantis introduced you to Mr. Pagliarulo?
7  A.   Yes.
8  Q.   Prior to meeting Mr. Pagliarulo, did Mr. DeSantis or
9  Mr. Chiodo describe Mr. Pagliarulo to you?
10  A.   Yes.
11  Q.   Could you tell the jury what, in substance, Mr. Chiodo
12  and Mr. DeSantis told you about Mr. Pagliarulo at this time?
13  A.   They told me he was a tough guy and he was a shooter and
14  he was a good friend of Michael's.
15  Q.   After being introduced to him, did Mr. Pagliarulo engage
16  in conversation with you from time to time directly?
17  A.   Yes.
18  Q.   In this time period when you first met Mr. Pagliarulo,
19  did he give you, from time to time, some information directly
20  from him to you concerning his own background in connection
21  with organized crime?
22  A.   Yes. Well, he had said that he originated with the Gallo
23  crew. I believe his uncle was one of the Gallos, either Joey
24  or Albert, one of the Gallos.
25  Q.   Who was Joey Gallo?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 176

599

Carew/direct/O'Connell

1  A.   He was the head of a faction that broke off from the
2  Colombo crew, and years ago they had a war, which is what they
3  call the Gallo wars. Joey was one of the main participants.
4  He was a leader of one of the factions.
5  Q.   Is it fair to say that over the next several years, you
6  spent a lot of time with Mr. Chiodo, Mr. DeSantis,
7  Mr. Pagliarulo and other persons involved with Mr. Chiodo and
8  his crew?
9  A.   Yes.
10  Q.   Is it also fair to say that you personally engaged in
11  plots involving murder and in an actual murder with
12  Mr. Pagliarulo and other members of that crew over the next
13  few years?
14  A.   Yes.
15       (Continued on next page.)
16
17
18
19
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 177  SHEET 45                                      600

Carew-direct-O'Connell

1  EXAMINATION CONTINUES
2  BY MR. O'CONNELL:
3  Q.   I'd like to turn your attention, Mr. Carew, to an
4  individual named Joseph Martinelli.
5        Did you know Mr. Martinelli or who Mr. Martinelli was
6  back in the 1980s?
7  A.   Yes.
8  Q.   Tell the jury who you knew Mr. Martinelli to be at that
9  time?
10 A.   Mr. Martinelli was the -- one of the principals in a
11 construction company called Northberry Construction.
12 Q.   Turning your attention to around the time that Mr. Chiodo
13 first became a member, in approximately early 1987. Did there
14 come a time when a member of the Lucchese Crime Family
15 approached you and attempted to assign you to a matter
16 involving Mr. Martinelli?
17 A.   Yes.
18 Q.   Who was that Lucchese member who approached you?
19 A.   Chris Funari, Junior, Jumbo.
20 Q.   As of early 1987, who -- what position, if any, did Chris
21 Funari, Junior or Jumbo hold in the Lucchese Crime Family?
22 A.   He was acting captain for a while.  Then he was put back
23 to the regular soldier.
24 Q.   What assignment involving Mr. Martinelli did Mr. Jumbo
25 Chris Funari Junior attempt to assign to you?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER


PAGE 178                                                 601

Carew-direct-O'Connell

1  A.   He wanted me to give -- to get Pete Chiodo and give
2  Martinelli a beating.
3  Q.   Did he explain to you the reason?
4  A.   He said that Martinelli wasn't doing the right thing with
5  money.
6  Q.   Was Mr. Chris Funari, Junior the son of Chris Funari,
7  Senior, the man you described who eventually became the
8  consigliere, later was jailed?
9  A.   Yes.
10 Q.   Did you discuss this matter with Mr. Chiodo after being
11 approached by Mr. Funari to go give Mr. Martinelli a beating?
12 A.   I did.
13 Q.   Who at that time were you and Mr. Chiodo reporting to?
14 who was the captain in charge of Mr. Chiodo?
15 A.   Bobby Amuso, Vic Amuso's brother.
16 Q.   Did Mr. Chiodo attempt to review with any of his
17 superiors this request from Chris Funari, Junior to give
18 Martinelli a beating?
19 A.   Yes.  Well, we had talked it over and Chris had -- I had
20 asked Chris that, and he said that his father wanted it done
21 and that he had gotten the okay from Bobby Amuso.
22        We figured we'd better just check it out with Bobby
23 before we went and did anything, and before it went any
24 further, and Pete made arrangement to do that.
25 Q.   Did you later receive word from Mr. Chiodo about what

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER


PAGE 179                                                 602

Carew-direct-O'Connell

1  decision had been made, whether you should proceed or not
2  proceed with the beating of Mr. Martinelli?
3  A.   Yes.  He said it was called off.  He had made an
4  appointment to meet Angelo DeFendis and Mickey DiCostanzo at
5  Angelo's club on a Saturday and proceed to give Martinelli a
6  beating after that, and they called it off and they said that
7  Bobby had nothing to do with it, that he didn't even know
8  about it.
9  Q.   Was there any repercussion that followed from this and
10 any other incidents involving Mr. Funari around this time
11 period?
12 A.   Could you repeat that?
13 Q.   Okay.
14      I will rephrase it entirely.
15      Around this time period, following this particular
16 event where Mr. Funari had asked you and others to go give a
17 beating to Mr. Martinelli, did Mr. Martinelli's position in
18 the family change?  Excuse me.  Mr. Funari's position in the
19 family change around this time period?
20 A.   Yes.
21      He -- I think they called him down on the fact that
22 he said that, you know, he tried to get something done to
23 Martinelli without getting it okayed and saying that he had it
24 okayed.  And I believe eventually he was shelved for that and
25 a few other things that took place.  They didn't -- they put

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER


PAGE 180                                                 603

Carew-direct-O'Connell

1  him on what we call the shelf.  He was inactive.
2  Q.   Now, this event you described took place sometime in
3  early 1987, as you recall?
4  A.   Yes, I would say early '87, spring of '87.
5  Q.   Turning your attention to about two years later.  Did
6  there come a time when you learned that a murder contract was
7  placed on Joseph Martinelli?
8  A.   Yes.
9  Q.   Who informed you of this?
10 A.   Pete Chiodo.
11 Q.   What did Mr. Chiodo tell you in substance at the time?
12 A.   He said that Gas and Vic wanted Martinelli taken out, or
13 killed, and that we wound up with the assignment, and to get
14 on it and start doing some layout work, surveillance.
15 Q.   Other than yourself, was anyone else in your crew
16 assigned the task of participating in the planning, the
17 carrying out of the murder of Joseph Martinelli back in 1989?
18 A.   Yes.
19 Q.   Tell the jury who else participated in the planning and
20 attempts to kill Mr. Martinelli from that time forward?
21 A.   Mike DeSantis, myself, Richard Pagliarulo, Pete Chiodo
22 and Whitey Cappello.  Greg Cappello.
23 Q.   Can you tell the jury what the first steps were that you
24 and Mr. Pagliarulo and the others took regarding your efforts
25 to plan and carry out this murder contract?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 181  SHEET 46

604

Carev-direct-O'Connell

1  A.   Well, we did -- first thing we did, we did surveillance
2  on the house and on his place of business, Woodberry
3  Construction (sic), to see what -- where the best place to --
4  where we would have the best opportunity to take him out.
5  Q.   Was Mr. -- was the Northberry Construction site found by
6  you and the others to be a good location for attempting to
7  kill Mr. Martinelli?
8  A.   We went there on a few occasions and every time that we
9  saw Martinelli -- Mr. Martinelli there, he was always in
10 somebody's company, and there was always a lot of people in
11 his place of business.  We decided that the best place was at
12 the house and that's where we -- we decided to make the first
13 attempts.
14 Q.   You used this term "surveillance."  What was the purpose
15 of conducting surveillance at the Northberry site, at the
16 house that you just mentioned?
17 A.   To get familiar with his movements, so we could, you
18 know, kind of get a time when, or an opportunity where we
19 could -- could shoot him.
20 Q.   Now, did you and the others plan to use cars in the
21 course of your efforts to set up and murder Mr. Martinelli?
22 A.   Yes, we did.
23 Q.   Could you tell the jury what plans generally were made
24 regarding what cars to use for this assignment?
25 A.   Well, we always -- we used to do -- we got a couple of

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 182

605

Carev-direct-O'Connell

1  work cars, either rentals that were rented in a phony name or
2  cars that were stolen and we would put them in the nearby area
3  and when we needed them, we would use them to do the work.
4  Q.   When you and Mr. Pagliarulo and the others engaged in
5  these efforts to kill Mr. Martinelli, would you take certain
6  precautions so as not to leave fingerprints?
7  A.   Yes.
8        While we're in the work cars we would usually wear
9  gloves.
10 Q.   What kind of gloves would you wear?
11 A.   We would either wear that -- what they call the racing
12 driver's gloves or we would wear the plastic kind of gloves
13 like a doctor wears.
14 Q.   Surgical gloves?
15 A.   Surgical gloves, yes.
16 Q.   Is it fair to say that over the next few months, you,
17 Mr. Pagliarulo and other members of your crew made a series of
18 attempts to kill Mr. Martinelli?
19 A.   Yes, we did.
20 Q.   Were any of these attempts to kill Mr. Martinelli
21 successful?
22 A.   No.
23 Q.   Can you tell the jury what location was the first
24 location that you and Mr. Pagliarulo and the others selected
25 to make an actual attempt to murder Joseph Martinelli?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 183

606

Carev-direct-O'Connell

1  A.   The first attempt was made at his house.  We went and we
2  laid across the street.  We saw his car.  It was Richie,
3  myself, Mike and Gregory, and we saw his car by the house and
4  we waited for him to come.  He never came out, and then Mikey
5  decided to lay in the lot.  There was a lot across the
6  street.  Mikes decided that the next attempt he would lay in
7  the lot, either the next evening or a couple of evenings after
8  that.  He would lay in the lot and wait for the opportunity if
9  Martinelli came home, he would shoot him.
10 Q.   When you say he would lay in the lot, was there any kind
11 of screening or coverage?
12 A.   It was a wooded lot.  There was bushes and leaves and all
13 kinds of things there.
14 Q.   For this --
15 A.   Fairly well wooded lot.
16 Q.   Excuse me.
17       For this particular assignment, did you and
18 Mr. Chiodo and Mr. Pagliaruio and the others decide who, if
19 anyone, among you was to be the shooter?
20 A.   Yes.
21 Q.   For the murder of Mr. Martinelli at this stage, who was
22 it decided?
23 A.   Richie wanted Mike Mike to do the work.  Felt it was
24 Mike's turn to, you know, to get in and do the work.
25 Q.   It was Mr. Pagliarulo who suggested Mr. DeSantis do this

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 184

607

Carev-direct-O'Connell

1  work?
2  A.   Yes.
3  Q.   What role did you intend for yourself to play or what was
4  decided by you and the others would be played by yourself?
5  A.   I was going to be a crash -- I was driving a crash car
6  or, you know, one of the follow-up cars.  Pickup car.
7  Q.   This series of attempts beginning at the first location,
8  Mr. Martinelli's house, what role did Mr. Pagliarulo agree to
9  play in the attempted murder of Mr. Martinelli?
10 A.   At the house?
11 Q.   At the house, and subsequently.
12 A.   At the house, he was just present on the one occasion
13 where we set up and Martinelli didn't come out of the house.
14 Other than that, he didn't have nothing else that I know of.
15 I think he went with Mikey one time to -- while Mikey was
16 doing his thing in the lot.  He accompanied Mikey.  Other than
17 that, I don't think he had any other involvement in the
18 house.
19 Q.   So with regard to the house, Mr. Pagliarulo's role was in
20 the form of backup, is that fair to say?
21 A.   Yes.
22 Q.   Similar to your own?
23 A.   Yes.
24 Q.   Not the shooter?
25 A.   No.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 185  SHEET 47

608

Carey-direct-O'Connell

1 Q.   You said that the first efforts to kill Mr. Martinelli at
2 his home were unsuccessful, is that right?
3 A.   Yes.
4 Q.   Before we move on, I'd like to turn to --
5      MR. O'CONNELL:  May I approach the witness, Your
6 Honor?
7      THE COURT:  Yes.
8 Q.   I'd like to turn your attention to Government Exhibits
9 2-150, 151 and 153.
10     First, number 150.
11     Do you recognize the location depicted in Government
12 Exhibit 2-150?
13 A.   Yes.
14 Q.   What location do you recognize that to be?
15 A.   That corner building with the brown shingle on the top is
16 Martinelli's office, Northberry on -- down in --
17 Q.   Keep your voice up.
18 A.   It's -- it's Martinelli's office for Northberry
19 Construction.
20 Q.   Turning your attention to 2-151.
21 A.   That's a different view from the other side of the same
22 place.
23 Q.   Is this the same location that you and the others you
24 mentioned surveilled, if you will, in the early stages of this
25 efforts to kill Joseph Martinelli?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 186

609

Carey-direct-O'Connell

1 A.   Yes.
2 Q.   This is the location that you and the others decided not
3 to set up on to make an attempt?
4 A.   Yes.
5 Q.   Turn your attention to 2-153.
6      Do you recognize 2-153?
7 A.   Yes.  It looks like Martinelli's house on Stratford.
8 Q.   Is this the place that you and the others set up on
9 several occasions unsuccessfully to attempt to kill
10 Mr. Martinelli?
11 A.   Yes.
12 Q.   Now, after you and the others were unsuccessful in your
13 efforts to catch Mr. Martinelli near his residence and to
14 murder him there, did there come a time when you selected an
15 alternate -- an alternative location to attempt to set up on
16 him and murder him?
17 A.   Yes.
18 Q.   What was the second location that you and the others
19 picked for this purpose?
20 A.   Nostrand Avenue in Brooklyn.  It was by a Prudential Life
21 Insurance.  I think it was around Avenue X, Avenue Y.
22 Something like that.
23 Q.   Who selected this location, if you recall?
24 A.   I think Pete Chiodo did, but I am not sure.
25 Q.   Can you tell the jury what efforts were first made to

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 187

610

Carey-direct-O'Connell

1 lure Mr. Martinelli to this location for the purpose of
2 murdering him?
3 A.   I believe Pete made an appointment to meet him in front
4 of that location and we went and checked it out and then we
5 set up at the time of the meeting, we set up, I believe Richie
6 and Mike were in one car.  I was there in one car and I think
7 Gregory Cappello was across the street in the parking lot.
8 Q.   What happened with the first attempt?
9 A.   He came -- he came with his brother and they decided not
10 to do it.  I was parked around the corner.  They came and told
11 me that it was off, he came with his brother.
12 Q.   Did you see who showed up or was this just reported to
13 you?
14 A.   No.  Him coming with his brother?  No, I didn't see
15 that.
16 Q.   Where were you located?
17 A.   I was around the corner, on the -- in other words, if --
18 where he would have pulled up, if -- if they hadda shot him,
19 they would have turned the corner and went right past me.  I
20 would have pulled out in back of them to block anybody that
21 would have been coming, and that's where I was parked.
22 Q.   After that first attempt at this location on Nostrand
23 Avenue failed, was another effort made to lure Mr. Martinelli
24 to the same general area for the purpose of murdering him?
25 A.   Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 188

611

Carey-direct-O'Connell

1 Q.   Could you describe for the jury what the second plan, if
2 you will, was for murdering Mr. Martinelli at that location?
3 A.   We had a -- they had told him to meet him in the -- in
4 the building where the insurance company was upstairs and
5 Gregory was across the street.  He was going to pull down
6 around the -- to the driveway of the building and act as a
7 crash car if they came out that side of the building.  There
8 was a -- in the building there was an alleyway in the back and
9 it was a rear door, so if they -- they were going to come out
10 the rear door I was going to pick them up and leave.
11 Q.   Who is "they"?
12 A.   Richie Pagliarulo and Mike DeSantis.
13 Q.   What role was Mr. DeSantis assigned on this second effort
14 to kill Mr. Martinelli at the Nostrand Avenue location?
15 A.   Mike was supposed to be the shooter.
16 Q.   What role was Mr. Pagliarulo assigned on the second
17 effort to kill Mr. Martinelli at this Nostrand Avenue
18 location?
19 A.   He was going to back him up.
20 Q.   What role were you to perform?
21 A.   I was going to pick them up when they come out the back
22 door and leave.  Gregory was acting as a crash car, back us
23 up.
24     MR. O'CONNELL:  May I approach again, Your Honor?
25     THE COURT:  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 189 SHEET 48

612

Carew-direct-O'Connell

1 Q.   I direct your attention to Government Exhibit 2-146.
2      Do you recognize the area depicted in Government
3 Exhibit 2-146?
4 A.   Yes.
5 Q.   Tell the jury what location this is, as you recall?
6 A.   This is the Prudential Insurance building on Nostrand
7 Avenue, where we were going to shoot Martinelli.  To your
8 right of the picture --
9      THE COURT:  Keep your voice up.
10 A.  To the right of the picture is the entrance where it says
11 Professional Plaza and when you go in there you go up steps to
12 the -- there are steps and you go up to where the offices
13 are.  There is a big hallway there and in that hallway, they
14 were going to get him as he came in either coming up the steps
15 or in the hallway.
16 Q.  I will show you what's been marked as 2-147.
17      Did this location have a unique kind of entrance and
18 exit arrangement for that doorway?
19 A.  For which one?  The --
20 Q.  For that entrance that you --
21 A.  Oh, yes.
22      You entered the building down to the right.  You went
23 up the stairs and the Prudential office was on one side.
24 There were some other offices there.  Then there was a -- you
25 went down the stairs in the back there was a -- a stairs going

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

PAGE 190

613

Carew-direct-O'Connell

1 down to a service door into the alleyway.  That was going to
2 be used for the escape.
3 Q.  So a person could go through the front door, up the
4 stairs, and immediately down the staircase and out the back?
5 A.  Yes, through the back there is another door.
6 Q.  I will show you Government Exhibit 2-149.
7      Does 2-149 look familiar to you, Mr. Carew?
8 A.  Yes.
9      It looks like the alley in back of the Prudential
10 Insurance building.
11 Q.  Now, on this second attempt at the Nostrand Avenue
12 location, again could you tell the jury where you were
13 positioned during the attempt?
14 A.  I was up in the other end of the alley.
15 Q.  Please keep your voice up?
16 A.  I was in this end of the alley up here.
17 Q.  Pointing to the right?
18 A.  Looking down this way.  In other words, the fence would
19 have been on my left side as I was looking down.
20 Q.  Now, what I'd like you to do for the jury briefly is to
21 explain to the jury what actually happened on the day that you
22 and Mr. Pagliarulo and the others made this second attempt to
23 kill Joseph Martinelli at the Nostrand Avenue location, as
24 best as you can recall today.
25      THE COURT:  Move a little away so he keeps his voice

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

PAGE 191

614

Carew-direct-O'Connell

1 up.
2 A.  Well, we went there.  We -- we were starting to set up.
3 Mikey pulled up next to the car that me and Richie were in and
4 he said he was -- he had to do something with the car that he
5 was driving and that he would meet us in the insurance
6 building.
7      We drove around, looked the area over.
8      Greg went across the street.  He was going to wait
9 there until he saw Martinelli go in and then move around the
10 corner to where he was, to where he would act as the crash
11 car, if anyone was after us.
12      I went around the block several times and around the
13 area to check that it was clean, into the alley and
14 everything, and then Mikey pulled up next to us and he said he
15 had a problem with the car and that he would meet us by the
16 building.
17      We went around again for a little while and we
18 decided Richie was worried that Mikey went in the building and
19 if Martinelli came, you know, he wouldn't have a backup with
20 him and Richie went in, got out of my car, the car I was
21 driving, and he had a shotgun wrapped up in a shirt or a
22 sweatshirt type thing like and sawed off shotgun and he went
23 into the building.  I went around the corner and stayed on the
24 corner.
25      About five, ten minutes later, Richie came out.  He

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

PAGE 192

615

Carew-direct-O'Connell

1 said Mikey never showed up and Martinelli never showed up and
2 we left.
3 Q.  Did Mr. Pagliarulo make any comment to you regarding
4 Mr. DeSantis about that time?
5 A.  Yes.
6 Q.  Tell the jury as best as you can recall what
7 Mr. Pagliarulo said about Mr. DeSantis?
8 A.  In effect he said he was a punk.  He didn't show up, some
9 words to that effect.
10      MR. O'CONNELL:  Your Honor, this would be a good time
11 for a short break, perhaps?
12      THE COURT:  All right.  Let's do that, members of the
13 jury.
14      Don't discuss the case.
15      (The following occurred in the absence of the jury.)
16      THE COURT:  All right.
17      (Recess taken.)
18      (Continued on the next page.)
19
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

PAGE 193  SHEET 49                                    616

Carew-direct-O'Connell

1      (The following occurred in the absence of the jury.)
2      THE COURT: Well, are we all ready to resume,
3  Mr. O'Connell?
4      MR. O'CONNELL: Yes, Your Honor.
5      THE COURT: All right. Would you ask the jury in?
6      THE MARSHAL: Yes, Your Honor.
7      MR. O'CONNELL: He's daring me to try to argue that
8  motion again.
9      MR. ROSE: He made me go through with it first.
10     THE COURT: What is the penalty for contempt?
11     MR. O'CONNELL: Life.
12     (Jury present.)
13     THE COURT: Please be seated.
14     All right, Mr. O'Connell.
15 EXAMINATION CONTINUES
16 BY MR. O'CONNELL: -
17 Q.  Mr. Carew, after you and Mr. Pagliarulo and the others
18 failed in your second attempt to murder Joseph Martinelli at
19 the Nostrand Avenue location that you described, am I correct
20 that you and the others selected yet another location to
21 attempt to set up and murder Joseph Martinelli?
22 A.  Yes.
23 Q.  Tell the jury what the next location was that was
24 selected?
25 A.  It was a garage building down on 13th Street, around

            ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 194                                               617

Carew-direct-O'Connell

1  Fourth Avenue. It was a garage owned by Vinnie Guarino. He
2  had his electric company base in there. And Pete made an
3  appointment to meet Martinelli and bring him to that location,
4  where Mike DeSantis, Richie and Greg Cappello would be waiting
5  inside the building.
6      I was going to be on the outside across the street on
7  the corner watching for them to come in and we had two-way
8  radios so I could tell them when he pulls up to the door and
9  to get ready.
10 Q.  If you can just stop there for a second?
11     You referred to two-way radios.
12 A.  Yes.
13 Q.  In prior efforts to set up on Mr. Martinelli, did you
14 also use radios to contact each other in some of the attempts?
15 A.  Yes.
16 Q.  Or some of the surveillances?
17 A.  We had them, yes.  On one other occasion.
18 Q.  What kind of radios were these?
19 A.  Two-way radios, like you would use like the police use,
20 similar to that.
21 Q.  Were you actually sitting in your cars at the locations
22 where you physically couldn't see each other and communicate
23 to one another over radios in your efforts to murder
24 Mr. Martinelli?
25 A.  Yes.

            ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 195                                               618

Carew-direct-O'Connell

1  Q.  On this next attempt at Mr. Guarino's business?
2  A.  Yes.
3  Q.  Is this the same Vincent Guarino you mentioned earlier
4  who was an associate of your crew?
5  A.  Yes.
6  Q.  Did Mr. Vincent Guarino have any street name that he was
7  known by from some of you?
8  A.  Vinny Electric or Vinny Electrician.
9  Q.  Did Mr. Guarino or Vinny Electric develop a close
10 relationship over time with anybody in particular on your
11 crew?
12 A.  He was close with Richie.
13 Q.  Mr. Pagliarulo?
14 A.  Yes.
15 Q.  Now, you have described generally what the plan was.
16 Again you were to be outside in an automobile?
17 A.  I was up the street and I could watch when they turned to
18 go down that building whichever way they came. I could see
19 them going right up to the building. I had good vision on the
20 building. And I would just tell them that they're coming and
21 they would, you know, they would be ready.
22 Q.  What time of the day did you and Mr. Pagliarulo and the
23 others select?
24 A.  It was early evening.
25 Q.  Excuse me?

            ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 196                                               619

Carew-direct-O'Connell

1  A.  Early evening.
2  Q.  Evening.
3      Who was designated by you and the others, Mr. Chiodo,
4  Mr. Pagliarulo, to be the shooter on this latest attempt at
5  Vinny Electric's building to shoot and kill Mr. Martinelli?
6  A.  Mike DeSantis I believe was supposed to be. Richie was a
7  little aggravated that he didn't show up the prior attempt and
8  he -- I believe Mike was the shooter and Richie and Greg were
9  back upstairs.
10 Q.  The Greg you are referring to is Greg Cappello?
11 A.  Yes.
12 Q.  He also had a street name?
13 A.  Whitey.
14     (Continued on the next page.)
15
16
17
18
19
20
21
22
23
24
25

            ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 197   SHEET 50

620

Carew/direct/O'Connell

1  BY MR. O'CONNELL:
2  Q.   What plans were made to lure Mr. Martinelli to his murder
3  at Vinny Electric's?
4  A.   Pete just told him he had to talk to him. I'm not sure.
5  I think he told him that Vic might be there, but I'm not
6  sure. I know he had used that on another occasion.
7  Q.   Did Mr. Chiodo assume the role of luring Mr. Martinelli
8  to the location?
9  A.   Yes, Mr. Chiodo was bringing him there.
10 Q.   Mr. Carew, now, as best as you can recall, would you
11 describe to the jury what happened on the evening that you,
12 Mr. Pagliarulo and the other members of the crew were involved
13 in this that night, what happened?
14 A.   Well, we went there, and the guys went in the building.
15 I set up on the other corner. And a little while later, I saw
16 Mikey come out of the place, and he went up to Fourth Avenue
17 and went a block away or went out of my vision, went a block
18 away or so. I didn't see him after that.
19          And a little while later, Pete pulled up with
20 Martinelli in the car. I told Richie and Whitey, the guys on
21 the phone, I called them on the radio and I told them that
22 Pete was outside. They said Mikey wasn't back, and they were
23 not going to open up. Pete banged on the door. I saw him
24 bang on the door a few times, and then they got in the car and
25 they left.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 198

621

Carew/direct/O'Connell

1  Q.   Did you meet with Mr. Pagliarulo and others following the
2  departure of Mr. Chiodo and Mr. Martinelli?
3  A.   Yes.
4  Q.   Did you have a conversation with Mr. Pagliarulo about
5  what happened inside Vinny Electric's business premises that
6  evening?
7  A.   Yeah. Evidently, there was surveillance cameras for a
8  burglar alarm, and they didn't know if they were direct to the
9  burglar alarm place or they were storing the pictures and they
10 would see them in there and everything. That's what Mikey or
11 somebody went out to try to find out what was going on there,
12 and he didn't come back, you know, in time, whatever. I
13 didn't see him right away. He came back later or something.
14 Q.   Sometime after this failed attempt at Vinny Electric's
15 building, did Mr. Pagliarulo make any comment to you regarding
16 Mr. DeSantis' performance that night?
17 A.   He said, he did it again. He didn't, you know -- he
18 wasn't where he was supposed to be when the hit was supposed
19 to go down.
20 Q.   Did Mr. DeSantis, following this failed attempt to kill
21 Mr. Martinelli at Vinny Electric's, ever give you any
22 explanation for why he left that building that evening and was
23 out of place for that murder?
24 A.   He said something about he was trying to get a phone that
25 worked, and the phones didn't work, the outside phones, and he

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 199

622

Carew/direct/O'Connell

1  had to go a few blocks away to the phone or whatever.
2  Q.   Sometime after this failed attempt at Vinny Electric's
3  business premises that you described for the jury, did you
4  learn that Mr. Chiodo and another person in your crew made
5  still another attempt to kill Mr. Martinelli?
6  A.   Yes.
7  Q.   From whom did you learn this?
8  A.   From Richie and Pete.
9  Q.   With respect to what you learned from Mr. Pagliarulo,
10 could you tell the jury, as best as you can recall, what, in
11 substance, Mr. Pagliarulo told you about this next attempt to
12 murder Joseph Martinelli?
13 A.   He said he made an appointment and met him again.
14       THE COURT:   Who said?
15 A.   Richie said that Pete made another appointment to meet
16 Martinelli again, and they met him, and that Martinelli was
17 sitting in the car and the gun -- Pete went to shoot him and
18 the gun didn't go off. And later, Pete told me -- Richie said
19 that Pete told him not to say nothing, so, I didn't say
20 nothing.
21       And a couple of weeks later, Pete told me, maybe a
22 week or ten days later, Pete told me that he pulled the gun on
23 the guy and went to shoot him and it didn't click, it didn't
24 go off, and he told him it was his kid's toy. Martinelli
25 believed him.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 200

623

Carew/direct/O'Connell

1  Q.   Were you involved in any other attempts to kill
2  Mr. Martinelli?
3  A.   No.
4  Q.   Throughout each of those attempts, Mr. Carew, that you
5  have described, beginning at his home, following up at the
6  insurance offices on Nostrand Avenue and at the business
7  premises of Vinny Electric, as you described it, so there's no
8  mistake at all about this, were you deliberately committed to
9  participating in murdering Joseph Martinelli?
10 A.   Yes.
11 Q.   Could you tell the jury what your understanding was as to
12 your own culpability in each of those efforts, notwithstanding
13 you were not the designated shooter?
14 A.   If they shot him, I'm just as guilty as the guy who did
15 it.
16       MR. O'CONNELL:   May I approach, your Honor?
17       THE COURT:   Yes.
18 Q.   Please try and keep your voice up, though I'm standing
19 right near you, so the jury can hear you.
20       Turning your attention to 2-140, you've had an
21 opportunity to examine 2-140?
22 A.   Yes.
23 Q.   Again, could you identify for the jury the persons
24 depicted 2-140?
25 A.   Sitting down is Vinny Guarino, Vinny Electric. I'm

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 201  SHEET 51

624

Carew/direct/O'Connell

1 standing in back of him. Peter Chiodo is next to me.

2 Q.   Turning to 2-142. In the top photo, marked as "2-142,"

3 could you tell the jury, from left to right, who those persons

4 are?

5 A.   Vinny Guarino is sitting down, that's Vinny Electric.

6 Richie is standing up next to me, and I'm sitting down on the

7 right-hand side of Richie.

8 Q.   With respect to 2-143, in the lower half of this exhibit,

9 again, from left to right, the person on the far left seated,

10 who is that?

11 A.   Richard Pagliarulo and myself. I'm next to him.

12 Q.   Please keep your voice up.

13       Across the table, there's a person indicated. Do you

14 recognize him?

15 A.   Mike DeSantis. Next to him is Bob McGarvy. And the far

16 side of Mike is my ex in-law, Joe Belfiore.

17 Q.   This was the occasion of your daughter's wedding

18 reception?

19 A.   Yes.

20 Q.   Was it customary during your days with the Luchese Crime

21 Family to invite members and associates of your crew to social

22 functions that you might have?

23 A.   Yes.

24 Q.   Turning to 2-141, do you recognize the individuals in

25 2-141?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 202

625

Carew/direct/O'Connell

1 A.   Yes.

2 Q.   Could you identify them for the jury, going from left to

3 right, and telling the jury who they are and what affiliation

4 with any organized crime family the individuals depicted have?

5 A.   Dominick Trusciello, a member of the Luchese Family;

6 Anthony Casso, he was the underboss of the Luchese Family;

7 Joey Testa and Anthony Senter, members of the Luchese Family;

8 and Frankie Lastorino was a captain and part of the

9 administration of the Luchese Family.

10 Q.   I have two more pictures. Turn to 2-144, please. I show

11 you 2-144, taken at -- it's actually a photo from

12 Mr. Pagliarulo's wedding reception. Did you attend that

13 reception?

14 A.   Yes, I did.

15 Q.   You recognize the individuals, of course, here?

16 A.   Yes. Right-hand side is Richard Pagliarulo, and next to

17 him is Frankie Lastorino.

18 Q.   Did Mr. Lastorino play any role in the wedding ceremony?

19 A.   Frankie was Richie's best man.

20 Q.   Turning your attention to 2-145, could you quickly

21 identify the persons from left to right? Again, this is from

22 the photos from the wedding.

23 A.   Yes. Frank Lastorino, Mike Spinelli and Richard

24 Pagliarulo.

25 Q.   What position did Mike Spinelli hold in the Luchese

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 203

626

Carew/direct/O'Connell

1 Family?

2 A.   He was an associate, and then later on, a member.

3 Q.   Could you keep your voice up, please?

4 A.   Yes. He was an associate, and later on, a member.

5 Q.   When did he become a member, if you know?

6 A.   He became a member, I would believe, in 1992 -- 1993.

7 Q.   Do you know where he was at the time?

8 A.   Yes, in prison.

9 Q.   You mean the ceremony was actually taking place in

10 prison?

11 A.   That's what I heard, yes.

12 Q.   Did you hear who presided over that ceremony to elevate

13 Mr. Spinelli to a soldier in the Luchese Family while he was

14 in prison?

15 A.   I knew who was in prison at the time. I don't know

16 exactly who presided.

17 Q.   Did you know whether he had been formally proposed and

18 approved by the boss of the family?

19 A.   Yes. I believe Vic approved it.

20 Q.   Mr. Carew, just briefly, what high-ranking persons were

21 in prison and located in the same institution as Mr. Spinelli

22 at the time you learned that he was promoted to an actual

23 member of the Luchese Family?

24 A.   Well, Anthony Bovat was there. Sal Avellino was in

25 prison with us. Anthony Casso, Frank Lastorino, Anthony

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 204

627

Carew/direct/O'Connell

1 Casso, Sal Avellino, Anthony Baratta. And then Mike DeSantis

2 and a few other members were there.

3 Q.   Mr. Carew, I would like you to turn your attention to

4 September 1989. First, I'll ask you whether you knew a person

5 named John Morrissey?

6 A.   Yes.

7 Q.   Did you know him to have a street name?

8 A.   "Sonny."

9 Q.   Would you tell the jury who you knew John Sonny Morrissey

10 to be?

11 A.   Sonny was a union official with the Ironworkers' Union.

12 I think it was Local 580.

13 Q.   Did you know this particular union to have any

14 affiliation with the Luchese Crime Family?

15 A.   Yes.

16 Q.   Briefly describe what you knew that to be?

17 A.   Sonny was close to Vic, and Pete had told me that they

18 belonged to our family, that that union belonged to our

19 family.

20 Q.   Did you know Mr. Morrissey to have any particular

21 friendship with any individual member of the Luchese Crime

22 Family in particular?

23 A.   He was friends with Vic Amuso.

24 Q.   The boss of the family?

25 A.   Yes.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

628

Carew/direct/O'Connell

1      MR. O'CONNELL:  May I approach?
2      THE COURT:  Yes.
3      MR. O'CONNELL:  Please turn to 2-109.
4  Q.  Do you recognize the persons depicted in this exhibit
5  marked 2-109?
6  A.  Yes.
7  Q.  From left to right, could you identify them?
8  A.  On the left in the brown jacket is Sonny Morrissey, and
9  the other guy is Pete Savino.
10  Q.  Did you know Pete Savino to have a street name?
11  A.  Black Heart.
12  Q.  Black Heart?
13  A.  Yes.  That was his nickname.  The guys used to -- that
14  was his nickname.
15  Q.  Keep your voice up.
16  A.  That was his nickname.  The guys used to call him Black
17  Heart among themselves.  I don't know if they called him that
18  to his face.
19  Q.  I show you Exhibit 2-130.  Do you recognize the persons
20  depicted in 2-130?
21  A.  Yes.
22  Q.  Going from left to right, could you identify them for the
23  jury?
24  A.  Yes, the heavyset guy is Joe Cakes, Joe Marion; Sonny
25  Morrissey is in the middle; and Frankie Arpino has his back to

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

629

Carew/direct/O'Connell

1  the camera.
2  Q.  Did you know Mr. "Joe Cakes" Marion to have an
3  affiliation with any crime family?
4  A.  Yes.  He was around us a while, the Luchese Crime Family.
5  Q.  What about Mr. Arpino?
6  A.  Yes.  He was friends with Vic and Gas.
7  Q.  Keep your voice up, please.
8  A.  Yes.  He was friends with Vic and Gas.  He was around us,
9  too.  He used to come to the Walnut all the time.
10      MR. O'CONNELL:  You can put the books down.  I won't
11  be referring to the photographs anymore.
12  Q.  Again, turning your attention to September 1989,
13  Mr. Carew.
14  A.  Yes.
15  Q.  Did there come a time when a certain member of the
16  Luchese Crime Family asked you to participate in the murder of
17  John "Sonny" Morrissey?
18  A.  Yes.
19  Q.  Who was the member of the Luchese Crime Family who asked
20  you to do this?
21  A.  Pete Chiodo.
22  Q.  Could you tell the jury, as best as you can recall, what
23  Mr. Chiodo told you, in substance, at the time he asked you to
24  assist him in killing John "Sonny" Morrissey?
25  A.  He said that Vic and Gas thought that Sonny was going bad

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

630

Carew/direct/O'Connell

1  and they wanted him hit, and we were supposed to do it.
2  Q.  What does "going bad" mean, as you understood it?
3  A.  That he was going to be an informer.
4      THE COURT:  Going to be what?
5      THE WITNESS:  An informer.
6  Q.  Did you agree to assist Mr. Chiodo in murdering John
7  "Sonny" Morrissey?
8  A.  Yes.
9  Q.  Did Mr. Chiodo inform you whether or not other members of
10  your crew would also be assisting Mr. Chiodo and yourself in
11  killing John "Sonny" Morrissey?
12  A.  Yes.
13  Q.  Who else?
14  A.  He said that Mike DeSantis and Richard Paolarulo would
15  be there, and he said that Richie would be the shooter.
16  Q.  I would like to review with you the events that led up to
17  the murder of Mr. Morrissey.
18      Mr. Carew, did Mr. Chiodo make any arrangements, to
19  your knowledge, to meet with Mr. Morrissey in September 1989?
20  A.  Yes, he did.
21  Q.  And did you accompany Mr. Chiodo to a meeting place where
22  he, in fact, met with Mr. Morrissey?
23  A.  Yes.
24  Q.  Tell the jury where you went, and who was there when you
25  got there, and what happened?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

631

Carew/direct/O'Connell

1  A.  I went with Pete to a coffee shop, I think it was on
2  Second Avenue between 28th and 29th Street in Manhattan.  And
3  when we got there, Sonny Morrissey was there with Jimmy
4  McCarthy and Paulie Paiola.
5  Q.  Did you know Jimmy McCarthy?
6  A.  Yes.
7  Q.  What did you know about Jimmy McCarthy?  Who was he, to
8  your knowledge?
9  A.  Jimmy and Paulie owned a windows installation company,
10  and they were friends with Sonny, as well as other members of
11  the family.
12  Q.  Did you see Mr. Chiodo engage Mr. Morrissey in
13  conversation?
14  A.  Yes.  Him and Sonny, after saying hello and everything,
15  we sat down and Pete took Sonny for a walk and came back about
16  fifteen minutes later.  Everybody said, you know, a few
17  things, social things, and then the meeting broke up, and me
18  and Pete went back to Brooklyn.
19  Q.  Mr. Carew, did you have a conversation with Mr. Chiodo on
20  your return from Manhattan, in which Mr. Chiodo told you what
21  he had discussed with Sonny Morrissey?
22  A.  Yes.
23  Q.  Tell the jury, as best as you can recall, what Mr. Chiodo
24  informed you at that time?
25  A.  He said that he told Sonny to meet him tomorrow and come

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 209  SHEET 59

632

Carew/direct/O'Connell

1 alone, that he was going to have Vic present at a meeting, Vic
2 wanted to see Sonny, and that he should come alone the next
3 day, and then made an appointment for a restaurant, right a
4 luncheonette, I believe it was on First Avenue, right on the
5 corner of 29th Street -- I think it was on the corner, anyway.
6 Q.   Did Mr. Chiodo give you any further instructions
7 regarding what you might do the next day?
8 A.   Yes.  He told me to come loaded, which meant to bring a
9 gun.
10 Q.  Did you meet with Mr. Chiodo the next day?
11 A.  Yes, I did.
12 Q.  Did you follow his instructions to bring a gun?
13 A.  Yes, I did.
14 Q.  What kind of gun did you bring?
15 A.  I had a .38 snub-nose revolver.
16 Q.  Did you and Mr. Chiodo drive to the prearranged site to
17 collect Mr. Morrissey?
18 A.  Yes, we did.
19 Q.  This was that luncheonette you described?
20 A.  Yes.
21 Q.  Did he come alone, as he was instructed?
22 A.  Yes, he did.
23 Q.  After you picked him up, where did you go from there?
24 A.  We got in the car.  He was in the back, I was in the
25 front next to Pete, and Pete drove.  We went to a development

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 210

633

Carew/direct/O'Connell

1 in Jersey, the housing development that Pete was involved
2 with.  He had lived on the site at one time, and we drove
3 there.
4 Q.  Before you picked up Mr. Morrissey, prior to that time,
5 did Mr. Chiodo tell you what role you would be playing that
6 day in the murder of Sonny Morrissey --
7 A.  Yes.
8 Q.  -- what role he would play, what role Mr. Pagliarulo would
9 play and what role Mr. DeSantis would play?
10 A.  Yes.
11 Q.  Tell the jury what Mr. Chiodo told you?
12 A.  He said that Richie would do the shooting, and I would
13 back him up.  Mikey and him would be there for backup, if we
14 needed it, and to help us with anything that we might have
15 needed help with.
16 Q.  Please, try and keep your voice up.
17     Mr. Carew, could you tell the jury what you saw as
18 you and Mr. Chiodo drove into that site you described in
19 New Jersey, with Mr. Morrissey in the car with you?
20 A.  Yes.  As we drove in, we went down a road, a dirt road.
21 And on the right-hand side, there's a chalet-type building
22 that Pete used as an office for his housing development.
23     There was a parking lot.  We pulled into the parking
24 lot and on the front of the chalet building, there was a
25 porch, a wooden deck.  And on the wooden deck, Richard

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 211

634

Carew/direct/O'Connell

1 Pagliarulo was waiting when we got there.
2     We got out of the car.  We went up the ramp to the
3 deck.  We started to walk inside, and Pete introduced Richie
4 to Sonny, and we got inside.  And Pete left to go --
5 supposedly to go get Vic.
6     And as he went walking out, I took my jacket off and
7 put it on the desk that was there.  And I turned around and
8 Richie had reached into a wastebasket or some kind of
9 receptacle, a pail that was there, and he had an automatic gun
10 with a long silencer on it.  He pulled it out, and he pointed
11 it at Sonny.
12     Sonny looked, and he said, I'm no rat.  And Richie
13 shot him twice in the head, and the gun jammed.  When the gun
14 jammed, he said, shoot him, shoot him.  So I turned around and
15 went to the pocket of my jacket and took out the gun.  Sonny
16 was on the floor, and he said, it hurts, finish me, it hurts,
17 and I shot him.
18     And as I was shooting him, I shot him a few times,
19 and as I was shooting him, Richie went like this, wait a
20 minute, and he had unjammed his gun.  He walked over to where
21 Sonny was.  Sonny was on the ground like moaning, and he put
22 the gun to his head and shot him, or stood there and shot him
23 one more time.
24 Q.  After Mr. Morrissey was shot that last time by
25 Mr. Pagliarulo in the head, did he stop moaning?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 212

635

Carew/direct/O'Connell

1 A.  Yes.
2 Q.  Did you and Mr. Pagliarulo make some efforts to conceal
3 Mr. Morrissey's body and avoid detection by the authorities?
4 A.  What we did was, there was a rug on the floor, and I had
5 a little penknife and we couldn't find nothing to put the body
6 in, so we started cutting the rug.
7     And Pete came in, wanted to know what happened
8 because he heard gunshots.  And we told him what happened,
9 that the gun jammed.  And he went out and got Mike, and Mike
10 came with a backhoe, and right in back of the chalet, between
11 the chalet and there was a trailer-type building that Pete
12 used to live in, they started to dig a hole.  It was right
13 near the back door of the chalet.  And they started to dig a
14 hole with the backhoe.
15     I went back in and started cutting the rug with the
16 little penknife, and it was a tiresome job.  So after a while,
17 Richie helped me.  We took turns, and we cut the rug.  And
18 then we -- I think Pete took the stuff out of Sonny's pockets,
19 and we wrapped the body in the rug.  And we found some wire, I
20 think it was telephone wire or electric wire or something like
21 that, and we tied the rug up with it.
22     And then the four of us dragged the body out to the
23 back where the hole had been dug, and we threw the body in the
24 hole.  The hole was a little lopsided.  Mikey wasn't too
25 familiar with the backhoe, and he didn't dig the hole

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 213  SHEET 54

Carew/direct/O'Connell                                    636

1  straight, it was on a slant. And we threw the body in there,
2  and then Mikey started to bury it with the backhoe.
3  Q.    Backing you up just a bit to the point where
4  Mr. Morrissey had been shot for the final time, did either
5  Mr. DeSantis or Mr. Chiodo come inside where you and
6  Mr. Pagliarulo were?
7  A.    Yes.  I said that Pete came in.  Pete came in and wanted
8  to know what happened.  He heard the shots.  And we told him
9  -- we explained to him that the gun jammed and I had to shoot
10  him with the revolver, the one that didn't have a silencer.
11  That's why he heard the shots.
12  Q.    Mr. Carew, after Mr. Morrissey's body was buried by you
13  and the others, how did you leave and how did Mr. Pagliarulo
14  leave?
15  A.    Richie and Mike left together.  They took the guns with
16  them and disposed of them.  And I left with Pete, and on the
17  way back, we broke up Sonny's credit cards, and Petey ripped
18  up his wallet.  We threw it out the window of the car at
19  various intervals as we were driving.
20         (Continued on next page.)
21
22
23
24
25

                ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 214

Carew-direct-O'Connell                                    637

1  EXAMINATION CONTINUES
2  BY MR. O'CONNELL:
3  Q.    Jumping ahead, you became aware at some point in 1991
4  Mr. Chiodo was shot, is that correct?
5  A.    Yes.
6  Q.    You also became aware that Mr. Chiodo began cooperating
7  with the government?
8  A.    Yes.
9  Q.    Did there come a time when you, Mr. Pagliarulo and others
10  discussed possibly moving Mr. Morrissey's body after
11  Mr. Chiodo's cooperation became known?
12  A.    Yes.
13         Mikey, Richie and myself discussed it.  Mikey was
14  going to go there and check out, see what -- you know, if it
15  was feasible to move the body, if it was -- if there was, you
16  know, if it was easily accessible, what was going on in Hidden
17  Hills.  Nobody had been there for a while.
18         So Mikey went and checked it out and he came back and
19  he said that there was new construction and there was a lot of
20  activity there and that you know, he didn't feel that it was a
21  good idea to move -- to try to move the body.  We might get
22  caught.
23  Q.    One last question about the actual day when Mr. Morrissey
24  was murdered by yourself and Mr. Pagliarulo and the others.
25         You testified that Mr. DeSantis had some difficulty

                ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 215

Carew-direct-O'Connell                                    638

1  operating the back hoe; is that correct?
2  A.    Yes.
3  Q.    Did he cause any damage that you recall?
4  A.    Yes.
5         At one point, the -- with the fork on the -- you
6  know, on the hoe, with the part with the hoe on it, he hit the
7  building, made a gash in the -- in the trailer that was next
8  to where we buried the body.
9  Q.    Mr. Carew, you pled guilty under your agreement for your
10  role in murdering Mr. Morrissey, is that correct?
11  A.    Yes.
12  Q.    I am going to turn your attention, Mr. Carew, if I may,
13  to about a year before, in the fall of 1988.
14         I'd like to ask you some questions concerning a
15  particular faction of the Lucchese Crime Family.
16         Did you know of a faction or crew of the Lucchese
17  Crime Family that operated out of New Jersey at about that
18  time?
19  A.    Yes.
20  Q.    Do you know who was the captain of that crew at that
21  time?
22  A.    Yes.  Anthony Accetturo, Tumac.
23  Q.    The street name was?
24  A.    Tumac, yes.
25  Q.    Tumac?

                ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 216

Carew-direct-O'Connell                                    639

1  A.    Yes.
2  Q.    Did Mr. Accetturo have a family member who was a made
3  member in that crew?
4  A.    Yes; his son.
5  Q.    What was his name, if you recall?
6  A.    Anthony Junior.
7  Q.    Prior to 1988, had you ever met Anthony Accetturo, Senior
8  or Junior?
9  A.    Yes.
10  Q.    Who had you met?
11  A.    I had met Senior and I had met Junior at the Walnut.
12  Junior used to frequent the Walnut Bar, where we used to meet
13  occasionally on weekend -- we used to meet there once or twice
14  a week.
15  Q.    Was that a location that was used much like The 19th
16  Hole?
17  A.    Yes.  Gas and Vic used it for their meeting place.
18  Q.    Gas and Vic?
19  A.    Yes.
20  Q.    Now, in the fall, late 1988, did you learn that Gas and
21  Vic or Mr. Casso and Mr. Amuso had reached a certain decision
22  on how to deal with Mr. Accetturo?
23  A.    Yes.
24  Q.    Tell the jury what decision you learned about?
25  A.    They were going to kill him.

                ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 217 SHEET 55

**Carew-direct-O'Connell**                                          648

1 Q.  Did you learn why they were going to kill him?

2 A.  Yeah.

3         After -- he had a case and after he beat the case,

4 he -- he wasn't turning in money to the family and then he

5 refused to come in when they wanted to see him.  He kept

6 making excuses and not coming in.

7 Q.  When you say come "in," could you perhaps explain that a

8 little more?

9 A.  Come to a meeting with -- with Anthony Casso and Vic

10 Amuso.

11 Q.  Was there any particular requirement among the membership

12 of the Lucchese Crime Family when an order came out from the

13 administration to report to a meeting?

14 A.  Yes.

15        You had to go or you had to have a real good excuse

16 not to go.  He couldn't just keep putting it off.

17 Q.  Now, is it fair to say that over the next few years, you

18 were personally involved along with others in efforts to hunt

19 down and kill Mr. Accetturo and certain members of his crew?

20 A.  Yes.

21 Q.  Turning your attention to late 1986.  Did there come a

22 time when a Lucchese member suggested using your own home,

23 your own residence, for a meeting with Mr. Accetturo?

24 A.  Yes.

25 Q.  Who suggested using your own home for a meeting with

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 218

**Carew-direct-O'Connell**                                          641

1 Mr. Accetturo?

2 A.  First Anthony Casso.  He asked me if I could make

3 arrangements for my house to be used for a meeting with Tumac

4 and his son.

5 Q.  What was initially envisioned by Mr. Casso as related

6 it to you for the use of your home in this meeting, for what

7 purpose?

8 A.  At -- in the first time?

9 Q.  Initially.

10 A.  I thought it was just a meeting to settle, you know, to

11 try to settle the dispute.

12 Q.  Did there come a time when another member of the Lucchese

13 Crime Family informed you that your home was to be used for a

14 different purpose?

15 A.  Yes.

16 Q.  Who informed you of this and what was it that you were

17 told?

18 A.  Pete Chiodo told me that they wanted to use my house to

19 kill Anthony Accetturo and his son.  That they had made an

20 arrangement for a meeting and when they showed up, they were

21 going to be killed.

22 Q.  Who is the "they" who made this decision to use your

23 home?

24 A.  Gas and Vic.

25 Q.  Were you instructed to make certain arrangements in

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 219

**Carew-direct-O'Connell**                                          642

1 preparation of this event?

2 A.  Yes.

3         They told me to make sure my family wasn't home and

4 they said to get some sandwiches and food to make it, you

5 know, look like it was a real -- that we really had intentions

6 of having a meeting there, which I did.  I prepared it.  I got

7 it ready.

8 Q.  How far did the plan to kill Accetturo and his son at

9 your house progress?

10 A.  Well, a short time before, I think a day or two before it

11 was supposed to happen, they told me it was called off, that

12 Accetturo couldn't make it.  He wasn't going to come.  It was

13 a short time before.

14 Q.  Before it was called off, could you tell the jurors as

15 best as you can recall what the plan was to lure Mr. Accetturo

16 to your home and who was to participate in this particular

17 attempt?

18 A.  They were going to meet him by the -- either in a hotel

19 or by the airport.  I think by the airport.  They were going

20 to meet him and bring him because he was coming I think from

21 Florida.  They were going to meet him by the airport and bring

22 him to my house.  I think Frankie Lastorino, Gas, Pete

23 Chiodo.  I don't know who else.  Myself.  I was going to be

24 there.  Vic.

25 Q.  Did you actually make arrangements to bring food in?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 220

**Carew-direct-O'Connell**                                          643

1 A.  Yes.

2         My son-in-law had a -- a salamaria, Italian grocery

3 store and meat store, butcher store, and I had told him to

4 make up some sandwiches and potato salad and things like that,

5 that I might need them on a certain day.  I believe it was a

6 Thursday.

7         Then I called him and told him to forget about it

8 after -- after they told me that the meeting wasn't going

9 to --

10       THE COURT:  Keep your voice up.

11 Q.  Did you actually make arrangements to have your family

12 out of there for that date that was selected?

13 A.  I told my wife that, you know, I wanted her to leave.  I

14 didn't know exactly what, you know, when.  But I would let her

15 know.  And then I wanted her and my daughters to -- to go stay

16 with a friend of theirs for the day, and they agreed.  My

17 daughter was going to go after work.

18 Q.  Mr. Carew, when Mr. Chiodo told you that Mr. Amuso and

19 Mr. Casso wanted to use your home for murdering Mr. Accetturo

20 and his son, what was your reaction?

21 A.  Well, I wasn't happy about it.  You know, I didn't think

22 it was right, that they should look to use my house.  But I

23 was going to go along with it.

24 Q.  You agreed to go along with it?

25 A.  Yeah.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

─ PAGE 221  SHEET 56 ─

Carew-direct-O'Connell                                      644

1  Q.  Around this same time period, do you recall an occasion
2  where you and Mr. Chiodo and Mr. Pagliarulo traveled to
3  Florida together?
4  A.  Yes.
5  Q.  Did Mr. Chiodo meet anyone in particular in Florida that
6  you recall on this trip?
7  A.  Yes.
8  Q.  Who do you remember he met?
9  A.  He had to meet a -- a Spanish fellow by the name of
10  Junior.  I had an appointment in a hotel in Cocoanut Grove in
11  Miami.
12  Q.  Did you go to the Cocoanut Grove or whatever place
13  Mr. Chiodo met Junior at?
14  A.  Yes, yes.
15  Q.  Were you introduced to Junior?
16  A.  Yes, I was. --
17  Q.  Was Mr. Pagliarulo?
18  A.  Yes.
19  Q.  Did Mr. Chiodo and this person Junior meet together, away
20  from you?
21  A.  They went in -- and sat together and me and Richie
22  stayed together.
23  Q.  Tell the jury what, if anything, you observed took place
24  between Mr. Chiodo and this person Junior you described?
25  A.  Well, Pete was in a huddle with him.  He gave him a

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

─ PAGE 222 ─

Carew-direct-O'Connell                                      645

1  little package wrapped in paper, in gift paper.
2  Q.  Did you and Mr. Pagliarulo subsequently learn what the
3  contents of that package were?
4  A.  Later on, Pete told me there was fifty thousand in it
5  from Gas.  They were going -- that was his -- a fee, a
6  start-up fee for the guy to kill the Accetturos.  Or to kill
7  Anthony Accetturo, Senior.
8  Q.  Now, did you ever travel to Florida again as you -- as
9  best as you can recall for the purpose of murdering anyone in
10  Mr. Accetturo's crew?
11  A.  No.
12  Q.  Did you learn that other members of your crew did in fact
13  travel again to Florida for that purpose?
14  A.  Yes.
15  Q.  From whom did you learn this?
16  A.  From the guys that were going back and forth to Florida,
17  Richie, Mike DeSantis, Mike Spinelli and Pete Chiodo.
18  Q.  From time to time would Mr. Pagliarulo, Mr. Chiodo and
19  me in Florida on these trips?
20  in Florida on these trips?
21  A.  Yes.
22  Q.  Did you keep generally abreast of what they were doing
23  down there through these conversations that you had with them
24  from time to time?
25  A.  Yes, I would say so.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

─ PAGE 223 ─

Carew-direct-O'Connell                                      646

1  Q.  Could you tell the jury as best as you can recall what
2  you learned from Mr. Pagliarulo and Mr. Chiodo about what
3  their first efforts were on their trips to Florida to help
4  find and kill Mr. Accetturo and other members of his crew?
5  A.  Well, when they first went down there, they needed a
6  place to stay so they could start doing their surveillance and
7  try to get some information on where Mr. Accetturo stayed and
8  everything.  They enlisted Danny Laratro.  He was -- Danny was
9  the son of -- of Joey Marrows, who was a long time Lucchese
10  member and he had moved to Florida.  He lived in Florida and
11  they -- they went and see Danny and Danny let them stay at a
12  house -- at his house.
13  Q.  Did you learn whether they found other accommodations?
14  A.  Yes.  After a while they found out that Accetturo hung
15  out in the Diplomat occasionally and went to the Diplomat,
16  which is a hotel in Fort Lauderdale.  At that point they
17  rented an apartment across the street from the Diplomat that
18  they could see whoever went in and everything with spy glasses
19  and long-range glass that they had.
20  Q.  Did they make any other arrangements to surveil
21  Mr. Accetturo that they discussed with you during this time
22  period?
23  A.  Yes.
24       He came up with an address --
25  Q.  Keep your voice up?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

─ PAGE 224 ─

Carew-direct-O'Connell                                      647

1  A.  They came up with an address that was Accetturo's house
2  in Florida.
3       THE COURT:  Who told that you?
4       THE WITNESS:  Pete Chiodo.
5       And they went down there and they were looking for a
6  house to rent on the block so that they could have
7  surveillance on the house and see who came in and out and if
8  there was a possibility to get him.  They couldn't rent a
9  house so they wound up, there was a house for sale on the
10  block and they winded up buying the house or proceeding to buy
11  it.
12  Q.  Did you learn whether they were successful in their
13  efforts to hunt down and kill Anthony Accetturo?
14  A.  No, they weren't.
15  Q.  Did there come a time when you learned that Mr. Chiodo
16  and other members of your crew made an attempt to kill a
17  member other than Mr. Accetturo of Mr. Accetturo's crew?
18  A.  Yes.
19  Q.  Who was that person they attempted to kill?
20  A.  A fellow they called Uncle Joe.
21  Q.  From whom did you learn this?
22  A.  I learned it from Pete Chiodo and Mike DeSantis.
23  Q.  Tell the jury as best as you can recall what you learned
24  from Mike DeSantis and Pete Chiodo regarding this attempt to
25  kill Uncle Joe.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 225   SHEET 57

648

Carev-direct-O'Connell

1  A.   They went and did some surveillance on him and they
2  looked at his house a few times and then I think he had
3  another place, a store or something that he used to -- to have
4  something to do with or frequent and they went there and
5  finally, on one occasion after a couple of times going back
6  and forth, they set up by the guy's house.  I think Richie
7  and -- and Pete were in one car and Mike and Mike Spinelli
8  were in the other and they spotted him coming home.  They
9  pulled up next to him.  Mike Spinelli got out, shot him, and
10 then they left him.  Poet and Richie followed them out, after
11 they passed him, followed them out.  I think that guy's name
12 was Joe La Morte, his real name.  They called him Uncle Joe.
13 Q.   How long after Mr. La Morte was shot do you recall
14 learning about that event from Mr. DeSantis and Mr. Chiodo?
15 A.   I would say, a couple of days later.
16 Q.   Did you learn from Mr. DeSantis what they believed at the
17 time they left Mr. La Morte following the shooting?
18 A.   They thought he was dead.
19 Q.   Did you learn when they learned -- withdrawn.
20          Did you learn how they came to discover that he was
21 alive and survived this attempt?
22 A.   About a week later they told me he was alive.
23 Q.   You testified that you did not play a role in the
24 activities of your crew down in Florida that you have
25 described apart from the trip when the meeting with Junior

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

PAGE 226

649

Carev-direct-O'Connell

1  took place; is that correct?
2  A.   Yes.
3  Q.   Nevertheless, were you involved in efforts in this area?
4  A.   Yes.
5  Q.   To track down certain -- certain individuals who were
6  alined with Mr. Accetturo?
7  A.   Yes.
8          There was a fellow by the name of Tommy Ricciardi and
9  I was given an address and I went to check it out and then I
10 went there a few times and I brought the other fellows there,
11 different occasions.  It was a house next to a horse farm, on
12 a Vermont Avenue in Toms River, New Jersey.
13 Q.   Who were the others that you went to this location with
14 from time to time?
15 A.   Mike DeSantis.  I am not sure, I think Richie was there
16 at one time.  I went there with Al D'Arco and his son.
17 Q.   So there is no mistake about it, were your trips to New
18 Jersey to look for Mr. Ricciardi aimed at finding him and
19 killing him?
20 A.   Yes.
21          At a given point, Mikey DeSantis rented a --
22 Q.   Please keep your voice up.
23 A.   Mikey DeSantis rented a place in the horse farm.  He had
24 a friend of his that had a horse and he rented a spot to leave
25 the horse there so he would have reason to go to the farm

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

PAGE 227

650

Carev-direct-O'Connell

1  right next door to Tommy Ricciardi's house and if he had an
2  opportunity, he would try to shoot Tommy Ricciardi.  That was
3  the plan.
4  Q.   Were you successful, you and the others, in your efforts
5  to hunt down and kill Mr. Ricciardi?
6  A.   No.
7  Q.   To your knowledge, were your fellow crew members,
8  Mr. Pagliarulo and the others, successful in their efforts to
9  hunt down and kill Mr. Accetturo?
10 A.   No.
11          MR. O'CONNELL:  With the Court's permission, this
12 would be a good time to break.
13          THE COURT:  All right.  Let's take the rest of the
14 afternoon off, members of the jury.
15          Don't discuss the case.
16          I will see you tomorrow.
17          By the way, on Friday, I won't be able -- Friday is
18 my day for motions and other things in the morning so I won't
19 be able to meet with you until 1:30.  So you will have had
20 your lunch by 1:30 and we will start in at 1:30.  You can
21 sleep late.
22          Okay.  Don't discuss the case.
23          Monday though is a holiday, the following Monday.
24          (The following occurred in the absence of the jury.)
25          THE COURT:  Mr. Heelan, don't lean back in those

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

PAGE 228

651

Carev-direct-O'Connell

1  chairs.
2          MR. HEELAN:  Are they that fragile?
3          THE COURT:  No.  As you can see, they are old.  We
4  have no money to buy new ones.
5          MR. HEELAN:  Okay, Your Honor.
6          THE COURT:  All right.  All right.  How much longer
7  do you plan to be with this witness?
8          MR. O'CONNELL:  I think about half an hour to an
9  hour.  On direct.
10         THE COURT:  Then --
11         MR. O'CONNELL:  I'd say at least an hour.
12         THE COURT:  Okay.  Then you have another witness?
13         MR. ROSE:  Yes.
14         THE COURT:  How long will that witness be?
15         MR. ROSE:  Mr. Marino will -- could be two hours.
16 Two hours.  Two to three hours for Mr. Marino.
17         THE COURT:  We may spend a good portion of the day
18 tomorrow on those two?
19         MR. O'CONNELL:  Mr. Horlick has his cross.
20         THE COURT:  Oh, that's true.
21         All right.
22         MR. O'CONNELL:  I don't know how long he anticipates
23 the cross will be.
24         THE COURT:  All right.  Then after that, what do you
25 have?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

PAGE 229  SHEET 58

652

Carew-direct-O'Connell

1       MR. ROSE:  Crime scene searches.  That's all.
2       THE COURT: That's about it?
3       MR. ROSE:  Yes.
4       THE COURT: We should finish next week then.
5       MR. ROSE:  I believe so, sir.  Given that you might
6  consider tomorrow whether you -- not sit on Friday.
7       THE COURT: Let me think about that and --
8  prayerfully.
9       All right.
10      MR. ROSE:  And the plea agreement?
11      THE COURT: Pardon?
12      MR. ROSE:  And perhaps the plea agreement.
13      THE COURT: I will find that Learned Hand case for
14  you.
15      (Matter recessed until 9:30, May 26, 1994.)
16
17
18
19
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 230

653

Carew-direct-O'Connell

1               I N D E X
2

| Witness        | Direct | Cross | Re-d | Re-X | Voir Dire |
|----------------|--------|-------|------|------|-----------|
| Peter Chiodo   | 426    |       |      |      |           |
| Chris Cincotta | 551    | 560   | 562  |      |           |
| Thomas Carew   | 563    |       |      |      |           |

3  Witness        Direct  Cross  Re-d  Re-X  Voir Dire
4  Peter Chiodo   426
5  Chris Cincotta 551     560    562
6  Thomas Carew   563
7
8               E X H I B I T S
9

| Plaintiff/Govt    | For Identification | In Evidence |
|-------------------|--------------------|-------------|
| 11 A 1            |                    | 490         |
| 11-L-1            |                    | 554         |
| 12-A-5, 12-A-6,   |                    |             |
| 12-A-6-A          |                    | 556         |
| 12-A-8            |                    | 558         |
| 12-A-7            |                    | 559         |
| Defendant         | For Identification | In Evidence |
| A                 | 490                |             |

10 Plaintiff/Govt    For Identification    In Evidence
11 11 A 1                                  490
12 11-L-1                                  554
13 12-A-5, 12-A-6,
14 12-A-6-A                                556
15 12-A-8                                  558
16 12-A-7                                  559
17
18 Defendant         For Identification    In Evidence
19 A                 490
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

HEADER LINE

PAGE 1  SHEET 1

654

```
 1               UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK
 2  - - - - - - - - - - - - - - - X
 3  UNITED STATES OF AMERICA,      :   CR 90-446(S)
 4              v.                  :   U.S. Courthouse
                                        Brooklyn, New York
 5  RICHARD PAGLIARULO,            :   May 26, 1994
 6              Defendant.          :   9:30 o'clock a.m.
 7  - - - - - - - - - - - - - - - X
 8                  TRANSCRIPT OF TRIAL
 9        BEFORE THE HONORABLE EUGENE H. NICKERSON
          UNITED STATES DISTRICT JUDGE, and a jury.
10
11  APPEARANCES:
12  For the Government:        ZACHARY W. CARTER
                               United States Attorney
13                             By:  CHARLES ROSE
                                    GREGORY O'CONNELL
14                             Assistant U.S. Attorney
                               225 Cadman Plaza East
15                             Brooklyn, New York 11201
16  For the Defendant:         JAY HORLICK
                               RICHARD HEELAN
17
18  Court Reporter:            Anthony M. Mancuso
                               225 Cadman Plaza East
19                             Brooklyn, New York 11201
                               (718) 330-7007
20
21
22
23  Proceedings recorded by mechanical stenography, transcript
    produced by CAT.
24
25
             ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER
```

PAGE 2

655

```
 1          (Trial resumed.)
 2          (In open court; jury not present.)
 3          THE COURT:  Gentlemen, before we start, I think I
 4  was wrong yesterday on the cooperation agreement.  I looked at
 5  the cases and I was under the impression -- erroneous
 6  impression -- that the impeachment had to be cross-examination
 7  with respect to the particular agreement rather than a general
 8  attack on the credibility.
 9          And it's clear to me from reading the cases that any
10  questioning of the credibility of the witness will allow the
11  cooperation agreement to be put in.  And I'll cite to you the
12  cases:  It's United States v. Musacchia, 900 F.2d 493, Second
13  Circuit.  And it cites all the cases, all of which I have
14  read, United States v. Fernandez, United States v. Borello and
15  United States v. Arroyo-Angulo.  In most of them they found
16  harmless error even though it was introduced on direct
17  examination.
18          However, I am going to give a charge along these
19  lines -- I'll let you argue this -- I am going to give a
20  charge after the point where it's charged the fact that he's
21  gotten a cooperation agreement and he's gotten a break and it
22  may give him a motive to testify falsely.
23          I'm going to charge something like this:  This motive
24  to testify falsely is not eliminated by the fact that the
25  agreement this witness may have entered into with the
             ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER
```

PAGE 3

656

```
 1  government requires him to testify truthfully.  You should
 2  consider whether the witness may nevertheless believe that if
 3  he says what he thinks is helpful to the prosecution it is
 4  unlikely that the U.S. Attorney will claim he lied and
 5  withdraw benefits conferred by the plea agreement.
 6          That's not as strong as what Judge Friendly said one
 7  could charge.  At any rate, I'll hear you on that charge
 8  before I actually give it.  But you may offer the cooperation
 9  agreement and I will receive it over Mr. Horlick's objection.
10          MR. ROSE:  Shall we do that right away?
11          THE COURT:  We'll do it whenever you want.  He's
12  identified it.
13          MR. O'CONNELL:  Can I have one moment before you
14  call in the jury, your Honor.
15          THE COURT:  Sure.
16          I'm going to sit Friday, by the way, at 1:30.
17  THOMAS CAREY, resumed.
18          (Pause.)
19          THE COURT:  Are we ready now?
20          MR. O'CONNELL:  Yes, your Honor.
21          THE COURT:  Would you ask the jury in.
22          (Jury present.)
23          THE COURT:  Please be seated.  Shall we resume?
24          MR. ROSE:  Before we continue with this witness,
25  yesterday I neglected to offer and I offer now Government's
             ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER
```

PAGE 4

652

```
 1  Exhibit 3500-676, the plea agreement between the United States
 2  and Peter Chiodo.
 3          THE COURT:  I'll receive it probably after
 4  cross-examination.
 5          MR. ROSE:  Yes, sir.
 6          THE COURT:  I don't receive it now.
 7          I'm sorry.  That's Mr. Chiodo's.  I'll receive it.
 8          (So marked.)
 9          THE COURT:  All right.  Let's move ahead.
10          MR. O'CONNELL:  Yes, your Honor.
11  DIRECT EXAMINATION
12  BY MR. O'CONNELL:  (Continuing).
13  Q.   Mr. Carew, we left off yesterday afternoon with your
14  testimony concerning the activities of your crew and yourself
15  as part of that crew relating to the Accetturo faction.
16          Do you recall that?
17  A.   Yes.
18  Q.   I would like to turn your attention now to another event
19  which occurred in the spring of 1989.  Calling your attention
20  to the spring of 1989, did there come a time when you and
21  other members of your crew went to a business location that
22  was known as the Renewal Arts Company?
23  A.   Yes.
24  Q.   Who asked you to accompany other members of your crew to
25  Renewal Arts?
             ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER
```

PAGE 5  SHEET 2

Carew/direct/O'Connell                                    658

1  A.   Pete Chiodo.

2  Q.   In the spring of 1989 Mr. Chiodo was the captain of your

3  crew, is that correct?

4  A.   Yes.

5  Q.   Do you recall who else accompanied you to Renewal Arts at

6  that time from your crew?

7  A.   It was Pete Chiodo, Mike DeSantis, Richie Pagliarulo,

8  Dino Marino, Mike Spinelli, Angelo DeFendis.

9  Q.   Jumping ahead, on that day that you traveled there,

10  Mr. Carew, briefly, what was your role in the events of that

11  day at Renewal Arts?

12  A.   We were supposed to go there to give a guy a beating.

13  Q.   A beating?

14  A.   Yes.

15  Q.   You testified yesterday that pretty much throughout your

16  early part of your career you engaged in strong-arm tactics,

17  is that correct?

18  A.   Yes, sir.

19  Q.   You had given beatings before, isn't that right?

20  A.   Yes, sir.

21  Q.   You testified that while you were associated with

22  Mr. Funari, from time to time, he would ask you to go act as

23  an enforcer, is that right?

24  A.   Yes.

25  Q.   Now, this event that you are describing at Renewal Arts,

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 6

Carew/direct/O'Connell                                    659

1  is it fair to say it's much like the other strong-arm tactics

2  that you personally had been involved in in the past?

3  A.   Yes.

4  Q.   Had you ever been to this company Renewal Arts before?

5  A.   No.

6  Q.   Had you taken part in any plans involving a shakedown of

7  that company, personally?

8  A.   No.

9  Q.   So there's no mistake about it, when Mr. Chiodo asked you

10  to go visit Renewal Arts that day with other members of your

11  crew, you agreed to go and participate in giving a beating to

12  a person, is that correct?

13  A.   Yes.

14  Q.   You didn't even know who that person was at that time?

15  A.   No.

16  Q.   But you agreed to go nevertheless, is that right?

17  A.   Yes.

18  Q.   You testified that there was several others that traveled

19  with you that day?

20  A.   Yes.

21  Q.   Did you all travel to Renewal Arts in the same manner?

22  A.   We went in two cars.

23  Q.   In two separate cars?

24  A.   Yeah.  I believe so, yes.

25  Q.   I would like you to turn your attention back to the

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 7

Carew/direct/O'Connell                                    660

1  events of that day, upon your arrival, and describe for the

2  jury as best as you can recall what happened, what you did and

3  what the other members of your crew did that day?

4  A.   Well, we entered the building.  We went into the offices

5  that were Renewal Arts and Mr. Chiodo confronted some people

6  in the first office and he was looking for this guy that we

7  were supposed to give a beating.  And in the beginning nobody

8  would say where he was and then somebody said that he was in

9  the office and they pointed in a little hallway.

10          At that time Mike DeSantis, Richie Pagliarulo and

11  myself went into that office.  There was a guy there standing

12  -- standing -- he was behind a desk on a phone.  Mike had

13  some words with him and threw a punch at him.  I grabbed the

14  phone out of his hand and Mike and Richie started throwing

15  some punches at him.

16          After that we went back out into the hall and Pete

17  was in conversation with this other guy that he was talking to

18  there.  When we walked out, we walked right past him and we

19  off left, got back in the cars and left.  Dino was outside.

20  Q.   Mr. Carew, at the time that you walked into the office,

21  saw that person at Renewal Arts sitting at a desk, you

22  testified he was on a telephone?

23  A.   Yes.

24  Q.   Is it fair to say you ripped the telephone out of his

25  hands?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 8

Carew/direct/O'Connell                                    661

1  A.   Yes.

2  Q.   Stood right there as that man was beaten up?

3  A.   Yes.

4  Q.   Was he beaten badly?

5  A.   Yeah.  He was hit pretty good.

6  Q.   Did you see any outward signs of injury before you left?

7  A.   I really didn't notice anything.  I turned around and we

8  started to walk out.

9  Q.   Do you recall whether he was bleeding from this beating?

10  A.   I don't recall any blood.  I don't remember seeing any

11  blood.

12  Q.   While you were there that day, Mr. Carew, did you have

13  any doubt in your mind that the purpose was to instill fear in

14  that man who was given a beating that day?

15  A.   Yes.  I would feel that that was the intention.

16  Q.   Other than playing a role in the physical beating of that

17  man at Renewal Arts that day, did you have any further

18  involvement in matters dealing with that company or those

19  individuals?

20  A.   No, I didn't.

21  Q.   Now, as part of your agreement, did you enter a plea of

22  guilty relating to your role in this extortion of Renewal Arts

23  and the beating that you participated in?

24  A.   Yes.

25  Q.   You understand that that event, as the case with the

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 9  SHEET 3
662
Carew/direct/O'Connell

1 others that you have described, would be considered at the
2 time of your sentencing?
3 A.  Yes.
4 Q.  I would like to turn your attention to 1990, Mr. Carew,
5 specifically, the summer of 1990.
6       Is it fair to say that following Mr. Chiodo's arrest
7 in May 1990 that you and the other members of the crew had far
8 less contact with him?
9 A.  Yes.
10 Q.  In August of 1990, approximately August 1990, did you
11 learn that a member of your Luchese Crime Family, an actual
12 made member, named Bruno Facciola was murdered at that time?
13 A.  Yes.
14 Q.  Did you know Bruno Facciola personally?
15 A.  Yes, I did.
16 Q.  Could you tell the jury who you knew Bruno Facciola to
17 be?
18 A.  Bruno was a member of the family.  Originally he was part
19 of the Paulie Vario crew.  He worked in crap games with us and
20 he usually handled Paulie Vario's end.  He had a stable and
21 some businesses in Canarsie.
22 Q.  Was Mr. Facciola a long time member of the Luchese
23 Family?
24 A.  Yes.  Well, he -- I don't know how long.  He wasn't a
25 member that long.  But he was in the family for a lot of

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 10
663
Carew/direct/O'Connell

1 years.  He was an associate for a lot of years before he was a
2 member.
3 Q.  Based on your own personal knowledge, he was an
4 individual who had been associated with the Luchese Crime
5 Family for quite a long time prior to August 1990?
6 A.  Yes.
7 Q.  When you learned of Mr. Facciola's murder, did the fact
8 of his murder, that occurrence, become the topic of
9 conversation among the members of your crew, including
10 yourself?
11 A.  Yes.
12 Q.  Could you explain to the jury, in substance, what was
13 discussed, following your learning of this murder, among the
14 members of your crew?
15 A.  Well, a lot of guys were wondering why he was killed, if
16 he was a rat or if it was for some other reason, he was using
17 money or what.  Everybody was trying to -- they had an opinion
18 on what was the reason.
19 Q.  Not long after you learned of Mr. Facciola's murder, did
20 you have a conversation with Mr. Pagliarulo directly
21 concerning this subject matter where in he made a remark to
22 you?
23 A.  Yes.
24 Q.  As best as you can recall, tell the jury what in
25 substance you said to Mr. Pagliarulo and what he said to you

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 11
664
Carew/direct/O'Connell

1 at that time?
2 A.  Well, I asked Richie if he thought that Bruno was a rat
3 and he turned around and said I don't know if he was a rat but
4 when he saw me he tried to make a break for it.
5 Q.  Now, as of the summer of 1990 you had already been
6 involved, as you testified, in several murder plots with
7 Mr. Pagliarulo, is that correct?
8 A.  Yes.
9 Q.  Including the actual shooting of Mr. Morrissey?
10 A.  Yes.
11 Q.  At the time Mr. Pagliarulo made that remark to you
12 concerning Mr. Facciola, what did you understand him to mean
13 by that comment?
14      MR. HORLICK:  Objection.
15      THE COURT:  Read that question, please.
16      (Record read.)
17      THE COURT:  Sustained.
18 Q.  You testified that you were arrested in October 1992,
19 Mr. Carew?
20 A.  Yes.
21 Q.  Following your arrest you were incarcerated, is that
22 right?
23 A.  Yes.
24 Q.  Along with other Luchese members and associates who were
25 arrested at that time?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 12
665
Carew/direct/O'Connell

1 A.  Yeah.
2 Q.  Did there come a time when you learned, following your
3 arrest, that a dispute had developed between Mr. Pagliarulo
4 and Mr. DeSantis?
5 A.  Yes.
6 Q.  Did you have conversations with Mr. DeSantis concerning
7 this?
8 A.  Yes.
9      MR. HORLICK:  Objection.
10      THE COURT:  Come up here.
11      (Sidebar.)
12      THE COURT:  I'm not sure I understand how this is in
13 furtherance of a conspiracy.
14      MR. O'CONNELL:  May I make a proffer?
15      THE COURT:  Yes.
16      MR. O'CONNELL:  Mr. Carew will testify that
17 following their arrest he and the others still remained active
18 loyal associates and members of the Luchese Crime Family -- if
19 I'm pressed to bring that out -- that they continued to
20 exchange information concerning the Luchese Crime Family's
21 activities --
22      THE COURT:  This is Mr. DeSantis.
23      MR. O'CONNELL:  Mr. DeSantis, a member of his crew
24 and what this lead to is the following:  Mr. DeSantis and
25 Mr. Pagliarulo shared certain Luchese Family business

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 13 SHEET 4

Carew/direct/O'Connell                                    666

1   interests.  Mr. DeSantis was arrested first.  While
2   Mr. Pagliarulo remained on the street, before his
3   apprehension, a dispute arose because Mr. Pagliarulo was, in
4   Mr. DeSantis' view, mistreating his business interests on the
5   street.  That became a subject of dispute between the two
6   which led to a resolution by higher ranking members in the
7   Luchese Crime Family in a sit-down in prison, following which
8   -- and this is the punch line -- your Honor, following which
9   Mr. Pagliarulo complained to Mr. Carew that he had been
10  mistreated in this sit-down, that he was not given credit for
11  all the work he had done and that the people he had killed for
12  the Luchese Crime Family including Sonny Morrissey, with him,
13  and Bruno Facciola, among others.
14             That is what I'm leading to.  I'm trying to set the
15  context for this comment by Mr. Pagliarulo where he admits
16  directly murdering Bruno Facciola to Mr. Carew.
17             THE COURT:   Well, that part is certainly
18  admissible.  Do you want to press your objection?
19             MR. HORLICK:   Judge, yes, I would like to press my
20  objection.
21             THE COURT:   Tell me again what the question is
22  that's pending.
23             MR. O'CONNELL:   There's a preliminary question
24  setting the stage.
25             THE COURT:   Yes.  But what is the question?

            ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 14

Carew/direct/O'Connell                                    667

1             MR. O'CONNELL:   I believe it's did you learn that a
2   dispute had developed between Mr. Pagliarulo and Mr. DeSantis
3   over certain matters.  I can tailor this and keep it down to a
4   minimum without getting into the nitty-gritty of what the
5   dispute was about.
6             THE COURT:   Why don't you get to the admission of
7   Mr. Pagliarulo?
8             MR. O'CONNELL:   It would really lose its impact.
9   Ordinarily, as the jury will hear from these other witnesses,
10  they don't volunteer with great frequency their roles in
11  homicides.
12            THE COURT:   Can you ask him did you have a
13  conversation with Mr. Pagliarulo in which he brought up the
14  question that he had been treated unfairly in a sit-down as a
15  result of a dispute with Mr. DeSantis?
16            MR. O'CONNELL:   I think that would be fine to tailor
17  it down further with a couple of preliminary questions.  Was
18  there a dispute?  Did it become the subject of a sit-down?
19  Did Mr. Pagliarulo express his unhappiness with the result?
20            THE COURT:   I think I'll allow that.  Just keep it
21  to the minimum.
22            (In open court.)
23  BY MR. O'CONNELL:
24  Q.  Mr. Carew, following your arrest, without getting into
25  details, did you learn from conversations with other Luchese

            ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 15

Carew/direct/O'Connell                                    668

1   family members and associates that Mr. Pagliarulo had become
2   embroiled in a dispute with Mr. DeSantis over certain matters
3   around that time?
4   A.  Yes.
5   Q.  Did you learn that that dispute was resolved or a ruling
6   was made by certain higher ranking persons in the Luchese
7   Crime Family?
8   A.  Yes.
9   Q.  Following that ruling relating to the dispute between
10  Mr. Pagliarulo and Mr. DeSantis, did Mr. Pagliarulo express to
11  you at one time his dissatisfaction with how that dispute was
12  resolved by his superiors?
13  A.  Yes.
14  Q.  Could you, as best as you can recall, tell the jury what
15  Mr. Pagliarulo said to you after he learned that the ruling
16  concerning that dispute with Mr. DeSantis had gone against
17  him?
18  A.  Well, he said that he was being treated like shit and
19  that after all the things he did for the family, he says,
20  Tommy, you know I worked with you.  I worked with Bruno -- I
21  did a thing with Bruno and I did a lot of work for this family
22  and they are treating me like shit he says.  It wasn't right.
23  It started in with some other things that they didn't call him
24  to the legal meetings and things like that.
25  Q.  All right.  Without getting into further detail,

            ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 16

Carew/direct/O'Connell                                    669

1   Mr. Carew, you used the term "work"?
2   A.  Yes.
3   Q.  In the course of your experience and your activities with
4   the Luchese Crime Family, did you understand "work" to have a
5   certain meaning?
6   A.  Yes.
7   Q.  How was the term "work" used and what did it mean?
8   A.  It usually meant that you killed somebody.
9   Q.  Did you yourself use the term "work" when referring to
10  murder?
11  A.  Yes.
12  Q.  Did you yourself hear other individuals use the term
13  "work" when referring to murder?
14  A.  Yes.
15  Q.  Did you understand Mr. Pagliarulo to be referring to
16  murder when he used the term "work" at that time?
17  A.  Yes.
18  Q.  Who did you understand him to be referring to when he
19  made this reference to Bruno?
20  A.  Bruno Facciola.
21  Q.  Mr. Carew, turn your attention now to an earlier time
22  period, if you could collect your thoughts.  I'm turning your
23  attention now back to the summer of 1989.  I would like to ask
24  you a few questions concerning an individual named Julius
25  Calder.

            ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 17  SHEET 5

670

Carew/direct/O'Connell

1     First, did you come to learn that a person named
2  Julius Calder was murdered?
3  A.   Yes.
4  Q.   Tell the jury who Julius Calder was?
5  A.   He was a long-time associate of the Luchese Family.  He
6  was in the numbers business originally and then after that he
7  was in the heroin business.
8  Q.   Now, you testified that you learned that Mr. Calder was
9  murdered?
10 A.   Yes.
11 Q.   Did you have any role in the planning or carrying out of
12 the murder of Julius Calder?
13 A.   No.
14 Q.   Prior to Julius Calder's murder did there come a time
15 when you had a conversation with him where he informed you
16 that he owed a particular individual a sum of money?
17 A.   Yes.
18 Q.   Tell the jury what Mr. Calder said to you regarding this
19 debt and who Mr. Calder explained to you he owed the money to?
20 A.   He told me he owed $8,000 to Anthony Casso and that
21 Anthony was breaking his chops for the money.
22 Q.   Prior to his murder, did you have any conversation with
23 Mr. Casso where Mr. Casso brought up the subject matter of
24 this debt or a debt that was owed to him by Mr. Calder?
25 A.   Yes.  He asked me if I had seen Red around and he told me

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 18

671

Carew/direct/O'Connell

1  that he wanted to see him.  He said he owed him some money.
2  Q.   Again, prior to Mr. Calder's murder, do you recall having
3  a conversation with Mr. Chiodo concerning Mr. Calder?
4  A.   Yes.
5  Q.   Could you tell the jury what Mr. Chiodo told you about
6  this Luchese Family associate Julius Calder prior to the time
7  that he was killed, as best as you can recall on that
8  occasion?
9  A.   He asked me if I seen him lately and where he hung out
10 and I told him where I thought -- that he hung out in a video
11 store on Fourth Avenue, near the Tiffany Diner and he hung out
12 in the Italian restaurant right across the street from the
13 Tiffany Diner on Fourth Avenue.
14     I asked him what's going on and he said that they are
15 looking to clip Red, which meant kill Red.
16 Q.   Following the time that Mr. Calder was actually killed,
17 did there come a time when you overheard certain associates in
18 your crew discussing the fact of his murder?
19 A.   Yes.
20 Q.   As best as you can recall, who do you remember discussing
21 Mr. Calder's murder with?
22 A.   Well, there was myself, Georgie Conte, Mike DeSantis and
23 somebody else.  I just can't place who it was.  I thought it
24 was Joe D'Arco, but I'm not sure.  We were outside Concept
25 Autobody.  We had just come from someplace and we were

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 19

672

Carew/direct/O'Connell

1  standing in the driveway next to Concept Autobody and Georgie
2  Conte was talking to Mike about Red and he said something
3  about that Frankie Bono didn't want to stop shooting him was
4  the remark that he made.
5  Q.   Who was Frankie Bono?
6  A.   He was a member of the family.
7  Q.   Now, you testified that you played no role in the actual
8  murder of Julius Calder or had no involvement in that episode
9  other than the extent to which you testified to this jury?
10 A.   Yes.  I didn't have nothing to do with it.
11 Q.   Am I correct that you learned of no information from your
12 crew concerning any role that Mr. Pagliarulo played, as far as
13 you know?
14 A.   As far as I know, he didn't have nothing to do with it.
15 Q.   I would like to ask you a few questions now, Mr. Carew,
16 concerning the attempted murder of Mr. Chiodo.
17     Mr. Chiodo was shot several times you learned in May
18 1991, is that correct?
19 A.   Yes.
20 Q.   Now, as of the time that Mr. Chiodo was shot in 1991,
21 what was your understanding as to what his status, Mr.
22 Chiodo's status, was in the Luchese Crime Family?
23 A.   He was a skipper, but he was on the shelf and he wasn't
24 in good graces with the bosses.
25 Q.   Had you and other members of your crew learned that Mr.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 20

673

Carew/direct/O'Connell

1  Chiodo, prior to the time he was shot, had pled guilty in
2  certain cases pending against him?
3  A.   Yes.
4  Q.   Did that become a topic of conversation among your crew?
5  A.   Yes, it did, because evidently he didn't get permission
6  from Gas and Vic before he copped out and they didn't like
7  that and that was one of the topics of conversation.
8     Then he supposedly owed some money to them and they
9  were mad that the money didn't jibe with what the figures that
10 he had put in.
11 Q.   Did you participate in planning of the shooting or the
12 actual shooting of Mr. Chiodo in May 1991?
13 A.   No, I did not.
14 Q.   Now, there came a time, did there not, following Mr.
15 Chiodo's shooting, when you and the other members of your crew
16 learned that he had survived?
17 A.   Yes.
18 Q.   Did the fact that he survived that shooting likewise
19 become a topic of conversation among the members of your crew,
20 including yourself?
21 A.   Yes.
22 Q.   And Mr. Pagliarulo?
23 A.   Yes.
24 Q.   Did you and the others discuss what Mr. Chiodo might do?
25 A.   Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 21   SHEET 6

674

Carew/direct/O'Connell

1  Q.   Explain that to the jury.

2  A.   Well, we figured that he would become an informer.

3  Q.   And cooperate with the government?

4  A.   Cooperate with the government, yes.

5  Q.   Did you and the other members of your crew, including

6  Mr. Pagliarulo, from time to time discuss what consequences

7  might fall to you, him, Mr. Pagliarulo, by reason of Mr.

8  Chiodo's cooperation?

9  A.   Yes.  We felt that he could do a lot of damage to us.

10 Q.   After this attempt on the life of Mr. Chiodo failed,

11 following the time or at or about the time that you and

12 Mr. Pagliarulo and the others engaged in the conversation

13 you've described, did there come a time when Mr. Pagliarulo

14 made a specific reference to a role he played in the attempted

15 murder of Peter Chiodo?

16 A.   Yes.

17 Q.   Where did this conversation take place when

18 Mr. Pagliarulo made these references?

19 A.   Around the corner from the Cafe Cecilia on 64 Street in

20 Brooklyn.

21 Q.   Tell the jury as best as you can recall, what

22 Mr. Pagliarulo said to you at that time around the corner from

23 the Cafe Cecilia, regarding the attempt on Peter Chiodo?

24 A.   He said that if he was one of the shooters instead of

25 being in the crash car Pete wouldn't be alive today.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 22

675

Carew/direct/O'Connell

1  Q.   You've previously made a reference in your testimony to

2  the term crash car?

3  A.   Yes.

4  Q.   Could you explain to the jury, again, what a crash car is

5  and what role, if any, a crash car would play in a murder or a

6  hit?

7  A.   Usually, what a crash car does is they block anybody from

8  following you, if there's anybody in pursuit of the guys who

9  did the work.  The crash car crashes them and let's the other

10 people getaway or he cuts them off and stops them from being

11 in pursuit.

12 Q.   Now, you testified that prior to the time when Mr. Chiodo

13 was shot in early 1991 or thereabouts he was a captain but he

14 was on the shelf, is that right?

15 A.   Yes.

16 Q.   That's your term, on the shelf?

17 A.   Yes, sir.

18 Q.   Is it fair to say that has a meaning that he was inactive

19 as captain?

20 A.   Yes.

21 Q.   Well did the Luchese Crime Family have someone take his

22 place for a time period to supervise your crew while he was on

23 the shelf?

24 A.   Yes.  For a while Frank Lastorino took care of us.

25 Q.   Now, did there come a time when the Luchese Crime Family

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 23

676

Carew/direct/O'Connell

1  administration decided to officially appoint a replacement for

2  Mr. Chiodo as captain of your crew?

3  A.   Yes.

4  Q.   Who did the administration of the Luchese Crime Family

5  select to replace Mr. Chiodo as the captain of your crew?

6  A.   Richard Pagliarulo.

7  Q.   Mr. Pagliarulo was promoted?

8  A.   Yes.

9  Q.   And became captain?

10 A.   Yes.

11 Q.   How long after the attempted murder of Mr. Chiodo in the

12 spring of 1991 was Mr. Pagliarulo made captain of your crew?

13 A.   I think it was late summer, early fall.

14 Q.   After Mr. Pagliarulo was elevated to the position of

15 Luchese Crime Family captain, did he select any particular

16 location or locations to hold meetings for the crew that he

17 supervised, your crew?

18 A.   Well, he had two places.  One was the Cafe Cecilia on

19 65th and Bay Parkway.  It was on Bay Parkway near 65th.  He

20 had another place.  He had opened a restaurant, the Cafe La

21 Gondola I think it was the name.  It was on 85th Street and

22 20th Avenue on the corner.

23 Q.   From the summer of 1991 until October 1992 when you were

24 arrested, what kinds of criminal activities did you know to

25 Mr. Pagliarulo to engage in as captain of your crew of the

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 24

677

Carew/direct/O'Connell

1  Luchese Crime Family, briefly and generally?

2  A.   Well, he still had a shylock business and he was handling

3  the construction business for the family.  He was the liaison

4  with some of the other families with the construction business

5  and the jobs that were going around and who got what, things

6  like that.

7  Q.   Was there any particular person from another crime family

8  that he would contact as liaison for the Lucheses, for

9  example?

10 A.   He was in contact with Johnny G., who was taking care of

11 the Gambino crime family construction business, things with

12 the unions.

13 Q.   Did you know Johnny G.'s last name?

14 A.   Giambola or something like that.

15 Q.   You knew him on the street as Johnny G.?

16 A.   Yes.  He hung out in a bar around Third Avenue and 83th

17 Street in Brooklyn.

18 Q.   Was there any particular associate on your crew who had a

19 close relationship with Mr. Pagliarulo that he would use from

20 time to time, more frequently than others?

21 A.   You mean towards the end?

22 Q.   Well, at any time during this time period.

23 A.   In the end Vinny Guarino was doing a lot of the running

24 around for him.

25 Q.   Vinny Guarino, is that the same Vinny Guarino you

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 25 SHEET 7

---

678

Carew/direct/O'Connell

1  referred to earlier in connection with the Martinelli murder
2  plot and his business premises?
3  A.  Yes.
4  Q.  Vinny Guarino had what street name?
5  A.  Vinny Electric or Vinny The Electrician.
6        MR. O'CONNELL:  May I approach the witness, your
7  Honor?
8        THE COURT:  Yes.
9        MR. O'CONNELL:  You can take our photo albums out.
10 Q.  First, I would like to show you 2-51.
11       Are you able to recognize the individuals depicted in
12 2-51, Mr. Carew?
13 A.  Yes.  From left to right that's Frank Lastorino, Frankie
14 Bones and Richie Pagliarulo.
15 Q.  The person that's indicated Frank Papagni, his street
16 name was Frankie Bones?
17 A.  Yes.
18 Q.  It's the same individual you heard Mr. Conte refer to in
19 connection with the Calder murder as you testified before?
20 A.  Yes.
21 Q.  If you could turn to 2-131.  You previously identified
22 the individuals in this photograph.  The one you identified as
23 Mr. DeFendis, is he one of the Luchese soldiers who
24 accompanied you and the others to Renewal Arts the day you
25 described?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 26

679

Carew/direct/O'Connell

1  A.  Yes.
2  Q.  Next to him is the person you previously identified as
3  Bruno Facciola.  Is that the individual who was murdered in
4  the summer of 1990?
5  A.  Yes.
6  Q.  Toward the end of his life, Mr. Carew, prior to the time
7  that he was murdered, did you personally know of any change in
8  his physical well-being or health?
9  A.  I know he was sick.  I think he had a serious operation
10 at one time.
11 Q.  Turn your attention to 146, 2-140.  You previously
12 identified in this photograph Mr. Chiodo and Mr. Guarino?
13 A.  Yes.
14 Q.  Is that the same Vincent Guarino or Vinny Electric that
15 you have testified about today?
16 A.  Yes.
17 Q.  Turn to 2-142.  Again in 2-142 you previously identified
18 Mr. Guarino and Mr. Pagliarulo?
19 A.  Yes.
20 Q.  That's the same Vinny Electric that you testified became
21 very active with Mr. Pagliarulo?
22 A.  Yes.
23 Q.  Towards the end?
24 A.  Yes.
25       MR. O'CONNELL:  Your Honor, I will be referring now

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 27

680

Carew/direct/O'Connell

1  to certain documents that are in evidence in the 79 series,
2  the Casso records.  The jury has copies of these.
3  Q.  Turn to 79-A-7-C.
4        MR. O'CONNELL:  May I approach the witness, again,
5  your Honor?
6        THE COURT:  Yes.
7  Q.  I know I'm standing close to you, Mr. Carew.  I'll remind
8  you to keep your voice up if you could so that the jury can
9  hear you.  Direct your voice to them, not just to me.
10       Turning your attention to 79-A-7-C.  This is one of
11 many documents that are in evidence and it's stipulated were
12 recovered from Mr. Casso's residence at the time of his
13 arrest.
14       You've had an opportunity to examine this document
15 prior to testifying today, is that correct?
16 A.  Yes.
17       THE COURT:  See that last juror over there?
18       THE WITNESS:  Yes.
19       THE COURT:  Speak to him so he can hear you.  I can
20 barely hear you.
21       THE WITNESS:  Okay, your Honor.
22       THE COURT:  His ears are younger than mine.
23 Q.  Now, in the course of your dealings with various members
24 and associates of the Luchese Crime Family, did you become
25 familiar with who occupied certain positions of authority in

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 28

681

Carew/direct/O'Connell

1  the Luchese Crime Family as captains, for example?
2  A.  Yeah.
3  Q.  Turning your attention to about the time of your arrest
4  in 1992, were you familiar generally with certain individuals
5  who occupied that high ranking position of captain in the
6  Luchese Crime Family?
7  A.  Yes, in most cases.
8  Q.  Keep your voice up, please?
9  A.  In most cases, yes.
10 Q.  Turning your attention to Government's Exhibit 79-A-7-C,
11 directing your attention to the center of that document, I
12 would like you to start from right to left.  There's indicated
13 a name Sal, is that correct?
14 A.  Yes.
15 Q.  Did you know of any person in the Luchese Crime Family
16 who held the position of captain who had the name Sal at or
17 about that time?
18 A.  Yes.
19 Q.  Who was that?
20 A.  Sally Avellino.
21 Q.  Next to the left of that name is the name Steve.  Did you
22 know anyone in the Luchese Crime Family who held that position
23 of captain in the Luchese Crime Family with the name of Steve?
24 A.  Yes, Stevie Corrao.
25 Q.  Turning your attention down the page further did you know

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 29  SHEET 8

682

Carew/direct/O'Connell

1  of any person in the Luchese Crime Family who held the
2  position of captain who had the name Joe G?
3  A.    Yes, Joey Giampa.
4  Q.    Next to that is the Bronx, did you know of any connection
5  between Joey Giampa and the Bronx?
6  A.    Yes.
7  Q.    What was that?
8  A.    Joey was captain of a crew that came from the Bronx.  It
9  was originally Mikey Salerno's crew and Mikey was killed and
10 Joey G took the crew over.
11 Q.    Under Joey G further down is a reference to New York.
12 There's a reference to New Jersey.  Was there a crew that
13 operated in New York and New Jersey?
14 A.    Yes.
15 Q.    Was there a crew that had as its captain a person named
16 Anthony Bowat?
17 A.    Yes, Anthony Baratta, Bowat, yes.
18 Q.    He held the position of captain?
19 A.    Yes.
20 Q.    Turning your attention to the top of the page, the first
21 name on the left on the top, do you see the name Danny?
22 A.    Yes.
23 Q.    Did you know of any person who held the position of
24 captain in the Luchese Crime Family named Danny?
25 A.    Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 30

683

Carew/direct/O'Connell

1  Q.    Who was that?
2  A.    Danny Cutaia.
3  Q.    Did you know of any person in the Luchese Crime Family
4  named George who held the position of captain?
5  A.    Yes.
6  Q.    Who was that?
7  A.    Georgie Neck, Georgie Zappola.
8  Q.    Turning your attention again to the center of that page,
9  do you see the name Richie to the left of the center?
10 A.    Yes.
11 Q.    Did you know of any person in the Luchese Crime Family
12 who held the position of captain?
13 A.    Yes, Richie Pagliarulo.
14 Q.    Turning your attention to the two columns of names in the
15 upper portion of Government's Exhibit 79-A-7-C, under the name
16 Danny are a list of names?
17 A.    Yes.
18 Q.    Go through each one and tell the jury whether you knew
19 who that individual was and whether there was any connection
20 between that person and Danny.  First, did you know of a Sal
21 Boy?
22 A.    Yes, that's his son, Sally.
23 Q.    There appears to be a Fat A N T E, did you know of a
24 person who had that name?
25 A.    Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 31

684

Carew/direct/O'Connell

1  Q.    Who was that?
2  A.    That's a fellow that was around the Canarsie crew, I
3  think -- I think Anthony and his last name began with a G.
4         THE COURT:  Can you stand back there?
5         MR. O'CONNELL:  Yes, your Honor.
6  Q.    Go through each name on the left-hand column and keep
7  your voice up.
8  A.    Petey V is Pete Vario.
9         Pete the killer is the next guy.
10        Tommy Red is the next guy.
11        They are all -- they were all members under Danny.
12 Patty Air I think it might be Patty Dellarusso and Patty Cars,
13 might be Patty Testa.
14 Q.    Did Patty Testa have any connection to the car business?
15 A.    Yes.
16 Q.    What was that?
17 A.    He had a used car lot on Foster Avenue and a body shop on
18 89th Street, down the street from the used car lot.
19 Q.    Okay.  Next is a Louie.  Did you know of a Louie in the
20 Canarsie crew with Danny Cutaia?
21 A.    There's a Louie and then there's a Ray underneath it.  It
22 might be Louie Daidone and Ray Argentina, but I'm not sure of
23 that.  Louie I thought had his own crew.
24 Q.    There's a Frank W A P?
25 A.    Yes, Frank The Wap.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 32

685

Carew/direct/O'Connell

1  Q.    Who is that?
2  A.    He's a long-time member.  At one time, he was acting boss
3  of the crew when Paulie Vario was in jail.  He's in jail
4  himself, I believe, now.
5  Q.    All persons, did you know them at or about the time we're
6  talking about, late 1992, to be actual made members?
7  A.    Yes.
8  Q.    Not associates?
9  A.    No.
10 Q.    Turn your attention to the column under the name George?
11 A.    Yes.
12 Q.    You knew of a George Zappola, who was a captain, is that
13 correct?
14 A.    Yes.
15 Q.    What crew did he pick up as captain, which crew did he
16 head?
17 A.    I think they put the crew together to make a crew for him
18 out of the guys that were relative new members, but I don't
19 know who had it before him.
20 Q.    Could you review the names under the name George, and
21 tell the jury what names you recognize to be names of made
22 members of the Luchese Crime Family under that name George?
23 A.    Well, L. George, that is probably Little George, that's
24 Georgie Conte.  The next guy I think is Frankie Bones, and
25 Frankie Papagni.  Frankie Giota would probably the next

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 33 SHEET 9

606

Carew/direct/O'Connell

1  guy. Anthony B.L. might be Anthony Blue Eyes. Patty I'm not
2  sure of. Jimmy Frog was a guy that hung out with Little
3  Georgie. I'm not sure if he was a made member or not. I
4  think he was.
5  Q.   Did you know of a guy with a street name Frog, or
6  something like that?
7  A.   Yes.
8  Q.   What name was that?
9  A.   It was Froggie.
10 Q.   Froggie?
11 A.   Froggie. That was his nickname.
12 Q.   Could you go to the next name?
13 A.   Tony Albanese. Tony I'm not sure of. Frankie Bola I
14 know. And Big Mike, it could be any one of a couple of guys.
15 I don't know which one it is.
16 Q.   Who did you know by Big Mike?
17 A.   Mikey DeSantis. He was around us.
18 Q.   Did you know of any other Big Mikes?
19 A.   Mikey Spinelli. I don't know at the time if he was made
20 yet.
21 Q.   As you testified, there came a time when he was made. Is
22 that correct?
23 A.   Yes.
24 Q.   Now, under the name Richie, there's a name Vinny with a
25 question mark?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 34

607

Carew/direct/O'Connell

1  A.   Yes.
2  Q.   You previously testified that a close associate, at or
3  about this time, of Mr. Pagliarulo was Vinny Electric Guarino?
4  A.   Yes.
5  Q.   In the course of your experience in the Luchese Crime
6  Family, did you come to learn, Mr. Carew, of certain
7  procedures that were used when associates were proposed for
8  membership?
9  A.   Yes.
10 Q.   In fact, did you learn that their names were circulated
11 among the organized crime families in lists?
12 A.   Yes.
13 Q.   Did you ever personally, as an associate of the Luchese
14 Crime Family, circulate such lists?
15 A.   No.
16 Q.   I'll show you several documents that were seized from
17 Mr. Casso's residence, at the time of his arrest in 1993, that
18 are in evidence.
19      First, I'll turn your attention to 79-A-10-C.
20      MR. O'CONNELL:   May I approach, your Honor?
21      THE COURT:   Yes.
22      You'll have the originals of these with you in the
23 jury room, members of the jury, when you go to deliberate.
24 They are somewhat easier to read than the xeroxes.
25 Q.   Again, this is a document which was seized from

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 35

608

Carew/direct/O'Connell

1  Mr. Casso's residence in January 1993.
2       Mr. Carew, I just asked you to review, starting with
3  the left column and then turning your attention to the right
4  column, the names on that list, and explain to the jury
5  whether you knew these persons and when you knew them to be,
6  starting with Anthony Grado?
7  A.   Yes, Anthony Grado was the guy Fat Anthony, I believe in
8  Danny Cutaia's crew. I think that's who they are referring to
9  when they said Fat Anthony. Salvatore Cutaia is Sally Boy on
10 that list. That's Danny's son.
11      James Gallione, that's Froggie, the guy that's marked
12 F R O G.
13      Raymond Rescildo I don't think I know.
14      Frankie Rosati I can't place. And Mike Spinelli was
15 "Mikey" around us.
16 Q.   Turning your attention to the column on the right?
17 A.   Yes.
18 Q.   Do you recognize any of those names and know who those
19 people were?
20 A.   Yes.
21 Q.   Could you explain to the jury one by one who they were or
22 are, as you knew them?
23 A.   Sammy Graffiolto was a guy they called Sammy Black. He
24 was a member with the family. He died a few years back. He
25 was from the Brooklyn Canarsie area.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 36

609

Carew/direct/O'Connell

1       Nunnzie Arra was one of the Harlem guys. He hung out
2  up on 116th Street.
3       Petey DePalermo, he's dead also. Nunnzie, and Petey
4  DePalermo was Petey Beck. That's Joe Beck's brother. He died
5  a few years back.
6       The next guy I didn't know, at least I can't tell by
7  his name.
8       Joe Fragipane and Joe Capra are guys that were
9  members, and they are dead, as far as I know.
10 Q.   If you could turn to 79-A-7-D.
11      On this slip of paper, again, there are two columns
12 of names. Could you review the first column on top, and go
13 through each one and tell the jury whether you knew these
14 individuals and who you knew them to be, and whether they had
15 any connection to the Luchese Crime Family?
16 A.   The first guy I'm not sure of. The second guy is Peter
17 Argentina. He's Ray Argentina's brother.
18      Fat Tommy D'Ambrosio.
19      Frankie Gioia, Junior, he's one of the guys that was
20 on that other list.
21      Joseph Tortorella, he's Tortie's son from New York.
22      Enzo Napole, he's a guy that is a friend of
23 Richie's. He was around the crew for a long time. He's an
24 Italian guy from the other side.
25 Q.   What do you mean "the other side"?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 37 SHEET 10                                690

Carew/direct/O'Connell

1  A.  He's from Italy.  He speaks with an accent and
2  everything.
3          Joey Calabrese.  Joey.  That's Richie's cousin.
4  Jody.  And Whitey Capella, Gregory Capella.
5  Q.  Whitey Capella is an individual you referred to
6  previously when you described the various attempts to kill
7  Joseph Martinelli?
8  A.  Yes.
9  Q.  Turn your attention to 79-A-18-8.
10         THE COURT:  Is that the one that's headed "Deads"?
11         MR. O'CONNELL:  Yes, your Honor.
12  Q.  Could you quickly review 79-A-18-8, and tell the jury
13  whether you are familiar with any of names of these persons
14  listed under the column "Deads" and their status in the
15  Luchese family?
16  A.  Yes, I know some of them.
17  Q.  Review them, please?
18  A.  Anthony Stabile is Anthony Blue Eyes.  I testified that I
19  set him in prison in the early 60's.  He later became a member
20  in the family.  He was later killed.
21          The Saccos, I knew them to be, you know, old-time
22  members.  Petey Barbera, I didn't know him, but I heard of
23  him.
24          Salvatore Pellegrino, I didn't know.
25          Joey Falzone I didn't know.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 38                                         691

Carew/direct/O'Connell

1          Joe Spatara I didn't know.
2          Joe Zaza I knew.
3          Paulie Vario I knew.  He was a captain in a crew.  He
4  ran the Canarsie crew for a lot of years.
5  Q.  When you say "Joey Zaza," is that the name Zaza
6  Giambalvo?
7  A.  I think so.
8  Q.  You knew Joey Zaza?
9  A.  Yes.
10  Q.  Is he dead?
11  A.  No.  He can't be the same guy.
12  Q.  You knew Paulie Vario?
13  A.  Yes.  He was the captain of the Canarsie crew for a lot
14  of years.
15  Q.  Is he dead?
16  A.  Yes.
17          Nunzio Arra, he was on one of the other lists I
18  testified earlier.  He's dead.  He came from 116th Street.
19          Petey DePalermo, that Joe Beck's brother.
20          Lennie Pizzolato, he is from the Jersey crew.  In
21  fact, one of the meetings we had with the Jersey crew, we were
22  trying to make peace with them.  He came.
23          Joe Sciavo I didn't know.  Michael LaRossa I didn't
24  know.  Vincent Rao, I knew him, he was an old-timer.  Tommy
25  DioGuardia.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 39                                         692

Carew/direct/O'Connell

1  Q.  Is he dead?
2  A.  Yes.
3  Q.  Are there any you knew of that are not dead?
4  A.  I know a lot of guys here.  I couldn't say if they were
5  dead or not.
6  Q.  I'm asking you with respect to the persons you recognize?
7  A.  Everyone I recognize on there is dead.  Willie LoCasio is
8  Willie Brown, he's dead.  Joe and Frankie Peck are dead.  He's
9  dead.  Sam Cavelieri, he used to be a skipper with the crew.
10  He had a pet store up in Harlem on Second Avenue.  Vince
11  Foccari, that's Vinny Beans.  He was the consigliere before
12  Christy Tic got it.  That's it so far.
13          Do you want me to go to the back?
14          THE COURT:  Wait until he asks you a question.
15          (Continued on next page.)
16
17
18
19
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 40                                         693

Carew-direct-O'Connell

1  EXAMINATION CONTINUES
2  BY MR. O'CONNELL:
3  Q.  If you will turn your attention to the book and review
4  the document in the same manner?
5          MR. O'CONNELL:  The back portion appears, Your Honor,
6  on the Xerox copy, the lower portion.
7          THE COURT:  Yes.
8          MR. O'CONNELL:  The same page on the lower portion.
9  A.  Louie Foccari, that's Louie Beans, Ben's brother.  He was
10  a member.  He's dead.
11          And Tom DiDinato, Big Tom.  He was with us and he's
12  dead.
13          The -- Salvatore Shillitani and Philly, I know
14  Salvatore.  I know him.  The other guy I don't know.
15          And Joey Blue Eyes and Anthony Mangana, I'm not sure
16  unless -- the only Anthony I would know of is Anthony Blue
17  Eyes.  If he was Anthony Mangana.
18  Q.  Did you know a Joey Blue Eyes?
19  A.  No.
20  Q.  Now, in the lower -- off to the left, next to the name
21  Salvatore Shillitani?
22  A.  Yes.
23  Q.  Off to the left of that there is a -- a comment used on
24  dead list.
25  A.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 41  SHEET 11

694

Carew-direct-O'Connell

1  Q.   Off to the right there is a have two coming.  Do you see
2  that?
3  A.   Yes.
4  Q.   In the course of your many, many years experience as you
5  have testified and your association with the Lucchese Crime
6  Family, did you come to learn about a certain procedure that
7  had to be followed in making new members that was used as a
8  form of control on the total number of members each family was
9  permitted to have?
10  A.   After they opened the books, from '57 to mid-'70s, the
11  books were closed and there was no members made.  Unless it
12  was a special thing, you know, like --
13  Q.   Keep your voice up, please.
14  A.   After they opened the books, everybody got allowed to
15  make a certain amount of people and after that, you had to
16  have somebody die or be, you know, sick or retired, where
17  otherwise you couldn't make any -- you know, any new members
18  and you had -- if someone died you had a spot open that you
19  could make another guy and put him in that spot.  It kept a
20  balance like where everybody, that nobody got ahead of each
21  other in the crews, you know, the different families.
22        MR. O'CONNELL:  One moment.
23        THE COURT:  Yes.
24        (Pause.)
25        MR. O'CONNELL:  Your Honor, I have no further

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 42

695

Carew-cross-Horlick

1  questions.
2        THE COURT:  All right, Mr. Horlick?
3        MR. HORLICK:  Yes.
4        Thank you, Judge.
5  CROSS-EXAMINATION
6  BY MR. HORLICK:
7  Q.   Mr. Carew, am I correct that you did not prepare any of
8  these lists that are in the book that you just testified
9  about?
10  A.   Yes, I did not prepare.
11  Q.   You were not present when anyone else prepared those
12  lists?
13  A.   No, I wasn't.
14  Q.   You don't know what year any of those lists were
15  prepared?
16  A.   I do not.
17  Q.   You don't know what purpose any of those lists served to
18  whoever prepared them?
19  A.   I -- I can imagine what they are, from what -- you know,
20  what the procedures are.
21  Q.   You can imagine what they are?
22  A.   Yes.
23  Q.   But nobody told you, no one in the Lucchese Crime Family
24  ever sat down with you and discussed these particular pieces
25  of paper with you, did they?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 43

696

Carew-cross-Horlick

1  A.   No.
2  Q.   Nobody ever told you that you were carrying a list of
3  replacements or new members, did they?
4  A.   No.
5  Q.   You never did that?
6  A.   Did what?
7  Q.   Carried a list to circulate among crime families?
8  A.   No, I never did.
9  Q.   Of proposed new members?
10  A.   No.
11  Q.   You wouldn't have any idea of your own knowledge what
12  such a list looked like, would you?
13  A.   Not really.
14  Q.   So you are not telling us that any of these documents
15  that you looked at for the first time were used for any
16  particular purpose?
17  A.   No.  I only could tell you what they look like.
18  Q.   You can tell us if you recognize a name, whether it is
19  written in hand or it is typed?
20  A.   Yes.
21  Q.   And you can tell us if you knew that person, whether he
22  is presently dead or alive?
23  A.   Right.
24  Q.   Can you tell us anything else of your own knowledge about
25  any of those documents that you looked at?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 44

697

Carew-cross-Horlick

1  A.   Well, it looks like that some of them are replacements
2  for dead guys to be made.
3  Q.   You can look at the piece of paper and understand that
4  because it says replacements?
5  A.   Yes.  That's what I thought it -- it would mean.
6  Q.   You thought it might mean that?
7  A.   That's that I think it means, yes.
8  Q.   Even as you sit here now, you are not sure that that's
9  what it means?
10  A.   I can't really be sure, no.
11  Q.   So you are speculating upon what these names and these
12  procedures are, is that right?
13  A.   Yes.  To the best of my knowledge, that's what it is.
14  Q.   In the lower right-hand corner of one of those it said
15  "have two coming."
16        Do you remember reading that a moment ago?
17  A.   I think next to one of them it said "have two coming."
18  Q.   And nobody ever told you what that meant, did they?
19  A.   No, other than that the fact that if somebody dies, you
20  have a spot open and you have some -- you have a spot open to
21  put a new member in.
22  Q.   So you understood that reference "have two coming" to
23  mean that there would be two more people about to die?
24  A.   No.
25        I understood it that there was two guys had died

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

**PAGE 45   SHEET 12**

690

Carev-cross-Horlick

1 somewhere along the line and that there was two coming, that
2 they had two spots open.
3 Q.   Now, the first time you saw these documents, these pieces
4 of paper, was not after you started to cooperate with the
5 government, is it?
6 A.   No.
7 Q.   You saw them when you were in jail, didn't you?
8 A.   Some of them, yes.
9 Q.   Some of them were given to you by your lawyer, by other
10 defendants that you talked to in jail, isn't that right?
11 A.   Yes.
12 Q.   And you went over these lists?
13 A.   Casually, yes.
14 Q.   Casually.  You picked up a piece of paper and you said,
15 hey look, there is Mr. and Mrs. Spinelli, they are on a list?
16 A.   Yes.
17 Q.   Isn't that right?
18 A.   Yes.
19 Q.   One of the people you spoke to while you were in jail was
20 Anthony Casso, wasn't it?
21 A.   Yes.
22 Q.   Did you say to Anthony Casso, look at this list.  What
23 does it mean?
24 A.   I don't think I went over that with him.  It was kind of
25 a touchy subject so we didn't get into it.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

**PAGE 46**

699

Carev-cross-Horlick

1 Q.   Touchy subject that he had all these documents laying in
2 his house?
3 A.   Yes.
4 Q.   And no one even knew what year they were prepared.  Did
5 you ask them that?
6 A.   I didn't ask him nothing.  He was the underboss and it
7 wasn't my place to get in his face and ask him any kind of
8 questions about that.  It was up to the lawyers to discuss
9 that I thought.
10 Q.   So you didn't want to ask the man who had these documents
11 in his possession when they were prepared or for what purpose?
12 A.   I didn't want to ask him, no.
13 Q.   And you never asked that question of Anthony Casso?
14 A.   No.
15 Q.   Now, you told us -- let's see what that word was.  That
16 there were people that obtained a high ranking position of
17 captain.  You gave us names from the lists of people who
18 attained that high ranking position, is that right?
19 A.   Yes.
20 Q.   Did they have anything to do with running the Lucchese
21 Crime Family, those high ranking captains?
22 A.   With the overall decisions, no.  They just ran their
23 crews and reported to the bosses.
24 Q.   Who ran the family and who made the -- those decisions?
25 A.   The bosses or the administration made most policy

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

**PAGE 47**

700

Carev-cross-Horlick

1 decisions.
2 Q.   Most policy decisions?
3 A.   Yes.
4 Q.   What policy decision do you know of that someone other
5 than a boss, an underboss or a consigliere made?
6 A.   Well, as far as a guy's family, a captain takes care of
7 their own family.  Then they go up to the administration if
8 there is anything really important.  They -- they have to get
9 it approved from the administration or the -- or the bosses.
10 Q.   Is it fair to say, Mr. Carew, that in all of your
11 experience, the Lucchese Crime Family, the boss made the
12 decisions?
13 A.   Major decisions, yes.
14 Q.   And the captains were so afraid of the boss that they
15 wouldn't do anything without conferring with the boss or the
16 underboss first, isn't that true?
17 A.   On major decisions, yes.  Bosses were the only ones that
18 could usually order hits and things like that.
19 Q.   There was never a murder ordered by a captain that you
20 know of?
21 A.   Not without getting an approval first.
22 Q.   Approval from the administration?
23 A.   From the -- the administration or the boss.
24 Q.   What was the administration of the Lucchese Crime Family
25 while you were with it?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

**PAGE 48**

701

Carev-cross-Horlick

1 A.   The -- the boss, underboss and consigliere was the three
2 positions of power, other than the -- the general captains.
3 Q.   Now, in May of 1990, Peter Chiodo was your captain, is
4 that right, even though you were an associate of the family?
5 A.   Yes.
6 Q.   Until the time of his shooting?
7 A.   Yes.
8 Q.   And at that time Vic Amuso was the boss?
9 A.   Yes.  Vic was on the lam at that time.  I don't know -- I
10 just can't place at the time if there was an acting boss.
11 Al.  Al was an acting boss.
12 Q.   Al D'Arco?
13 A.   Yes.
14 Q.   Who was the underboss at that time, May of 1990?
15 A.   I think Anthony Casso was.
16 Q.   Anthony Casso was the underboss?
17 A.   I think so.
18 Q.   You didn't ever report directly to either of these two
19 people, did you?
20 A.   No.  Which ones?  Anthony or Vic?
21 Q.   Yes, Anthony and Vic.
22        Did you report directly to them?
23 A.   I was friendly with Anthony and sometimes we, you know,
24 on his move, I would talk directly to him.
25 Q.   Anthony Casso is the man who took away your legitimate

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 49  SHEET 13

782

Carew-cross-Horlick

1  business, wasn't he?

2  A.   Yes.  I don't know what you mean by taking it away.

3  Q.   He destroyed it for you, didn't he?  When you were making

4  a living in your legitimate business and you were not

5  associating with the family at all?

6  A.   Yes.

7  Q.   Casso saw to it that that ended, didn't he?

8  A.   Well, later on, when things got bad, he wanted his -- you

9  know, he wanted properties that the business owned that I had

10  been involved with.

11  Q.   Even while you were doing legitimate business, you were

12  connected to Casso in terms of money and property?

13  A.   This was later.  I got involved with Casso after '86.

14  And got involved with him with the property after '86 and

15  in -- in around '89 or somewheres in there, '90, I turned the

16  property over to him.

17  Q.   You ended up with nothing?

18  A.   Yes.

19  Q.   You were back to driving Peter Chiodo around?

20  A.   Well, not even too much of that.

21  Q.   Now, sir, after Peter Chiodo is shot, there is a change

22  in the family administration, is there not?

23  A.   Yes.

24  Q.   Where is Mr. Amuso at the time that Peter Chiodo is shot?

25  A.   I believe he was on the lam.

ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

PAGE 50

783

Carew-cross-Horlick

1  Q.   That means he's running away from this area that he had

2  his roots in, is that right?

3  A.   Yes.

4  Q.   He's trying to make sure he doesn't get caught by the FBI

5  or any police agencies?

6  A.   Yes.

7  Q.   Did you have any contact with him while he was on the

8  lam?

9  A.   No.

10  Q.   And was there a method for family members or designated

11  members to reach him if they had to?

12  A.   No.  There was only certain guys that used to reach him.

13  Q.   So there was not a general telephone number that was

14  known to every captain or every soldier or every associate?

15  A.   No.

16  Q.   And none of those people, the general people in the

17  family, had access to wherever Vic Amuso was?

18  A.   No, not unless he called a meeting to come in and meet

19  anybody.

20  Q.   Otherwise, there were specific individuals who had a way

21  to contact him?

22  A.   Yes.

23  Q.   Who was running the family while he was on the lam?

24  A.   For a while Al D'Arco was.  Al was the acting boss.

25  Q.   How did Al D'Arco get any power?

ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

PAGE 51

784

Carew-cross-Horlick

1  Who did he get it from?

2  A.   They -- Vic gave it to him.

3  Q.   Do you know, was Al D'Arco one of the people that was in

4  touch with Vic during this period?

5  A.   Yes, I believe so.  Yes.

6  Q.   What happened to Anthony Casso during this period in

7  terms of rank in the family?

8  A.   He was -- as far as I know, he was still underboss, but

9  he was also on the lam.

10  Q.   Did you have access to him while he was on the lam?

11  A.   Not unless, you know, he sent a message to me a couple of

12  times.

13  Q.   On a day-to-day basis, you wouldn't be able to find him

14  directly?

15  A.   No.

16  Q.   Did you know who you could go to in the family if you had

17  to get a message to Casso?

18  A.   Yes.

19  Q.   There was a designated person, as far as you knew?

20  A.   I knew that a couple of guys were in touch with him.

21  Q.   After Amuso was on the lam, was there a consigliere in

22  the family?

23  A.   No.

24       The -- I am not sure of that.  There came a time when

25  there was an administration put in, three different guys wound

ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

PAGE 52

785

Carew-cross-Horlick

1  up being part of that administration after Al D'Arco came

2  down, but I don't know who was the consigliere.  I don't

3  remember.

4  Q.   When you say "after Al D'Arco came down," what are you

5  referring to?

6  A.   When Al D'Arco became a government witness.

7  Q.   So he was no longer acting boss of the family?

8  A.   No.

9  Q.   And now you say that in place of the boss, the underboss

10  and the consigliere, there is an administration that's placed

11  in the place of the administration?

12  A.   Yes.

13  Q.   These people who become the administration as you are

14  talking about now do not become the boss, or the underboss, or

15  the consigliere, do they?

16  A.   No.

17  Q.   Who are these three people?

18  A.   There was Sally Avellino, Anthony Bowat, and Frankie

19  Castorino, I believe.

20  Q.   These three people oversaw the daily operation of the

21  Lucchese Crime Family?

22  A.   Yes.

23  Q.   And the power to kill people rested where at that time?

24  A.   I guess with the administration.

25  Q.   You don't know?

ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

PAGE 53  SHEET 14

706

Carev-cross-Horlick

1  A.   I wasn't really privy to that,

2  Q.   Now, Mr. Carev, there came a time when Peter Chiodo told

3  you that it was time to kill Sonny Morrissey.

4       Do you remember that?

5  A.   Yes.

6  Q.   And you recall specifically that after Morrissey was

7  dead, Peter Chiodo went to the body and took his wallet, is

8  that right?

9  A.   Yes.

10 Q.   Did you end up with four hundred dollars when he did

11 that?

12 A.   No.

13 Q.   Did you end up with anything?

14 A.   No.

15 Q.   Now, when he took the wallet, you and he drove back to

16 the city and you ripped everything up, is that right?

17 A.   Yes. We bent the credit cards and broke them and threw

18 them out the window and Pete ripped up the wallet and threw

19 them out.

20 Q.   Before that happened, somebody talked to you about the

21 jewelry that was on Mr. Morrissey's body, didn't they?

22 Q.

23 Q.   Someone in that room was concerned that perhaps the

24 jewelry would be a way that the body could be identified, is

25 that right?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 54

707

Carev-cross-Horlick

1  A.   Yes.

2  Q.   And they therefore decided to take the jewelry from the

3  body?

4  A.   Yes.

5  Q.   And then you found out that person said to you, I threw

6  the jewelry into the grave, isn't that right?

7  A.   Yes.

8  Q.   Did you see the jewelry?

9  A.   No.

10 Q.   Do you know what the jewelry was?

11 A.   No.  I think was a watch and a ring though.

12 Q.   Going over any of the exhibits that you ever saw while

13 you have been cooperating, while you were in jail, did you

14 ever see a list of jewelry found in the grave with

15 Mr. Morrissey?

16 A.   No.

17 Q.   This man who said he wanted to take the jewelry to

18 prevent an identification and then said I threw it in the

19 grave, what was his name?

20 A.   Mike DeSantis.

21 Q.   Did you see him throw jewelry into the grave?

22 A.   No.

23 Q.   How was Mr. Morrissey dressed on the day that he died?

24 A.   He was dressed in pants and a shirt.

25 Q.   Can you describe them in any greater detail?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 55

708

Carev-cross-Horlick

1  A.   I'm not sure.  I think they might have been brown. But I

2  don't remember.

3  Q.   Now, during the course of your time in Hidden Hills,

4  somebody mentioned that they saw a man walking with a dog, is

5  that right?

6  A.   Yes.

7  Q.   Who saw that man?

8  A.   Peter Chiodo, but he went out to tell the guy to get off

9  the property.

10 Q.   Nobody -- did you see the man?

11 A.   No.

12 Q.   Did anybody else in the room with you see the man from

13 where you were?

14 A.   I don't know.  I didn't see him.

15 Q.   There was no mention of that man other than from Peter

16 Chiodo?

17 A.   Right.

18 Q.   Now, Chiodo told you to come on that day to kill

19 Morrissey with a gun, is that right?

20 A.   Yes.

21 Q.   And you brought your own snub-nosed 38?

22 A.   Yes.

23 Q.   And that was what, a five or a six shotgun?

24 A.   I think it was a five shotgun.

25 Q.   And did you check it before you went to do this job, that

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 56

709

Carev-cross-Horlick

1  you were going to shoot a man?

2  A.   No, but I knew it was loaded.

3  Q.   You had loaded it?

4  A.   It was loaded from before, yes.

5  Q.   With five bullets?

6  A.   I believe so.

7  Q.   You had never killed a man before in your life, had you?

8  A.   No.

9  Q.   This is a special occasion for you, wasn't it?

10 A.   Yes.

11 Q.   You were going to show the Italian big guys that you were

12 as good as them?

13 A.   I wasn't supposed to be the shooter.  Richie was.  I had

14 to back him up.  So I wasn't -- I didn't have intentions of

15 showing anybody anything in the beginning.

16 Q.   You were just going to back up the person who was a

17 shooter?

18 A.   Yes.

19 Q.   Did you understand that to mean that if anything went

20 wrong and the shooter couldn't accomplish the murder, that you

21 were going to shoot the man?

22 A.   Yes, I did understand.

23 Q.   There was no doubt in your mind that when you went there,

24 there was a strong possibility at least that you might be

25 called upon to kill a person?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

710

Carew-cross-Horlick

1  A.  Yes.
2  Q.  And you said that it is Mr. Pagliarolo, this man in
3  court, who is going to be the shooter of Mr. Morrissey, isn't
4  that right?
5  A.  That's what I was told.
6  Q.  Who told you that?
7  A.  Pete.
8  Q.  Pete is the man who told you everything you know about
9  Florida?
10  A.  No.
11  Q.  Except for the two times you went there?
12  A.  No.  I had conversations with all the guys.  I had
13  conversations with Richie.  I had conversation with Mike.
14  Q.  Now you walk into this place in Hidden Hills.  You have
15  your gun in your jacket somewhere, right?
16  A.  Yes.
17  Q.  And you put the jacket down?
18  A.  Right.
19  Q.  And when Richie -- you told us he stood on the porch and
20  he waited and greeted everybody who showed up, isn't that
21  right?
22  A.  He just greeted -- what happened was, he said hello to me
23  and Pete introduced him to Sonny.  We walked inside.
24  Q.  Now, when you walk inside, you know you are in the room
25  where Morrissey is going to be murdered, isn't that right?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

711

Carew-cross-Horlick

1  A.  Yes.
2  Q.  And you saw, you tell us, Mr. Pagliarolo pull a gun out
3  of a waist band?
4  A.  Yes.  It was folded.  It was a newspaper folded around it
5  I believe and he took it out of in between the newspaper.
6  Q.  It had a silencer?
7  A.  Yes.
8  Q.  It was pretty big?
9  A.  Yes, it was pretty long.
10  Q.  He walked right up to Morrissey, didn't he?
11  A.  Yes.  He -- he took a couple of steps towards him.
12  Q.  How close was he standing when you saw him fire that gun?
13  A.  Ten feet, seven feet.  Something like that.
14  Q.  Ten feet away from Mr. Morrissey?
15  A.  Yes.  Seven to ten feet.  Something like that.
16  Q.  He fires the gun twice?
17  A.  Yes.
18  Q.  Morrissey drops to the ground?
19  A.  Yes.
20  Q.  And now --
21  A.  First he says -- first he says he wasn't -- when he seen
22  the gun, he turned around and saw the gun and he said I ain't
23  no rat.
24  Q.  He didn't say don't shoot me?  He didn't say don't murder
25  me?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

712

Carew-cross-Horlick

1  A.  No.
2  Q.  He didn't say please let me go.  I have a family.  He
3  said I'm not a rat.
4  A.  Yes.  He said I'm no rat.
5  Q.  And then he's shot?
6  A.  Richie shot him, yes.
7  Q.  The man is laying on the ground?
8  A.  Yes.
9  Q.  He's moaning and groaning?
10  A.  Yes.
11  Q.  And he tells you or he tells everybody, it hurts, finish
12  the job?
13  A.  He said it hurts.  Finish me.
14  Q.  So you went to your coat and you took out your 38?
15  A.  Yes.
16  Q.  Isn't that right?
17  A.  Yes.
18  Q.  Because you knew that his gun was fouling up.  It was
19  jammed.  It won't fire again?
20  A.  He was trying to unjam it.
21  Q.  He was trying -- so you knew that he wasn't going to fire
22  that gun for a while.  Maybe not at all.  Isn't that right?
23  A.  Yes.
24  Q.  So now --
25  A.  I wasn't sure.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

713

Carew-cross-Horlick

1  Q.  So now you are the shooter, is that right?
2  A.  Yes.
3  Q.  You are about to kill your first human being, is that
4  right?
5  A.  Yes.
6  Q.  You understand that when you are standing over this body
7  on the floor, don't you?
8  A.  Yes.
9  Q.  You pull out your gun and you fire the gun to kill the
10  man, isn't that's right?
11  A.  I shot at him a few times.
12  Q.  You shot at him?
13  A.  Yes.
14  Q.  Where did you hit him?
15  A.  I don't know.  I hit him -- I was aiming for his body.
16  Q.  You are the man that fired the gun into his right leg,
17  aren't you?
18  A.  I don't know where it went.  He was laying on the ground
19  and I shot at him.
20  Q.  Then you fired a shot into his left leg, didn't you?
21  A.  I don't know where they --
22  Q.  Didn't you watch your handiwork?
23  A.  I was standing there but in -- in the way the whole thing
24  took place, in the excitement of it I just kept shooting until
25  Richie went like that.  He had his gun unjammed.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 61  SHEET 16

Carew-cross-Horlick
714

1  Q.  You kept shooting until the gun was empty, didn't you?
2  A.  No.
3  Q.  You had more bullets left?
4  A.  I think there was one more but I am not sure.
5  Q.  You don't even know?
6  A.  No.
7  Q.  You couldn't even see where you were firing your own gun?
8  A.  No I could see.  I was -- I was only a few feet away.  I
9  was maybe seven, eight feet away.
10 Q.  Did you hit him any time?
11 A.  Did I --
12 Q.  Any of those bullets that you fired, the first shot that
13 you fired?
14 A.  Yes.
15 Q.  Did that hit him?
16 A.  Yes.
17 Q.  How do you know?
18 A.  I think it did.  I didn't go examine it but later on I
19 saw holes in him.
20 Q.  Did you see a hole when you fired that first shot?
21 A.  No.  I wasn't really looking.  I just was shooting.
22 Q.  You weren't looking at him?
23 A.  I was looking at him but I wasn't looking for the holes.
24 I mean, you just asked me if I saw holes.
25 Q.  Were you standing over a man who is on the floor and you

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 63

Carew-cross-Horlick
716

1  Q.  So you -- you do the same thing again.  You look down,
2  you see him, you fire.
3  A.  No.  He was moaning after I finished, after Richie went
4  like this.
5  Q.  So you fired all your shots?
6  A.  I fired -- I think four shots.
7  Q.  You don't know where they went?
8  A.  I they went into his body.  I was right close to him.
9  Q.  You were too close to see where they went?
10 A.  Not that I was too close to see.  I just don't know where
11 they went.
12 Q.  Now Richie says to you with a hand motion?  You don't
13 have to do this anymore, I'm ready to finish the job?
14 A.  He just went like that.
15 Q.  This man is -- has already been shot, let's see, twice by
16 Richie you told us, four times by you?
17 A.  Yes.
18 Q.  And now stop, don't have to do it anymore.  I am going to
19 do it.
20 A.  That's what happened.
21 Q.  Okay.  What did he do?  What did Richard do now?
22 A.  He took a couple of steps near him and he fired one more
23 time at him.
24 Q.  He took a couple of steps closer to Morrissey?
25 A.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 62

Carew-cross-Horlick
715

1  believe at least he's wounded severely, right?
2  A.  Yes.
3  Q.  He's not going up to run away, is he?
4  A.  I don't think so.
5  Q.  You were pretty sure he wasn't getting up, right?
6  A.  Definitely.
7  Q.  You were going to finish this job.  You were going to, in
8  your words, the man, weren't you?
9  A.  Yes.
10 Q.  The first time that you were going to murder a man, gun
11 in hand, it's loaded, you are ready to go.  You look down at
12 him.  You have the gun pointed out like I'm standing right now
13 with your arm extended?
14 A.  Yes.
15 Q.  Away from your own body and you can see Morrissey.  You
16 can see the gun?
17 A.  Definitely.
18 Q.  You fire it.
19 A.  Yes.
20 Q.  Can't see where the bullet goes?
21 A.  I didn't.
22 Q.  Now, is the job done?  Is he dead?
23 A.  He's moaning.
24 Q.  Still moaning.
25 A.  Like a moan is coming out of his mouth like aah, aah.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 64

Carew-cross-Horlick
717

1  Q.  And he held out the gun the way you just showed you had,
2  extended his arm?
3  A.  Yes.  And shot.
4  Q.  He fired?
5      Where did he hit him?
6  A.  He was aiming for his head.  Was close to his head.  He
7  was maybe a few feet from his head.
8  Q.  Did he hit him in the head?
9  A.  I would assume so.
10 Q.  You didn't see that either?
11 A.  The trajectory of the bullet probably would have went
12 right into his head.  He was four feet away pointing at the
13 guy's head.
14 Q.  Now this man is dead?
15 A.  He stopped moaning.
16 Q.  Still moaning?
17 A.  He stopped moaning.
18 Q.  Stopped moaning?
19 A.  Yes.
20 Q.  So he's dead.
21      Now you have Chiodo who has just come in with
22 DeSantis, right?
23 A.  Chiodo came in alone first.
24 Q.  And then DeSantis came in?
25 A.  Then he went to get Mike to bring the back hoe over.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 65  SHEET 17

                                                    718
Carew-cross-Horlick

1  Q.  And you are standing in the room with Richie?
2  A.  Yes.
3  Q.  The four of you are in this room?
4  A.  Three of us.
5  Q.  And you have Mr. Morrissey laying there dead?
6  A.  Yes.
7  Q.  When does Mr. Chiodo take his wallet?
8  A.  We were cutting the rug.  Pete went out for a while,
9  while they were digging the hole.  Then he came back in, and
10 he took the wallet.  Before we wrapped him up.
11 Q.  Now you wrapped up this man in the rug.
12 A.  Yes.
13 Q.  And you tied it with a -- some kind -- what was it?
14 A.  Wire.  It was like the phone wire, electric wire.
15 Something like that.
16 Q.  And you take the man and you put him in the hole?  You
17 bury him?
18         Now, Mr. Carew, let's go back to two minutes before
19 that.  Morrissey is laying on the rug.  You have already cut
20 this piece of rug so that it's ready to be rolled up.
21 A.  Yes.
22 Q.  Chiodo has already taken his wallet?
23 A.  Yes.
24 Q.  And DeSantis has already taken his jewelry?
25 A.  Yes, he has.

             ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER


PAGE 66

                                                    719
Carew-cross-Horlick

1  Q.  Is that the purpose, to steal all his property from
2  Mr. Morrissey, is that why he was shot?
3  A.  No.
4  Q.  Now, Morrissey is wearing a shirt and a pair of pants you
5  told us, and I assume shoes?
6  A.  Yes, I think he had loafers on.  But I am not sure.
7  Q.  Do you put a bag on his head?
8  A.  No.
9  Q.  Does Mr. DeSantis put a bag on the man's head?
10 A.  I didn't see anybody put a bag.
11 Q.  Nobody put a bag on the man's head?
12 A.  I don't know.  I didn't see anybody.  It might have been
13 but I didn't see.
14 Q.  Well, you are standing in a room.  How big is that room
15 with the body in it?
16 A.  Maybe twenty by twenty or something in that area.
17 Q.  And in this twenty by twenty room, is there a single
18 piece of furniture?
19 A.  Yes.  There are desks and a few things.  Well, there is
20 one desk and I think a couple of chairs.
21 Q.  Is there any way that anything could happen to Morrissey
22 while he's laying on the floor that you would not be able to
23 see because you were obstructed?
24 A.  No.
25 Q.  Did anybody put a bag on the man's head?

             ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER


PAGE 67

                                                    720
Carew-cross-Horlick

1  A.  I don't know.  Maybe somebody when I wasn't looking just
2  before they -- they wrapped him up.  They could have did that,
3  yes.  But I didn't see it.
4  Q.  As far as you are concerned, there was no bag ever put on
5  the man's head?
6  A.  I didn't see it.  I don't know.
7  Q.  Did you help roll up the body in the rug?
8  A.  Yes.  We all -- I helped tie.  I don't know about rolling
9  it.  I helped tie the cord.
10 Q.  You watch them roll the body up in the rug?
11 A.  I don't independently watch them roll the body up.  I
12 remember coming over and helping them tie the cord.
13 Q.  In the course of your studies prior to cooperating with
14 the government, you got a list of the materials that were
15 found with the body of Sonny Morrissey, didn't you?
16         MR. O'CONNELL:  Objection, to form of the question.
17         THE COURT:  Yes.  Sustained.
18 Q.  Did you ever see a list of the body -- of the body and
19 anything recovered at the site?
20 A.  I believe so.
21 Q.  You know from reading the material that there was a bag
22 placed around the man's head, don't you?
23 A.  I don't remember reading that.
24 Q.  You don't remember reading that at all?
25 A.  No.  I just don't recall that.

             ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER


PAGE 68

                                                    721
Carew-cross-Horlick

1  Q.  When you went to set up this murder of Mr. Morrissey, you
2  met him on some street in Manhattan with Peter Chiodo, is that
3  right?
4  A.  The day before.
5  Q.  The day before was a --
6  A.  Saturday.
7  Q.  A preliminary meeting, sidewalk meeting, is that right?
8  A.  It was in a -- in a restaurant.  In a little coffee
9  shop.
10 Q.  Someone had called Morrissey to say, come down, we have
11 to talk to you about this?
12 A.  Yes.  Pete made an appointment I think through Jimmy
13 McCarthy.
14 Q.  Jimmy McCarthy was a friend of Pete's?
15 A.  A friend of Pete's and a friend of Sonny's.
16 Q.  And a friend of Sonny's.
17         What about Paoli, who was he?
18 A.  He was Jimmy McCarthy's partner in a window business that
19 they had.
20 Q.  So on the day before you are planning the murder of
21 Morrissey, you meet with Chiodo, Morrissey and two of
22 Morrissey's friends, is that right?
23 A.  Yes.
24 Q.  These two people, McCarthy and Paoli, they don't come to
25 that site with you and Pete, do they?

             ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 69  SHEET 18

722

Carey-cross-Horlick

1  A.  What site?
2  Q.  To the meeting.
3  A.  I don't follow you.
4  Q.  When you go to the meeting the day before the murder?
5  A.  Yes.
6  Q.  You say that you and Pete go to a place on First Avenue
7  or Third Avenue in Manhattan?
8  A.  Second Avenue.
9  Q.  And you meet Morrissey?
10 A.  We meet Morrissey, Pauley Paoli and Jimmy McCarthy.
11 Q.  They are already there, the three of them?
12 A.  Yes, as I recall.  Yes.
13 Q.  The meeting that takes place on that day is not to be a
14 shooting, is it?
15 A.  No.
16 Q.  You don't have a gun that day, do you?
17 A.  No.
18 Q.  You don't know if Chiodo has a gun?
19 A.  I don't know.  I don't think so, but I don't know.
20 Q.  Now, you don't want McCarthy or Paoli to hear any of the
21 conversation you are about to have, do you?
22 A.  I didn't --
23 Q.  Or Peter Chiodo is about to have?
24 A.  Chiodo went for a walk with Sonny.
25 Q.  And left you with McCarthy and Paoli?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 70

723

Carey-cross-Horlick

1  A.  Yes.
2  Q.  And then they came back?
3  A.  Yes.
4  Q.  And Pete told you basically that he cheered the guy up.
5  He told him don't worry about the windows case.  Vic and Gas
6  are behind you and whatever you need we're going to do for you
7  and he made him feel like he was still part of the Lucchese
8  Crime Family.
9  A.  I don't know what he did as far as that's concerned.  All
10 he told me is that he made an appointment for the next day.
11 Q.  The next day was to be a day for shooting, is that right?
12 A.  Yes.  He told him to come alone, that he was going to
13 meet Vic.  That's what he told me.
14 Q.  Now, Mr. Chiodo, you testified that you, Mr. Pagliarulo
15 and Mr. Chiodo took a trip to Florida, is that right?
16 A.  Yes.
17 Q.  Was that the only time that you, Chiodo and Pagliarulo
18 went to Florida together?
19 A.  Yes.
20 Q.  Was that trip in early December of 1988?
21 A.  I'm not sure.  I think it was.
22 Q.  The purpose of that trip --
23 A.  Might have been early '89.  I am not sure.
24 Q.  The purpose of the first trip was to see a man named
25 Junior, do you remember that?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 71

724

Carey-cross-Horlick

1  A.  Yes.  When you say "the first trip," that was the only
2  trip that I made there.
3  Q.  You didn't go down to Florida with Michael DeSantis in
4  early 1989?
5  A.  Oh, yes.  I went with Mike but I'm talking about anything
6  with Pete or with the family.
7  Q.  The trip that you made in -- in early 1989 had nothing to
8  do with family business, did it?
9  A.  No.
10 Q.  That was just going down for a holiday, to have some fun?
11 A.  Yes.
12 Q.  Let's go back to the other trip, the first trip?
13 A.  Yes.
14 Q.  You are going to see a man named Junior, is that right?
15 A.  I didn't know his name at the time.  I was introduced to
16 him at the meeting.
17 Q.  All right.  Peter Chiodo tells you he's going to Florida?
18 A.  Yes.
19 Q.  And he wants you to come along with him?
20 A.  Yes.  He said he wanted us to watch his back.
21 Q.  And he says he wants Mr. Pagliarulo to go too, is that
22 right?
23 A.  Yes.  He told me Richie was going to come.
24 Q.  You are going down to see Junior, whoever he may be?
25 A.  He didn't mention the name.  He just said he had to meet

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 72

725

Carey-cross-Horlick

1  somebody for Gas.
2  Q.  Ultimately, you see on the way to Florida that he has a
3  package that's wrapped in Christmas paper?
4  A.  I didn't see it then.  I saw it with the morning that we
5  were going to the meeting.
6  Q.  And that trip is now from the -- this area, from
7  Brooklyn, down to where, what airport do you go to?
8  A.  I think we went to Fort Lauderdale.  I am not sure.
9  Q.  Did you buy the ticket?
10 A.  No, I don't think I did.
11 Q.  Do you know who bought the ticket?
12 A.  I believe Pete did but I am not sure.
13 Q.  You weren't with him?
14 A.  When he bought the ticket?
15 Q.  Yes.
16 A.  I just don't remember, you know.
17 Q.  But --
18 A.  That particular incident.
19 Q.  Anyway, you get to Florida?
20 A.  Yeah.
21 Q.  And you go in a hotel or motel?
22 A.  We went in the Marriott Hotel, I believe.
23 Q.  You stayed there until you went to meet this man Junior?
24 A.  No.
25 Q.  What did you do?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 73   SHEET 19

726

Carew-cross-Horlick

1  A.  We went out the night we got there.  We went to eat and
2  then we went to a bar and had a few drinks.
3  Q.  Socializing?
4  A.  Socializing, yes.
5  Q.  Just the three of you having a dinner and a good time
6  together?
7  A.  Yes.
8  Q.  And then the next day, did you go to Cocoanut Grove?
9  A.  Yes.
10  Q.  Did you drive there?
11  A.  Yes.
12  Q.  You rented a car?
13  A.  Yeah.
14  Q.  Did you pay for that?
15  A.  No.
16  Q.  Do you know if Mr. Pagliarulo paid or if Mr. Chiodo paid?
17  A.  I don't know who paid for it.  I think Pete paid for it
18  but I am not sure.
19  Q.  Did you fly and did you rent this car in your own name or
20  in whoever's name it was, if you know?
21  A.  I don't know.  I don't know whose name it was in.
22  Q.  Now you go to the Cocoanut Grove and you are introduced
23  by Pete to a man named Junior?
24  A.  Yes.
25  Q.  Mr. Pagliarulo is introduced to the man named Junior?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 74

727

Carew-cross-Horlick

1  A.  Yes.
2  Q.  Do you have any other conversation about that man?
3  A.  No.  Not really.  Other than, you know, the weather is
4  nice or something maybe like that.
5  Q.  You don't even know why this man Junior is meeting Pete
6  do you, at this time?
7  A.  No.
8  Q.  Pete has this present?
9  A.  Yes.
10  Q.  And he and this man Junior sit away from you?
11  A.  Yes.
12  Q.  And they look like they're talking to each other?
13  A.  Definitely, yes.
14  Q.  You can see that that Christmas present wrapping,
15  whatever that is, is passed from Pete to Junior?
16  A.  Yes.
17  Q.  And they talk a few more minutes and then you all get
18  back together and talk a few more minutes?
19  A.  Yes.
20  Q.  And you leave?
21  A.  Right.
22  Q.  What do you do with the rest of the day?
23  A.  I think we went to eat and -- that Burt Reynold's place
24  or something.  We went to have dinner there.
25  Q.  Burt and Jacks?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 75

728

Carew-cross-Horlick

1  A.  Burt and Jacks, yes.
2  Q.  That's dinner?
3  A.  Yes.  We had dinner there.
4  Q.  You do the same this evening you did the night before,
5  dinner and you go out for a few drinks?
6  A.  I just don't remember after that.  That night, what we
7  did.  I know we went home.  I think that night or the next
8  morning.  I am not sure.
9  Q.  So basically what you're telling us, you fly to Florida
10  on one day.  You meet with this man Junior and you either
11  leave later in that day or the next?
12  A.  Yes.  I believe that's what it was.
13  Q.  You don't take any time to go to find out if Accetturo
14  owns a house in Florida, do you?
15  A.  No.
16  Q.  You don't take any time to go sit and watch the front
17  door where you think Joseph La Morte lives, do you?
18  A.  No.
19  Q.  You don't meet anyone, you don't have a conversation with
20  anyone about those people at all, do you?
21  A.  No.
22  Q.  And you have no idea until Pete tells you at some other
23  time what his conversation is with Junior?
24  A.  Yes.
25  Q.  And he tells you that that Christmas wrapping thing had

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 76

729

Carew-cross-Horlick

1  fifty thousand dollars in cash in it, is that right?
2  A.  That's what he said.
3  Q.  You never saw the money, did you?
4  A.  No.
5  Q.  So there is no way for you to know of your own knowledge
6  whether or not there was really money in there or not and
7  there was nothing else said about that, was there?
8  A.  No.
9       Just he said that -- that there was -- that was the
10  money for Junior was -- was the down payment on Junior killing
11  Accetturo.
12  Q.  Right.  He said this was money that was sent down from
13  Casso or Vic or both and this is setup money so he can get
14  ready to kill Accetturo?
15  A.  Yes.
16  Q.  You don't know if that conversation ever took place, do
17  you?
18  A.  That's what he told me.  I went by that.
19  Q.  The second time you go to Florida is a little bit later,
20  early in 1989 and you go with Michael DeSantis?
21  A.  Yes.
22  Q.  Again, you don't take out time from whatever socializing
23  you are going to sit on anybody's house or to buy guns or to
24  rent cars or to do anything like that?
25  A.  No.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

Carew-cross-Horlick                                        730

1 Q.  This trip has nothing to do with family business at all?
2 A.  Nothing at all.
3 Q.  Now, you told us that while Michael Spinelli was in jail,
4 there was a ceremony held to induct him into the Lucchese
5 Crime Family, is that right?
6 A.  I believe so.
7 Q.  You weren't there?
8 A.  I wasn't there.
9 Q.  So this is again something that you heard from someone
10 else?
11 A.  Yes.
12 Q.  Do you know where the ceremony took place?
13 A.  No.
14 Q.  Do you know who attended the ceremony?
15 A.  No.
16 Q.  And but one thing you are sure of, they didn't have a gun
17 and a knife on the table when they did that ceremony?
18 A.  They might have had a knife.  I don't think they had a
19 gun.
20 Q.  Because everybody was in jail?
21 A.  Yes.
22 Q.  Now, you told us that long before you went on this trip
23 to shoot Mr. Morrissey, you were prepared to do violence as
24 part of your life as an associate in this family, is that
25 right?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

Carew-cross-Horlick                                        732

1 house.
2 Q.  Who lived with you?
3 A.  My wife and children.
4 Q.  How many children?
5 A.  One of my daughters.
6 Q.  How many children did you have at that time at home?
7 A.  Two.  One lived at home.
8 Q.  One lived at home?
9 A.  Yes.
10 Q.  And did you express to them your unhappiness of the
11 consent of having someone shot in your home, two people?
12 A.  I expressed it to Pete.
13 Q.  What did he tell you?
14 A.  He said that they want to do it, and you know.
15 Q.  That is the only place in the world that's available on
16 that day at that time to have the Accetturos shot?
17 A.  Well, to be honest with you I just didn't want to go
18 against the bosses and say no so I went along with it.
19 Q.  You knew that one of the rules, even though you weren't a
20 made member, but one of the rules that they lived by was that
21 if you said no, you would suffer a penalty, isn't that right?
22 A.  Well, I don't know about that.  That particular thing
23 for -- for not wanting somebody to get killed in your house, I
24 don't know if -- if there would have been a penalty for that,
25 other than, you know.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

Carew-cross-Horlick                                        731

1 A.  Yes.
2 Q.  And Ray Fontain came to mind, Fountain or Fontain?
3 A.  Ray Fontain.
4 Q.  That was a mediation dispute between people that you --
5 knew you and that you knew?
6 A.  Yes.
7 Q.  And you were prepared at that time you said if you had to
8 resort to violence you would have?
9 A.  Yes.
10 Q.  And of course, there was time that you were prepared to
11 allow two people from New Jersey to be murdered in your home,
12 isn't that right?
13 A.  Yes.  I wasn't happy about it but I would have let it go.
14 Q.  You were not happy that your home was going to be used as
15 a site for murder, is that right?
16 A.  That's correct.
17 Q.  And even though Peter Chiodo told you about a meeting, it
18 was Gaspipe who told you that it was a meeting and a murder,
19 isn't that right?
20 A.  No.  Gaspipe told me it was -- he wanted to have a
21 meeting at my house and then later on Pete came to me and told
22 me they wanted to use it to kill the Accetturos.  Father and
23 son.
24 Q.  Where were you living at that time?
25 A.  I was living in 39 Hanover Avenue in Staten Island was my

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

Carew-cross-Horlick                                        733

1 Q.  There were rules but then the rules had to relate to
2 specific situations?
3 A.  Not specific.  You --
4 Q.  You didn't tell your wife that there was going to be a
5 meeting in your house and two people were going to be shot but
6 don't worry.  The place will be cleaned up, did you?
7 A.  No.
8 Q.  You didn't tell her anything about the proposed murders,
9 did you?
10 A.  No.
11 Q.  You told her basically on a certain day, which I'll tell
12 you about, we need the house empty?
13 A.  Yes.  I just told her that I wanted her to go stay with a
14 friend of hers for the day, her and my daughter.
15 Q.  Your daughter was approximately how old at the time?
16 A.  Twenty-five.
17 Q.  You told your daughter the same thing?
18 A.  Yes, basically.  My wife told her.
19 Q.  Did either of them say to you, what's going to happen
20 here?
21 A.  No.
22 Q.  Did either of them ask you who might be coming over?
23 A.  No.  I just told them I was going to have some of my
24 friends over for a meeting.
25 Q.  And you told your son-in-law that you might need some

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 81  SHEET 21

734

Carew-cross-Horlick

1  cold cuts and some potato salad you said?
2  A.   Yes.  Stuff for a meal.
3  Q.   And that never happened?
4  A.   No.
5  Q.   Before the delivery of the cold cuts this meeting was
6  called off?
7  A.   Yes.
8  Q.   And somebody, either Gaspipe or Peter told you forget
9  about it?
10  A.   Yeah.
11  Q.   Now, you told us that very often when business, work was
12  going to be done, you would use, or the family would use cars
13  that were stolen or cars that had been rented with phony IDs,
14  is that right?
15  A.   Yes.
16  Q.   Why did you use stolen cars?
17  A.   For crash cars or cars that would be seen.  They would
18  use those cars.
19  Q.   Why did you use phony IDs to rent cars?
20  A.   Because in case someone seen it they couldn't trace the
21  car back to the person who took it.
22  Q.   You mean the people who were going to do murders wanted
23  to keep their identities secret?
24  A.   If you were going to do a murder, wouldn't you want to
25  keep your identity secret?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 82

735

Carew-cross-Horlick

1  Q.   So that people didn't go to Hertz to rent a car with
2  their license and their registration and their own credit card
3  when they were going to do work, did they?
4  A.   Not usually, no.
5  Q.   Not at all, isn't that right?
6  A.   No, not if the car was going to be used for a crash car
7  or anything like that.  If it was going to be in a clean
8  situation, I'm sure why not use your own.
9  Q.   What's a clean situation?
10  A.   Well, if you are not going to use it directly in a murder
11  or any kind of criminal activity.
12  Q.   In other words, if you are going to drive yourself to
13  some place and then walk ten blocks away and not have that car
14  involved in the crime, you might use your own car?
15  A.   Yes.
16  Q.   But if you have it in your mind that you are going to use
17  a car as a getaway car which might be followed or stopped, you
18  are going to use a stolen car or a rented car with a phony ID?
19  A.   In most cases, unless there was an emergency and you
20  might --
21  Q.   The information part of this is that there be no way to
22  trace the car to a Lucchese Crime Family member, isn't that
23  right?
24  A.   Basically.
25  Q.   And you said when you used cars, the rule was that you

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 83

736

Carew-cross-Horlick

1  wore either racing car driver gloves or surgical gloves?
2  A.   It's not a rule.  It's just the way that we -- that I
3  worked and a few of the other guys.
4  Q.   Wouldn't you say, Mr. Carew, that there was a certain
5  amount of common sense in doing that?
6  A.   Of course, yes.
7  Q.   You wanted to prevent any automobile that was left at a
8  scene or crashed or abandoned in a flight, you wanted to
9  prevent that from yielding a fingerprint that would lead back
10  to you or to Richie or to me or to anyone associated with this
11  venture, right?
12  A.   Yes.
13  Q.   What about the use of disguises, anybody ever use
14  disguises?
15  A.   I've heard of it, yes.
16  Q.   What kind of disguises?
17  A.   All different kinds, beards.
18  Q.   Hats?
19  A.   Hats, beards, baseball hats or regular hats.  Anything
20  that --
21  Q.   Sunglasses?
22  A.   Glasses.  Phony glasses.
23  Q.   Anything that would help an observer to be unable to
24  identify somebody?
25  A.   Yeah.  To make it more difficult.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 84

737

Carew-cross-Horlick

1  Q.   Now there came a time where you found out that
2  Mr. Martinelli had to be killed, isn't that's right?
3  A.   Yes.
4  Q.   He had to be killed because Vic and Gas said so, isn't
5  that what you learned?
6  A.   Yes.
7  Q.   And you went out and one of the many places that you
8  started to observe was his house?
9  A.   Yes.
10  Q.   Is that right?
11        And what happened at his house?
12        Did you ever see him?
13  A.   On two occasions -- one occasion we saw his car and --
14  and another occasion he parked the car and we went away to get
15  another car and when we came back his car was gone.
16  Q.   But there was an occasion when you saw him go into his
17  house, isn't there?
18  A.   One occasion, yes.
19  Q.   And you reported back to Mr. Chiodo or to Gaspipe or
20  whoever was in charge and wanted to know, the man never came
21  out of his house?
22  A.   Yes.  That's --
23  Q.   Did anybody who was waiting to commit this murder say, we
24  know Martinelli is in the house.  Why don't we just wait?
25  A.   You know when you are standing there with a gun and

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 85  SHEET 22

Carew-cross-Horlick                                                    738

1 everything, you don't want to stay there too long.  Eventually
2 somebody is liable to see you there for a long amount of time
3 and call the authorities so you try not to stay too long.
4 Q.  You mean, you were standing in the street with a gun in
5 your hand?
6 A.  No.  Parked in a car.
7 Q.  But you had guns?
8 A.  On a couple of occasions, sure.
9 Q.  Some occasions there were no guns.  It was just
10 surveillance, right?
11 A.  Right.  In the beginning that's what most of it was.
12 Q.  Most of the time when you did this surveillance, you did
13 not have guns?
14 A.  No.
15 Q.  And for the very purpose that you are talking about, in
16 case someone called the police or saw you there for too long,
17 isn't that right?
18 A.  Right.
19 Q.  You could give them any story you wanted about what you
20 were doing?
21 A.  Right.
22 Q.  Now Mr. Martinelli never coming out of his house again,
23 you decide to go to his place of business, is that right?
24 A.  No.
25       We -- they were -- they were surveilling the both

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 86

Carew-cross-Horlick                                                    739

1 houses.  The both things at the same time basically.
2 Q.  So while you were watching in-house --
3       THE COURT:  Excuse me.
4       MR. HORLICK:  I'm sorry.
5       THE COURT:  I am going to have to take another case
6 now so we will take our recess now and don't discuss the
7 case.
8       (Recess taken.)
9       (Continued on the next page.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 87

Carew-cross-Horlick                                                    740

1       (In open court; jury not present.)
2       THE COURT:  Are we ready?  Can someone call
3 Mr. Rose?
4       (Pause.)
5       THE COURT:  All right.  Are we ready to resume?
6 Would you ask the jury to join us?
7       (Jury present.)
8       THE COURT:  Please be seated.
9       All right, Mr. Horlick.
10       Sorry for that delay, members of the jury.
11 CROSS-EXAMINATION (Continuing)
12 BY MR. HORLICK:
13 Q.  Mr. Carew, we were talking about the time when you were
14 watching the home of Mr. Martinelli; do you recall that?
15 A.  Yes.
16 Q.  You said at the same time there were people who were
17 watching his place of business?
18 A.  Not at the same particular time.  At the same time that
19 we were watching the house, we were doing surveillance on the
20 business, too.  If we went to the house in the afternoon at
21 2:00 o'clock, maybe at 4:00 o'clock, maybe we went by the
22 business, something like that.
23 Q.  When you got to the place of business, you could see, on
24 some occasions, at least, Mr. Martinelli walking around
25 talking to people?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 88

Carew/cross/Horlick                                                    741

1 A.  Yes.
2 Q.  Most often when you did see him at his place of business,
3 he was with other people?
4 A.  Yes.
5 Q.  And you decided that it would be too risky to do anything
6 at that place and time because of the other people around?
7 A.  Yes.
8 Q.  You didn't want to expose yourselves unnecessarily to the
9 problem of either being caught or having people identify you?
10 A.  Well, also, if he was with any other people, that anyone
11 else would get hurt.
12 Q.  You had no intention of shooting when people came to see
13 him for business?
14 A.  Right.  That's why in a lot of cases if you couldn't get
15 him by himself.
16 Q.  There came a time when you decided, your group, that you
17 were going to use this place on Nostrand Avenue where the
18 insurance company was, is that right?
19 A.  Yes.
20 Q.  And Peter Chiodo came over and he looked at the site?
21 A.  Yes.
22 Q.  And basically you all discussed the positioning of the
23 various components of this group that would commit a murder,
24 right?
25 A.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 89  SHEET 23

742

Carew/cross/Horlick

1  Q.  You discussed where the crash car would be and where the
2  pickup car would be, is that right?
3  A.  Yes.
4  Q.  The crash car was meant to provide some delay if the car,
5  the getaway car, was followed?
6  A.  Right.
7  Q.  And the pickup car was to pick up whoever was going to do
8  the work, the shooting?
9  A.  Right, yes.
10  Q.  You looked at everything and you found that when it was
11  set up, Mr. Martinelli came in his car with his brother?
12  A.  Yes.
13  Q.  Mr. Chiodo didn't want to do it then, because his brother
14  was present?
15  A.  I don't remember if he was there at that time.
16  Q.  Didn't Mr. Chiodo call off one of these plans?
17  A.  It was called off, but I don't know -- I don't recall him
18  being there.  I think it was Richie and Mike, and they called
19  it off because he came with the brother.  I was around the
20  corner, and they came and told me that, you know, that he came
21  with the brother and they called it off.
22  Q.  You don't remember who it was that called it off?
23  A.  No.  I think it was Richie and Mike decided not to do it,
24  because he came with the brother.
25  Q.  Now, let me show you a document that is 3500-1466, and

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 90

743

Carew/cross/Horlick

1  ask you to read a paragraph on page 4.  Read it to yourself,
2  sir.
3       (Pause.)
4  Q.  Does that refresh your recollection, Mr. Carew, that Pete
5  Chiodo was on the scene at the time that Martinelli drove up
6  with his brother?
7  A.  I don't think he did.  I don't think he was.
8  Q.  Did you tell that to the FBI at some time?
9  A.  Tell what to them?
10  Q.  That Chiodo was on the scene when Martinelli drove up,
11  but because his brother was there, Chiodo called off the hit?
12  A.  I don't remember saying that Chiodo was there.
13  Q.  Do you remember Chiodo being present at that scene, at
14  the Nostrand Avenue scene, at any time?
15  A.  Yes, when we first looked at it, I know he was there.
16  Q.  And when you first looked at it, was that a surveillance
17  walk-by situation as opposed to getting ready to do anything?
18  A.  Yes.
19  Q.  So it was just to look at the scene physically so that
20  Mr. Chiodo could understand how this murder would take place
21  and how everybody would be able to get away from the scene?
22  A.  Well, he was part of the planning of it.  He would have a
23  lot to say with the planning.
24  Q.  Now, there came a time when you go back to that same
25  Nostrand Avenue address, and you have DeSantis, Michael

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 91

744

Carew/cross/Horlick

1  DeSantis, who is supposed to be a shooter, is that right?
2  A.  Yes.
3  Q.  And basically Mr. Pagliarulo, you told us -- let's not
4  forget him -- he's a backup shooter, is that right?
5  A.  Yes.
6  Q.  That's the same situation that we discussed before; if
7  for some reason DeSantis can't get the job done, then it falls
8  to Mr. Pagliarulo as the number two man, the backup man, to do
9  the job?
10  A.  Yes.
11  Q.  Now, you are driving what, is it a crash car or pickup
12  car on this occasion?
13  A.  Which occasion, the first one?
14  Q.  No.  The occasion when DeSantis is the shooter and
15  Mr. Pagliarulo is the backup; is that the first occasion?
16  A.  That's how it was on both occasions, I believe.
17  Q.  What's your job on this occasion?
18  A.  On the first occasion, I was running the block car.  In
19  other words, they would turn the corner, come past me, and I
20  would pull out in back of them.
21  Q.  That's similar to a crash car?
22  A.  Yes.
23  Q.  A crash car doesn't necessarily crash into anything?
24  A.  No.  It just runs interference.
25  Q.  Also on the scene is Greg Capella?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 92

745

Carew/cross/Horlick

1  A.  Yes.
2  Q.  He's the person you referred to as "Whitey"?
3  A.  Yes.
4  Q.  His job is to be in another car?
5  A.  Yes.
6  Q.  What is his job?
7  A.  He was, at that time, if we turned and came the other
8  way, he would pick them up on the other side.  In other words,
9  if they made a U-turn and went down Nostrand Avenue, he was on
10  the other side.  He would pick them up and go in back of them
11  that way.
12  Q.  If who made a U-turn?
13  A.  If Richie and Mike made a U-turn and went that way
14  instead of coming around the corner, Greg would pick them up.
15  Q.  If this shooting happened the way that you planned it,
16  Richie and Mike DeSantis would come running out of that
17  building?
18  A.  No.  The first time, it was outside.  They were going to
19  shoot him as soon as he came up in his car.
20  Q.  You've told us about that, and because the brother came,
21  nothing happened?
22  A.  Right.
23  Q.  The next time, you also set up at the Nostrand Avenue
24  insurance place?
25  A.  Yes, yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 93 SHEET 24

746

Carew/cross/Horlick

1 Q.  That time, what is your job?

2 A.  I'm to pick them up when they finish the job.

3 Q.  "They" meaning?

4 A.  Richie and Mike.

5 Q.  And what is Mr. Capella's job?

6 A.  He was running the interference car.

7 Q.  Now, he was in place, was he not, Mr. Capella?

8 A.  Yes.  He was on Nostrand Avenue, and as soon as he saw

9 Martinelli going into the building, he was going to move

10 around the corner, and when we came out of the driveway, he

11 would come right in back of us.

12 Q.  And you were ready to do your job, which was to pick up

13 the people -- Mr. Pagliarulo and Mr. DeSantis -- pick them up

14 when they came running out of the building?

15 A.  Yes.

16 Q.  Michael DeSantis is the shooter, is that right?

17 A.  Yes.

18 Q.  How does Michael DeSantis get to that area, if you know?

19 A.  He had another car.  He pulled up next to me, and Richie

20 and he said there was something wrong with the car.  He was

21 going to park it and see if later on he would -- he would fix

22 it later.

23 Q.  He was going to park the car on the street, because it

24 was not going to be used in this crime, isn't that right?

25 A.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 94

247

Carew/cross/Horlick

1 Q.  He drives around to find a parking spot?

2 A.  Yes.  Then he said he would meet us by the building.  We

3 went around the block a couple of times.  We didn't see him in

4 front of the building, and Richie was afraid that he was

5 inside.  He didn't want him to be alone in there and

6 Martinelli show up.

7 Q.  Richie didn't want who to be alone?

8 A.  Mike.

9 Q.  Because he thought -- I think what you are saying --

10 correct me if I'm wrong -- Mr. Pagliarulo feels at this time

11 in the street that Michael DeSantis may actually be in the

12 building?

13 A.  In the building, right.

14 Q.  And he is upset, because it's sort of out of whack with

15 the plan; they are supposed to go in together?

16 A.  Right.

17 Q.  Does Mr. Pagliarulo have a gun at this time?

18 A.  Yes.

19 Q.  Does he have that shotgun you're talking about?

20 A.  He has a sawed-off shotgun.

21 Q.  He's now wondering and you're wondering, where is

22 DeSantis, is that right?

23 A.  That's right.

24 Q.  Does the backup man now go in to do the job?

25 A.  He thought Mike might have been in there.  He told me to

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 95

748

Carew/cross/Horlick

1 drop him off and wait for him in the back, like we planned.

2 He went in.  About five to ten minutes later, maybe

3 closer to ten minutes later, he came out of the back door in

4 the alley, and I drove down and picked him up, came out of the

5 alley and went back to the neighborhood.

6 Q.  You had not heard a shotgun blast, had you?

7 A.  No.

8 Q.  You didn't hear any gunshots, did you?

9 A.  No.

10 Q.  The fact is, Martinelli never showed up, did he?

11 A.  Not that we know of.

12 Q.  So nothing happened?

13 A.  Nothing happened.

14 Q.  The only thing that happened is, Mr. Capella got in the

15 car, and he got in position, you got in a car and you got in

16 position, and you say that Mr. Pagliarulo walked into a

17 building with a sawed-off shotgun?

18 A.  Yes, wrapped up in a jacket, yeah.

19 Q.  What time was this?

20 A.  Around 7:00 o'clock at night, I would think.

21 Q.  Did you know at that time or in your prior preparations

22 whether there would be people still working in that building?

23 A.  I believe the building was occupied, yes.

24 Q.  And was there a concern that somebody might come out and

25 see people standing around with sawed-off shotguns?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 96

749

Carew/cross/Horlick

1 A.  Yes.

2 Q.  But Mr. Pagliarulo went in anyway?

3 A.  Yes.

4 Q.  And he's now lost from sight?  You don't know where he

5 is?

6 A.  No.

7 Q.  Just you know he's in the building?  You have to say it

8 out loud.

9 A.  I knew he was in the building.

10 Q.  You drive around now to where you're supposed to wait in

11 the alley?

12 A.  Yes.  I am up in the top of the alley, looking down.

13 Q.  You can see the entire length of this alley?

14 A.  Just about, yes.

15 Q.  It went from the street you were on to the next street?

16 A.  To the next street.

17 Q.  Whichever way you ended up going, you would reach the

18 street and continue?

19 A.  Right.

20 Q.  After nothing happens, you see Mr. Pagliarulo come out?

21 A.  I drive down the alley.

22 Q.  You pick him up and everybody drives away?

23 A.  Right.

24 Q.  So that as a result of all of this planning and as a

25 result of all the effort that went into it, there's nothing

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 97  SHEET 25

750

Carew/cross/Horlick

1  that went on?

2  A.  No.

3  Q.  Now, you decide that Mr. Martinelli, who has to be

4  killed, and Gas and Vic's order is going to be -- withdrawn.

5      All this time, now, you have set up at his house, his

6  place of business, and twice at this Nostrand Avenue place, is

7  that right?

8  A.  Yes.

9  Q.  None of the times that you're set up, Martinelli is in

10  position to be killed, he's with someone or he's not there?

11  A.  Right.

12  Q.  Or he doesn't show up where he's supposed to show up?

13  A.  Right.

14  Q.  Now you decide that you're going to use Vinny Electric's

15  business premises?

16  A.  Right.

17  Q.  Which looks like -- has a big pull-down door?

18  A.  Yeah.  It has a pull-down door in the front, and two

19  small doors on the side.

20  Q.  And you're going to use those premises, is that right?

21  A.  Yes.

22  Q.  And as far as you knew at that time, there was, in fact,

23  a business being operated on those premises?

24  A.  Yes.

25  Q.  Did you go to Vinny Electric to ask for keys to get into

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 98

751

Carew/cross/Horlick

1  this premises?

2  A.  No.  I believe Pete did.

3  Q.  You weren't with him?

4  A.  I wasn't with him.

5  Q.  So you don't know how he did this?

6  A.  No.

7  Q.  What you are going to do now is, you're going to set up

8  inside the building, and Pete is going to call Martinelli to

9  set up a meeting to bring him so that he can have a secret

10  meeting with Vic or Gas?

11  A.  He already had an appointment to meet him when we set up.

12  Q.  He made the appointment?

13  A.  Right.

14  Q.  So you begin to set up, Mr. Pagliarulo goes to Vinny

15  Electric's place, Mr. DeSantis goes into Vinny Electric's

16  place --

17  A.  And whites.

18  Q.  Whites.

19      The team stays the same?

20  A.  Yes.

21  Q.  The murder team stays the same?

22  A.  Right.

23  Q.  And you go into this building, and where are you?

24  A.  I'm on the corner.

25  Q.  You're job -- I'm sorry.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 99

752

Carew/cross/Horlick

1  A.  I'm on the corner, parked, watching the street to let

2  them know when Pete arrives, and make sure that there's no

3  cops or anything in the street.

4  Q.  Your job is to use some kind of a two-way radio --

5  A.  Yes.

6  Q.  -- to call into the premises to say they are at the door?

7  A.  Yes.

8  Q.  In fact, when Pete gets there and you see him get there,

9  he knocks on the door?

10  A.  Yes.

11  Q.  So what was your job?

12  A.  Well, I called them when I seen them turn the corner, and

13  I told them, he's coming.  They says, I believe it was Richie,

14  he said, Mikey went out and didn't come back, and they are not

15  going to open the door.

16  Q.  You were in place when the people went into the building,

17  weren't you?

18  A.  Yes.

19  Q.  Did you see Michael come out of the building?

20  A.  Before that, yes.

21  Q.  Did he come over to you to tell you what he was doing?

22  A.  No.  I was on the corner here.  He turned this way and

23  went that way.

24  Q.  He just walked out of the building, walked away from you

25  and kept going?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 100

753

Carew/cross/Horlick

1  A.  Yes.

2  Q.  He didn't have a radio?

3  A.  No.

4  Q.  When he left, which was not part of your plan, did you

5  call up and say, where is Michael going?

6  A.  Yes.

7  Q.  Right away?

8  A.  Yes, a minute or so later.

9  Q.  And you got a message back where Michael was going?

10  A.  Yeah.  They said that there was something with a camera

11  and he's going to check it out.

12  Q.  He's going to check out the camera?

13  A.  Yes, I think that was it.

14  Q.  The camera that you saw in the photograph, that you saw

15  on that day when you were in front of Vinny Electric's, was

16  mounted in the one that's in the courtroom?

17  A.  I think there were cameras inside the building, too.

18  Q.  Did you ever go into the building to see if there were

19  cameras?

20  A.  Yes, I had been in the building before.

21  Q.  Did you see cameras in the building?

22  A.  I believe so, yes.

23  Q.  Did you see where a TV or tape machine might be located?

24  A.  Yes.  He had the monitors in the office upstairs.

25  Q.  So you call up, and you say, what's going on, Michael

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 101  SHEET 26

Carew/cross/Horlick                                    754

1  just walked away?
2  A.  Yes.
3  Q.  What do they tell you?
4  A.  He went to check on the cameras.  In other words, what
5  happened was, they wanted to see if they were direct into a
6  place or they were recording what was going on.
7  Q.  Mr. Carew, maybe you figured that out.  What I'm asking
8  you is, what did they say?
9  A.  They said that they were going to check on the cameras.
10 Q.  Going to check on the cameras?
11 A.  Yes.
12 Q.  Did you say, where is he going?
13 A.  No.  I didn't ask them.
14 Q.  Do you have any idea who he could call or see, in the few
15 minutes that might be available, to check on the cameras?
16 A.  No.  I assumed he was going to try to beep Pete or get in
17 touch with Vinny.  I don't know if they had any prearranged
18 thing to meet later or anything.
19 Q.  You had no idea where he was going --
20 A.  No.
21 Q.  -- to check on the cameras?
22 A.  No.
23 Q.  You said he might beep Pete?
24 A.  Yes.  That was an assumption on my part.
25 Q.  Pete was driving with Martinelli at this time, wasn't he?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 102

Carew/cross/Horlick                                    755

1  A.  Yes.
2  Q.  This was getting close to the time that he was supposed
3  to show up?
4  A.  Yes.
5  Q.  Now, you see the car, Pete's car?
6  A.  No.  It was Martinelli's car, a blue Lincoln.
7  Q.  Who is driving the car?
8  A.  I believe Martinelli was driving.
9  Q.  He pulls up to where you think it should be, and pulls
10 almost close to the building itself?
11 A.  Yes, right up in front.  Pulled into the driveway.
12 Q.  Does Pete beep the horn?
13 A.  No.  I think he got out of the car and banged on the
14 window.  I didn't hear him beep the horn.  I was a little too
15 far away.  I was maybe two hundred feet away.  Pete banged on
16 the door.
17 Q.  What time was this?
18 A.  Early evening, maybe 6:30, 7:00 o'clock at night.
19 Q.  Is it dark or light out?
20 A.  It was dark out.
21 Q.  And you see Pete physically get out of the car, go to one
22 of the doors and bangs on it?
23 A.  Right.
24 Q.  You can't hear whether or not anybody says anything or
25 does anything from the inside?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 103

Carew/cross/Horlick                                    756

1  A.  No.  I didn't think they answered at all.
2  Q.  And from where you are situated, you don't see any doors
3  open?
4  A.  No.
5  Q.  Pete gets back in his car --
6  A.  Yes.
7  Q.  -- with Martinelli, and they drive away?
8  A.  Yes.
9  Q.  Does DeSantis ever come back?
10 A.  No, not then, later on.
11 Q.  Now, at this moment, Peter Chiodo is in a car with the
12 man he was told to kill, is that right?
13 A.  Yes.
14 Q.  He had already exhausted the plan to kill him in the
15 electrician's place, is that right?
16 A.  Definitely, yes.
17 Q.  He had him in the car, didn't he?
18 A.  Yes.
19 Q.  They are together?
20 A.  Yes.
21 Q.  They are alone?
22 A.  Yes.
23 Q.  Instead of being on the inside of the door, they are on
24 the outside of the door to the electrician's place, isn't that
25 right?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 104

Carew/cross/Horlick                                    757

1  A.  Yes.
2  Q.  He doesn't shoot him there, does he?
3  A.  No.
4  Q.  He doesn't take him to some other place where people can
5  meet up with him and shoot him?
6  A.  No.
7  Q.  He doesn't take him to someplace where he can shoot him?
8  A.  No.
9  Q.  He drives him back wherever they go?
10 A.  I guess back to get his car, wherever he left his car.
11 Q.  Back for Pete -- to get Pete's car?
12 A.  Yes, I would assume so.
13 Q.  So Martinelli can go away on his own?
14 A.  Yes.
15 Q.  Now, you learn that there's another plot to kill
16 Martinelli, right?
17 A.  Yes.
18 Q.  Do you learn about it before it happens, or do you find
19 out about it after it happens?
20 A.  After it happened.
21 Q.  Talking to Peter Chiodo?
22 A.  Talking to Richie and then Pete.
23 Q.  Richie.  And they basically tell you that, again, a
24 meeting is to be held between Pete, Martinelli and Gas or Vic?
25 A.  Yeah.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 105  SHEET 27

758

Carew/cross/Horlick

1  Q.  And Martinelli --
2  A.  I didn't say nothing about Gas and Vic.  He just said
3  they made an appointment to meet Martinelli.  Richie told me.
4  Q.  And sometime later, Chiodo told you that he actually did
5  meet with the man?
6  A.  Yes.
7  Q.  He was in the car with him and they drove to someplace on
8  Staten Island?
9  A.  Yes.
10 Q.  Not your house this time?
11 A.  No, not my house.
12 Q.  Peter gets out of the car and he walks over to where
13 Martinelli is sitting, whatever side of the car that is?
14 A.  He didn't say he walked over to him.  He just said he
15 pointed the gun at him and it didn't go off.
16 Q.  Took out a gun, what you understood to be an automatic of
17 some kind, from your conversation?
18 A.  I assume it was an automatic when he said it didn't
19 work.  I don't know.
20 Q.  He told you afterwards he banged the clip in and then the
21 gun fired, Pete told you that?
22 A.  No.
23 Q.  He didn't tell you he found out the reason it didn't work
24 was the clip wasn't in?
25 A.  I don't believe he told me that, no.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 106

759

Carew/cross/Horlick

1  Q.  By the way, did you ever own an automatic?
2  A.  Yes.
3  Q.  Can you fire an automatic if you have a round in the
4  chamber without having forced up through the clip?
5  A.  Yes.  I believe sometimes you can just cock the gun and
6  it's in the chamber, I believe.
7  Q.  Pete tells you -- Pete tells you he takes the gun and
8  puts the gun close to Martinelli and he pulls the trigger?
9  A.  He just said he pointed at him and pulled the trigger and
10 it didn't work.
11 Q.  The gun didn't work?
12 A.  Yes.
13 Q.  Did he say he pulled the trigger a number of times?
14 A.  No.  He said it didn't work and he said it was his kid's
15 gun.
16 Q.  He said, look at this, it's so real, I just took it away
17 from my kid?
18 A.  Something like that.
19 Q.  Mr. Martinelli is looking down the barrel of an automatic
20 weapon, and he looks at it and it looks like a toy to him?
21 A.  That's the way they told it to me.
22 Q.  Then you do not -- you are not told by Pete that he ever
23 finds out that there's something wrong with the way the
24 mechanism of the gun was operating?
25 A.  I don't recall that, no.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 107

760

Carew/cross/Horlick

1  Q.  Mr. Carew, you spent many years in the company of Pete
2  Chiodo, did you not?
3  A.  Yes, on and off.  Yes.
4  Q.  You acted as his driver on occasion?
5  A.  Yes.
6  Q.  You were a person that confided in Pete Chiodo?
7  A.  To a degree, yes.
8  Q.  And he told you things?
9  A.  Yes.
10 Q.  Basically he told you what you could do and couldn't do,
11 isn't that right?
12 A.  That was later on.  In the early days, we were all equal.
13 Q.  You were collecting money that had to be turned over to
14 Pete?
15 A.  I don't recall.
16 Q.  Did Pete collect money for the family?
17 A.  Yes.
18 Q.  In your presence?
19 A.  Oh, yes.
20 Q.  And some of those notes you looked at; did they reflect
21 money that went up to Gaspipe?
22 A.  Yes, I believe so.
23 Q.  Was Pete Chiodo one of the people that you could trust?
24 A.  I thought I could.
25 Q.  Did you think he was an honest man in dealing with you?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 108

761

Carew/cross/Horlick

1  A.  To a degree.
2  Q.  But he was untruthful to a degree as well, wasn't he?
3  A.  Some occasions.
4  Q.  He was a person that could not always be relied upon to
5  tell you the truth?
6  A.  Well, on most occasions, he did, as far as I know.
7  Q.  Now, after your arrest, there comes a period of time,
8  about a year or so, perhaps more, where you are reading Pete
9  Chiodo's materials, isn't that right?
10 A.  We read some of them, yes.
11 Q.  When I say "materials," I'm talking about transcripts of
12 his testimony in other cases?
13 A.  Yes.
14 Q.  And interviews that were reduced to writing with members
15 of the Federal Bureau of Investigation?
16 A.  Are you talking about like what they call the 302's?
17 Q.  Yes.
18 A.  Yes.
19 Q.  You read his?
20 A.  Some of them.
21 Q.  And during the course of time, you had conversations
22 with, for instance, Michael DeSantis about the content of
23 those documents, did you not?
24 A.  Yes, some.
25 Q.  And you said to Mr. DeSantis and to other people that

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 109  SHEET 28

762

Carew/cross/Horlick

1 Pete Chiodo was a liar when he said that you did certain
2 things, didn't you?
3 A.   I don't recall that.
4 Q.   Did you ever stand up in front of any of your friends,
5 DeSantis, Mr. Pagliarulo, Mr. Casso, Mr. Avellino, any of
6 those people, and say, you know, Chiodo's telling the truth
7 about what I did in the Morrissey case?  Did you ever say that
8 to anybody?
9 A.   No.  I didn't say he was telling the truth.
10 Q.   You told them exactly the opposite, didn't you?
11 A.   I don't recall ever saying anything either way.
12 Q.   You had no opinion that you expressed to the people that
13 were facing the same charges you were facing?
14 A.   I don't think so.  I don't recall ever saying anything
15 one way or another about his testimony.  You know.  We all
16 knew he testified, and we all knew what we did, if he was
17 telling the truth or not.
18 Q.   And did there come a time when the people that you were
19 in jail with wanted to know if something was the truth or not
20 because you were supposed to be present?
21 A.   Most of the things that he said in there that I recall,
22 in fact, everything that I had read, was the truth.
23 Q.   Was true?
24 A.   Basically, yes.
25 Q.   That's what you told these people?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 110

763

Carew/cross/Horlick

1 A.   We didn't go into that and discuss that.  We basically
2 knew what we did and what we didn't do, and nobody really went
3 into, is that true or is that true?  They were looking for --
4 Q.   You were --
5         MR. O'CONNELL:  Objection.
6         THE COURT:  Wait a minute.  Let him finish his
7 answer.
8         MR. HORLICK:  I'm sorry.
9         THE COURT:  Go ahead.  Finish your answer.
10        THE WITNESS:  I'm finished.
11 Q.   You knew what you had done?
12 A.   Yes.
13 Q.   And on many occasions, you had done things with Pete
14 Chiodo where no one else was present, isn't that true?
15 A.   That were on the 302's and everything?
16 Q.   Testimony that you read, the 302's, any of it?
17 A.   No.  Most of the stuff we did as a group.
18 Q.   You never did anything just you and Pete Chiodo?
19 A.   Not that I can recall, other than in the beginning, when
20 they brought him in, and I went and told him, you know, the
21 fact that he was to be proposed if he wanted it, things like
22 that.  But nothing, no criminal activity that would appear in
23 anything to do with this case.
24 Q.   Now, there came a time when you decided that you should
25 cooperate with the government in this case?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 111

764

Carew/cross/Horlick

1 A.   Yes.
2 Q.   Is that right?
3 A.   Yes.
4 Q.   You had been a defendant, you had been charged in this
5 indictment, and you made a decision, based upon what you
6 thought were your best interests, to go to the other side, so
7 to speak?
8 A.   Yes.
9 Q.   When you made that decision, you agreed to tell the FBI
10 or the U.S. Attorney, or whoever they wanted you to, whatever
11 you knew about this case?
12 A.   Yes.
13 Q.   Isn't that right?
14 A.   Yes.
15 Q.   They might ask you about Morrissey or they might ask you
16 about Calder or they might ask you about who held certain
17 ranks, and you told them that, right?
18 A.   Yes.
19 Q.   And very often, you saw that the members of the group
20 that were interviewing you were taking notes, isn't that
21 right?
22 A.   Yes.
23 Q.   And do you know from your own experience as a defendant
24 in this case that when those notes are reduced to written
25 form, they are going to be turned over to whoever goes to

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 112

765

Carew/cross/Horlick

1 trial?
2 A.   Right.
3 Q.   You told us that Richard Pagliarulo told you about a time
4 where he committed a murder, is that right?
5 A.   Yes.
6 Q.   Did you ever tell that to the FBI?
7         MR. O'CONNELL:  Objection to the form of the
8 question.  It's too vague, your Honor.
9         THE COURT:  I think it is.
10        If you could be more specific.
11 Q.   You told us that Richard Pagliarulo told you, in essence,
12 that he didn't get enough credit at this meeting, when he had
13 the dispute, for shooting Morrissey?
14 A.   That wasn't what I said.
15 Q.   What did you say, sir?
16 A.   I said that he was angry that, you know, the way the
17 meeting had went.  Are you talking about the meeting that
18 happened in prison?
19 Q.   You told us Mr. Pagliarulo had a conversation with you
20 after some kind of a sit-down over a problem with Michael
21 DeSantis?
22 A.   Yes, that was in prison.
23 Q.   That took place in jail?
24 A.   Yes.
25 Q.   In that conversation, Mr. Pagliarulo said to you, I

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 113  SHEET 29

**766**

Carew/cross-Horlick

1 didn't get enough credit for the Morrissey thing?
2 A.  He didn't say that.
3 Q.  What did he say?
4 A.  He said that, you know, that he was being treated shitty
5 after he had done a lot of work for the family.  He worked
6 with me with the thing with Sonny.  He did Bruno, and a whole
7 lot of work for the family, and they are treating him like
8 shit.  That, in other words, like they were taking the other
9 guy's part over him.
10 Q.  When was the first time that you told a member of the law
11 enforcement community that Mr. Pagliarulo made that statement?
12 A.  After I was arrested and they debriefed me.
13 Q.  Did you ever read the 302 debriefings of yourself?
14 A.  No, I don't think so.
15 Q.  Do you know the content of them?
16 A.  I would assume it's what I told them.
17 Q.  You assume, then, that that reference to the meeting
18 after the dispute was settled, that's in there?
19 A.  I would assume so.
20 Q.  He said, according to you, that he had done a lot of work
21 for the family?
22 A.  Yes.
23 Q.  Isn't that right?
24 A.  Yes.
25 Q.  You decided that the word "work," in that context as he

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 114

**767**

Carew/cross/Horlick

1 said it, meant murder?
2 A.  That's what I thought he meant.
3 Q.  Was there any other work that was ever done for the
4 Luchese family?
5 A.  I don't know.  I took it to mean work, as in killing.
6 Q.  You took it to mean?
7 A.  That's what I took it to mean, yes.
8 Q.  When he said to you -- he's supposed to have said to you,
9 when Bruno Facciola saw me, he tried to make a break or run
10 away, you took it to mean that was at a time when he was
11 shooting him, isn't that right?
12 A.  Yes.  I took it to mean when Bruno saw him, he knew he
13 wasn't -- that he was there to be killed.
14 Q.  So you have no idea what Mr. Pagliarulo meant when he
15 said those words, do you?
16 A.  Other than that, no.
17 Q.  And you did not ask him any questions about the
18 statements that he made to you, did you?
19 A.  No.  I didn't want to go into anything further without
20 him telling me, like that I was prying into his business.
21 Q.  When he said to you, I worked with you and shot
22 Morrissey, you didn't want to pry into that, because that was
23 his business?
24 A.  I didn't want to go into that.  I didn't ask him any
25 questions about it.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 115

**768**

Carew-cross-Horlick

1 EXAMINATION CONTINUES
2 BY MR. HORLICK:
3 Q.  Weren't you there?  Didn't you see what happened with
4 Morrissey?
5 A.  I'm sorry?  I didn't --
6 Q.  Weren't you present and didn't you see what happened to
7 Morrissey?
8 A.  Yes.  I thought you meant with the -- with the other
9 thing with Bruno.  I'm sorry.
10 Q.  Bruno Facciola, you don't know anything about from your
11 personal knowledge, isn't that right?
12 A.  No.  Other than what he told me.
13 Q.  You weren't consulted about how he should be killed or
14 why he should be killed?
15 A.  No.
16 Q.  You weren't on the scene when he was, if he was killed?
17 A.  No.
18 Q.  And you don't have any personal knowledge about what
19 happened afterwards?
20 A.  No.
21 Q.  There came a time that the newspapers carried a story
22 that Bruno Facciola, that a man by that name, was found?
23 A.  Right.
24 Q.  It described to you what you thought was a murder, right?
25 A.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 116

**769**

Carew-cross-Horlick

1 Q.  And you told us that after that newspaper story appeared,
2 that there were a lot of people that were talking about it?
3 A.  Yes.
4 Q.  A lot of people meaning people that you associated with
5 the family?
6 A.  Yes.
7 Q.  And they were talking about the motive that was possible?
8 A.  Right.
9 Q.  Somebody thought he was going to cooperate, somebody
10 thought he owed money to the administration, somebody thought
11 other things?
12 A.  Right.
13 Q.  Nobody knew the answer?
14 A.  No.
15 Q.  It was a lot of talk, gossip, back and forth?
16 A.  Right.
17 Q.  Then some other time, some later time Mr. Pagliarulo says
18 to you when you used to see me, he used to run away?
19 A.  Asked him if he thought that Bruno was bad, that Bruno
20 was a rat.  He said I don't know.  But when he saw me, he
21 tried to make a break for it.
22 Q.  Now, when you say "make a break for it," that means he
23 wanted to run away?
24 A.  That's what I thought, yes.
25 Q.  And that certainly was an idea that occurred to you when

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 117  SHEET 30

770

Carew-cross-Horlick

1 Q.  you heard those words?
2 A.  Right.
3 Q.  Did you say to him, what are you talking about?
4 A.  No.
5 Q.  Did you say to him, did you actually do that?
6 A.  No.
7 Q.  Piece of work?
8 A.  No.
9 Q.  Did you say to him, who else was involved in this?
10 A.  No.
11 Q.  You didn't say a word to him about Bruno Facciola?
12 A.  No.  I didn't ask him.  It's not my place.  If he wanted
13 to tell me, he would have told me.
14 Q.  Well, you are an associate in the family at this time?
15 A.  Yes.
16 Q.  And what is he at this time?
17 A.  At that time he was --
18 Q.  He's in jail remember.  I'm sorry.  Is he in jail at this
19 time?
20          MR. ROSE:  Excuse me.  I'm sorry.  Could Mr. Carew
21 be permitted to finish his answer?
22          THE COURT:  I think he changed the question.
23          MR. HORLICK:  I will withdraw the question.
24 Q.  When you had this conversation with Mr. Pagliarulo about
25 Bruno?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 118

771

Carew-cross-Horlick

1 A.  The first conversation where he told me about the -- that
2 Bruno tried to make a break.
3 Q.  Yes.
4 A.  Okay.  That was outside in the street.
5 Q.  That's in the street?
6 A.  Yes.
7 Q.  Now, you say you don't ask him any questions at all about
8 that?
9 A.  No.
10          If he wanted to tell me --
11          THE COURT:  No.  Listen, just respond to the
12 questions.  Don't volunteer.
13 Q.  Mr. Carew, during the course of conversations that you
14 had with Peter Chiodo, you testified he told you things about
15 what had happened in Florida after you went with Michael
16 DeSantis.  Is that right?
17 A.  I don't --
18 Q.  If it is confusing I can break it up?
19 A.  Please.
20 Q.  You went to Florida with Richard Pagliarulo and Peter
21 Chiodo before Christmas of 1988, to see Junior?
22 A.  Yes.
23 Q.  Then shortly after the new year, you went to Florida with
24 DeSantis on that social trip you told us?
25 A.  Yes.  I think it was right after that, yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 119

772

Carew-cross-Horlick

1 Q.  From that time on, you did not physically go to the state
2 of Florida?
3 A.  No.
4 Q.  And yet, you told us what Peter Chiodo had told you went
5 on in Florida?
6 A.  Pete told me, Mike told me, Richie told me different
7 things.
8 Q.  You were told about buying houses, renting houses, going
9 to hotels, right?
10 A.  Yes.
11 Q.  All in the context of trying to either locate or kill
12 Accetturo?
13 A.  Yes.
14 Q.  Senior?
15 A.  A hum.
16 Q.  And at some time you were told a story about going down
17 and watching places where they thought they could find Joe
18 La Morte?
19 A.  Yes.
20 Q.  And all of that, all of the information that you restated
21 in court yesterday, had only to do with Peter Chiodo telling
22 that to you?
23 A.  No.  Some of it --
24 Q.  And other people?
25 A.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 120

773

Carew-cross-Horlick

1 Q.  But not from your independent observation of what went
2 on?
3 A.  No, I didn't have independent.
4          MR. HORLICK:  I have no other questions.
5          THE COURT:  Do you have anything more?
6          MR. O'CONNELL:  No, Your Honor.
7          THE COURT:  All right.  Do you have another witness?
8          MR. ROSE:  Judge, the other witness will not be here
9 until after lunch.  I'm sorry.
10          THE COURT:  What time will he or she be here?
11          MR. ROSE:  He will be here at 2:00 o'clock.
12          Actually, he could be here -- we have to switch him.
13 There is a manpower problem, Judge, in transporting this
14 particular witness.  So when Mr. Carew is taken back, the next
15 witness will come.  It will be Corrado Marino.
16          THE COURT:  All right.  What time shall we tell the
17 jury to come back?
18          MR. ROSE:  I have to ask the marshals.  I'm not --
19          THE COURT:  No.  When is your lunch?
20          THE MARSHAL:  1:00 o'clock, Judge.
21          THE COURT:  We will take a recess and we will come
22 back here at 2:00 o'clock.
23          Don't discuss the case.
24          THE WITNESS:  Your Honor, Mr. Horlick left this.
25          THE COURT:  Just leave it there.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER



**U.S. Department  of Justice**
United  States  Parole  Commission
5550  Friendship  Boulevard
Chevy  Chase,  Maryland  20815-7201

**Notice  of Action**

---

Name:  FURNARI,  Christopher

Register  Number:  19815-054                    Institution:    Allenwood  FCI

---

In  the  case  of  the  above-named,  the  following  parole  action  was  ordered:

Continue  to  15-Year  Reconsideration    hearing  (December  2011).

**REASONS**:

Your  offense  behavior  has  been  rated  as  Category  Eight  severity  because  it  involved  murder  and
conspiracy  to  murder  and  multiple  separate  acts  of  extortion  through  racketeering  offenses.  Your
salient  factor  score  (SFS-98)  is  8.  You  have  been  in  federal  confinement  as  a  result  of  your  behavior
for  a  total  of  169  months  as  of  December  8,  2000.  Guidelines  established  by  the  Commission  indicate
a  range  of  100 + months  to  be  served  before  release  for  cases  with  good  institutional  adjustment  and
program  achievement.    After  review  of  all  relevant  factors  and  information  presented,  a  decision
exceeding  the  lower  limit  of  the  applicable  guideline  category  by  more  than  48  months  is  warranted
based  on  the  following  pertinent  aggravating  factors:  You  were  involved  in  the  hierarchy,  first  as
a  Capo  and  later  as  a  Consigliere  of  a  major  organized  crime  organization  and  were  involved  either
directly  in  the  planning  or  approval  of  murder  and/or  attempted  murder.  Further,  the  murder  of  Lee
Schleifer  was  of  a  prospective  informant/witness  and  the  conspiracy  to  murder/murder  of  Richard
Taglianetti    was  a  contract  murder.    The  Commission  has  determined    that    there  is  sufficient
corroboration  of  information  provided  by  Casso  to  rely  upon  the  information  supplied  by  Casso
notwithstanding    the  affidavit  from  AUSA  Stamboulidis  of  the  Eastern  District  of  New  York.

As  required  by  law,  you  have  also  been  scheduled  for  a  statutory  interim  hearing  during  December
2002.

The  above  decision  is  appealable  to  the  National  Appeals  Board  under  28  C.F.R.  2.26.  You  may
obtain  appeal  forms  from  your  caseworker  or  U.S.  Probation  Officer  and  they  must  be  filed  with  the
Commission  within  thirty  days  of  the  date  of  this  Notice.

See  the  attached  sheet  for  your  individual  item  points  and  explanation  for  the  Salient  Factor  Score.

cc:        U.S.  Probation  Office
           Southern  District  of  New  York
           500  Pearl  Street
           Sixth  Floor
           New  York,  NY  10007-1312

Date:  December  27,  2000                                      Clerk:  vab

EXHIBIT
20



| Your Pts | Item Explanation | SALIENT FACTOR SCORE |
|---|---|---|

1 = ... **A - Prior** convictions/adjudications    (adult or juvenile)
None = 3; One = 2; Two or three = 1; Four or more = 0

1 = ... **B - Prior** commitments of more than thirty days (adult or juvenile)
None = 2; One or two = 1; Three or more = 0

3 = ... **C - Age** at commencement of the current offense/prior commitments of more than thirty days (adult or juvenile)

1 = ... **D - Recent** commitment free period (three years)
No prior commitment of more than thirty days (adult or juvenile), or released to the community from last such commitment at least three years prior to the commencement of the current offense = 1; Otherwise = 0

1 = ... **E - Probation/parole/confinement/escape** status violator this time
Neither on probation, parole, confinement, or escape status at the time of the current offense; nor committed as a probation, parole, confinement or escape status violator this time = 1; Otherwise = 0

1 = ... **F - Older offenders**
If the offender was 41 years or more at the commencement of the current offense (and the total score from Items A-E above is 9 or less) = 1; Otherwise = 0

| Points For SFS Item C | | |
|---|---|---|
| Age | Prior Commitments | |
| | 0-3 | 4 | 5+ |
| 26 & Up | 3 | 2 | 1 |
| 22-25 | 2 | 1 | 0 |
| 20-21 | 1 | 0 | 0 |
| 0-19 | 0 | 0 | 0 |

**Date: December 27, 2000**

**Clerk: vah**

 

**U.S. Department   of Justice**
United States Parole Commission
5550 Friendship   Boulevard
~~Chevy Chase Maryland  20815 7201~~

NOTICE  OF  ACTION  ON  APPEAL

Name:  Furnari,  Christopher

Register  Number:  19815-094          Institution:   Allenwood  FCI

The  National   Appeals  Board  examined   the  appeal  of the  above  named  and  ordered  the  following:

Affirmation   of the  previous   decision.

## REASONS:

The  Commission  has  reviewed  your  appeal  and  relevant  documents  from  the  case  file,  including   the Stamboulidis  affidavit,  the  transcript  of Thomas  Carew's  testimony  in  the  Pagliarulo  case.  AUSA Kelley's  letter  of September  25, 2000,  and  Mr. Breitbart's  letter  of December  6, 2000.  This  review does  not  lead  the  Commission  to  conclude  that  a change  in  the  previous  offense  severity  rating  or decision  is  necessary  or appropriate.

The  Stamboulidis  affidavit  raises  doubt  about  the  credibility  of Anthony  Casso,  who  has  linked  you to  murders/attempted   murder.  The  Commission  has  reviewed  the  affidavit  and  the  other  available information   and  concluded  that  Casso's  information   about  your  involvement   in  these  crimes  is accurate.   The  reasoning   is  as  follows.

You  were  the  leader  of a crew  in  the  Lucchese  crime  family  when  the  crimes  were  committed.   Casso was  a member  of your  crew.  It  is  unlikely  that  you  would  be  unaware   of any  murders   or  plots  to murder  others  in  order  to fulfill  the  aims  of the  criminal  enterprise  given  the  structure  and  discipline of  the  crime  family.   Even  if only  the  "boss"  of a crime  family  can  order  or approve  a murder,  this does  not  mean  that  crew  leaders  are  unaware   of the  ordered  murder,  especially  since  crew  members, based  on  orders  presumably   passed  through  the  crew  leaders,  carry  out  the  murders.   In  addition, there  appears  to  be  no  restriction   on  crew  leaders  initiating  requests  for  a murder.   The  request simply  must  be  approved  by  the  family  boss.

In  order  to  accept  your  claim  that  you  had  no  knowledge   of the  murders/attempted    murder,  the Commission   would  have  to  conclude  that  your  crew  was  a renegade  unit  which  committed   crimes  for reasons  unrelated   to  the  enterprise.   This  conclusion  is  not  warranted   because  the  motives  for  the murders/attempted    murder  committed   by  your  crew  were  related  to  the  aims/purposes   of the enterprise,  for example  to silence  a suspected  cooperating  individual  or punish  the  wrongdoing  of a member  or associate.   Casso's  information   simply  corroborates   an  inference  that  is reasonably  made given  your  leadership   role  in  the  crew  and  Casso's  membership   in  the  crew,  i.e., that  you  at  the  very least  knew  about,  and  more  likely  directed,  the  murderous   activities   of members  of your  crew.  You are  clearly  responsible   for  the  murders/attempted    murder  under  a theory  of vicarious   criminal liability,  and  moreover,  the  information   presented  shows  that  you  personally   solicited  or ordered some  of the  crimes.

Date:  April  24, 2001                                    Clerk:  pgn

**EXHIBIT**

21



AUSA Kelley's assurance in his September 25, 2000 letter as to Casso's credibility regarding your responsibility for the crimes, despite the Stamboulidis affidavit, may be reasonably credited. The AUSA checked with the U.S. Attorney's Office in the Eastern District of New York and was informed that while Casso's denials of recent allegation of crimes committed by him and attempts to impeach other witnesses' credibility were unreliable, that office believed that historical information provided by Casso on your activities was still credible. This is consistent with the Stamboulis affidavit itself (para. 22) in which the affiant attests to the value of Casso's information on the past organized crime activities of Vincent Gigante, while at the same time noting the unreliability of Casso's statements concerning more recent events. It is not unreasonable to find that Casso may not be worthy of belief when it came to his denials of his own recent serious crimes which could (and did) lead to his removal as a protected federal witness, and still conclude that he had given reliable information on past activities of organized crime. AUSA Kelley has corrected the record in the past when your attorney challenged the accuracy of adverse information in your presentence report. Therefore, there is no reason to suspect that the AUSA would ignore his duty to provide accurate information to the Commission or seek a parole denial in reckless disregard of the truth.

The AUSA has asserted that Casso's information is corroborated by other sources, including Tommy Carew. The excerpt of Carew's testimony in the Pagliarulo case does corroborate certain significant information provided by Casso, information which shows that you employed violence to advance the interests of or to protect the Lucchese crime family. For example, Carew testified that you ordered Carew and others to assault James Wolford in order to clear the way for Jimmy Bishop, a painters union official friendly to the Lucchese family, to exercise more control over the union. Even if the allegations of Carew and others did not result in a conviction for the assault under the reasonable doubt standard of proof, the Commission finds that the information is reliable and that, using the preponderance of the evidence standard, that it is likely you gave the order to assault Wolford.

Carew also states in his testimony that he was given the assignment of meeting Anthony Casso at a club and helping him with "something". The task turned out to be assisting Casso in the disposal of the body of a man who had been shot and killed. The circumstances described therein indicate that the body was that of Lee Schleifer. In his testimony, Carew does not identify you as being present at the club after the murder was committed and Schleifer's body was still present. As your attorney points out, this omission is inconsistent with the representation made by AUSA Kelley. However, Carew's testimony indicates that someone other than Casso gave him an assignment to help Casso. Given that you were the person who introduced Carew to the crime family and your crew, that Carew was your driver/bodyguard at the time of this crime, your leadership role in the crew, and Carew's testimony about other "assignments" made by you, it is more likely than not that you were the person who told Carew to help Casso.

Carew also testified that you gave him the assignment of murdering Joseph Abinanti, the son of a Lucchese member. While this particular contract was recalled, Abinanti was later shot and wounded, according to Casso, by Casso and Vic Amuso at your direction. If you issued a murder contract for Carew to kill Abinanti, there is good reason to credit Casso's information that you also issued such a contract to Casso and Amuso.

Carew testified that he stored multiple handguns for the Lucchese crime family. This information

---

supports the inference that Lucchese family crews, including yours, employed violence to promote the goals of the criminal organization. Therefore, it also indirectly supports the credibility of Casso's statements linking you, a member and leader in the crime family, to murders and attempted murder.

In sum, you have not demonstrated that the information from AUSA Kelley alleging your responsibility for murders and murder plots is unreliable and should not be used to deny you parole. Any one of these crimes (the Schleifer, DeCicco, and Taglianetti murders and the attempt to murder Abinanti) would result in a parole denial under the policy at 28 C.F.R. §2.20, Offense Behavior Severity Index, Notes to Category Eight offenses.

All decisions by the National Appeals Board on appeal are final.



Date: April 24, 2001                                                    Clerk:  pgn

**BOP-Allenwood    FCI**                    Page  3 of 3                    FURNARI.198

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

CHRISTOPHER FURNARI,                :

             Petitioner             :        No. 4:CV-98-0222
                                    :
        vs.                         :        (Petition Filed 02/11/98)
                                    :
                                    :        (Judge Muir)
WARDEN, FCI-ALLENWOOD, et al.,      :                         FILED
             Respondents            :                    WILLIAMSPORT, PA

                                                          APR 12 1999

              ORDER
                                             MARY E. D'ANDREA, CLERK
        April  12 , 1999                     PER _____
                                                         DEPUTY CLERK

        Christopher Furnari, an inmate presently confined at the
Allenwood Federal Correctional Institution, White Deer, Pennsylvania
(FCI-Allenwood) initiated the above-captioned petition for writ of
habeas corpus pursuant to 28 U.S.C. § 2241. The required filing fee
has been paid.  Following service of the petition, respondents
submitted a response seeking dismissal of the petition. Petitioner
thereafter filed a reply, consequently, this matter is now ripe for
consideration.

        By way of background, petitioner is serving a 100-year
sentence for racketeering, extortion, and racketeering conspiracy,
imposed by the United States District Court for the Southern District
of New York on January 13, 1987.  According to the presentence
investigation report ("PSI"), and the United States Court of Appeals
for the Second Circuit, Furnari was the "consigliere" (counselor) of

EXHIBIT
22

the Luchese organized crime family[1], (Doc. No. 7, Exhibit 1, presentence report at p. 17), a position identified as "practically the equivalent of the underboss". United States vs. Salerno, 868 F.2d 524, 543 (2d Cir. 1989). Furnari's conviction grew out of his participation in "the Commission", a national ruling body of La Cosa Nostra (Mafia) in the United States, the activities of which included the extortion and other racketeering acts which underlie his conviction. (Doc. No. 7, Exhibit 1, p. 17-18).

On August 1, 1996, Assistant United States Attorney ("AUSA") David Kelley sent a letter to the Parole Commission informing it that Furnari had been a capo prior to becoming consigliere, and had been involved in numerous violent acts during his membership in the Luchese family. (Doc. No. 7, Exhibit 2, copy of letter). Specifically, Furnari had requested that Anthony "Gaspipe" Casso execute one Lee Schleifer, who was suspected of cooperating with law enforcement. Schleifer's dead body, which had suffered a gunshot wound was found by New York City police on February 18, 1975. (Id.). AUSA Kelly reported that Casso and another informant, Thomas Carew (a Luchese family associate) had informed the government that Furnari issued a

---

[1] In New York, there are five La Cosa Nostra ("LCN") families -- Genovese, Gambino, Luchese, Colombo and Bonanno -- the activities which are coordinated by the Commission. Each is run by a "boss" with the assistance of two deputies known as an "underboss" and "consigliere"; beneath these are "capos" (captains), each of whom directs a crew of soldiers ("made men") and associates who commit crimes and share their criminal proceeds with the family leadership. (Id. at 18).

2

"contract" to Casso in the early 1980's to kill Richard Taglianetti, another Luchese family associate[2]. (Id.).

Kelley's letter reports another murder contract, led by Furnari in the 1970's to kill Joseph Abinanti, which Furnari assigned to Casso and Amuso. Amuso shot Abinanti but he survived the shooting and fled to California. (Id.). Kelley's letter also reported that Alfonso D'Arco (former acting Luchese family boss) had stated that virtually every murder contract carried out by the Luchese family members while Furnari was consigliere was sanctioned by him. (Id.).

On August 19, 1996, Furnari's counsel sent a letter to the United States Parole Commission ("USPC"), urging the agency not to rely on the information in Kelley's letter because it had been provided by Anthony Casso, who had not been "tested" by cross-examination in any criminal trial. (Doc. No. 7, Exhibit 3, copy of letter). Furnari's counsel requested that the USPC not consider Kelley's letter unless the "FBI's 302s" (form 302) regarding the debriefing of witnesses were provided to him. Petitioner's counsel also sent a letter to Kelley asking for the FBI forms. (Doc. No. 7, Exhibit 4, copy of letter). Kelley declined to release those forms to petitioner's counsel, noting that there was no legal basis for the request. (Doc. No. 7, Exhibit 5, copy of letter).

---

[2]Although Casso and Vittorio Amuso took steps towards carrying out the contract, the intended victim "went on the lam" for several years and it was not carried out until he resurfaced in Brooklyn in 1992, when he was killed by Luchese family member George Conti). (Id.).

3

Furnari's counsel also submitted a letter to the USPC dated December 2, 1996, "to supplement [Furnari's] presentation during his upcoming parole hearing on December 3, 1996". (Doc. No. 7, Exhibit 6, copy of letter).

On December 3, 1996, Furnari's initial parole hearing was conducted.(Doc. No. 7, Exhibit 7, Initial Hearing Summary). At that hearing, Furnari's counsel attacked the credibility of Anthony Casso, arguing that his involvement in a vast number of murders made him not credible. He argued that D'Arco's statement that Furnari sanctioned murders while he was consigliere was not credible because D'Arco was in custody from 1983 to 1986 and would have known this only through hearsay. He also claimed that to his knowledge there were no murders committed by the Luchese family between 1983 and 1986. (Id. at p. 1).

AUSA Kelley was present at the hearing and also made a statement. Specifically, he stated that D'Arco is, as petitioner's counsel conceded, an expert on the hierarchy and structure of organized crime, and that D'Arco had stated that murders done by Furnari's "crew" of soldiers when he was a capo would only have been done with his knowledge and approval. Kelley stated that a number of murders were committed by the Luchese family while Furnari was capo and consigliere. (Id. at pp. 2-3).

The hearing examiner requested AUSA Kelley to submit further information regarding those murders to the USPC for consideration and afforded petitioner's counsel the opportunity to reply to Kelley's

4

information.   (Id. at 3).

Kelley sent the USPC a letter dated December 11, 1996, detailing fourteen murders committed by members of Furnari's "crew" during the time he was capo and after he became consigliere.  (Doc. No. 7, Exhibit 8, copy of letter at p. 2).  At least five of these murders occurred after petitioner was consigliere (Vincent Albano, 7/85; Frank DeCicco, 4/86; Nicholas Guido, 12/86; James Hydel, 12/86; Anthony Luongo, 11/86, and Vincent Craparotta, 6/84).  Kelley further stated that D'Arco and at least two other sources from the Luchese family had reported that immediately prior to Furnari's conviction in the instant case, he met with other members of the Luchese family hierarchy to select successors in the event of conviction and imprisonment.   They selected Amuso as boss, Mariano Macaluso to replace Furnari, and elevated Casso to capo.  They also decided that Anthony Luongo, who had been vying for the position of boss, would pose a threat to the new administration and must be killed.  Casso and Amuso were instructed to murder Luongo, who was in fact killed by them.  (Id.).  (In his letter to the USPC, Kelley stated that he did not wish to disclose the FBI 302 forms underlying his letter regarding Casso's debriefing because he might be called as a witness in upcoming trials and because information provided in some of the reports was the subject of ongoing investigations. (Id. at 1, n.1)).

On December 18, 1996, petitioner's counsel responded with a letter, arguing that Kelley's "obdurate refusal" to disclose the 302

5

forms should preclude the USPC from considering any of the information provided by Kelley.  (Doc. No. 7, Exhibit 9, copy of letter).  With regard to Kelley's statement that Furnari had participated in ordering the murder of Luongo, petitioner's counsel states that that allegation had already been "dealt with".  (Id. at p. 4).  It appears that petitioner's counsel is referring to his earlier letter to the USPC in which he implied that Casso had undertaken that murder on his own accord.  (See Doc. No. 7, Exhibit 6, copy of letter at p. 7).

The hearing examiner fully reviewed the letters provided by Kelley and by petitioner's counsel before reaching his recommendation. He recommended that Furnari's offense be rated as a Category Eight severity because of his involvement in murder.  28 C.F.R. § 2.20, Chapter Two, Subchapter A, paragraph 201.  (Doc. 7, Exhibit 7, Initial Hearing Summary at p. 3).  Combined with the salient factor score of 8 points, this yielded a parole guideline range of 120+ months.  The examiner recommended that Furnari be required to serve to a fifteen-year reconsideration hearing in December, 2011, finding that release of petitioner on parole earlier would depreciate the seriousness of the offense and promote disrespect for the criminal justice system. (Id. at p. 5).  See 18 U.S.C. § 4206(a).  By Notice of Action dated January 8, 1997, the Regional Commissioner adopted the hearing examiner's recommendation.  (Doc. No. 7, Exhibit 10, Notice of Action).

On August 19, 1997, the National Appeals Board affirmed this

6

decision on administrative appeal.   (Doc. No. 7, Exhibit 11, Notice of Action on Appeal).   The Board found that:

> You have properly been held accountable for murders committed to further the purposes of the Luchese or other crime families.  At a minimum, as the capo of a crew in the Luchese family, you were in a position to be informed of murders ordered by the boss of the family.   Given the hierarchical nature of the organization, it is likely that you directed the murderous acts of your crew members.  And, in fact, the Parole Commission finds the information from the U.S. Attorney's Office on your personal responsibility for several of the murders (victims Schleifer, Taglianetti, and DeCicco) and attempted murder (victim Abinanti) to be credible and reliable, even though much of the information may have come from Anthony Casso, one of the most violent members of your organization. Reliable information on crimes committed through La Cosa Nostra activities has been provided by members of the criminal organization, including those who have committed violent crimes. Even if Casso has continued to commit or plot other crimes after his debriefing by federal law enforcement, this does not disqualify him as a reliable source concerning your criminal activities within the Luchese family.  In many cases, Casso's information is corroborated by information from other sources such as Carew and D'Arco.

> Your parole denial is warranted because you approved or participated in the planning of a contract murder. (Taglianetti), the murder of a potential informant/witness (Schleifer), and a murder and attempted murder to further the aims of an on-going criminal organization (DeCicco and Abinanti, respectively).  Any one of these crimes would support a parole denial.  There are no mitigating factors, including your age, that justify your parole when weighed against the aggravated nature of the crimes.

> Neither due process, parole statutes nor parole regulations require that you be granted access to reports which have not been provided to the Parole Commission for its consideration.  Therefore, you are not entitled to discovery of source materials that the U.S. Attorney's Office may have used to prepare

7

letters recommending against your parole.

(Doc. No. 7, Exhibit 10, Notice of Action at p. 1).

In the instant petition, Furnari claims that his rights to due process, as well as the statutory rights afforded him by the Federal statutes and regulations governing parole, were violated in the following ways:

1.  The USPC acted arbitrarily and capriciously when it grounded its denial of petitioner's parole almost entirely on the untested, non-specific allegations of Casso, someone, petitioner believes, should be deemed incredible as a matter of law;

2.  The USPC incorrectly rated petitioner's offense severity as Category Eight, crediting "untested unsupported hearsay allegations" of Anthony Casso.

3.  The government suppressed information revealing that Casso is not a reliable informant.

4.  The USPC violated petitioner's due process right by relying on AUSA Kelley's "conclusory" statement that Casso's allegations are corroborated by D'Arco and Carew.

## DISCUSSION

It is well-settled that "there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." Greenholtz vs. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1, 7 (1979). To the extent that any liberty interest exists, it must be created by the applicable parole statute. Id. Furthermore, even if a liberty interest exists, due process requires only that a hearing be provided, and that the prisoner be given a statement of reasons for denial of

8

parole, if parole is denied. Board of Pardons vs. Allen, 482 U.S. 369 (1987).

As to a parole decision rendered by the Commission, it is well settled that the determination of eligibility for parole has been committed by Congress to the discretion of the Commission. United States vs. Addonizio, 442 U.S. 178 (1979); Campbell vs. United States Parole Commission, 704 F.2d 106 (3d Cir. 1983). The function of judicial review of a Commission decision on a petition for writ of habeas corpus is to determine whether the Commission abused its discretion. The Court is not empowered to substitute its judgment for that of the Commission in evaluating habeas petitioner's claims unless the Commission's exercise of discretion represents an egregious departure from rational decision-making. See Butler vs. United States Parole Commission, 570 F. Supp. 67-77 (M.D. Pa. 1983).

In making this determination, the Court must insure that the Commission's decision was neither arbitrary or capricious, nor based on impermissible considerations; but rather, was based on appropriate criteria. Zannino vs. Arnold, 531 F.2d 687 (3d Cir. 1976). Furthermore, "[t]he appropriate inquiry is not whether the [Commission] is supported by the preponderance of the evidence or by substantial evidence; the inquiry is only whether there is a rational basis in the record for the [Commission's] conclusion embodied in its statement of reasons." Id. at 691; Paris vs. Whalen, 666 F. Supp. 715, 718 (M.D. Pa. 1987). If such a rational basis does exist, the

9

district court should defer to the Commission's determination. Isuteri vs. Nardoza, 732 F.2d 32 (2d Cir. 1984).

With respect to petitioner's contention that the Parole Commission's decision to deny him parole was arbitrary and capricious and without a rational basis, this argument is without merit. There does exist a rational basis for the Commission's decision to deny parole, and the basis was specified in petitioner's Initial Hearing Summary as well as the Notices of Action issued to petitioner on January 8, 1997 and August 19, 1997. (Doc No. 7, Exhibits 7, 10 & 11). The Parole Commission credited information that Furnara was directly involved in four murders, and also held him vicariously responsible for murders by his crew.

Specifically, with respect to the murders of Lee Schleifer, Richard Taglianetti, and Joseph Abinanti, information reported to the Parole Commission was independently confirmed by either or both Anthony "Gaspipe" Casso and Thomas Carew. Furnari attempts to discredit this information, by arguing that Carew, who disposed of Schleifer's body, testified elsewhere that Furnari was not present at the time Carew and Casso disposed of the body, and therefore, could not have been involved in the murder. Furnari also attempts to undermine the information provided to the Parole Commission with respect to Taglianetti, by arguing that although a contract had been

10

issued in the early 1980's[3] to murder Taglianetti, he was not ultimately murdered until 1992, after Furnari had been incarcerated for six years. Furnari argues that only a boss could order a hit, and since Furnari was incarcerated at the time of the murder, he could not have been involved in Taglianetti's murder. Finally, with respect to Abinanti[4], Furnari argues that the information provided to the Commission should not be believed because it came solely from Casso, who petitioner claims ordered, along with Amuso, the murders of the entire New Jersey faction of the Luchese family, of which Abinanti was a member.

With respect to the murder of Anthony Luongo, information provided to the Parole Commission showed that Alfonso D'Arco (former acting Luchese family boss), as well as at least two other sources from within the Luchese family, reported a meeting between Furnari and other members of the family hierarchy to select their successors, which ultimately resulted in a decision that Anthony Luongo, a potential threat to the newly selected boss, must be killed. (See Doc. No. 7, Exhibit 7 Initial Hearing Summary at p. 3). Furnari's position is that Casso undertook the murder of Anthony Luongo on his

---

[3]Information provided to the Commission showed that Furnari issued the contract in the early 1980's to murder Richard Taglianetti.
[4]Information provided to the Parole Commission showed that Furnari had assigned a murder contract to Casso and Vittorio Amuso to kill Joseph Abinanti, the son of a member of the Luchese family, because he had kidnaped an associate of Vincent Gigante, the boss of the Genovese crime family. (See Doc. No. 7, Exhibit 2, at p. 3). Amuso shot Abinanti, but he survived and later fled the area. (Id).

own.

Finally, with respect to the murder of Frank DeCicco, information provided to the Parole Commission showed that in December, 1985, during the time Furnari was consigliere of the Luchese family, the Commission decided that the Genovese and Luchese families were to kill DeCicco, after he and John Gotti killed the boss of the Gambino family, Paul Castellano, without authorization from the Commission. After this decision was made, Furnari asked Casso and Amuso to carry out the avenging murders, and DeCicco was later killed in April 1986 by a bomb in his car.   (Doc. No. 7, Exhibit 2, at p. 3).

Petitioner responds to this information by denying that the alleged meeting ever took place, arguing that if it had, surveillance would have detected it, arguing against the proposition that Casso was present at the meeting where the decision to kill DeCicco was made, and asserting that the rules of organized crime prohibit killing someone by using a bomb. (Doc. No. 7, Exhibit 6 at pp. 4-5). Furnari also argues that Casso "hated" DeCicco and that DeCicco was killed by Casso as a result of direct solicitation by another crime family boss outside the Luchese family.  (Doc. No. 7, Exhibit 9 at p. 3).

The decision of which version of events to credit rests solely with the Parole Commission.  Iuteri vs. Nardoza, 560 F. Supp. 745, 755 (D. Conn. 1983)(holding that "Judgement on credibility of the evidence is vested solely in the Commission...."); Farkas vs. United States, 744 F.2d 37, 38-39 (6th Cir. 1984)(USPC's fact finding is part of its

discretion and is unreviewable by a court under the Administrative Procedures Act). To the extent that Furnari seeks to have this Court reweigh the evidence which was before the Parole Commission, as well as consider information which was not part of the Parole Commission's record, and make its own determination as to whether the petitioner should be held accountable for murder, this the Court cannot do, as judicial review of Parole Commission's parole decisions does not permit a de novo determination of factual issues by the Court. Kramer vs. Jenkins, 803 F.2d 896, 901 (7th Cir. 1986); Billiteri vs. United States Board of Parole, 541 F.2d 938, 943-44 (2d Cir. 1976). Rather, the scope of this Court's review is limited to determining whether the Parole Commission had "any evidence" to support its finding:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that support the conclusions reached. . .

Superintendent vs. Hill, 472 U.S. 445, 455 (1985); Marshall vs. Lansing, 839 F.2d 933, 946 (3d Cir. 1988).

The Parole Commission decided to credit the information provided to ~~them~~ that Furnari was directly involved in four murders, and also vicariously[5] responsible for murders by his crew. In doing

---

[5]Under the Parole Commission's regulations:

A prisoner is to be held accountable for his own actions and actions done in concert with others; however, the prisoner is not be held accountable for activities committed by associates over which the prisoner has no

13

so, ~~they have~~ *the Commission has* provided a rational basis in the record to support the decision to rate Furnari's offense as a Category Eight[6].   Thus, petitioner's contention that the Parole Commission's decision to deny him parole was arbitrary and capricious and without a rational basis, is without merit.

Moreover, Furnari's arguments that the Government "suppressed" information allegedly revealing that Casso is not a reliable informant, and that the USPC improperly relied on AUSA Kelly's "conclusory" assertion that Casso's allegations had been corroborated by other informants, are also without merit.

Furnari's only due process rights in connection with an initial parole decision, are to a hearing and a statement of reasons for the denial of parole.  Greenholtz vs. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1, 7 (1979); Board of Pardons vs. Allen, 482 U.S. 369 (1987).   Both of which Furnari has received.

---

control and could not reasonably be expected to foresee. 28 C.F.R. § 2.20, Chapter Thirteen, Subchapter A, General Note 4.
    As such, Furnari is vicariously responsible for the murders committed by persons under his control or which are reasonably foreseeable to him.   The Parole Commission was provided with information that fourteen persons were killed by Furnari's crew members during the time he was capo and consigliere to the Luchese family.   Thus, it was not arbitrary and capricious for the Parole Commission to conclude that, in his position as capo, and then consigliere, of a criminal organization known to resort to violence to resolve disputes, murders committed by petitioner's crew, a group of individuals under his control, were reasonably foreseeable to him.

[6]In fact, to warrant the Category Eight rating, the Parole Commission need only have found one murder.  28 C.F.R. § 2.20, Chapter Two, Subchapter A, paragraph 201.

14

Parole determination proceedings before the Parole Commission are not adversarial proceedings, like a criminal trial. Cf. Morrissey vs. Brewer, 408 U.S. 471, 484-9 (1972)(for parole violators, as to whom due process requires substantially more process than for person not yet paroled, revocation hearing is "informal" and not the equivalent of a criminal prosecution in any sense); 28 C.F.R. § 2.13(b)("a prisoner may be represented at a[n initial] hearing by a person of his or her choice. The function of the prisoner's representative shall be to offer a statement at the conclusion of the interview [of the prisoner by the examiner], and to provide such additional information as the examiner shall request. Interested parties who oppose parole may select a representative to appear and offer a statement. The hearing examiner shall limit or exclude any irrelevant or repetitious statement.").

Furnari is no longer in the status of a criminal defendant facing trial; he has been convicted and that conviction has extinguished his liberty right. Greenholtz, 442 U.S. at 6, citing Meachum vs. Fano, 427 U.S. 214 (1976). The procedures required by Brady vs. Maryland, 373 U.S. 83 (1963), which arise out of the due process right of a defendant to a fair trial, are simply inapplicable to a petitioner who has already been convicted and whose conviction has extinguished the liberty interest which gave rise to the procedural protections of Brady. Brady is simply inapplicable to a parole hearing, and the government was not under any obligation to

15

disclose any investigative information to Furnari.

Finally, Furnari's argument that it was improper for the Parole Commission to allow AUSA Kelley to rely upon undisclosed documents which supposedly corroborated Casso's information, without requiring the disclosure of these documents to the USPC hearing officer and to petitioner's counsel, is, at best, an attempt to compel discovery in the parole context, to which he is simply not entitled. The only provision requiring disclosure of information is contained in the Parole Commission's statute and regulations. Title 18, Section 4208(b) requires the USPC to grant a parole applicant "reasonable access to a report or other document to be used by the [Parole] Commission in making its determination". The USPC's regulations provide for prehearing disclosure of "reports and other documents to be used by the [Parole] Commission in making its determination". 28 C.F.R. § 2.55(a). In Furnari's case, the USPC fully disclosed to him all documents it considered in making his parole decision and that is all that is required by law.

Furnari, however, seems to believe that the USPC may not consider information provided by an Assistant United States Attorney to be reliable unless other documentary evidence is also provided to the Parole Commission. The USPC, routinely, and lawfully, relies on information provided by the United States Attorney's Office when it considers information contained in presentence investigation reports; the "prosecution version" of which is generally provided by the

16

prosecutor, as it was in Furnari's case.   28 C.F.R. § 2.19 (a)(3).

See U.S. ex rel. Goldberg vs. Warden, 622 F.2d 60 (3d Cir. 1980)(USPC

may consider hearsay information in PSI in making parole decision);

Maddox vs. U.S. Parole Commission, 821 F.2d 997, 999 (5th Cir.

1987)("[T]he only constraints on the information that may be

considered by the Parole Commission are constitutional. Specifically,

the Commission may consider dismissed counts of an indictment, hearsay

evidence, and allegations of criminal activity for which the prisoner

has not even been charged"); Hackett vs. U.S. Parole Commission, 851

F.2d 127, 131 (6th Cir. 1987)(USPC may consider allegations of victim

that she had been raped as reported in PSI, even though petitioner was

only convicted of bank extortion and sentencing court stated it would

not rely on rape allegation for purposes of sentencing).

The role of the U.S. Attorney's Office in Furnari's case was

to provide relevant information to the USPC for its use in making a

parole decision; the U.S. Attorney's Office and AUSA Kelly did not

bear any burden of proof.  See 28 C.F.R. § 2.19(a)(4), (b)(1) and (d).

While the USPC may not consider information provided by prosecutors

to be conclusive, neither may it presume that prosecutors are

dissembling and must provide source documents to support the

information they provide.  The presumption of good faith on the part

of government employees extends to a prosecutor who provides

information about a parole applicant's criminal history to the Parole

Commission.  See Zannino vs. Arnold, 531 F.2d 687, 692, n.22 (3d Cir.

17

1976)(law enforcement officials presumed to act in good faith).  Thus, petitioner's claim that the USPC should have declined to consider information provided by AUSA Kelley unless he provided FBI investigative reports to the USPC is clearly without merit, as it would divest the USPC of its statutory discretion to weight the information before it.  Moreover, since Furnari's presentence report was an acceptable source under Goldberg, the Parole Commission's reliance on it in reaching its decision did not constitute an abuse of discretion under Campbell.  The petition for writ of habeas corpus will be denied.  An appropriate order will enter.

AND NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The petition for writ of habeas corpus is denied.

2.    The Clerk of Court is directed to close the case.

3.    Based on the court's conclusion herein, there is no basis for the issuance of a certificate of appealability.

_____
MUIR
United States District Judge

MM:dlb

18

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

CHRISTOPHER FURNARI,                    :
              Petitioner               :
                                       :
         v.                            :    Civil No. 4:CV-02-0555
                                       :    (Muir, J.)
UNITED STATES PAROLE COMMISSION        :
and WARDEN, Federal Correctional       :
Institution - Allenwood, PA.,          :
              Respondents              :

## CERTIFICATE OF SERVICE BY MAIL

     The undersigned hereby certifies that she is an employee in
the Office of the United States Attorney for the Middle District
of Pennsylvania and is a person of such age and discretion as to
be competent to serve papers.

     That on May __30__ , 2002, she served a copy of the attached

**RESPONDENTS' EXHIBITS IN SUPPORT OF THEIR RESPONSE TO
THE PETITION FOR WRIT OF HABEAS CORPUS**

by placing said copy in a postpaid envelope addressed to the
person hereinafter named, at the place and address stated below,
which is the last known address, and by depositing said envelope
and contents in the United States Mail at Williamsport,
Pennsylvania.

Addressee:

Peter Goldberger
James H. Feldman, Jr.
50 Rittenhouse Place
Ardmore, PA 19003-2276

                                   _____
                                   MICHELE E. LINCALIS
                                   Paralegal Specialist